# APPENDIX "A"
# EXTRADITION TREATY BETWEEN
# UNITED STATES AND CANADA

Case 2:11-mj-00310-KJN   Document 18-1   Filed 11/15/11   Page 2 of 41

Switch Client | Preferences | Help | LiveSupport | Sign Out

| Search | Get a Document | *Shepard's*® | More | | History | Alerts |
|---|---|---|---|---|---|---|

FOCUS™ Terms                    Advanced...  **Get a Document**                    View Tutorial

Service: **Get by LEXSEE®**
Citation: **27 ust 983**

*27 U.S.T. 983; 1971 U.S.T. LEXIS 226, *

U.S. Treaties on LEXIS

CANADA

Extradition

TIAS 8237

27 U.S.T. 983; 1971 U.S.T. LEXIS 226

December 3, 1971, Date-Signed; June 28, 1974, Date-Signed; July 9, 1974, Date-Signed

March 22, 1976, Date-In-Force

**STATUS:**
[*1] Treaty signed at Washington December 3, 1971;
And agreement amending the treaty
Effected by exchange of notes
Signed at Washington June 28 and July 9, 1974;
Ratification of the treaty, as amended, advised by the Senate of the United States of America
December 1, 1975;
Ratified by the President of the United States of America December 12, 1975;
Ratified by Canada February 2, 1976;
Ratifications exchanged at Ottawa March 22, 1976;
Proclaimed by the President of the United States of America May 6, 1976;
Entered into force March 22, 1976.

TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA
TRAITE D'EXTRADITION ENTRE LES ETATS-UNIS D'AMERIQUE ET LE CANADA

**TEXT:**
BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

**A PROCLAMATION**

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Canada was signed at
Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9,
1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of
the Senators present concurring therein, gave its advice and consent to ratification of the

Treaty, **[*2]** as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada;

The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended, to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six and of the Independence of the United States of America the two hundredth.

The United States of America and Canada, desiring to make more effective the cooperation of the two countries **[*3]** in the repression of crime by making provision for the reciprocal extradition of offenders, agree as follows:

ARTICLE 1

Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty committed within the territory of the other, or outside thereof under the conditions specified in Article 3(3) of this Treaty.

ARTICLE 2                    Amended - See 1988 Amend.

(1) Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

(2) Extradition shall also be granted for attempts to commit, or conspiracy to commit or being a party to any of the offenses listed in the annexed Schedule.

(3) Extradition shall also be granted for any offense against a federal law of the United States in which one of the offenses listed in the annexed Schedule, or made extraditable by paragraph (2) of this **[*4]** Article, is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

ARTICLE 3

(1) For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including air space and territorial waters and vessels and aircraft registered in that Contracting Party or aircraft leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in, that Contracting Party if any such aircraft is in flight, or if any such

vessel is on the high seas when the offense is committed. For the purposes of this Treaty an aircraft shall be considered in flight from the moment when power is applied for the purpose of the take-off until the moment when the landing run ends.

(2) In a case when offense 23 of the annexed Schedule is committed on board an aircraft at any time from the moment when all its external doors are closed following embarkation until the moment when any such door is opened for disembarkation, such offense and any other offense covered by Article [*5] 2 committed against passengers or crew of that aircraft in connection with such offense shall be considered to have been committed within the territory of a Contracting Party if the aircraft was registered in that Contracting Party, if the aircraft landed in the territory of that Contracting Party with the alleged offender still on board, or if the aircraft was leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in that Contracting Party.

(3) When the offense for which extradition has been requested has been committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

ARTICLE 4

(1) Extradition shall not be granted in any of the following circumstances:

(i) When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

(ii) [*6] When the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character. If any question arises as to whether a case comes within the provisions of this subparagraph, the authorities of the Government on which the requisition is made shall decide.

(2) The provisions of subparagraph (iii) of paragraph (1) of this Article shall not be applicable to the following:

(i) A kidnapping, murder or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt to commit such an offense with respect to any such person.

(ii) When offense 23 of the annexed Schedule, or an attempt to commit, or a conspiracy to commit, or being a party to the commission of that offense, has been committed on board an aircraft engaged in commercial services carrying passengers. [*7]

ARTICLE 5

If a request for extradition is made under this Treaty for a person who at the time of such request, or at the time of the commission of the offense for which extradition is sought, is under the age of eighteen years and is considered by the requested State to be one of its residents, the requested State, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting State that the request for extradition be withdrawn, specifying the reasons therefor.

ARTICLE 6

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

ARTICLE 7

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may [*8] be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

*(handwritten margin note: mended ce 1988)*

ARTICLE 8

The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

ARTICLE 9

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3) When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person [*9] to whom the warrant of arrest refers.

(4) When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting State, by a statement showing how much of the sentence has not been served, and by evidence proving that the person requested is the person to whom the sentence refers.

ARTICLE 10

(1) Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

(2) The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada, or when, in the case of a request emanating [*10] from the United States, they are authenticated by an officer of the Department of State of the United States and are certified by the principal diplomatic or consular officer of Canada in the United States.

*(handwritten margin note: mended ce 2001)*

ARTICLE 11

(1) In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.

(2) On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3) A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents **[*11]** specified in Article 9 shall not have been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

*amended see 1988*

## ARTICLE 12

(1) A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i) He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii) He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii) The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his extradition to a third State, provided such other offense is covered by Article 2.

(2) The foregoing shall not apply to offenses committed after the extradition.

## ARTICLE 13

(1) A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of **[*12]** the requesting States it will extradite the person sought.

(2) Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

## ARTICLE 14

(1) The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2) If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

ARTICLE 15

(1) To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence **[*13]** shall, if found, be surrendered to the requesting State if extradition is granted.

(2) Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall be returned to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

ARTICLE 16

(1) The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

(2) The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE 17

(1) Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State. The appropriate legal officers of the State in which the extradition proceedings take place shall, by all legal **[*14]** means within their power, assist the requesting State before the respective judges and magistrates.

(2) No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

ARTICLE 18

(1) This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2) This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3) This Treaty shall enter into force upon the exchange of ratifications. n1 It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 Mar. 22, 1976.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*15]**

1988 Amendment
( Pages 9 of 41 in 1995)

No. 15678.   TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA. SIGNED AT WASHINGTON ON 3 DECEMBER 1971[1]

Nº 15678.   TRAITÉ D'EXTRADITION ENTRE LES ÉTATS-UNIS D'AMÉRIQUE ET LE CANADA. SIGNÉ À WASHINGTON LE 3 DÉCEMBRE 1971[1]

---

PROTOCOL AMENDING THE ABOVE-MENTIONED TREATY, AS AMENDED. SIGNED AT OTTAWA ON 11 JANUARY 1988

PROTOCOLE MODIFIANT LE TRAITÉ SUSMENTIONNÉ, TEL QUE MODIFIÉ. SIGNÉ À OTTAWA LE 11 JANVIER 1988

Came into force on 26 November 1991 by the exchange of the instruments of ratification, in accordance with article IX (2).

Entré en vigueur le 26 novembre 1991 par l'échange des instruments de ratification, conformément au paragraphe 2 de l'article IX.

*Authentic texts: English and French.*

*Registered by Canada on 27 January 1995.*

*Textes authentiques : anglais et français.*

*Enregistré par le Canada le 27 janvier 1995.*

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN CANADA AND THE UNITED STATES OF AMERICA SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

The Government of Canada and the Government of the United States of America;

Desiring to make more effective the Extradition Treaty between the Contracting Parties, signed at Washington on December 3, 1971, as amended by the agreement effected by an Exchange of Notes on June 28 and July 9, 1974 (hereinafter referred to as "the Extradition Treaty");

Have agreed as follows:

## ARTICLE 1

Article 2 of the Extradition Treaty is deleted and replaced by the following:

### "Article 2

(1)    Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

(2)    An offense is extraditable notwithstanding

    (i)    that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States, or

    (ii)   that it relates to taxation or revenue or is one of a purely fiscal character."

## ARTICLE II

The SCHEDULE to the Extradition Treaty, as amended, is deleted.

## ARTICLE III

Paragraph (2) of Article 3 of the Extradition Treaty is deleted.  Paragraph (3) of Article 3 of the Extradition Treaty is amended to read as follows:

"~~(2)~~        ~~When the offense~~ for which extradition is requested was committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall grant extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.  If the laws in the requested State do not so provide, the executive authority in the requested State may, in its discretion, grant extradition."

## ARTICLE IV

Paragraph (2) of Article 4 of the Extradition Treaty, as amended, is deleted and replaced by the following:

"(2)        For the purpose of this Treaty, the following offenses shall be deemed not to be offenses within subparagraph (iii) of paragraph 1 of this Article:

*Political Character*

(i)     An offense for which each Contracting Party has the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to its competent authorities for the purpose of prosecution;

(ii)    Murder, manslaughter or other culpable homicide, malicious wounding or inflicting grievous bodily harm;

(iii)   An offense involving kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

(iv)    An offense involving the placing or use of explosives, incendiaries or destructive devices or substances capable of endangering life or of causing grievous bodily harm or substantial property damage; and

(v)     An attempt or conspiracy to commit, or counselling the commission of, any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses."

## ARTICLE V

Article 7 of the Extradition Treaty is deleted and replaced by the following:

### "Article 7

When the person sought is being proceeded against or is serving a sentence in the requested State for an offense other than that for which extradition is requested, the requested State may surrender the person sought or postpone surrender until the conclusion of the proceedings or the service of the whole or any part of the sentence imposed."

## ARTICLE VI

Paragraph (3) of Article 11 of the Extradition Treaty is deleted and replaced by the following:

"(3)    A person arrested shall be set at liberty upon the expiration of sixty days from the date of arrest pursuant to such application if a request for extradition and the documents specified in Article 9 have not been received.  This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request and documents are subsequently received."

## ARTICLE VII

The Extradition Treaty is amended by adding the following after Article 17:

### "Article 17 bis

If both contracting Parties have jurisdiction to prosecute the person for the offense for which extradition is sought, the executive authority of the requested State, after consulting with the executive authority of the requesting State, shall decide whether to extradite the person or to submit the case to its competent authorities for the purpose of prosecution.  In making its decision, the requested State shall consider all relevant factors, including but not limited to:

(i)    the place where the act was committed or intended to be committed or the injury occurred or was intended to occur;

(ii)    the respective interests of the Contracting Parties;

    (iii)   the nationality of the victim or the
          intended victim; and

    (iv)   the availability and location of the
          evidence."

## ARTICLE VIII

Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date.

## ARTICLE IX

(1)      This Protocol shall be subject to ratification in accordance with the applicable procedures of the Government of the United States and the Government of Canada and instruments of ratification shall be exchanged as soon as possible.

(2)      The Protocol shall enter into force upon the exchange of instruments of ratification.

*[For the testimonium and signatures, see p. 416 of this volume.]*

2001 Protocol

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNEMENT OF CANADA

Signed at Washington on December 3, 1971,
as amended by an Exchange of Notes at Washington on June 28 and July 9, 1974,
and by a Protocol signed at Ottawa on January 11, 1988

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND
THE GOVERNMENT OF CANADA (hereinafter "the Parties");

RECOGNIZING the close bilateral relationship which exists between them,
reflected in numerous instruments and mechanisms of legal cooperation;

COMMITTED to strengthening legal cooperation in the fight against crime;
and

DESIRING to make more effective the Extradition Treaty between the Parties,
signed at Washington on December 3, 1971 (hereinafter "the Extradition Treaty"), as
amended by an exchange of notes of June 28 and July 9, 1974, and the Protocol to the
Extradition Treaty between the Parties, signed at Ottawa on January 11, 1988
(hereinafter "the Protocol");

HAVE AGREED as follows:


ARTICLE 1

The Extradition Treaty is amended by adding the following after Article 7:

"Article 7 bis

1.      The requested State, after granting an extradition request made in accordance
with the Extradition Treaty, may temporarily surrender a person who has been
convicted and sentenced in the requested State, in order that the person sought may be
prosecuted in the requesting State. The temporary surrender of the person shall not
divest the Courts in the requested State of jurisdiction over any appeal or habeas corpus
application relating to the conviction or sentence that otherwise may be available under
the laws of the requested State.

(1)

2

2.      A person temporarily surrendered pursuant to paragraph 1 shall be kept in custody in the requesting State. The person shall be returned to the requested State within forty-five (45) days after the conclusion of the proceedings for which the person's presence was required in the requesting State or at another time as specified by the requested State, in accordance with conditions to be determined by the Parties for that purpose.   The return of the person to the requested State shall not divest the Courts in the requesting State of jurisdiction over any appeal or habeas corpus application that otherwise may be available under the laws of that State, in relation to the matter for which the person was temporarily surrendered.

3.      The period of time spent in custody in the requesting State may be credited to the sentence in the requested State.

4.      When the sentence that the person was serving in the requested State expires during the temporary surrender, the requested State may waive the return of the person and the surrender will be considered to be a final surrender. A "final surrender" is a surrender of a person pursuant to this Treaty other than as provided for by this Article.

5.      Subject to paragraph 7, if a person temporarily surrendered and returned to the requested State has been sentenced to imprisonment in the requesting State for the offence for which the person was temporarily surrendered, the person shall be finally surrendered to the requesting State, in accordance with paragraph 6, without a further request for extradition.

6.      Final surrender shall take place when the person has finished serving the custodial portion of the sentence in the requested State, or at an earlier time specified by the requested State.

7.      Final surrender shall not take place when:

        (a)     the requesting State advises that final surrender is no longer required due
                to the expiration of the sentence imposed or for other reasons; or

        (b)     after the temporary surrender, the warrant or order for the final
                surrender of a person sought is revoked by the competent authority of the
                requested State."

## ARTICLE 2

        Article 10(2) of the Extradition Treaty is deleted and replaced by the following text:

"(2)   The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when:

        (a)     in the case of a request emanating from Canada, they are authenticated
                by an officer of the Department of Justice of Canada and are certified by
                the principal diplomatic or consular officer of the United States in
                Canada;

3

(b)    in the case of a request emanating from the United States for a person who is sought for prosecution, they are certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction.  In the case of a request emanating from the United States for a person who is sought in connection with a conviction, the documents must be certified by a judicial, prosecuting or correctional authority who attests to the fact that the documents are accurate; or

(c)    they are certified or authenticated in any other manner accepted by the law of the requested State."

## ARTICLE 3

1.    This Second Protocol shall form an integral part of the Extradition Treaty.

2.    Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Second Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

3.    This Second Protocol shall be subject to ratification, and shall enter into force upon the exchange of instruments of ratification.  It shall terminate upon termination of the Extradition Treaty.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Second Protocol.

DONE in duplicate at Ottawa          this Twelfth day of January 2001 in the English and French languages, the two texts being equally authentic.

**FOR THE GOVERNMENT OF**          **FOR THE GOVERNMENT**
**THE UNITED STATES OF**              **OF CANADA**
**AMERICA**

# APPENDIX "B"
# LETTERS FROM FRIENDS AND FAMILY

Derek Sidenius
3346 Haida Drive, Victoria, BC V9C 3P1
Tel: 250 744 2869  Work: 250 384 0858
Email: wanda@pacificcoast.net

The Honorable United States Magistrate Judge
c/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814                     Nov 7, 2011

Dear Your Honor,

I am writing this letter in support of James Robertson. My name is Derek Sidenius. I was for many years a journalist in Canada and the Far East, notably China, Japan and Hong Kong. Since 1996 I have owned and operated Wan-Da Tour Company, an international tour business, based in Victoria, registered in the Province of British Columbia, and drawing a clientele from across North America.

I have known Jim since 1983 when he was practicing law in Victoria and acting as attorney for persons in court cases I was covering for our local daily newspaper. Our friendship stems from a shared academic interest: attending a Greek and Latin Classics Course together at the University of Victoria in 1983/84. We have remained friends ever since. Over the years he has met and been friends with most of the members of my immediate family. I met several of his family members, as well. I visited him when he made his home in Santa Barbara, and he visited me when I was living and working in China. We have always kept in close touch, despite often living far apart in different cities and countries.

I have stood by him throughout his long ordeal with his legal troubles that began in 1997, and I have done so because, quite frankly, I believe in him. I believe in his version of the events. I believe in his contention that he was made an object of revulsion and scorn by a vengeful ex-wife. I believe in his lament that he did not receive fair treatment from the legal system in Canada. And I believe he has endured unusually severe punishment, which was meted out to the fullest extent the law demanded.

It is not for me to make a judgment on his case. That belongs solely with the courts. But I would like to mention public safety has never been at issue in Jim's case. All his charges arose out of his home environment, dating back 30 or 40 years. His honesty has never been at issue, either. To my mind, he poses no threat whatsoever to society.

Jim, himself, is as respectful of the law as anyone I have ever met. While never admitting guilt -- a bone of contention with the courts here – he has endeavoured to work hard to reform his ways and character to regain the high standing in the community that he once enjoyed.

Derek Sidenius
3346 Haida Drive, Victoria, BC V9C 3P1
Tel: 250 744 2869   Work: 250 384 0858
Email: wanda@pacificcoast.net

Jim has never shirked from assuming a civic responsibility. He took an active role in politics on Vancouver Island and had a lengthy record of service through organizations such as the Freemasons. As far as I can tell he has been active in every association of which he was a member. Nor have I ever felt that he shirked his responsibilities as a father to his seven children, until as a family they turned against him. As a friend he has always been loyal, generous and dependable.

Impressive has been the remarkable versatility he has shown in his life's work. He has been able to switch from sailor to truck driver to lawyer to teacher to paramedic to working on a ski patrol well into his 60s and then back to lawyer again, and has done so in a series of leaps of self-confidence that speak to his resilience, determination and discipline, qualities essential to overcoming the fifteen years of adversity that he has gone through, qualities essential to building a new life back in the United States as he is attempting now to do.

Thank you.


Yours truly,


Derek Sidenius

08 November 2011

The Honourable United States Magistrate Judge
C/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd floor
Sacramento, CA 95814

Reference: James William Robertson

I am delighted to have been given the opportunity to show my support for James [Jim] Robertson by way of this reference letter.

My name is Robert [Bob] Orrick; I am retired and have lived in Ladner, BC for approximately 15 years. Prior to that, my wife and I resided in Richmond, BC. My wife and I are devout attendees at St. John's Vancouver Anglican Church in Vancouver, BC and have done so for about five years. Previously, we attended St. Mark's Ocean Park Anglican Church in South Surrey, BC. It was at St. John's that I met Jim. Moreover, I am a veteran of the Korean War and was one of two representatives of Canada in South Korea at the 41st Anniversary of the Commencement of the Korean War in June 1991 and in 2010 was a member of the Canadian contingent of veterans at the 60th Anniversary of the Commencement of the Korean War in April of that year. At the June 1991 anniversary, I had the distinct honour to give the opening speech to the South Koreans on behalf of all 21 UN Force countries that served in Korea 1950-53. I have been a member of the Fourth Estate and a ministerial assistant to a government cabinet minister as well as having been one of four founding partners in an international marketing company as well as later a private tutor. I put these points to establish my bona fides.

As fellow parishioners, Jim and I met and discussed topical subjects and on several occasions assisted with the Church's Missions Lunch. These are lunches hosted by St. John's Vancouver Anglican Church and held following the noon hour after the normal 1100 service on a semi-regular basis. In order for the lunches to be successful, a suitable space [room] has to be prepared. On many occasions, Jim assisted with the set up; this included setting up portable tables and chairs, arranging cutlery and water dispensers on each table and generally assisting wherever necessary. The lunches normally were attended by upwards of 150 persons. Then, following the Missions Lunch, removing the aforementioned items from the tables, disassembling the tables, returning the chairs to their normal holding space, and, again, generally ensuring the space is returned to its normal status. While such actions might appear on the surface to be of little concern, they show that Jim was willing to assist others in the congregation in these important Missions Lunches

[St. John's Vancouver Anglican Church has planted missions in several countries including Cairo, Egypt; Jerusalem, Israel; Malawi, Africa, as well as other points in the world. At the lunches, the congregation, along with guests, hear up-to-date reports from these missionaries.]

Additionally, during the Missions Lunch, those of us who assisted in either the setting up or in the kitchen, then individually sat at a table with our guests; this was in order to be available to respond to any questions the guests might have about St. John's Vancouver Anglican Church in general or the Missions Lunch in particular. In order for this to happen, a reasonable knowledge of the Church and the purpose of the Missions Lunch were necessary. In both, Jim was 'on top of his game' as it were.

As Jim and I share a common naval background, we were able to exchange tales on our individual times in the Royal Canadian Navy [RCN]. In addition to the common bond of having served in the RCN, our naval trades were the same: communicators. As such, there was much we were able to share.

It was during one of those 'sharing episodes' that I became aware that Jim had represented the RCN, and thus Canada, at one of the NATO communications skills competition held annually in Europe. Jim, along with a fellow communicator from Halifax, pitted their communications expertise against representative of each of the other NATO countries. To write that Canada, the RCN and Jim and his co-competitor did well is to understate the competition result – they were tops. In order for Jim to have been selected to represent Canada is an honour that only came about because of his superior communications ability. Those who represented the RCN at the NATO competitions were there because they were the best of the best. It was a feather in Jim's RCN cap and something that he can savour all of his life.

His selection showed that Jim was a team player in that he pulled his weight onboard ship and that he shared his abilities with his fellow communicators. In the RCN, communicators were held to an extremely high standard. For instance, a pass mark was more often 100 per cent with the occasional standard of 80 per cent on certain written examinations. Not all sailors were capable of being communicators and the commanding officers relied heavily on the expertise of the ship's communicators. To make a mistake at sea had the potential to result in the loss of a ship and the death of hundreds of the ship's company. In addition, the security clearance of a communicator in the RCN was top secret with cryptographic clearance. None was higher and such clearance was not handed out willy-nilly. Any miscue might – and often did – result in the loss of that highly-important security clearance. An example: if a communicator was inclined to imbibe in spirits or beer and become 'unsteady' and start to babble, that would result in loss of clearance. Any communicator in the RCN who lost his security clearance was denied access to communication spaces and as such was incapable of carrying out his sworn duties. To my knowledge, at no time did Jim lose his top secret-crypto security clearance. An ability to remain steadfast at all times was a hallmark of a competent communicator in the RCN. Jim was, in my opinion, such a communicator.

Again, because of our shared RCN background, Jim introduced me to the Vancouver Naval Veterans Association – he was a member and I soon became one. Such associations of ex-military personnel, in this case, former RCN and/or mercantile sailors are a bond of like experiences and accomplishments. There is no room for a pseudo-member for any comments he might offer soon would be exposed as being false. Therefore, members of the Association had to toe the line and stand behind the oath taken upon being accepted as a member. None of these actions is taken lightly and each shows a willingness to cooperate and associate and accept whatever duty was asked of the member. Jim was an active participant in the Association and when he spoke, others listened. A quality not all have or readily display.

There were two occasions when Jim met with my wife and I outside of Canada. The first was a few years ago when we met at a restaurant in Thousand Oaks, CA. My wife and I were in the vicinity visiting a cousin of mine who resides in Sherwood Park not far from Westlake Village. The second time was in Blaine, WA. At that meeting, Jim's sister, Carol, was present. We had met Carol previously at St. John's Vancouver Anglican Church at a regular Sunday service.

Jim and Carol are close and each appears to rely on the other as close-bonded siblings ought to do. Subsequent to the Blaine meeting, my wife and I learned that Carol had suffered a serious medical problem and was admitted to hospital. Through email communications, Jim expressed his love for his sister and his grave concern for her health. Carol did recover from her malady but more recently has had a recurrence and was again admitted to hospital. The problem appears to be the same as previously; again, Jim has expressed deep concern for his sister. We pray for her successful recovery.

From my times with Jim either at St. John's or the VNVA or simply over a cuppa, I learned that he is an accomplished person. For instance, he is a proven long-haul trucker, a certified pilot and a member of the legal profession. None of these accomplishments came about other than through hard work, a strong discipline to succeed and a willingness to accept whatever bumps there were in the pathway to success as part of the learning curve – to use the vernacular. Jim is a strong, steadfast person, in my opinion.

Whatever episodes there might have been in Jim's past that have brought him to the present dilemma, I am confident that there is much more to the story than has appeared in print or has been recorded in official documents. I write that because based on my shared experiences with Jim and from what I know of his RCN background, I cannot in all good conscience see him as being anything other than a quality individual who has been and will continue to be an asset to any setting or community in which he closes to reside.

To put this into naval parlance were I at sea in an open boat and in extreme distress, and I had but one choice as a companion, I would not hesitate in holding out my hand to James William Robertson.

3

Sincerely,


Robert [Bob] Orrick
 201-4768 53rd Street
Ladner, BC V4K5B2

Attorney Jim Robertson
rnelhtl
to:
Rachelle_Barbour, rnelhtl
11/08/2011 03:59 PM
Show Details

November 8, 2011

The Honorable United States Magistrate Judge
c/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814

In the matter of:       **James William Robertson**

I have known Jim for several years and have worked closely with him. His residence is located very close to my current office.

Jim is a classic example of the Six Pillars of Character: Trustworthiness, Respect, Responsibility, Fairness, Caring and Citizenship. Jim has proved to be a great asset to our membership, assisting with the interpretation of our CC&R's, which the current board has disregarded. Jim has volunteered to attend court hearing in the myriad of lawsuits which the current board has perpetrated on our homeowners.

Jim has many friends here at Lakeland Village, enjoying their and my friendship. He also enjoys the friendship of the local superior court justices, and the justice community. As I am certain that you are aware, Jim has California State Teaching Credentials, a California State Bar Association License and a FAA approved Pilots license. Besides all of this, I certify that Jim is a friend of mine!

Jim had openly and voluntarily discussed all of the Canadian Charges, and shared with us the order of dismissal 97-C-11086 by the State Bar decision in December of 1999. He has also been reviewed and cleared by the State Attorney Generals Office.

For your information, I am a life member of Rotary, having been awarded several Paul Harris awards, served as the Western District Director for Holiday Inns for 11 years, a past member of the School of Hospitality Board of Directors, at San Jose State. I was the on-site general manager during construction of Lakeland Village in South Lake Tahoe, and at Northstar at Tahoe during the projects development. During my career in the Hospitality Industry, 43 years, I have literally interviewed thousands of applicants, and consider myself to be a good judge of character. This is exemplified by the many protégés that continue to lead the Hospitality Industry through out the country.

Jim Robertson is a friend of mine and I would be more than happy to assist in anything I could do to help in this matter.
November 8, 2011

Thank you,

Ron Nelson

November 9, 2011


The Honourable United States Magistrate Judge

c/o Rachelle Barbour

Office of the Federal Defender

801 I Street, 3rd Floor

Sacramento CA  95814


Dear Sir/Madame:


**Re:  ROBERTSON, James**


Thank you for receiving this letter.  I would like to begin by introducing myself to the Court.


| | |
|---|---|
| Name: | Edward Eaton Jacox |
| DOB: | June 5, 1933 |
| | Edmonton AB CA |
| Education: | Senior Matriculation |


Throughout the course of my working years I have worked for 15 years in banking in all positions up to and including branch Management, 10 years in business management in the arts and 15 years in advertising management.  During this time I was an active member of the Kinsmen Club, served on the Board of the Edmonton Art Gallery and the Edmonton Fund for Recreational Talent and was a founding member of the Canadian Art Dealer Association.

I am submitting this letter to the court in support of James (Jim) Robertson.  I met Jim in Victoria BC shortly after he had been charged with child abuse.  I got to know Jim very well during the long run up to his trial and ultimate conviction.  During this period I found Jim to be an honest, hardworking man who was completely overwhelmed and devastated by the charges laid against him.  However difficult and uncomfortable that situation was for Jim and his children, at no time did I see him lash out at his children.  Rather, Jim showed incredible compassion and support for his children as they dealt with an exorbitant amount of pressure put on them by their mother to testify against their father.

As to Jim's trial and ultimate conviction, it is pertinent to know that I personally sat through the lengthy proceedings as an unbiased observer.  Through the course of this trial I became convinced that Jim must have had some enemies in positions of power as I felt a complete absence of fair play in the trial along with what I felt was an extreme prejudice by the Bench in all matters of his defence.  This included the intimidation of the young lawyer acting as his defence.

I would like to point out that for an offence that supposedly took place some 20 years earlier, I felt it highly suspect that all of the witnesses gave the exact same testimony regarding their memory of past events down to the identical phraseology used.  Having worked in banking, and in that capacity having had to appear before the Courts on a number of occasions, I am only too aware of the frailty of the human memory over much shorter periods of time.  This concerned me when I heard the testimony of those involved which was so clearly rehearsed and in my mind, tutored to by the prosecuting attorney.

In an effort to speak to the type of man that Jim is I would like to share that Jim was a simple truck driver in British Columbia with a family.  Jim decided to better both his and his family's situation. He worked his way through university ultimately gaining his law degree and admittance to the BC Bar, all the time working as a truck driving and providing for his family. This would be a daunting task for anyone.  Jim showed great dedication and perseverance through what most people would consider impossible obstacles to obtain his goal.  In conversations with Jim he radiates humility and  I have never seen any sign whatsoever of resentment towards any member of his family.

In my opinion Jim has shown great concern for the feelings of others and has on occasion gone to great lengths to ease the burdens of others in times of grief.  I would like to bring to the attention of the Court that Jim demonstrates a strong sense of responsibility and loyalty towards those who have supported him throughout this long and painful ordeal.  I am honoured to be counted among Jim's friends.

In closing I would humbly plead with this Court to deny Jim's extradition to Canada and allow him to return to a normal life without fear that the nightmare unleashed upon him by a vindictive former wife be allowed to continue.


With Respect,



Edward Eaton Jacox

6165 Rosecroft Pl

Nanaimo BC  V9T 6L2

Phone: 250-751-0755

Email:  marionjay@shaw.ca

The Honorable United States Magistrate Judge
c/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814

My name is Dianna Dorn and I am an owner at Lakeland Village and
a neighbor of James W. Robertson. I met Jim a year ago in the
lobby when I approached him to introduce myself. I am a local
Realtor and always welcome the opportunity to meet someone new.

I consider Jim to be a good friend of mine.  We got together
numerous times on the property and had very nice conversations.

Jim decided to run for the Lakeland Village Board of Directors
and he had my trust & support.  Jim is very detail oriented and
he had great ideas for improving our property. Jim was very
passionate about running for the position and worked hard to get
all the documentation that he needed to come up to speed on the
affairs of the Homeowners Association.

I believe the date was Monday September 24th 2011 that my husband
Jon and I received a call from Jim, that he urgently wanted to
talk to us.  Jim, Jon and I spent two hours in our condo
discussing Jim's history. Jim explained the accusations that
incarcerated him and was very open to our questions.  He was
distressed, and I could tell he was concerned about losing our
friendship. My husband and I told him to give some thought to
resign from the election and just go on with the peaceful life
he seemed to be living and enjoying.

When I heard that Jim was arrested I felt sad and concerned for
him.  I still have many questions (why's) for him, the Board and
Hotel Management.

I am writing this letter for my friend Jim.  I pray that he
receives fair treatment and that justice is served.

Sincerely,

Dianna Dorn

The Honorable United States Magistrate Judge
c/o  Rachelle Barbour
Office of The Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814

To Whom This May Concern:

My name is Hank Chicoine.
I reside in Canada in Kamloops, British Columbia.  I am a former Fur Trapper, Ranch hand, Farmhand, worked three years in the Aluminium Industry for Alcan, and also worked five years for Pacific Elevators in Vancouver, B.C. in the Grain Industry.  The remaining full time employment of proximately thirty years was in the Electrical Industry.  In the beginning as a Electrician and then as a Businessman operating my own Electrical Contracting Company.  I did have short stays of employment in the Wood Industry and others.  I started working when I was very young as did James Robertson.  I suppose you could say we both have been around the block.

Both my Father and Mother were born in Canada and on my Father's side I am a tenth or eleventh generation Canadian.  I never remember which is correct.
I am enjoying retirement with my wife and we are blessed with two children, two grandchildren, and also have one great grandchild on the way.

In 1960 when I was in my early twenties I moved to Kitimat, British Columbia to work for Alcan and this is where I met James Robertson.  At that time in his life he used the name Tim Robertson as his family gave him that nickname to distinguish him from his Father who also was named James Robertson.  There is a long line of James Robertson's in his family.  To this day I still refer to him as Tim although he prefers to be called Jim.  I believe all his friends from the last thirty or so years all refer to him as Jim.  He gets back at me by referring to me as Henry which is my birth name.

We became good friends and have remained so to this day.  At the time Jim (Tim) had an Uncle, Aunt, and cousins in Kitimat and in 1962 I married his cousin Bev and asked him to be my best man which happily he complied with.  Over the following years our family's visited back and forth when possible and communicated with mail and telephone to keep up on family news as our homes were in different Cities.  Jim (Tim) and Ellen had children younger, the same age, and older then our children, seven in all.

One of his many accomplishments was going to university to become a lawyer and at the same time purchasing a home and raising seven children.  Of course his wife Ellen was working out and he was working during the summer months and they had some savings.

Even after his separation and divorce from his wife Ellen he continued to support his children.  Later after all the the children were grown up except one, he moved to the US.  He continued his support by travelling back to Canada for special celebrations like a birth of a grandchild or some other family function.  Even helped some of his children with down payments when they wanted to purchase a home.  On many of these trips Bev and I would be able meet with him.  On our trips south to get a break from our winters we always got together as well.

Jim (Tim) is an avid communicator and is willing to help anyone if asked. Over the years he has volunteered for many duties relating to elections as well helping candidates during their election endeavours. This would be only some of his volunteer work I am sure.

He is honest and dependable and able to control the stress of what life throws your way better than most. I have trusted him all these fifty plus years and continue to do so.

Yes I do believe he is innocent of these allegations which his conviction is based on. As the sentence imposed on him has been served and then some, that should be the end of it. I could go on and explain what I believe took place during these many years, a miscarriage of justice I am sure but you would not believe me anyway. So I will say this, when a person serves his time for what ever he or she was charged with and is a pillar of society after should we as a society keep kicking them and knocking them down. Should we allow people or Governments or whom ever with their personal agendas to continually use someones past against them?

This man has done no harm to anyone in your Country and I defy you to show me otherwise. His choice is to live in your Country that is why he took out citizenship.

I also defy anyone in my Country of Canada to look me in the eye and tell me they were harmed by James (Jim or Tim) Robertson. It is one thing to lie to strangers in a court room but to do the same to a relative or friend is much harder. As you know being a Witness at a trial precludes you from seeing them in person give their testimony. They never had to face us and utter their allegations.

In this case when the Judge or Jury is afraid not to believe the allegations, you are convicted and that is where we sit or stand today.

Is he Sister Teresa dressed in a man's clothing, of course not, none of us are. If he is a bad man or a possible harm to the public then please try to convince my children and grandchildren of this.

Thank you for reading my ramblings, as you can tell this is very personal for me.


Hank Chicoine

1453 Todd Road
Kamloops, B.C.  V2C 5B6
Canada

Phone: 1.250.573.1164

November 12, 2011

The Honorable United States Magistrate Judge
c/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814

I am cousin to James Robertson, and was a witness for him at his trial when I was serving Corporal-In-Charge of the Royal Canadian Mounted Police in Rossland, B.C. Canada.

I have know Jim all my life, and find him to be honourable, honest and dependable.  He is a staunch family man, including his family with ours on several special occasions.  He is always in touch, and is always part of our celebrations.  He is a huge source of pleasure for my Mother.

Thank you for your time,


Larry A. Burnett
Retired R.C.M.Police
668 Quarry Ave
Kelowna, B.C.
V4T 1N8

November 12, 2011

The Honorable United States Magistrate Judge
c/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814

I am Dorothy Robertson Burnett, 89 year old Aunt of James William Robertson and I and my deceased husband John, were both witnesses at his trial.  Jim's father was my older brother.  I was there when Jim was born, he has been in my life for his 71 years.  He is like a son to me and when his parents divorced, he was 14 and stayed with me and my children when my husband was in Kitimat working.  After he was married we always marvelled at his ever growing family.  My husband and I were very proud to be all seven children's Godparents.

As the family grew up, Jim was always a participant in family events, with 1, 2 or more of the children.  He very much supported and cherished his relationship with his sister and brother.

Jim is very dependable.  He borrowed money from me and very methodically paid it back, even when I told him that it wasn't necessary.  He is honest and sincere and he and his family have always attended church.

I will lend any kind of support to Jim and wish for this ordeal to be over.

Thank you very much.

*Dorothy Robertson Burnett*

Dorothy Robertson Burnett
#222 - 575 Sutherland Ave.
Kelowna, B.C.
V1Y 8V1

November 12, 2011

The Honorable United States Magistrate Judge
c/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814

I am Gordon Stewart Robertson, Uncle to James W. Robertson.  I have recently
had open heart surgery and cannot travel and have no way of communicating,
therefore I hereby authorize my niece to sign this letter on my behalf.

I was twelve when Jim became my nephew, and he has always been part of my
family's lives after I married, and then when he married, and became a father.
His family was always a delight to us, with seven children.

I was a witness for Jim at his trial.  He has always been dependable and a strong
family man, visiting and calling to make sure all is well with our family.  He is one
of the few people I know that remembers everyone's birthdays, anniversaries
and various dates of importance.  He is very concerned about my health and
welfare.


Thank you very much.

Gordon Stewart Robertson
Box 24
Westbridge, B.C.
V0H 2B0
(signed for Gordon Robertson by Beverly Chicoine)

November 12, 2011

The Honorable United States Magistrate Judge
c/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814

I am Beverly Chicoine, Jim's first cousin.  Jim is three years my senior and like a brother to me.  I cannot remember a time when he hasn't been a part of my life.  We were together quite a bit when we were children, and then as teenagers.  I was a witness for Jim at his trial, and strongly support him, as does the rest of my family.  When Jim was married, he made sure that I was singled out and introduced all around.  And I was always with his family as it was expanding and growing up.  I was the baby sitter for the children when his fifth child was born and we were visitors to his home many times.  In the early days of his marriage, I have seen Jim have 3 jobs at a time to financially support his family.

As my best friend growing up, he was introduced to my then to be husband, and became my husband's Best Man, at our wedding, 50 years ago.  He is also Uncle, to my children and grandchildren who have welcomed him many times into their homes.

Jim's oldest daughter Debbie lived in Kamloops for some time, and rented from me and my husband when her first child was born.  Jim was always in contact and eventually moved her back into the arms of her family in Victoria, when the relationship was in trouble.  Jim was always helping out his children, with loans for down payments for homes, and helping when one or the other was in financial trouble.  He also took his children and grandchildren on many vacations.  Jim always attended family functions, with 1, 2 or more of his children.  He has an uncanny memory for dates and makes sure he phones, attends or writes to commemorate the occasion.  His family ties are very strong and he nurtures these relationships.  He and his children always attended church on a Sunday, and then after, often visited elderly Aunts & Uncles, or Grandparents (when alive). He attended my parents 50th anniversary with two of his children, my Mother's and Father's 75th and 80th birthdays, with at least one of his children, and was a welcome participant in family weddings etc.  He is a very strong family man and will always be included in any family function.  He is the oldest of his siblings, and is a great supporter of his brother, and sister Carol who currently is fighting an illness, which is causing Jim a lot of concern.

I am most proud of him for returning to higher education while raising his seven children, haunting the "scholarship papers and bursary books", so that most of his tuition monies came without hurting his family unduly.   A remarkable achievement that most would have found daunting.

Jim is a very great love of my Mom, Dorothy Burnett and my Uncle Gordon Robertson. They are younger brother and sister to Jim's deceased father James, and both feel a very strong attachment to him.   In fact I know that Jim maintains that they are surrogate parents to him.  As both are elderly it is hard for them to understand what has happened to him in our judicial system, along with his children's betrayal.  My Mother and Dad (now deceased) were God Parents to all seven of Jim's children and very proud of that

distinction, but my Mom is very disturbed with the actions of those children.

One of Jim's great love's, was his service record in the Royal Canadian Navy.   He is very proud of this part of his life, and often recounts to me many stories on his life aboard Navy ships.   He was very proud of his service, and of the fact that our Grandfather, his Father and Uncle were all in the service during World War II.   I know that he is a member of the Veteran's association, and Royal Canadian Legion.

Jim is one of the most honest, kind, trustworthy and dependable people I know and he would be one of the first people to come to my aid if required.   The comments that he is a violent man are the most ludicrous describing Jim that I have ever heard.

Thank you very much.

Beverly A. Chicoine
1453 Todd Rd.
Kamloops, B.C.
V2C 5B6

12 November 2011

Rachelle Barbour
Federal Defender's Office
801 I Street, 3rd Floor
Sacramento, CA  95814
USA

Dear Ms. Barbour

I am  a long time friend of James Robertson. We met as Rotarians about 1967 or 1968 and have been close friends ever since. James and I also shared interests in the Saanich Peninsula Chamber of Commerce, the Progressive Conservative Party of Canada and other community organizations.

He is not only my friend, but a friend to my wife and to my children; from the time they were born to the present day, and now my five year old grandson.

I  knew some of his family especially Debbie, who prior to her complaint against him often expressed her gratitude and affection for her stepfather; for his love, understanding and support for her throughout many difficulties in her life.

James was always supportive of his family and was forever coming to their rescue. He assisted Debbie in purchasing a house and consistently baby sat and cared for her children; strange behavior for someone who would latter bring charges against him!

It was a shock to me when he was charged and a source of bitter disillusionment as I discovered how corrupt the judicial system could be when crusading police and prosecution could act in unethical and manner and in my opinion, railroad an innocent person. I knew the family well enough to disbelieve all the charges made.

His case was the first that his lawyer had taken since coming off maternity leave and as well as being weak and non assertive was distracted with her new baby. I was appalled at her handling. As well as being poorly prepared, she let many important issues go by.

During his time in prison he was active in counseling, befriending and mentoring his fellow inmates to assist them in coping with prison life and preparing them to reenter society upon their release.

James had completed his sentence and was only required to report in connection with his long term offender designation. This designation is not subject to the rigors of a trial and is subject to very *flexible criteria decided by a judge alone.*

I was appalled when I saw the wanted poster describing James as "violent"; I challenge the RCMP to justify their assertion. However, given what we know about the tarnished reputation of our national police, this deceitful manipulation should not be surprising.

 I have never known James to display any tendencies to violence, I have never seen him loose control, even when angry. I have witnessed diligence, compassion, concern for others, fairness, honesty; all in fair measure. I know Jim as a good person and someone who I am proud to call a friend.

Respectfully,
John M. Robertson
4346 West Saanich Road
Victoria, BC, Canada, V8Z 3E9
250-812-6933
aero@islandnet.com



**Re: Attorney James Robertson**
Howard Friedman   to: Rachelle Barbour                                    11/08/2011 12:53 PM

---

To:  The Honorable United States Magistrate Judge
     c/o  Rachelle Barbour
     Office of the Federal Defender
     801 I Street, 3rd Floor
     Sacramento, Ca.  95814

From:  Howard S. Friedman M.D.


I live at Lakeland Village in South Lake Tahoe.  I've known Jim Robertson
since he moved into his unit here.  As a retired physician, as you might
imagine,  I am wary of lawyers.  Jim, however, restores faith.  He is a lawyer
who loves the law and insists on its proper application.  The Board of
Directors at Lakeland Village routinely refuses to follow California Civil
Codes.  They refuse all access to books and records.  Their attitude toward
owners is, "So Sue Us!"  As a result of this "So Sue Us!"  policy,  millions
of dollars of dues and reserves have been squandered in lieu of showing us a
simple piece of paper or doing a simple and inexpensive roof repair.  They
vigorously refuse audit and punish those who request transparency,  and on and
on; you get the point.

Well, Attorney James Robertson was the owners'  most vigorous and articulate
and intelligent and precise advocate.  His intellect is extraordinary.
Indeed,  once you get to know him,  you learn of his warmth and sincerity.
Those of us who have had the good fortune to know him and have grown to love
him, are now devastated.  Those who are mired in corruption are thrilled about
his arrest and actually joke about it and self-celebrate his incarceration.
It's disgusting.

Jim is a gentleman.  Desk workers, who knew of his supposed past, would freely
give Jim their babies to hold or their 5 year olds  to "baby-sit"  for a
while.  There was never, ever, an incident or even any vague suggestion of
incident regarding Jim.  That is startling in light of his having been branded
a "child-molester" and in light of management's wishes to portray him as a
pariah simply because he was on to all of their shenanigans.

Attorney James Robertson is the very best man I've met in my 67 years.  That is
not hyberbole.  It simply reflects my own hunger for honesty in these terribly
dishonest times.

          Sincerely,

          Howard Steven Friedman M.D.
           (husband of Sheila J. Starcevich)

----- Forwarded Message -----
From: Howard Friedman <shestar56@yahoo.com>
To: shewilt2413@yahoo.com
Sent: Wednesday, November 9, 2011 3:29 PM
Subject:

11-8-11

Sheila J. Starcevich
PO Box 14492
South Lake Tahoe, Ca.  96151

The Honorable United States Magistrate Judge
c/o Rachelle Barbour
Office of the Federal Defender
801 I Street, 3rd Floor
Sacramento, Ca. 95814

Your Honor;

     The purpose of this letter is to add insight into the
character of Attorney James William Robertson in order to
help you make the right decision. My husband, Howard Friedman
M.D. , and myself,  reside at Lakeland Village Beach and
Mountain Resort in South Lake Tahoe, Ca.  We have been Jim's
neighbors for approximately two years.

     I have assisted with teaching both Ballroom and Line
Dance at Lake Tahoe Community College.  I also volunteer as a
Ski Ranger with the U.S. Forest Service, providing free
informational tours at Heavenly Mountain Resort.

     Now, my opinion of Jim.  He is a uniquely kind and
intelligent man.  He was/is always ready to stand up for the
Lakeland Village Community.  He uncovered the rather deep
corruption that has enveloped this place.  Jerry Bindel is
the rental program manager here. Jerry Bindel has a history
of vocally berating owners. Jim Robertson, on the owners
behalf,  made it clear to Jerry Bindel that he is a licensee
here and thereby can be dismissed in accord with his
contract,  whereas owners cannot be dismissed. That
infuriated Jerry Bindel who had never before been rightfully
"put in his place". Though Jim was merely citing legal
standings and doing it in a calm and pleasant way,  that was
the beginning of his "Get Jim out of here!" rampage.

     Attorney Robertson has truly been the "peoples' advocate"
here and he volunteers endless hours to research matters,
attend court proceeding, and communicate with a broad swath
of owners via the owners communication board. He is not
replaceable from an owner's standpoint. Also, he has been
known to run to court to help employees who require guidance.

Although I can't say  it's an absolute fact, I have a very strong intuitive suspicion that Jim was "framed".  My guess is that Jerry Bindel was repeatedly calling the police every time he could dream up a cause to do so. Jim Robertson, in the owners' service, was a thorn in his side and Jim Robertson knew precisely how to stop his misconduct. Immediately after Jim's arrest, management sent out Jim's mugshot to all owners. Before his arrest, they never said a word.  But, only after the fact, did they yell it from the rooftop.  Why after the fact?  To smear him and make sure he'd never return.

Jim also worked as a member of Ski Patrol at Heavenly Resort. He saved lives. After his incarceration, Jim asked me to go to his unit and see if I could find his reading glasses. They were left behind when he was arrested. When I saw his unit, I got tears in my eyes. His family photo looks like The Brady Bunch.  His neatness and organization (in his small apartment) was impeccable. Next to his bed was a Bible and a book on "Forgiveness".

This great man should be allowed to return to his humble studio apartment and live out the rest of his life with dignity. I know my writing skills are sub-par, Your Honor, but my plea to you is PLEASE SET THIS GOOD MAN FREE! This is the type of guy you would want in your corner and also as a good friend if you knew him.

Thank you and very sincerely,

Sheila J. Starcevich

Reference Letter for James Robertson
Jack Lake
to:
rachelle_barbour
11/09/2011 02:38 PM
Show Details

Ms Barbour,  Will you please deliver this letter to:  The Honorable United States Magistrate Judge
prior to the hearing for Mr. James Robertson. I do appreciate your kind cooperation in this matter.

Date: Wednesday, 09 November 2011

To:  The Honorable United States Magistrate Judge      From: Jack Lake, Owner-Broker  Lake Realty
c/o Rachelle Barbour                                                      3535 Lake Tahoe Blvd. #128 Lakeland Village
Office of the Federal Defender                                       Post Office Box 18485
801  I  Street, 3rd Floor                                                 South Lake Tahoe, CA 96151-8485

Sacramento, CA  95814                                               Ph 530.725.8487   Fax 530.600.1230

Your Honor, I have known Mr. Robertson since he acquired his condominium apartment in Lakeland Village
in July of 1996.  I am a California Licensed Real Estate Broker (License ID Number 00355464) and have for
the last 37 years, specialized in the sale and resale of properties in Lakeland Village.  Lakeland is a 260
unit resort property located on the south shore of Lake Tahoe, in the city of South Lake Tahoe, California.

I have owned in and/or operated an office in Lakeland since March of 1972.  Over this period, I spent more
than 16 years as either an Officer and/or Director of the Lakeland Village Home Owner Association and in
doing so.. worked closely with many of our owners in Lakeland.  Mr. Robertson lives on-site, while most of
our owners live out of the area, out of State and in many cases, out of the United States.  As a resident
owner, Jim has been very helpful to other owners and he has many friends in Lakeland Village.

I consider Mr. Robertson not only my friend... but through his efforts in representing other owners, in dealing
with everyday problems affecting the ownership in Lakeland,  whether they live in Tahoe, Mexico, Canada,
Europe and even one U.S Citizen living in Thailand... he has earned my respect and admiration. Jim is well
known and liked by many others.  He has always been ready, willing and able to assist any one of them.  His
legal knowledge and background has been very helpful in dealing with legal matters as they relate to our
CC&R's and Bylaws.  His assistance in helping other LLV owners in dealing with contracts with Rental Agents
and Association Management personnel has earned the respect and friendship of a large number of grateful
owners in Lakeland Village.    Sincerely, Jack Lake