1  DANIEL J. BRODERICK
   Federal Defender
2  RACHELLE BARBOUR, BAR # 185395
   Research and Writing Attorney
3  801 I Street, 3rd Floor
   Sacramento, California 95814
4  Telephone: (916) 498-5700

5  Attorney for JAMES WILLIAM ROBERTSON

6

7             IN THE UNITED STATES DISTRICT COURT

8          FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10

11                              )    CASE NO. Mag. No. 11-310-KJN
                                )
12 In Re Extradition of         )
                                )    CANADIAN CASES CITED BY THE
13 JAMES WILLIAM ROBERTSON.     )    DEFENSE
                                )
14                              )
   _____)
15

16     1.  McMurray v. National Parole Board, 2004 FC 462 (Canada
               Fed. Ct. 2004)
17     2.  Regina v. L.M., 2 S.C.R. 163 (Canada Sup. Ct. 2008)

18 DATED: December 19, 2011      Respectfully submitted,
19
                                 DANIEL J. BRODERICK
20                               Federal Defender

21                               /s/ Rachelle Barbour
22                               RACHELLE BARBOUR
                                 Research and Writing Attorney
23                               Attorney for Defendant
                                 JAMES WILLIAM ROBERTSON
24

25

26

27

28

                              1

Case 2:11-mj-00310-KJN   Document 29   Filed 12/19/11   Page 2 of 62



Canadian Legal Information Institute

Home > Canada (Federal) > Federal Court of Canada >
2004 FC 462 (CanLII)                                    Français | English

# Mcmurray v. National Parole Board, 2004 FC 462 (CanLII)

| | |
|---|---|
| Date: | 2004-03-26 |
| Docket: | T-266-03 |
| Parallel citations: | 249 FTR 118 |
| URL: | http://canlii.ca/t/1gtjf |
| Citation: | Mcmurray v. National Parole Board, 2004 FC 462 (CanLII), <http://canlii.ca/t/1gtjf> retrieved on 2011-12-19 |
| Share: | Tweet \| Share |
| Noteup: | Search for decisions citing this decision |
| Reflex Record: | Related decisions, legislation cited and decisions cited |

Date: 20040326

Docket: T-266-03

Citation: 2004 FC 462

Ottawa, Ontario, this 26th day of March, 2004

Present:       The Honourable Justice James Russell

BETWEEN:

KENNETH McMURRAY

Applicant

and

NATIONAL PAROLE BOARD

Respondent

### REASONS FOR ORDER AND ORDER

[1]       This application is for judicial review of the decision ("Decision") of the Appeal Division of the National Parole Board ("Appeal Division") dated January 15, 2003, to decline to hear the appeal of Kenneth McMurray ("Applicant") under s. 147 of the *Corrections and Conditional Release Act*, S.C. 1992, c. 20, as amended ("*CCRA*"). That appeal concerned the previous decision of the National Parole Board dated September 13, 2002, imposing a residency condition upon the applicant pursuant to a claimed authority under the *CCRA*.

BACKGROUND

[2]       The Applicant is currently 32 years of age. He is a long-term offender within the meaning of ss. 753.1 and 753.2 of the *Criminal Code*, R.S.C. 1985, c. C-46, as amended ("*Criminal Code*") and Part II of the *CCRA*. The

National Parole Board ("Parole Board") is an administrative body, continued under s. 103 of the *CCRA*, which exercises jurisdiction under the *CCRA* in respect of federal offenders. The jurisdiction of the Parole Board includes the supervision of offenders subject to long-term supervision orders made under the *Criminal Code*.

[3]      The Appeal Division of the Parole Board likewise is an administrative body, consisting of a selection of not more than six full-time members of the Parole Board.

[4]      The Applicant is a first-time federal sex offender. On or about September 13, 1999, he pleaded guilty to, and was convicted in the Ontario Court of Justice of, five counts of sexual assault pursuant to s. 271 (1)(*a*) of the *Criminal Code*. The Applicant's victims were all male youths, whose ages ranged from 13 to 16 years at the times of the offences.

[5]      On March 14, 2000, the Applicant was sentenced to a period of four years incarceration. With credit for time already served, the actual period of additional incarceration to be served was reduced to 31 months.

[6]   .   Concurrent with the sentencing process, the Court further prescribed, pursuant to s. 753.2 of the *Criminal Code* and the *CCRA*, that the Applicant, upon the conclusion of his sentence, be subject to a long-term supervision order in the community for a period of five years.

[7]      The sentencing judge made several recommendations for terms of the long-term supervision order, none of which could be construed as binding, and none of which included mention of any residency requirement.

[8]      Pursuant to his sentence, the Applicant's Warrant Expiry Date ("WED") of the custodial sentence was October 13, 2002, and his Statutory Release Date ("SRD") was calculated at December 3, 2001. In consequence of a decision made by the Parole Board on November 2, 2001, the Applicant was denied statutory release. In the result, the Applicant remained in federal custody until his WED of October 13, 2002.

DECISION UNDER REVIEW

[9]      On September 13, 2002, the Applicant appeared at a hearing before a panel of the Parole Board for the purpose of determining the special conditions to be imposed for his long-term supervision in the community. On that same date, the Parole Board resolved to impose a number of special conditions, including the impugned residency condition, purportedly under s. 134.1(2) of the *CCRA*, as follows:

TO RESIDE AT A SPECIFIC PLACE

THE OFFENDER IS REQUIRED TO RESIDE AT A COMMUNITY CORRECTIONAL CENTRE (CCC)

[10]      At the September 13, 2002 hearing and subsequently, the Applicant, through his counsel, has taken the position that whereas he does not object to residing voluntarily in a Correctional Community Centre in the short term upon release, he does not accept the jurisdiction of the Parole Board to impose the contemplated special residency condition.

[11]      The Parole Board's apparent rationale in imposing this special residency condition arises from the following: (1) expressed concerns respecting the provision of monitoring, structure and support to the Applicant in order to assist in managing his overall risk to the community; (2) to assist in promoting his reintegration; and (3) to form the least restrictive measures available for managing risk.

[12]      Subsequent to the September 13, 2003 hearing, the Parole Board informed the Applicant of the residency condition and of his right of appeal to the Appeal Division for "any negative condition regarding conditional release."

[13]      Government of Canada publications suggest that the jurisdiction of the Appeal Division is to be broadly construed, and includes a jurisdiction to consider conditions imposed on offenders subject to a long-term supervision order.

[14]      The Parole Board's September 13, 2002 decision further caused a Long Term Supervision Certificate to be issued on October 11, 2001, wherein the impugned residency condition was reiterated and the Applicant was directed to proceed to the Keele Community Centre, Toronto. When the Parole Board forwarded its written decision to the Applicant, it attached a standard form letter to each decision as an introduction to the actual decision enclosed.

[15]      By letter dated October 3, 2002 to the Appeal Division, the Applicant sought to appeal the Parole Board's imposition of the residency condition. He further affirmed his objection to the jurisdiction of the Parole Board to direct it.

[16]      By letter dated October 15, 2002, the Vice-Chairperson of the Appeal Division advised the Applicant that, pursuant to s. 99.1 of the *CCRA*, (marked as "99-1" in the correspondence), the conditions imposed under long term supervision were not subject to review by the Appeal Division. The Appeal Division reiterated this view to the Applicant in several pieces of correspondence.

[17]      Section 161(1) of the *Corrections and Conditional Release Regulations* ("*Regulations*") provides for standard conditions to be imposed. Section 134.1(1) of the *CCRA* extends s. 161(1) of the *Regulations* to apply to Long Term Supervision Orders.

[18]      Section 99.1 of the *CCRA* refers to other sections of the *CCRA* which are extended to apply to Long Term Supervision Order cases, with such modification as may be required. The references list the various sections, including ss. 140 to 145 of the *CCRA* which address such items as hearing requirements, disclosure, decision registry. Section 99.1 does not refer to ss. 146 and 147 of the *CCRA*. These are the provisions that deal with the responsibilities of the Appeal Division.

[19]      The purpose of the residency condition applied to the Applicant is to allow for closer supervision and to enhance accountability. The sentencing judge asked for several provisions to ensure that the Applicant would not be able to commit more sexual offences. The purpose of the

residency condition was to ensure the protection of society as it relates to his sexual offences, the age of his victims and his lack of treatment.

[20]      The Applicant sought clarification of this position by reply letter dated October 23, 2002.

[21]      By letter dated November 14, 2002, the Vice-Chairperson of the Appeal Division repeated the view that the Applicant had no right of appeal to the Appeal Division on this matter. By reply letter dated December 5, 2002, the Applicant again sought clarification of, and justification for, this position and he presented a contrary interpretation of the relevant provisions of the *CCRA*.

[22]      By letter dated January 15, 2003, the Vice-Chairperson of the Appeal Division reiterated the same position and stated as follows:

. . . it is the position of the National Parole Board that decisions of persons being supervised under a long-term supervision order are not appealable.

Consequences of the Residency Condition

[23]      The impugned residency condition has significantly restricted the Applicant's liberty in that it has required him to reside at the Keele Correctional Centre at nights, imposed curfew hours, and has otherwise subjected him to coerced compliance with a variety of onerous rules associated with residing in an institutionalized community.

[24]      Though the Applicant would accept voluntary residency at a Community Correctional Centre on an interim basis while he establishes his rehabilitation and reintegration into the community, he raises the following objections:

I) he considers the imposition of the impugned residency condition and its associated restrictions as being an undue constraint on his liberty, punitive, and akin to a modified form of reincarceration even though he has served fully his sentence to his WED;

ii) being an individual with a criminal record of sexually-related offences, he has felt stigmatized, intimidated and physically threatened by other residents while in residence at the Keele Correctional Centre. In the result, he has suffered from increased anxiety and upset, which has served in part to impede his programming progress;

iii) he believes the removal of the residency condition, with its concomitant curfews and other restrictions, would enhance his ability to avoid stressors occasioned by coerced association with fellow residents, by permitting him to leave and return to his place of residence at pleasure;

iv) he has suffered prejudice through stress associated directly with the residency condition imposed on him.

PERTINENT LEGISLATION

Relevant Criminal Code provisions, and the application and development of the CCRA

[25]      Offenders who are required to be supervised in the community by order under s. 753.1 of the *Criminal Code* must be supervised in accordance with the *CCRA* upon completion of their sentence. Long-term supervision does not form part of the offender's sentence.

[26]      One of the stated purposes of the federal correctional system is to assist the rehabilitation of offenders, including those persons subject to a long-term supervision order, and their reintegration into the community as law-abiding citizens. One of the enunciated principles to guide Correctional Services Canada in the achievement of this purpose is the presumption in favour of liberty. This means that offenders retain the rights and privileges of all members of society except those that are necessarily removed or restricted as a consequence of a long-term supervision order.

[27]      Part II of the *CCRA* provides particular governance for those persons subject to long-term supervision. Under s. 99.1, a person who is required to be supervised by a long-term supervision order is deemed to be an offender for the purposes of Part II.

[28]      Section 99.1 also provides explicitly that ss. 100 ("purpose of conditional release"), 101 ("principles guiding parole boards"), 109 to 111 (respecting "prohibition orders," "clemency," "dissemination of information"), and 140 to 145 (which address parole "review hearings," "disclosure of information" in review hearings," "records and reviews of decisions," "review and evidence") apply to offenders subject to long-term supervision, with such modifications as the circumstances may require. Section 99.1 provides no express restriction on the application to long-term offenders of the benefits of other provisions falling within Part II.

[29]      Section 101(f) of the *CCRA*, as modified for the circumstances of offenders subject to long term supervision, requires, in part, that the Parole Board should be guided by the principle that offenders have access to the review of Parole Board decisions:

"...that offenders be provided with relevant information, reasons for decisions and access to the review of decisions in order to ensure a fair and understandable [long-term supervision] process."

[30]      Other provisions of Part II of *CCRA*, though not explicitly enumerated in s. 99.1, have obvious or implicit application to the circumstances of an offender subject to long-term supervision.

[31]      Section 147 of the *CCRA* provides for the right of offenders under Part II to appeal a decision of the Parole Board to the Appeal Division on the grounds specified. Like s. 101, s. 146 (which constitutes the Appeal Division) and s. 147 each frame the substance of appeals in language of a "review of the case," or "review of the decision."

[32]      Section 134.1 provides for the imposition of conditions on an offender subject to long-term supervision. Subsection 134.1(1) mandates the imposition of specific conditions as prescribed by regulation. Subsection 134.1(2) confers authority on the Parole Board to establish conditions "which it considers reasonable and necessary in order

to protect society and to facilitate the successful reintegration into society of the offender." Neither subsection provides express authority for the Parole Board to impose a residency condition on an offender.

[33]     Only one provision in the *CCRA* provides an express authority to bind a long term offender to reside in a specified place. Where the offender has breached the mandatory or other conditions of his/her supervision, or is seen as about to breach the same, s. 135.1 (1)(*c*) operates to permit a member of the Parole Board or its designates to:

...authorize the commitment of the offender to a community based residential facility or a mental health facility or, where the member or person is satisfied that commitment to custody is necessary, to custody until the suspension is cancelled, new conditions for the long-term supervision have been established or the offender is charged with an offence under section 753.3 of the Criminal Code.

[34]     Section 134.1 of the *CCRA* is analogous to s. 133. Section 133 has application for the conditional release of offenders who are on parole, statutory release or unescorted temporary absence, at times before the expiry of their sentence. Subsections 133(2) and (3), respectively, are comparable to ss.134.1(1) and (2) in their language and substance in relation to the mandatory and discretionary imposition of release/supervision conditions.

[35]     Sections 133 and 134.1 diverge appreciably in that s. 133 expressly allows, in ss. (4) and (4.1), for the imposition of, respectively, residency conditions in circumstances of parole or unescorted temporary absence, and statutory release. Section 134.1, in comparison, is silent respecting the conferral of authority to impose a residency condition.

[36]     Clause 135.1(1)(*c*) of the *CCRA* which, as noted above, can direct residency in a "community-based residential facility" under the prescribed limited circumstances, is informed directly by s. 133. Subsection 133(4.2) provides the only working definition in Part II of the *CCRA* for that term.

[37]     With the passage of Bill C-45 in 1995, Parliament amended the *CCRA* to add s. 133(4.1) to permit the imposition of a residency condition in the circumstances of statutory release.

[38]     When, in 1997, through Bill C-55, Parliament again amended the *CCRA* to provide for the supervision of a new category of offender (the long-term offender) the Applicant submits that it noticeably failed to include in the new s. 134.1 any express authority for the Parole Board to impose a residency condition. Yet, at the same time, Parliament did include such express authority for the limited circumstances referred to in s. 135.1. The Applicant notes that nowhere in the recorded Parliamentary debates can there be found the intent to confer a generalized authority to impose a residency condition.

ISSUES

[39]     The Applicant raises the following issues:

Does the Parole Board, pursuant to s. 134.1 of the *CCRA*, have the statutory authority to impose a residency condition on a long-term offender?

Does a long-term offender have the right to appeal a decision of the Parole Board to the Appeal Division pursuant to s. 147 of the *CCRA*?

**Did the Appeal Division err in law in refusing to consider the Applicant's appeal?**

**ARGUMENTS**

Applicant

Standard of Review

[1]        The Applicant points out that Canadian Courts take a pragmatic and functional approach to the review of administrative decisions. In determining the applicable standard of review within this approach, Courts will take the following four (4) factors into account:

I)        the presence or absence of a privative clause or statutory right of appeal;

ii)       the expertise of the tribunal relative to that of the reviewing judge on the issue in question;

iii)      the purposes of the legislation and the provision in particular;

iv)       the nature of the problem.

*Pushpanathan v. Canada (Minister of Citizenship and Immigration)*, 1998 CanLII 778 (SCC), [1998] 1 S.C.R. 982, at paras. 23-38, *Barrie Public Utilities v. Canadian Cable Television Assn.*, 2003 SCC 28 (CanLII), 2003 SCC 28, para. 10

[2]        In judicial review of findings of fact by the Appeal Division, where the Appeal Division has exercised its own jurisdiction of review under s. 147(4) of the *CCRA*, this Court has shown deference to the determinations of the Appeal Division and has applied a standard of review of "manifestly unreasonable" before judicial intervention is warranted (*Costiuc v. Canada (Attorney General)*, [1999] F.C.J. No. 241 (F.C.T.D.), at para. 6, *Dupuis v. Canada (Attorney General)*. 2002 FCT 508 (CanLII), 2002 FCT 508, at paras. 21-23)

[3]        Where, however, the Appeal Division has exercised its jurisdiction under the *CCRA*, s. 147(4) to review determinations made by the Parole Board on questions of law, this Court has seen fit to apply the less deferential review standard of "reasonableness". In so doing, the Court has said that the determination made ultimately is to ensure that the Parole Board's decision was "lawful." (*Cartier v. Canada (Attorney General)*, 2002 FCA 384 (CanLII), 2002 FCA 384, at paras.8-10).

[4]        The Applicant submits that in circumstances such as exist in the case at bar where the Appeal Division has conducted no review of the Parole Board's determination under s. 147(4) of the *CCRA*, but has refused to hear an appeal based upon a denial of jurisdiction under s. 99.1 and/or s. 147, or even upon a refusal pursuant to s. 147 (2), then this Court should apply the even lower threshold standard of review of "correctness."

(I)        Absence of "Privative Clause"

[5]        The *CCRA* contains no privative clause respecting judicial review of determinations made by the Appeal Division. The absence of a privative clause does not necessarily imply a high standard of judicial scrutiny where other factors suggest a low standard. On the other hand, the presence of a "full" privative clause is compelling evidence that a Court ought to show deference to a tribunal's decision unless other factors strongly indicate the contrary (*Pushpanathan, supra*, at para. 30).

(ii)       Expertise of the tribunal

[6]        The proper concern of the reviewing court is not the expertise of the decision maker in general but its expertise relative to the court itself *vis-à-vis* the particular issue. In determining the standard of review, the focus of the inquiry is on the particular provision being invoked and interpreted by the tribunal. Some provisions within the same statute may require greater curial deference than others. "Jurisdictional questions" must be answered "correctly" by the tribunal (*Pushpanathan, supra*, at paras. 28 and 33, *Barrie Public Utilities, supra*, at para. 12).

[7]        Making an evaluation of relative expertise has three dimensions:

i.        the court must characterize the expertise of the tribunal in question;

ii.       the court must consider its own expertise relative to that of the tribunal; and

iii.      the court must identify the nature of the specific issue before the administrative decision-maker relative to this expertise.

*Pushpanathan, supra*, at para. 33

(iii)     Purpose of the legislation and relevant provisions

[8]       The purpose the *CCRA* is enunciated in s. 3, which provides as follows:

| | |
|---|---|
| 3. The purpose of the federal correctional system is to contribute to the maintenance of a just, peaceful and safe society by<br><br>(a) carrying out sentences imposed by courts through the safe and humane custody and supervision of offenders; and<br><br>(b) assisting the rehabilitation of offenders and their reintegration into the community as law-abiding citizens through the provision of programs in penitentiaries and in the community. | 3. Le système correctionnel vise à contribuer au maintien d'une société juste, vivant en paix et en sécurité, d'une part, en assurant l'exécution des peines par des mesures de garde et de surveillance sécuritaires et humaines, et d'autre part, en aidant au moyen de programmes appropriés dans les pénitenciers ou dans la collectivité, à la réadaptation des délinquants et à leur réinsertion sociale à titre de citoyens respectueux des lois. |

[9]       The administration of the *CCRA* by Correctional Services Canada is guided by legislatively-prescribed principles. These principles include the following:

that the protection of society be the paramount consideration in the corrections process;

that the Service use the least restrictive measures consistent with the protection of the public, staff members and offenders;

that offenders retain the rights and privileges of all members of society, except those rights and privileges that are necessarily removed or restricted as a consequence of the sentence.

[10]      The function of the Appeal Division can be seen as quasi judicial when it exercises its jurisdiction. The Appeal Division is a "hybrid": it possesses authority to hear "appeals" and to reverse, cancel or vary decisions; yet the grounds of appeal listed in s. 147(1) are essentially those associated with judicial review. The Parole Board itself has described its Appeal Division's role as follows:

...to ensure that the law and the Board policies are respected, and that the rules of fundamental justice are adhered to and that the Board's decisions are based upon relevant and reliable information:

*Cartier, supra*, **para. 6**

(iv)     Nature of the Problem

[11]      The Applicant says that the essence of this application is the authority of the Parole Board to impose the impugned residency condition. A subsidiary issue is the jurisdiction of the Appeal Division to hear and rule upon

the Applicant's contention that the Parole Board lacks the statutory means to impose such a condition. Both these issues are jurisdictional, and, the Applicant argues, are pure questions of law.

[12]       The Applicant submits that the expertise of the Parole Board and its Appeal Division lies largely in the assessment, evaluation, determination and application of fact. In resolving factual issues, the Parole Board and Appeal Division engage in a "protective", "polycentric" role of the type which "involves a large number of interlocking and interacting interests and conditions" which could include considerations of public safety, the interests of victims, and the rehabilitation and reintegration interests of an offender. In such matters of fact or policy, the standard of review should properly be that of "reasonableness" and marked by curial deference. (*Pushpanathan, supra*, at para. 36).

[13]       However, in matters of pure law that lie at the heart of this Application, the Applicant points out that Courts hold greater expertise than administrative tribunals. Questions of statutory interpretation, going to the core and delineation of jurisdiction as they do here, are matters well-suited for resolution by the Courts; such questions cannot be claimed by the Parole Board or its Appeal Division as falling within their unique and specialized expertise so as to attract a greater curial deference.

[14]       The Applicant suggests that where the Appeal Division seeks to deny individuals such as the Applicant the fundamental right of review of decisions by the Parole Board, the Courts should be vigilant in protecting the interests of such applicants and adopt a lesser threshold for judicial intervention. The risk, otherwise, is that the Parole Board might trammel the interests of vulnerable persons without scrutiny and accountability.

[15]       Applying the pragmatic and functional approach in the circumstances of this Application, the Applicant submits that this Court should apply the more stringent review standard of "correctness" to the subject determinations of the Parole Board and its Appeal Division.

Guiding Principles of Statutory Interpretation

[16]       The Applicant says that, in modern times, the starting point for statutory interpretation has been accepted as follows:

Today there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.

*Barrie Public Utilities, supra*, at para. 20, citing Dredge's *Construction of Statutes*, (2nd ed. 1983), at p. 87

[17]       This directive finds confirmation in s. 12 of the *Interpretation Act*, which holds as follows:

Every enactment is deemed remedial, and shall be given such fair, large and liberal construction and interpretation as best ensures the attainment of its objects.

*Interpretation Act*, R.S.C. 1985, c. I-21

[18]       The modern approach to statutory interpretation requires the Court to interpret a legislative provision in its total context. The Court should consider and take into account all relevant and admissible indicators of legislative meaning and intent. The purpose and intention of Parliament are to be determined on the basis of intrinsic and admissible extrinsic sources regarding a statute's legislative history and the context of its enactment. The Court's interpretation should comply with the legislative text, promote the legislative purpose, reflect the legislature's intent and produce a reasonable and just meaning (*Ontario (Minister of Transport) v. Ryder Truck Rental Canada Ltd.*, [2000] O.J. No. 297 (Ont. C.A.), at para. 11, affirming *R. v. Gladue*, 1999 CanLII 679 (SCC), [1999] 1 S.C.R. 688 at 704).

[19]       It is a fundamental principle of statutory interpretation that, in determining the general objectives of the legislature, or the meaning of any particular passage, it is obvious that the intention which appears to be most in accord with convenience, reason, justice, and legal principles should, in all cases of doubtful significance, be presumed to be the true one (*Wolfe Island (Township) v. Ontario (Ministry of the Environment)*, [1995] O.J. No. 1537 (Ont. C.A.) at p. 9).

[20]        Not only must the whole statute be read, but every provision should, if possible, be given meaning; hence, if there are rival constructions, the general principle is that the construction that gives effect to the whole of the statute, or to the provision under consideration, should be adopted in preference to one that renders a part of the statute meaningless (E. A. Dredge, *The Construction of Statutes*, Butterworths, 1974 at p.72 as approved in *Gendron v. Baie James (Municipalité)*, 1986 CanLII 62 (SCC), [1986] 1 S.C.R. 401, at para. 62).

[21]        The Applicant also says that the legal maxim *expressio unius est exclusio alterius* (the "implied exclusion" rule of statutory interpretation) aids in the appropriate interpretation of the *CCRA* in this case respecting the authority of the Parole Board to impose the impugned residency condition under s. 134.1. "An implied exclusion argument lies whenever there is reason to believe that if the Legislature had meant to include a particular thing within the ambit of its legislation, it would have referred to that thing expressly." The basis for exclusion is the expectation of express reference (E. A. Dredge, *Construction of Statutes, supra*, at pp. 168, 173, and as approved in *Wolfe Island v. Ontario, supra*, at pp. 9-10).

[22]        Before amending the *CCRA* to provide for the supervision of long-term offenders, Parliament had recognized the need to enact express statutory authority to permit the imposition of a residency condition on offenders who obtain statutory release. In this contextual framework, Parliament's silence in not advancing a similar express statutory authority when promulgating the long-term supervision provisions, must have significance. Offenders who obtain statutory release are still under sentence and thus subject to reincarceration. Offenders subject to long-term supervision orders, whose sentences have been completed, have a greater claim to liberty than offenders whose sentences still subsist.

Charter Implications

[23]        Section 7 of the *Charter* provides as follows:

| | |
|---|---|
| 7. Everyone has the right to life, liberty and security of the person and the right not to be deprived thereof except in accordance with the principles of fundamental justice. | 7. Chacun a droit à la vie, à la liberté et à la sécurité de sa personne; il ne peut être porté atteinte à ce droit qu'en conformité avec les principes de justice fondamentale. |

[24]        Section 24(1) of the *Charter* provides as follows:

| | |
|---|---|
| 24. (1) Anyone whose rights or freedoms, as guaranteed by this Charter, have been infringed or denied may apply to a court of competent jurisdiction to obtain such remedy as the court considers appropriate and just in the circumstances. | 24. (1) Toute personne, victime de violation ou de négation des droits ou libertés qui lui sont garantis par la présente charte, peut s'adresser à un tribunal compétent pour obtenir la réparation que le tribunal estime convenable et juste eu égard aux circonstances. |

[25]       The Applicant points out that the right to "liberty" within the meaning of s. 7 of the *Charter* does not mean a right to unconstrained freedom. Freedom of the individual to do what he or she wishes must, in any organized society, be subjected to numerous constraints for the common good. The state has the right to impose many types of restraints on individual behaviour, and not all will attract *Charter* scrutiny. On the other hand, liberty does not mean mere freedom from physical restraint. In a free and democratic society, the individual must be allowed room for personal autonomy to live his or her own life and to make decisions that are of fundamental personal importance. The liberty interest is thus rooted in the fundamental concepts of human dignity, personal autonomy, privacy and choice in decisions going to the individual's fundamental being (*B. R.*) v. *Children's Aid Society of Metropolitan Toronto*, 1995 CanLII 115 (SCC), [1995] 1 S.C.R. 315, at para. 80, *Godbout v. Longueuil (City)*, 1997 CanLII 335 (SCC), [1997] 3 S.C.R. 844, at para. 65).

[26]       The autonomy protected by the s. 7 *Charter* right to liberty encompasses only those matters which can properly be characterized as fundamentally or inherently personal such that, by their very nature, they involve basic choices going to the core of what it means to enjoy individual dignity and independence. Choosing where to establish one's home is a quintessentially private decision going to the very heart of personal or individual autonomy. Choosing where to live will be influenced in each individual case by the particular social and economic circumstances of the person making the choice and, even more significantly, by his or her aspirations, concerns, values and priorities. Hence, the Applicant argues, choosing where to establish one's home is one of those narrow classes of decisions deserving constitutional protection under s. 7 (*Godbout. supra*, at paras. 66-68).

[27]       The Applicant submits that his right to choose his place of abode qualifies as one of those "narrow classes of decisions deserving of constitution protection" within the meaning of s. 7 of the *Charter*.

[28]       Deprivations by the state of an individual's right to liberty will not violate the *Charter* unless they contravene the "principles of fundamental justice." This term has been interpreted to include a substantive component as well as rules of procedure. If such deprivations are to survive *Charter* scrutiny, they must be "fundamentally just" not only in terms of the process, but also when measured against the basic general tenets of our judicial system (*Godbout, supra*, at para. 74).

[29]       The Applicant points out that the meaning of "fundamental justice" must be viewed contextually in any given case. It will depend upon the nature of the s. 7 *Charter* right asserted and the character of the alleged violation. It requires a balancing of the constitutional rights of the individual claimant against the countervailing interests of the state in causing the infringement. This balancing is eminently sensible and consistent with the aim and import of s. 7, since the notion that individual rights may, in some circumstances, be subordinated to substantial and compelling collective interests is itself a basic tenet of our legal system and is at or very near the core of our most deeply rooted juridical convictions (*Godbout. supra*, at paras. 75-76).

[30]       The Applicant says that, in determining whether the Parole Board and its Appeal Division have infringed the Applicant's s. 7 *Charter* right to liberty, an analysis respecting the principles behind the *CCRA* and legislative practice is required. The purpose of the federal correction system is to contribute to the maintenance of a just, peaceful and safe society by means including safe and humane supervision of offenders and the promotion of their rehabilitation and reintegration into the community as law-abiding citizens. To guide the system in this purpose the protection of society is the paramount consideration, but offenders should retain the rights and privileges of all members of society as much as reasonably possible.

[31]       It is submitted by the Applicant that the determinations made by the Parole Board to impose the residency condition and by the Appeal Division to refuse to hear the Applicant's appeal unjustifiably deny the Applicant's liberty right and thus offend against s. 7 of the *Charter*. The basic tenets and principles of our society include the obligation of an administrative tribunal to act within its lawful jurisdiction. They include the obligation to act fairly. They include the principles of accountability. As addressed above, Parliament has prescribed narrow circumstances in which a residency condition should be imposed; these do not include the present circumstances. Under s. 147 of the *CCRA*, Parliament has further conferred on offenders a broad right of appeal to challenge the grounds on which the Parole Board makes its decisions. Parliament has thus affirmed the important societal interest that determinations of administrative bodies should be susceptible to challenge and account. The blanket denial of a

right of appeal would render the Applicant, and others similarly situated, powerless under the *CCRA* to ensure that the Parole Board has followed its own processes, for example, or that it has acted fairly. This loss of scrutiny and accountability of the Parole Board under the mechanisms of the *CCRA* represents an untenable violation of our fundamental legal and juridical tenets.

[32]      The Applicant submits that this Court has the authority under s. 24(1) of the *Charter* to remedy appropriately the asserted s. 7 infringement.

Respondent

The Ability Of The Parole Board To Impose Residency Requirements On Long-term Offenders

[33]      Section 134.1(2) of the *CCRA* provides as follows:

The Board may establish conditions for the long-term supervision of the offender that it considers reasonable and necessary in order to protect society and to facilitate the successful reintegration into society of the offender

[34]      The Respondent points out that this provision does not make specific mention of residency conditions, nor does it say that residency requirements cannot be imposed.

[35]      Section 133(4) of the *CCRA* provides the following with respect to parolees:

Where, in the opinion of the releasing authority, the circumstances of the case so justify, the releasing authority may require an offender, as a condition of parole or unescorted temporary absence, to reside in a community-based residential facility.

[36]      The Respondent notes that the Applicant relies on the implied exclusion principle of statutory interpretation (*expressio unius est exclusio alterius*) to state that, because the power to impose residency conditions was not expressly conferred within s. 134. 1 of the *CCRA*, it was not meant to be conferred at all.

[37]      This issue, however, has been considered by the Ontario Superior Court of Justice in the case of *R. v. V. M.*, [2003] O.J. No. 436.

[38]      In *V.M., supra*, the Crown made the same argument as the Applicant that residency conditions could not be imposed because they were not expressly provided for in the relevant statutory provision. Wilson J.'s rejection of that argument supports the Respondent's position:

[Such an interpretation]

... flies in the face of the purpose of long-term supervision orders to protect the public. It would make little sense for the NPB to have the authority to order that ordinary offenders on parole be subject to residency conditions, and not have the authority to make similar orders for identified high risk, high need offenders.

*Ibid* at para 143

[39]      The court in that instance looked at the overall, long-term supervision test in the *Criminal Code* R.S.C. 1985, c. C-46, as amended in s. 753.1, which refers to "a reasonable possibility of eventual control of the risk in the community." Section 99.1 of the *CCRA* specifically provides as follows:

A person who is required to be supervised by a long term supervision order is deemed to be an offender for the purposes of this Part, and sections 100, 101, 109 to 111 and 140 to 145 apply, with such modifications as the circumstances require, to the person and to the long-term supervision of that person.

[40]      Section 100 of the *CCRA* is also relevant and provides as follows:

The purpose of conditional release is to contribute to the maintenance of a just, peaceful and safe society by means of decisions on the timing and conditions of release that will best facilitate the rehabilitation of offenders and their reintegration into the community as law-abiding citizens.

[41]     Clearly then, the Respondent argues, the statute specifically makes the maintenance of a just, peaceful and safe society its primary concern. And it is through this driving principle that s. 134.1(2) must be interpreted.

[42]     In *Re Rizzo and Rizzo Shoes Limited*, 1998 CanLII 837 (SCC), [1998] 1 S.C.R. 27, at para 21, the Supreme Court of Canada, citing *Dredge, supra*, made the following guiding statement about statutory interpretation:

Today there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.

[43]     The *Interpretation Act* reads as follows:

Every enactment is deemed remedial, and shall be given such fair, large and liberal construction and interpretation as best ensures the attainment of its objects.

[44]     The Respondent argues that the imposition of a residency condition on a long-term offender satisfies the broad language of s. 134.1. The principle of protecting society is met.

[45]     By the plain wording of the section the Parole Board is entitled to impose any condition that it considers reasonable or necessary to protect society and facilitate the successful reintegration of the offender into society. The Respondent submits that the imposition of residency conditions not only satisfies the applicable requirements of statutory interpretation and the general purpose of the *CCRA*, but it also benefits the Applicant.

[46]     In *V.M., supra*, Wilson J. analysed three other rules of general statutory interpretation to come to a conclusion that the Parole Board did have the jurisdiction to impose residency conditions.

[47]     At paragraph 157 of her decision she states as follows:

First, when a provision in penal statutes are (sic) capable of two interpretations, it should be interpreted in a manner favourable to the accused. If the NPB does not have the jurisdiction to impose residency requirements during long-term supervision order, then, for many offenders, the risk they pose would not be reasonably capable of being eventually managed in the community. These offenders would in all probability be classified as dangerous offenders.

[48]     Wilson J. goes on to state that the courts should interpret legislation so as to avoid absurd results. She posits that it would be an absurd result "to interpret legislation that is primarily intended to protect the public from high risk offenders as precluding the jurisdiction to impose a residency requirement, when jurisdiction exists to make such orders for lower risk individuals who are on parole." (*V.M., supra*, para. 158)

[49]     Finally, Wilson J. says in *V.M., supra*, that where a provision is capable of more than one interpretation, the court should choose the interpretation that is consistent with the *Charter* (para. 959, see also *R. v. Wust* 2000 SCC 18 (CanLII), (2000), 143 C.C.C. (3d) 129 (S.C.C.) at para. 34).

[50]     Wilson J. says that the long-term offender provisions ensure that only offenders whose condition is pathologically intractable become "dangerous offenders" with a mandatory indeterminate sentence.

[51]     Ryan J.A. of the British Columbia Court of Appeal in the recent decision in *R. v. Johnson*, [2001] B.C.J. No. 2021 at para. 98 described the purpose of the dangerous offender designation as follows:

... the dangerous offender designation under the new provisions is designed to ensure that those offenders who are truly dangerous, whose behaviour is unlikely to be modified or controlled, will be sentenced to an indeterminate sentence for the highest degree of state control. An offender whose conduct or behaviour is not pathologically intractable, in the sense that the offender can at least reach a stage where, though not curable, he or she can be safely controlled in the community and who would likely have been found to be a dangerous offender under the former provisions, may now qualify for long term rather than dangerous offender status. This offender would at least have the possibility, when the offender is no longer a risk in the community, to one day be free of state control.

[52]      The imposition of residency controls on long-term supervised offenders forms a bridge between the concepts of protecting the public and avoiding over-incarceration.

[53]      The Respondent submits that a residency condition can be imposed in the case of long-term supervision orders.

There Is No Access to the Appeal Division Granted to Long-term Offenders

[54]      Following the same concepts of statutory interpretation outlined above, and following the plain language reading of the statute, the Respondent argues that s. 99.1 of the *CCRA* makes clear reference to the provisions that apply to long-term offenders:

A person who is required to be supervised by a long term supervision order is deemed to be an offender for the purposes of this Part, and sections 100, 101, 109 to 111 and 140 to 145 apply, with such modifications as the circumstances require, to the person and to the long-term supervision of that person.

[55]      Sections 146 and 147 deal with an offender's access to the Appeal Division. The plain reading of para. 99.1 makes it clear that these two sections are not applicable to a long-term offender.

[56]      The Respondent says it is clear that the Appeal Division does not have the jurisdiction to hear a challenge to imposed conditions made pursuant to a long-term supervision order. The provisions of the statute make an explicit list of those sections that apply to long-term offenders. There is no ability to read two meanings into s. 99.1, nor is there any ambiguity over which paragraphs apply to long-term offenders.

[57]      This does not mean that an offender subject to long-term supervision does not have an avenue to challenge a decision of the Parole Board. But the avenue is not through the Appeal Division set up in ss. 146 and 147 of the *CCRA*.

[58]      The Respondent points to s. 18(1)(*b*) of the *Federal Court Act* which provides as follows:

Subject to section 28, the Trial Division has exclusive original jurisdiction to hear and determine any application or other proceeding for relief in the nature of relief contemplated by paragraph (a), including any proceeding brought against the Attorney General of Canada, to obtain relief against a federal board, commission or other tribunal.

[59]      Section 18(3) of the *Federal Court Act* is also relevant:

The remedies provided for in subsections (1) and (2) may be obtained only on an application for judicial review made under section 18.1.

[60]      The Respondent says that the Applicant has a right to judicial review of his long-term offender determination through this Court.

The Imposition of a Residency Condition Was a Reasonable Means to Ensure the Protection of Society

1) The Applicable Standard of Review is Curial Deference

[61]      At para. 50 of the Applicant's *Memorandum of Fact and Law*, the Applicant submits that the expertise of the Parole Board lies largely in the assessment, evaluation, determination and application of fact. He submits that the Parole Board engages in a "protective" and "polycentric" role which could include considerations of public safety, the interests of victims, and the rehabilitation and reintegration interests of an offender. The Applicant suggests that in such "matters of fact or policy, the standard of review may properly be that of "reasonableness" and marked by curial deference.

[62]      The Respondent submits that the Parole Board is applying its expertise in the assessment, evaluation, determination and application of fact. This Court has often applied a standard of patent unreasonableness to the

Appeal Division in its review of findings of fact (*Costiuc v. Canada (Attorney General)*, [1999] F.C.J. No. 241 (F.C.T.D.), at para. 6, *Cartier v. Canada (Attorney General)*, [2002] FCA 384, at paras 8-10, *Migneault v. Canada (Attorney General)*, [2003] F.C.J. 372 (F.C.T.D.).

[63]     The Respondent submits that the Court should apply the same standard of review of patent unreasonableness to the decision of the Parole Board in establishing a residency condition. The Parole Board is clearly within its expertise in assessing, evaluating, determining and applying the facts of the Applicant's supervision requirements in order to reach its decision.

2) The Rationale for the Residency Condition was Reasonable and Necessary

[64]     The Applicant was convicted of five counts of sexual assault with underage teenage boys. In the Ontario court's determination that the Applicant was a long-term offender and should be supervised for five years, the court urged the Parole Board as follows:

... inclusion in Kenneth McMurray's long-term offender supervision order that this accused for the duration of the order be prohibited from attending a public park, or public swimming area where persons under the age of 14 years are present or can reasonably be expected to be present, or a day-care centre, school-ground, play-ground, or community centre. 1 also urge the Board to impose a condition that he be prohibited from seeking, obtaining, or continuing any employment, whether or not the employment is remunerated, or becoming a volunteer in a capacity that involves being in a position of trust or authority towards persons under the age of 16 years. I urge the Board to order him to attend for psychological counselling, assessment, and treatment for his sexual deviance.

[65]     In response, when assessing the conditions to be imposed during the Applicant's long-term supervision, the Parole Board specifically considered the need for a residency condition.

[66]     The Parole Board had already ordered the Applicant detained until his warrant expiry due to concerns that, if released, he would be likely to commit a sexual offence involving a child before the expiration of his sentence.

[67]     The Applicant at WED remained an untreated sex offender. The Applicant has not participated in any program to address his correctional needs.

[68]     A phallometric test showed the Applicant to have a deviant arousal to stimuli involving adolescent males.

[69]     The assessment further reported that the Applicant was still engaged in his offence cycle.

[70]     The assessment determined that the Applicant was highly likely to reoffend.

[71]     The residency condition was imposed for the following reasons and purposes:

Residency at a CCC would provide additional structure and support in addition to more frequent contact and supervision. It would require the offender to return to the centre each night for a required curfew and would essentially limit the time he spends in the community. Residency at the Keele CCC would afford him close contact with the psychology department if this were deemed necessary. The programming department is also located in the same building and he would not be required to travel to address his programming needs.

The offender's risk is only viewed as being manageable within the community without a residency condition if he has taken the necessary steps to address his problem areas and to show some commitment to changing his lifestyle. Until these steps are taken this writer feels that a residency condition is the least restrictive measure for managing this case.

*Evenson affidavit*, Exhibit "B", Applicant's Application Record, Tab 2, p. 38.

[72]      There were no dissenting opinions in this assessment. The assessment was used in rendering a decision that the final condition of the Applicant's long-term supervision order be an imposed residency to be in effect for 90 days.

[73]      The Parole Board has not failed to give its reasons for making the order and there is no palpable error in its decision-making process. The Respondent submits that, given the Applicant's criminal record, his lack of treatment at that time and his continued sexual deviancy towards children, it is a supportable decision of the Parole Board to impose a 90-day reviewable residency condition to make sure that the Applicant is capable of reintegrating into society without reoffending.

Charter Implications

[74]      As regards s. 7 of the *Charter*, the Respondent points out that the Supreme Court of Canada has distinguished three types of liberty interest in the context of correctional law. Lamer J. (as he then was) in *Dumas v. Leclerc Institute*, 1986 CanLII 38 (SCC), [1986] 2 S.C.R. 459 at p. 464 identified these interests as follows:

I)        The initial deprivation of liberty;

ii)       A substantial change in conditions amounting to a further deprivation of liberty; and

iii)      A continuation of the deprivation of liberty.

[75]      The Applicant has framed his liberty interest as that of choosing where to live. He contends that such interest has been infringed by the residency condition.

[76]      The Applicant remains under the direction of a long-term supervision order that restricts his liberty without requiring incarceration.

[77]      The Respondent submits that the Applicant has not established under which branch his liberty interests have been infringed, given his restrictions under a long-term supervision order.

[78]      The Respondent argues that if this Court finds that there is a liberty interest engaged which attracts the protection of the *Charter* then the limit is in accordance with the rules of fundamental justice.

[79]      The Respondent also submits that a long-term supervision order is not a form of conditional release akin to parole. Long-term supervision orders begin to run after the warrant expiry of an offender's sentence because he/she is still considered a risk to the community.

[80]      Conversely, a long-term supervision order is akin to the dangerous offender situation, but is of a lesser magnitude and does not require indeterminate sentences for the highest degree of state control.

[81]      The Respondent submits that Wilson J. in *V.M., supra*, considered residency restrictions to be in keeping with the *Charter* because they protect the public, but avoid the over-incarceration that might occur if offenders are classified as dangerous offenders because they could not have structure, treatment and controls imposed upon them.

[82]      The Respondent further submits that fundamental justice requires that a fair balance be struck between the individual's liberty interest and the protection of society (*Cunningham v. Canada*, 1993 CanLII 139 (SCC), [1993] 2 S.C.R. 143).

[83]      The Respondent says that the residency restriction is directly related to the purpose of protecting society. There is clear evidence that the Applicant is an untreated sex offender. There is a risk to the public that must be addressed.

[84]      The Respondent further submits that the residency restriction also appropriately balances the Applicant's liberty interest with the protection of the public safety. The Applicant only has to meet a curfew at night, leaving him free to interact with the community during the day subject to the other restrictions on his long-term supervision which are not subject to this judicial review.

[85]     Further, the residency restriction is only enacted for periods of 90 days. There is a possibility for review in those periods to measure the Applicant's progress and determine whether the continuation of the restriction is warranted. The residency condition is not indeterminate, but depends entirely upon the Applicant's ability to complete his programming and demonstrate his ability to integrate into society.

[86]     The Respondent submits that the residency restriction does not contravene s. 7 of the *Charter*.

Neither the Parole Board Nor the Appeal Division Have Failed to Adhere to Their Own Processes

[87]     The Applicant submits that the Parole Board's and the Appeal Division's failure to adhere to their own processes attracts *Charter* consideration.

[88]     The Respondent has already put forward its arguments as to why the Parole Board has the right to include residency conditions in a long-term supervision order. The Respondent has also already submitted that the Appeal Division does not have the jurisdiction to review the decision of the Parole Board with respect to a long-term supervision order. It is the Respondent's position that both bodies have adhered to their duties.

[89]     Nonetheless, the Respondent submits that if the Court finds that the Parole Board or the Appeal Division erred in their decision-making, then the appropriate remedy would be to send the matter back to the Parole Board or the Appeal Division with directions.

[90]     The jurisprudence of *V.M., supra*, seems to contemplate the exact situation presented in this application for judicial review, although in that instance it was the defence who asked for the residency condition and not the Crown.

[91]     Although this situation has not been contemplated in the Federal Court, the decision of *V.M., supra*, has not been appealed in Ontario. The Respondent urges the Court to apply the same reasoning to the facts of this situation and reach a similar result to ensure harmony of the jurisprudence.

[92]     The Respondent requests that the application for judicial review be dismissed.

ANALYSIS

[93]     Although the Applicant raises substantive arguments in this Application concerning the power and jurisdiction of the Parole Board to impose a residency condition on him pursuant to the *CCRA*, this is an application that, by its terms, requests judicial review of the Decision of the Appeal Division confirmed by letter dated January 15, 2002, that declined to hear the Applicant's appeal under s. 147 of the *CCRA*.

[94]     This being the case, the Court is of the view that the only issue raised by the Applicant for proper consideration by the Court concerns the Decision of the Appeal Division to decline to hear the Applicant's appeal.

[95]     Although the Applicant is concerned with the jurisdiction of the Parole Board to impose a residence requirement, that matter was not part of the Appeal Division's Decision not to hear the Appeal and the Court is of the view that the Applicant cannot indirectly attack the decision of the Parole Board through an Application for judicial review of the Appeal Division's Decision. The power and jurisdiction of the Parole Board to impose a residence requirement on the Applicant are not relevant to a review of the Appeal Division's jurisdiction to hear the Applicant's appeal.

[96]     At the hearing of this matter on February 24, 2004, the Applicant sought leave to extend the time for launching an application for judicial review of the Parole Board decision and/or an amendment to the present Application to allow the Applicant to argue his case against the Parole Board. The Court declined to grant such application on the grounds that there was no evidence or acceptable argument to support either an extension of time or an amendment to the present Application. Consequently, the Court asked both counsel to confine their arguments to the Appeal Division Decision and the issue of whether the Appeal Division should have declined to hear the Applicant's appeal pursuant to s. 147 of *CCRA*.

[97]        Both parties agreed that, applying a pragmatic and functional approach to the Decision of the Appeal Division on this issue, the applicable standard of review is correctness. I agree that this issue raises a question of law that goes to the jurisdiction of the Appeal Division and that the appropriate standard of review is correctness.

[98]        In summary on this point, the Applicant argues that the Appeal Division erred in declining to hear the appeal because s. 147 of *CCRA* confers a broad right of appeal that is available to persons in the position of the Applicant that is not removed by any specific provision of the *CCRA*, and it was clearly Parliament's intent that long-term offenders would enjoy the appeal rights granted by s. 147. The Respondent argues that it is clear that Parliament did not so intend and that long-term offenders do not have a right at appeal under s. 147 of *CCRA* but do have a right to apply directly to this Court for judicial review of a decision of the Parole Board. Hence, the Court is being asked to engage in the statutory interpretation of s. 147 of *CCRA*.

[99]        Sections 146 and 147 of *CCRA* deal with the creation of the Appeal Division and with the right of an "offender" to appeal to the Appeal Division from a decision of the Parole Board. "Offender" is defined under Part II of *CCRA* as follows:

| | |
|---|---|
| "offender" means | « _délinquant_ » |
| (a) a person, other than a young person within the meaning of the Youth Criminal Justice Act, who is under a sentence imposed before or after the coming into force of this section | a) Individu condamné - autre qu'un adolescent au sens de la Loi sur le système de justice pénale pour les adolescents -, avant ou après l'entrée en vigueur du présent article, à une peine d'emprisonnement_ : |
| (I) pursuant to an Act of Parliament or, to the extent that this Part applies, pursuant to a provincial Act, or | (I) soit en application d'une loi fédérale ou d'une loi provinciale dans la mesure applicable aux termes de la présente partie, |
| (ii) on conviction for criminal or civil contempt of court if the sentence does not include a requirement that the offender return to that court, or | (ii) soit à titre de sanction d'un outrage au tribunal en matière civile ou pénale lorsque le délinquant n'est pas requis par une condition de sa sentence de retourner devant ce tribunal; |
| (b) a young person within the meaning of the Youth Criminal Justice Act with respect to whom an order, committal or direction under section 76, 89, 92 or 93 of that Act has been made, but does not include a person whose only sentence is a sentence being served intermittently pursuant to section 732 of the Criminal Code; | b) adolescent, au sens de la Loi sur le système de justice pénale pour les adolescents, qui a fait l'objet d'une ordonnance, d'une détention ou d'un ordre visés aux articles 76, 89, 92 ou 93 de cette loi.<br><br>La présente définition ne vise toutefois pas la personne qui, en application de l' article 732 du Code criminel, purge une peine de façon discontinue. |

[100]    Long-term offenders in the position of the Applicant do not qualify under this definition. Hence, we have to turn to s. 99.1 to discover how the provisions of Part II of *CCRA* should apply to long-term offenders:

| | |
|---|---|
| 99.1 A person who is required to be supervised by a long-term supervision order is deemed to be an offender for the purposes of this Part, and sections 100, 101, 109 to 111 and 140 to 145 apply, with such modifications as the circumstances require, to the person and to the long-term supervision of that person. | 99.1 La personne soumise à une ordonnance de surveillance de longue durée est assimilée à un délinquant pour l'application de la présente partie; les articles 100, 101, 109 à 111 et 140 à 145 s'appliquent, avec les adaptations nécessaires, à cette personne et à la surveillance de celle-ci. |

[101]    Because the appeal provisions of ss. 146 and 147 are not specifically referred to s. 99.1, the problem is to determine whether Parliament's intent was that long-term offenders should or should not have access to the appeal process.

[102]    The parties agree on the applicable rules of statutory interpretation, but they disagree on the result when those rules are applied in this case. Both sides refer to the well-known principle that can be found in the Supreme Court of Canada decision in *Re Rizzo and Rizzo Shoes Limited, supra*, at para. 21:

Today there is only one principle of approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament

[103]    The Applicant argues that his interpretation of s. 99.1 and s. 147 of the *CCRA* is consistent with the general purpose of the statute as found in provisions such as s. 3 and s. 101, as well as with Parliament's intent in amending the *CCRA* to deal with the category of persons known as long-term offenders.

[104]    The Applicant says that no specific reference is made to ss. 146 and 147 in s. 99.1 because such a reference is not necessary. Read as a whole, Part II of *CCRA* makes it clear that a right of appeal to the Appeal Division under s. 147 is granted to both generic offenders and long-term offenders. The only reason that certain sections are singled out for mention in s. 99.1 is for purposes of clarification. There are some provisions in Part II that are not specifically referred to in s. 99.1 that are clearly applicable to long-term offenders, so the fact that s. 147 is not cited in s. 99.1 cannot mean that Parliament did not intend to allow long-term offenders to have access to the appeal process under Part II.

[105]    The Applicant has also drawn the Court's attention to the way that key wording found in the guiding principles under s. 107 is picked up on ss. 146 and 147, thus suggesting that the whole scheme of Part II, including ss. 146 and 147, should be considered to be available to long-term offenders. The Applicant also lays particular emphasis on the fact that there is no provision in the *CCRA* that specifically excludes ss. 146 and 147 from long-term offenders, and, if a right and a benefit are going to be denied to a particular category of persons in a statute, Parliament must do so in a clear and unequivocal way.

[106]    The Applicant argues further that, because of its expertise, the Appeal Division is the appropriate forum for all appeals from the Parole Board and long-term offenders should not be denied the benefit of this expertise and made to come directly to the Federal Court by way of a judicial review application from Parole Board decisions.

Sections 147(2)(*a*) makes it clear that any concern over an excess of appeals can be controlled where frivolous and vexatious grounds exist.

[107]     The Respondent says that, in amending the *CCRA* in 1997 to deal with long-term offenders, Parliament did not need to refer specifically to every provision of Part II because it is clear that some provisions (ss. 134.1 and 135.1 for instance) are directly applicable. Other provisions of Part II, however, only use the term "offender," so that it was necessary to specify whether they should apply to long-term offenders.

[108]     This is the purpose of s. 99.1. The designated sections in 99.1 are provisions that deal either with guiding principles or with the rights of offenders, so that unless direct reference is made to them, it would not be clear whether they are intended to apply to long-term offenders.

[109]     So the rationale behind s. 99.1, says the Respondent, is that where a provision in Part II is not specific to long-term offenders, Parliament has directed that it will be applicable through s. 99.1.

[110]     The Respondent also points out that there are numerous provisions in Part II of *CCRA* that, if the Applicant's interpretation of s. 99.1 were accepted, would cause serious difficulties for the Parole Board and the Canada Corrections Service generally. For the most part, Part II deals with generic offenders, and Parliament could not have intended that all of the options available to persons in that class would also be available to long-term offenders. This is why, says the Respondent, Parliament used s. 99.1 to make it clear which provisions should apply. To exclude long-term offenders from ss. 146 and 147 is not unfair because they can come directly to the Federal Court by way of judicial review if they are unhappy with a Parole Board decision.

[111]     Having considered the various arguments raised by counsel on this point, and having reviewed the general scheme and purpose of *CCRA* (with specific regard to Part II and the provisions introduced to deal with long-term offenders), it is the view of the Court that context, scheme, purpose and the ordinary meaning of the words reveal that s. 99.1 refers to specific provisions for the purpose of making it clear that, where it is not obvious, they are to be applied to long-term offenders "with such modifications as the circumstances require." Other provisions not mentioned in s. 99.1 also apply to long-term offenders, but this is because the provisions themselves make it clear that this is the case. If Parliament had intended to make ss. 146 and 147 available to long-term offenders, then Parliament would have specifically said so in s. 99.1.

[112]     Most telling in my opinion is that the review process provisions in Part II begin at s. 140 and continue to s. 147. The appeal process is part of the normal scheme of review, but ss. 99.1 says that sections 140 to 145 will apply to long-term offenders. It would make no sense, in my opinion, in the context of review to leave sections 146 and 147 out of s. 99.1 if Parliament had intended that review by the Appeal Division would also be available to long-term offenders. Hence, my conclusion is that it is not.

ORDER

**THIS COURT ORDERS** that:

1.     This Application for judicial review is dismissed.

2.     The Respondent shall have costs of this Application.

"James Russell"

_____

JFC

FEDERAL COURT OF CANADA

Names of Counsel and Solicitors of Record

DOCKET:                          T-266-03

STYLE OF CAUSE:                  KENNETH MCMURRAY v. NATIONAL PAROLE BOARD

DATE OF HEARING:                 February 24, 2004

PLACE OF HEARING:                Toronto, Ontario

REASONS FOR JUDGMENT BY:         The Honourable Justice Russell

DATED:                           March 26, 2004

**APPEARANCES BY:**              Mr. Eric J. Bundgard

                                                    For the Applicant

                          Ms. Sadian Campbell for Derek Edwards

                                                    For the Respondent

**SOLICITORS OF RECORD:**        Eric J. Bundgard
                                 EVENSON BUNDGARD FLYNN

                                 1650 Yonge Street

Suite 203

Toronto, Ontario

M4T 2A2

                                                    For the Applicant

Derek Edwards/Sadian Campbell

DEPARTMENT OF JUSTICE

130 King Street West

Suite 3400, Box 36

Toronto, Ontario

M5X 1K6

                                                    For the Respondent

by LEXUM for the Federation of Law Societies of Canada



# SUPREME COURT OF CANADA

2008 SCC 31 (CanLII)

CITATION: R. *v.* L.M., [2008] 2 S.C.R. 163, 2008 SCC 31

DATE: 20080529
DOCKET: 31577

BETWEEN:

**Her Majesty The Queen**
Appellant
and
**L.M.**
Respondent

OFFICIAL ENGLISH TRANSLATION: Reasons of LeBel J.

CORAM: McLachlin C.J. and Bastarache, Binnie, LeBel, Deschamps, Fish, Abella, Charron and Rothstein JJ.

REASONS FOR JUDGMENT:
(paras. 1 to 54)

LeBel J. (McLachlin C.J. and Bastarache, Binnie, Deschamps, Abella, Charron and Rothstein JJ. concurring)

DISSENTING REASONS :
(paras. 55 to 70)

Fish J.

R. *v.* L.M., [2008] 2 S.C.R. 163, 2008 SCC 31

**Her Majesty The Queen** *Appellant*

*v.*

**L.M.** *Respondent*

**Indexed as:  R. *v.* L.M.**

**Neutral citation:  2008 SCC 31.**

File No.:  31577.

2007:  November 14; 2008:  May 29.

Present:  McLachlin C.J. and Bastarache, Binnie, LeBel, Deschamps, Fish, Abella, Charron and Rothstein JJ.

on appeal from the court of appeal for quebec

*Criminal law — Sentencing — Maximum sentence — Accused convicted of sexually assaulting his young daughter and of making, distributing and possessing child pornography — Sentencing judge stating that accused had committed worst crime in worst circumstances and*

2008 SCC 31 (CanLII)

*imposing maximum sentence on count of sexual assault — Principles applicable to imposition of maximum sentence — Criminal Code, R.S.C. 1985, c. C-46, ss. 718, 718.1, 718.2, 718.3.*

*Criminal law — Appeal against sentence — Principles applicable to intervention by appellate court in appeal against sentence.*

*Criminal law — Sentencing — Long-term offender — Accused convicted of sexually assaulting his young daughter and of making, distributing and possessing child pornography — Crown applying for finding that accused is long-term offender — Whether long-term offender's period of community supervision must be taken into account in determining appropriate term of imprisonment — Criminal Code, R.S.C. 1985, c. C-46, s. 753.1.*

The accused was convicted of sexually assaulting his four-year-old daughter and of making, distributing and possessing child pornography.  At the time of his arrest, his computer contained approximately 5,300 pornographic photographs and 540 pornographic videos involving children.  Many of the photographs were either of his daughter or a friend of his daughter, or of both of them.  Furthermore, this was not the first time the accused had been in trouble with the law for sexual assaults on minors.  Stressing that he had committed the "worst crime in the worst circumstances", the trial judge imposed the maximum sentence of 10 years for the count of sexual assault and a consecutive sentence for the other counts, resulting in a global sentence of 15 years.  Because of the record of the accused and the high risk that he would reoffend, the trial judge also found him to be a long-term offender and ordered that he be supervised in the community for a period not exceeding 10 years.  On the basis that certain facts had not been proven and that the

2008 SCC 31 (CanLII)

maximum sentence for sexual assault was not warranted, the majority of the Court of Appeal reduced the global sentence imposed on the accused from 15 to 9 years.

*Held* (Fish J. dissenting): The appeal should be allowed.

*Per* McLachlin C.J. and Bastarache, Binnie, LeBel, Deschamps, Abella, Charron and Rothstein JJ.: The sentence imposed by the trial judge should be restored. Appellate courts must show great deference in reviewing decisions of trial judges where appeals against sentence are concerned and should intervene to vary sentences imposed at trial only if the sentences are demonstrably unfit. In the instant case, the majority of the Court of Appeal did not meet this requirement of deference. Rather, it substituted its own assessment for that of the trier of fact and reviewed the exercise of her discretion without a valid reason. [14-16]

In sentencing matters, the trial judge enjoys considerable discretion because of the individualized nature of the process. To arrive at an appropriate sentence, the judge must weigh the normative principles set out by Parliament in ss. 718, 718.1 and 718.2 of the *Criminal Code*. Although exceptional in nature, the maximum sentence is not reserved for the worst crime committed in the worst circumstances; it must be imposed if warranted in light of the normative principles of the *Code*, applied in an individualized context, and of the circumstances. The trial judge's decision will continue to be dictated by the fundamental principle that a "sentence must be proportionate to the gravity of the offence and the degree of responsibility of the offender". [17] [20-22]

2008 SCC 31 (CanLII)

In the instant case, the sentence imposed by the trial judge was proportionate to the gravity of the acts of the accused, and the mitigating and aggravating circumstances and the objectives of the *Code* were accounted for. The acts of the accused were highly reprehensible, and the evidence convinced the judge that they were sufficiently serious, and the accused sufficiently blameworthy, to warrant the maximum sentence. Since the sentence was not unreasonable, the Court of Appeal should not have intervened to vary it. The Court of Appeal's finding that penetration had not been proven beyond a reasonable doubt constitutes an improper reassessment of the evidence in the absence of a reviewable error in the trial judge's assessment of the facts. Finally, the Court of Appeal could not give the principle — provided for in s. 718.2 of the *Code* — that sentences should be similar to other sentences imposed in similar circumstances priority over the principle of deference to the trial judge's exercise of discretion, since the sentence was not vitiated by an error in principle and the trial judge had not imposed a sentence that was clearly unreasonable by failing to give adequate consideration to certain factors or by improperly assessing the evidence. [30] [33] [35] [53]

The sentencing judge must not take the period of supervision of the accused in the community as a long-term offender into account when determining the acceptable length of his or her incarceration. Even though a judge determining the length of a sentence of imprisonment will also receive the application to find the offender to be a long-term offender before passing sentence, it is important to remain faithful to the conceptual distinction between sentencing and the imposition of a supervision period. A judge who confuses these two processes risks straying from the normative principles and the objectives of sentencing. The principal objective of a prison sentence is punishment, although a number of factors are considered in determining its length, including the

2008 SCC 31 (CanLII)

gravity of the offence, the degree of responsibility of the offender, the parity principle and the possibility of imposing a less restrictive sanction.  In contrast, the objectives of the supervision of an offender are to ensure that the offender does not reoffend and to protect the public during a period of supervised reintegration into society; the length of this period of supervision is based on an offender's criminal past and on the likelihood that he or she will reoffend.  In the instant case, the trial judge correctly applied the objectives and principles relating to the two types of decisions. [46-50] [53]

*Per* Fish J. (dissenting):  While trial judges are entitled to considerable deference in sentencing matters, the majority of the Court of Appeal did not err in varying the sentence imposed by the trial judge because of the excessive severity of the impugned sentences in relation to the sentences imposed in reasonably similar cases.  On an appeal against sentence, a court of appeal is required by s. 687 of the *Criminal Code* to "consider the fitness of the sentence appealed against", and the court is expressly empowered to vary the sentence if it finds the sentence unfit.  In determining a fit sentence, Parliament has now recognized in s. 718.2(*b*) of the *Code* that parity is a principle that trial judges must consider.  Failure to do so adequately thus amounts in itself to a reviewable error in principle:  appellate intervention does not depend on the existence of an additional error in principle as well.  However, the disparity of an impugned sentence will only justify appellate intervention where, as the majority of the Court of Appeal found was the case here, the sentence imposed by the trial judge represents a substantial and marked departure from sentences customarily imposed on similar offenders for committing similar crimes. [55-56] [63-65]

**Cases Cited**

2008 SCC 31 (CanLII)

By LeBel J.

      **Applied:** *R. v. Cheddesingh*, [2004] 1 S.C.R. 433, 2004 SCC 16; **distinguished:** *R. v. M.P.*, [2005] Q.J. No. 78 (QL), 2005 QCCA 7; **referred to:** *R. v. Shropshire*, [1995] 4 S.C.R. 227; *R. v. McDonnell*, [1997] 1 S.C.R. 948; *R. v. M. (C.A.)*, [1996] 1 S.C.R. 500; *R. v. W. (G.)*, [1999] 3 S.C.R. 597; *R. v. Johnson*, [2003] 2 S.C.R. 357, 2003 SCC 46; *R. v. Proulx*, [2000] 1 S.C.R. 61, 2000 SCC 5; *R. v. Lyons*, [1987] 2 S.C.R. 309; *R. v. Jones*, [1994] 2 S.C.R. 229; *Beaulieu v. R.*, [2007] Q.J. No. 2116 (QL), 2007 QCCA 403; *Corneau v. R.*, [2001] R.J.Q. 2509; *R. v. Ménard*, [2002] Q.J. No. 5271 (QL); *R. v. M. (J.S.)* (2003), 173 C.C.C. (3d) 75, 2003 BCCA 66; *R. v. Archer* (2005), 193 C.C.C. (3d) 376; *R. v. Blair* (2002), 167 B.C.A.C. 21, 2002 BCCA 205; *R. v. J.G.E.S.*, [2006] B.C.J. No. 3455 (QL), 2006 BCSC 2004.

By Fish J. (dissenting)

      *R. v. M. (C.A.)*, [1996] 1 S.C.R. 500;  *R. v. Shropshire*, [1995] 4 S.C.R. 227; *R. v. Larche*, [2006] 2 S.C.R. 762, 2006 SCC 56.

**Statutes and Regulations Cited**

*Criminal Code*, R.S.C. 1985, c. C-46, ss. 151, 152, 153, 161(2)(*a*), 163.1, 172.1, 173(2), 271, 272, 273, 687, 718, 718.1, 718.2, 718.3, 752.1(1), 753, 753.1, 810.1.

2008 SCC 31 (CanLII)

**Authors Cited**

Canada.  Public Safety Canada.  "Long term offender designation", updated October 2006 (online: http://www. publicsafety.gc.ca/prg/cor/tls/lto-eng.aspx).

Dadour, François.  *De la détermination de la peine:  principes et applications.*  Markham, Ont.: LexisNexis, 2007.

Ferris, Thomas W. *Sentencing: Practical Approaches.* Markham, Ont.: LexisNexis Butterworths, 2005.

Manson, Allan. *The Law of Sentencing.*  Toronto:  Irwin Law, 2001.

Ruby, Clayton C.  *Sentencing*, 6th ed.  Markham, Ont.:  LexisNexis Butterworths, 2004.

2008 SCC 31 (CanLII)

      APPEAL from a judgment of the Quebec Court of Appeal (Nuss, Morin and Côté JJ.A.), [2006] R.J.Q. 1354, 39 C.R. (6th) 133, [2006] Q.J. No. 4966 (QL), 2006 CarswellQue 4631, 2006 QCCA 735, setting aside the sentencing decision rendered by Wilhelmy J.C.Q., J.E. 2006-525, SOQUIJ AZ-50340372, [2005] Q.J. No. 15934 (QL), 2005 CarswellQue 9973.  Appeal allowed, Fish J. dissenting.

      *Benoît Lauzon*, *Michel Pennou* and *Lori Renée Weitzman*, for the appellant.

      *Yves Gratton*, for the respondent.

      English version of the judgment of McLachlin C.J. and Bastarache, Binnie, LeBel, Deschamps, Abella, Charron and Rothstein JJ. delivered by

      LeBel J. —

I.    Introduction

A.    *Nature of the Case*

[1]        In this appeal, the Court must reconsider certain sentencing principles, and in particular those relating to maximum sentences.  The case also raises difficulties flowing from the relationship between the procedure of the application for a finding that an offender is a long-term offender under s. 753.1 of the *Criminal Code*, R.S.C. 1985, c. C-46 ("*Cr. C.*"), and the process for determining the appropriate sentence.

[2]        The respondent, L.M., was convicted of sexually assaulting his daughter and of making, distributing and possessing child pornography.  The trial judge imposed the maximum sentence on him for the count of sexual assault and a consecutive sentence for the counts of making, distributing and possessing child pornography.  She also found him to be a long-term offender and ordered him to be supervised in the community for a period of 10 years.  L.M. appealed the sentence to the Court of Appeal.  The majority of that court allowed the appeal and reduced the global sentence imposed by the trial judge.  For the reasons that follow, I would restore that sentence.

B.    *Origin of the Case*

[3]        In 2002, Switzerland's federal police were investigating an international ring of pedophiles that included groups suspected of distributing child pornography on the Internet.  In the course of this investigation, Swiss police officers contacted the Sûreté du Québec ("S.Q.") after

2008 SCC 31 (CanLII)

identifying two Quebeckers in Internet user groups whose names included the root "sampi" (for "*sans pilosité*", meaning "hairless"). The first of these men revealed L.M.'s identity to the S.Q. Upon entering L.M.'s home, S.Q. officers noted that several items found there confirmed the origin of photographs discovered on the Internet, not to mention that the child who opened the door, R.M., the daughter of the accused, L.M., appeared in some of those photographs.

[4]       The investigation and trial revealed that the childhood of R.M., one of the respondent's four children, had been nightmarish. R.M. was her father's principal victim, having been sexually assaulted between the ages of two and four. The evening of L.M.'s arrest, R.M. was questioned by police. According to her highly candid testimony, related in the words of a four-year-old child, this little girl had been regularly photographed in the nude by her father, who periodically touched her sexually, penetrated her and spent the night with her in what they referred to as the [TRANSLATION] "love room".

[5]       During that time, L.M. made money distributing child pornography on the Internet. At the time of his arrest, his computer contained approximately 5,300 pornographic photographs and 540 pornographic videos involving children. Many of the photographs were either of R.M. or A., a four-year-old child who regularly visited L.M.'s home, or of both of them. For example, one of the hard drives seized by the S.Q. contained a series of 33 pictures of R.M. in which she first appears dressed as a princess, after which the final photographs are close-up shots of her genitals.

[6]       L.M.'s arrest was not the first time he had been in trouble with the law. At the age of 17, he had been convicted of sexually assaulting a six-year-old girl. At 24, he was charged with

2008 SCC 31 (CanLII)

sexually assaulting a minor, but the proceedings were terminated when he entered into a recognizance under s. 810.1 *Cr. C.* (sentencing decision, [2005] Q.J. No. 15934 (QL), at para. 38; judgment on long-term offender designation, [2005] Q.J. No. 15933 (QL), at para. 30).

C.   *Judgments of the Courts Below*

   (1)   Court of Québec

   (a)   *Conviction*

[7]      L.M. pleaded guilty on the counts of possessing and distributing child pornography but contested the charges of making child pornography and sexual assault.  At the end of the trial, Judge Wilhelmy found that the Crown had proven L.M.'s guilt on these counts.  Regarding the sexual assault charge, Judge Wilhelmy found R.M.'s testimony highly reliable and credible because of what she said and the circumstances in which she said it ([2005] Q.J. No. 1215 (QL), at paras. 151-52).  Furthermore, according to Judge Wilhelmy, virtual conversations on an ICQ chat site traced back to the computer of the accused confirmed the assault against R.M. (paras. 104, 123-24 and 155).  The conviction is not contested in this Court.

   (b)   *Sentence*

[8]      Eight months later, Judge Wilhelmy rendered her sentencing decision.  In her opinion, there were several aggravating factors in the circumstances of the case.  They included the repeated

2008 SCC 31 (CanLII)

assaults on a very young child; the parental relationship with and position of authority over her; the creation of pornographic images and their distribution over the Internet or, in other words, around the world; and the criminal record of the accused (sentencing decision, at paras. 59 and 61).  The trial judge then stated that the accused had committed the [TRANSLATION] "worst crime . . . in the worst circumstances" (para. 65).  For these reasons, Judge Wilhelmy sentenced L.M. to the maximum penalty of 10 years' imprisonment on the count of sexual assault and to 3, 5 and 5 years respectively on those of possessing, making and distributing child pornography. The global sentence was 15 years, as the sentences on the pornography-related counts were to be served concurrently with each other, but consecutively to the sentence for sexual assault.  Finally, Judge Wilhelmy reduced the sentence for sexual assault by 16 months to give the accused credit for time spent in remand custody.

[9]      That same day, in a separate judgment, the trial judge ruled on a motion by the Crown for a finding that the accused is a long-term offender and an order that he be supervised in the community for a period of 10 years under s. 753.1 *Cr. C.*  In her opinion, the imposition of a period of supervision such as this cannot affect the length of the period of deprivation of liberty, as determined at the time of sentencing (judgment on long-term offender designation, at para. 18). According to Judge Wilhelmy, in setting the length of the period of supervision that was to follow the sentence, she had to consider in particular the risk that the offender would reoffend, which she thought to be substantial, and the fact that his sexual deviance was deeply rooted (paras. 27 and 30). She therefore ordered a 10-year supervision period, the maximum permitted by law.

(2)  <u>Court of Appeal</u>, [2006] R.J.Q. 1354, 2006 QCCA 735

2008 SCC 31 (CanLII)

[10]       L.M. appealed the sentence to the Quebec Court of Appeal.  The appeal was allowed in part by the majority of that court.  I will now summarize the reasons of the majority and those of the dissent.

(a)  *Reasons of the Majority*

[11]       For reasons written primarily by Côté J.A., the majority of the Court of Appeal allowed L.M.'s appeal and reduced the sentence imposed by the Court of Québec, which they found inappropriate.  In Côté J.A.'s view, certain facts, the acts of penetration in particular, had not been proven.  After weighing the factors she considered to have been proven and the holdings in cases she considered to be comparable, Côté J.A. concluded that the maximum sentence for sexual assault was unwarranted.   In her opinion, this was not the worst crime committed in the worst circumstances.   She therefore reduced the sentence for sexual assault to 6 years.  Côté J.A. also reduced the concurrent sentences for making and distributing child pornography to 3 years.  The global sentence imposed on L.M. was thus reduced from 15 to 9 years, less 16 months for the time spent in remand custody.  However, Côté J.A. upheld the 10-year supervision period.  Nuss J.A. concurred with his colleague's proposed disposition, but expressed reservations about adopting the concept of the [TRANSLATION] "worst crime committed in the worst circumstances".

(b)  *Reasons of the Dissent*

[12]       Morin J.A., dissenting, would have upheld the sentence imposed by the Court of Québec.  In his view, the majority's intervention in the trial judge's assessment of the facts was

2008 SCC 31 (CanLII)

unwarranted, as was their interference with the exercise of her sentencing discretion.  He added that following Côté J.A.'s line of reasoning, it would never be possible to impose the maximum sentences provided for in the *Criminal Code* (para. 83).

II.     Analysis

A.     *Issues*

[13]        This appeal raises three issues with regard to sentencing.  The first two have been addressed often by the courts, but in light of the position of the majority of the Court of Appeal, it may be helpful to review the relevant principles in this area of criminal law and procedure.  The third issue is a newer one.  I will discuss the following issues in turn:

(1)        What principles are applicable to intervention in an appeal against sentence?

(2)        What principles are applicable to the imposition of a maximum sentence?   Is it necessary to imagine the worst crime committed in the worst circumstances?

(3)        Must a long-term offender's period of community supervision be taken into account in determining the appropriate term of imprisonment?

B.     *Intervention by the Court of Appeal*

2008 SCC 31 (CanLII)

(1)  <u>Principles</u>

[14]     In its past decisions, this Court has established that appellate courts must show great deference in reviewing decisions of trial judges where appeals against sentence are concerned.  An appellate court may not vary a sentence simply because it would have ordered a different one.  The court must be "convinced it is not fit", that is, "that . . . the sentence [is] clearly unreasonable" (*R. v. Shropshire*, [1995] 4 S.C.R. 227, at para. 46, quoted in *R. v. McDonnell*, [1997] 1 S.C.R. 948, at para. 15).  This Court also made the following comment in *R. v. M. (C.A.)*, [1996] 1 S.C.R. 500, at para. 90:

> . . . absent an error in principle, failure to consider a relevant factor, or an overemphasis of the appropriate factors, a court of appeal should only intervene to vary a sentence imposed at trial if the sentence is demonstrably unfit.

(See also *R. v. W. (G.)*, [1999] 3 S.C.R. 597, at para. 19; A. Manson, *The Law of Sentencing* (2001), at p. 359; and F. Dadour, *De la détermination de la peine:  principes et applications* (2007), at p. 298.)

[15]     Owing to the profoundly contextual nature of the sentencing process, in which the trier of fact has broad discretion, the standard of review to be applied by an appellate court is one based on deference.  The sentencing judge has "served on the front lines of our criminal justice system" and possesses unique qualifications in terms of experience and the ability to assess the submissions of the Crown and the offender (*M. (C.A.)*, at para. 91).  In sum, in the case at bar, the Court of Appeal was required — for practical reasons, since the trier of fact was in the best position to

2008 SCC 31 (CanLII)

determine the appropriate sentence for L.M. — to show deference to the sentence imposed by the trial judge.

### (2)  Violation of the Principles

[16]      The majority of the Court of Appeal did not meet this requirement of deference.  In effect, they reassessed L.M.'s sentence without showing it to be clearly unreasonable.  They even varied certain findings of fact, in particular with respect to the acts of penetration, despite Judge Wilhelmy's conclusions concerning the quality of the evidence, which she found to be clear.  In assessing the overall seriousness of the offences committed by L.M., the Court of Appeal also disregarded the close connection between the sexual assault charges and the charges of making child pornography and distributing it on the Internet.  In so doing, it substituted its own assessment for that of the trier of fact and reviewed the exercise of her discretion without a valid reason.  Moreover, as we will now see, the majority of the Court of Appeal misinterpreted the principles applicable to maximum sentences.

### C.   *Maximum Sentences*

### (1)  General Sentencing Principles

*Determining the Appropriate Sentence*

[17]      Far from being an exact science or an inflexible predetermined procedure, sentencing

2008 SCC 31 (CanLII)

is primarily a matter for the trial judge's competence and expertise.  The trial judge enjoys considerable discretion because of the individualized nature of the process (s. 718.1 *Cr. C.*; *R. v. Johnson*, [2003] 2 S.C.R. 357, 2003 SCC 46, at para. 22; *R. v. Proulx*, [2000] 1 S.C.R. 61, 2000 SCC 5, at para. 82).  To arrive at an appropriate sentence in light of the complexity of the factors related to the nature of the offence and the personal characteristics of the offender, the judge must weigh the normative principles set out by Parliament in the *Criminal Code*:

- the objectives of denunciation, deterrence, separation of offenders from society, rehabilitation of offenders, and acknowledgment of and reparations for the harm they have done (s. 718 *Cr. C.*) (see Appendix);

- the fundamental principle that a sentence must be proportionate to the gravity of the offence and the degree of responsibility of the offender (s. 718.1 *Cr. C.*); and

- the principles that a sentence should be increased or reduced to account for aggravating or mitigating circumstances, that a sentence should be similar to other sentences imposed in similar circumstances, that the least restrictive sanctions should be identified and that available sanctions other than imprisonment should be considered (s. 718.2 *Cr. C.*).

### (2)  Maximum Sentences and *Cheddesingh*

[18]      This individualized sentencing process is part of a system in which Parliament has established a very broad range of sentences that can in some cases extend from a suspended sentence

2008 SCC 31 (CanLII)

to life imprisonment.  The *Criminal Code* provides for a maximum sentence for each offence. However, it seems that the maximum sentence is not always imposed where it could or should be, as judges are influenced by an idea or viewpoint to the effect that maximum sentences should be reserved for the worst cases involving the worst circumstances and the worst criminals.  As can be seen in the case at bar, the influence of this notion is such that it sometimes leads judges to write horror stories that are always worse than the cases before them.  As a result, maximum sentences become almost theoretical:

> In the end the difficulty with maximums is that they may be seen as almost theoretical rather than as an indication of how seriously an offence is to be treated in the "ordinary" case.
>
> (T. W. Ferris, *Sentencing:  Practical Approaches* (2005), at p. 292)

[19]      As Morin J.A. noted in his dissenting reasons, human nature is such that it will always be possible for a court to imagine a worse case than the one before it.  Morin J.A. rightly pointed out that it is important for a judge, when deciding whether the maximum sentence can or should be imposed for a given offence, to avoid contemplating fictitious situations in this way.  This approach is consistent with this Court's recent case law.

[20]      In *R. v. Cheddesingh*, [2004] 1 S.C.R. 433, 2004 SCC 16, the Court acknowledged the exceptional nature of the maximum sentence, but firmly rejected the argument that it must be reserved for the worst crimes committed in the worst circumstances. Instead, all the relevant factors provided for in the *Criminal Code* must be considered on a case-by-case basis, and if the circumstances warrant imposing the maximum sentence, the judge must impose it and must, in so

2008 SCC 31 (CanLII)

doing, avoid drawing comparisons with hypothetical cases:

> . . . terms such as "stark horror", "worst offence" and "worst offender" add nothing to the analysis and should be avoided.  All relevant factors under the *Criminal Code* . . . must be considered.  A maximum penalty of any kind will by its very nature be imposed only rarely . . . and is only appropriate if the offence is of sufficient gravity and the offender displays sufficient blameworthiness.  As is always the case with sentencing, the inquiry must proceed on a case-by-case basis. [para. 1]

[21]      Even where a maximum sentence is imposed, therefore, regard must be had to the trial judge's discretion, the individualized nature of sentencing and the normative principles set out by Parliament in ss. 718, 718.1 and 718.2 *Cr. C.*  There is still a place in criminal law for maximum sentences in appropriate circumstances.

[22]      Thus, the maximum sentence cannot be reserved for the abstract case of the worst crime committed in the worst circumstances.  The trial judge's decision will continue to be dictated by the fundamental principle that a "sentence must be proportionate to the gravity of the offence and the degree of responsibility of the offender" (s. 718.1 *Cr. C.*).  Proportionality will be achieved by means of a "complicated calculus" whose elements the trier of fact understands better than anyone.  The trial judge's position in the sentencing process justifies the respect owed to the reasoned exercise of his or her discretion and the deferential approach that appellate courts should take in such matters (see Manson, at p. 86).  As is noted in one commentary on sentencing principles:

> [TRANSLATION] [The] objectives of denunciation, deterrence, separation from society, rehabilitation, reparations and retribution are all quite general, and there is no precise standard that can be applied to rank them.  At first glance, this is desirable, since the sentencing process is fundamentally an individualized one in that sentences will necessarily vary from one offender to another in light of the particular emphasis that

2008 SCC 31 (CanLII)

will be placed on one or the other of the objectives in order to arrive at the appropriate sentence, having regard to all the circumstances, in each case.

(Dadour, at p. 17)

[23]      In the case at bar, the Court of Appeal should have asked whether, in light of Judge Wilhelmy's findings of fact, imposing the maximum sentence was reasonable having regard to the circumstances and the objectives of sentencing rather than digging deeper to find something horrible.  A review of the Court of Québec's judgment in light of the principles stated above confirms that the sentence imposed was lawful and reasonable.  This is clear from the reasons given by Judge Wilhelmy for her sentencing decision.

(3)  Application of the Sentencing Principles by the Trial Judge

*Objective and Subjective Seriousness*

[24]      Judge Wilhelmy began her analysis by considering the objective seriousness of the offences of which L.M. had been convicted.  She noted the lengths of the maximum sentences provided for by Parliament:  10 years for sexual assault (s. 271(1)(*a*) *Cr. C.*), 10 years for making child pornography (s. 163.1(2)(*a*) *Cr. C.*), 10 years for distributing child pornography (s. 163.1(3)(*a*) *Cr. C.*) and 5 years for possessing child pornography (s. 163.1(4)(*a*) *Cr. C.*).

[25]      On the subjective seriousness of the offences, Judge Wilhelmy referred to a number of aggravating factors that led her to conclude that a long period of incarceration was necessary.  She noted L.M.'s record of similar acts, the repeated nature of the acts and their impact on the victims,

2008 SCC 31 (CanLII)

his parental relationship, position of authority and position of trust with respect to the principal victim, the quantity of pornographic materials seized, the central role played by the accused in supplying the distribution network and in facilitating the production of the materials, the children's ages, the nature of the scenes shown in the photographs and videos, and the medium — the Internet — used to distribute the pornographic photographs and videos (see in particular para. 61 of the sentencing decision).

[26]      In addition to the violence inherent in repeated sexual assaults on such a young child, the list of aggravating circumstances could include the fact that R.M. was unquestionably subjected to psychological violence.  According to a report by the Centre jeunesse de Montréal dated April 19, 2005 that was filed in the Court of Québec, the little girl had been scarred for life by her father's acts and was having difficulty fitting in with children her own age (A.R., at pp. 108-9; sentencing decision, at para. 28).

[27]      Moreover, the gravity of L.M.'s acts is clear from his *modus operandi*.  A portion of the collection of pornographic photographs and videos he posted on the Internet were the product of sexual assaults on his own little girl.  His acts must be considered as a whole.

[28]      Finally, I note that L.M. disseminated his pornography around the world over the Internet.  The use of this medium can have serious consequences for a victim.  Once a photograph has been posted on the Web, it can be accessed indefinitely, from anywhere in the world.  R.M. will never know whether a pornographic photograph or video in which she appears might not resurface someday.

[29]      The only mitigating circumstance identified by Judge Wilhelmy was L.M.'s recent acknowledgment of his sexual deviance.  Whether his admission was sincere is open to question.  According to the pre-sentence report prepared for the Court of Québec by probation officer Isabelle Mailloux on May 3, 2005, L.M. at no time used [TRANSLATION] "negative language in referring to child pornography or acknowledged the unacceptable nature of that act" (A.R., at p. 125).  In a psychiatric assessment submitted to the Court of Québec on June 13, 2005, Dr. Louis Morissette noted that L.M. had admitted [TRANSLATION] "the inadequacy of his fantasies" in a second interview only *after* having read the pre-sentence report (A.R., at p. 140).  Judge Wilhelmy made the following comment:  [TRANSLATION] "However, [the] reversal occurred after the accused had read the pre-sentence and psychological reports, which mentioned that he had acknowledged nothing and shown no regret whatsoever" (judgment on long-term offender designation, at para. 22).

[30]      L.M.'s acts were highly reprehensible, and the evidence convinced Judge Wilhelmy that they were sufficiently serious, and L.M. sufficiently blameworthy, to warrant the maximum sentence.  Judge Wilhelmy rightly wanted to denounce L.M.'s conduct, deter sex offenders from committing such offences and separate L.M. from society because of his lack of remorse, especially since his acts included the abuse of a person under 18 in relation to whom he was in a position of trust.  Similarly, the offence had been committed in the context of the abuse of a position of authority in relation to the victim.

[31]      The judge also correctly understood the close relationship between the offences, the overall situation they gave rise to and the need to impose a global sentence suited to that situation.

2008 SCC 31 (CanLII)

Viewed as a whole, the crime was complex.  The offence of sexual assault was closely connected with three other offences of making, possessing and distributing child pornography that are subject to express sanctions under the *Criminal Code*.  Each aspect of the offender's conduct could be considered only in light of all these charges, viewed as a whole.  As Judge Wilhelmy concluded, the global sentence was the crucial factor in determining the sentence in the case at bar.

[32]     From this perspective, the sentence imposed by Judge Wilhelmy was not unreasonable. The trial judge had a broad discretion, was in a privileged position as the trier of fact and certainly had the expertise to assess L.M.'s character, the heinous nature of his acts and the impact that a longer or shorter sentence might have on the chances of his reoffending and on his prospects for rehabilitation.

### (4)  Unwarranted Intervention by the Court of Appeal

[33]     As I mentioned above, the majority of the Court of Appeal erred in varying a sentence that was not unreasonable.  Their finding that penetration had not been proven beyond a reasonable doubt constitutes an improper reassessment of the evidence in the absence of a reviewable error in the Court of Québec's assessment of the facts.

[34]     Moreover, the majority of the Court of Appeal attached great importance to the principle that a sentence should be similar to sentences imposed on similar offenders for similar offences committed in similar circumstances (paras. 41 *et seq.*), which is one of the normative sentencing principles provided for in the *Criminal Code* (s. 718.2 *Cr. C.*).  Although this principle permits an

2008 SCC 31 (CanLII)

appellate court to temper the discretionary aspect of the sentencing process, it was applied incorrectly by the majority of the Court of Appeal.

[35]      This exercise of ensuring that sentences are similar could not be given priority over the principle of deference to the trial judge's exercise of discretion, since the sentence was not vitiated by an error in principle and the trial judge had not imposed a sentence that was clearly unreasonable by failing to give adequate consideration to certain factors or by improperly assessing the evidence (*M. (C.A.)*, at para. 92, quoted in *McDonnell*, at para. 16; *W. (G.)*, at para. 19; see also Ferris, at p. 149, and Manson, at p. 93). This Court has clearly confirmed the "trial judge's traditionally broad sentencing discretion" (*M. (C.A.)*, at para. 56). Furthermore, this principle has been codified in s. 718.3 *Cr. C.*

[36]      Owing to the very nature of an individualized sentencing process, sentences imposed for offences of the same type will not always be identical. The principle of parity does not preclude disparity *where warranted by the circumstances*, because of the principle of proportionality (see Dadour, at p. 18). As this Court noted in *M. (C.A.)*, at para. 92, "there is no such thing as a uniform sentence for a particular crime". From this perspective, an appellate court is justified in intervening only if the sentence imposed by the trial judge "is in substantial and marked departure from the sentences customarily imposed for similar offenders committing similar crimes" (*M. (C.A.)*, at para. 92).

[37]      The case at bar can be distinguished from each of the cases cited by the majority of the Court of Appeal. The case before this Court is markedly different as regards the quantity of

2008 SCC 31 (CanLII)

materials seized and the scope of the network of Internet users having access to them, not to mention the connection between the sexual assaults committed by L.M. and his making, possession and distribution of child pornography.  I will give one example of this.  The majority of the Court of Appeal stressed the similarity between *R. v. M.P.*, [2005] Q.J. No. 78 (QL), 2005 QCCA 7, and the instant case (see para. 73).  Their aim in doing so was to bring L.M.'s sentence in line with the one imposed in *M.P.*  But in that case the pornographic materials were not posted on the Internet; they were sent only to two friends of the abused child's father.  Having disregarded L.M.'s wide distribution of the materials, made possible by the Internet, the Court of Appeal failed to demonstrate any real similarity between *M.P.* and the case at bar.  Consequently, this attempt at achieving parity in sentencing, based as it was on an incorrect analogy, was itself inappropriate.

D. *Finding That the Offender Is a Long-Term Offender*

[38]      This appeal also raises the issue of the relationship between sentencing and the procedure for finding an offender to be a long-term offender.  When the Crown applies to have an offender found to be a long-term offender, must the judge, in determining the length of the term of imprisonment, take the subsequent period of community supervision into account?  I do not think so.  In my view, a distinction must be made between sentencing *per se* and the procedure for imposing a period of post-sentence supervision.

(1) Description of the System of Supervision

[39]      As this Court did with respect to *dangerous* offenders (*R. v. Lyons*, [1987] 2 S.C.R. 309,

2008 SCC 31 (CanLII)

at p. 339; *R. v. Jones*, [1994] 2 S.C.R. 229, at p. 297), I note the exceptional nature of the finding

that an offender is a *long-term* offender. As I will explain below, the strictness and precision of the

rules applicable to this supervisory mechanism necessarily limit the number of people to whom it

will apply. In 2005, or eight years after the introduction of this new system of supervision, there

were 300 long-term offenders in Canada: 187 of them were incarcerated, and 113 were in the

community under supervision. Most of them had committed sexual offences ("Long term offender

designation", Public Safety Canada (online:   www.publicsafety.gc.ca/prg/cor/tls/lto-eng.aspx)).

*2008 SCC 31 (CanLII)*

### *Procedure*

[40]      The *Criminal Code* provides that the Crown must first of all apply to have an accused

found to be a long-term offender after he or she has been convicted, but before sentence is imposed

(ss. 752.1(1), 753.1(1)(*a*) and 753.1(3.1)(*a*) *Cr. C.*). After this application is filed, the court may

have experts assess the offender. Their report will be used as evidence in the application

(ss. 752.1(1) and 753.1(1) *Cr. C.*). This report will enable the judge to determine whether the

offender poses a serious risk to public safety. The *Criminal Code* sets out three conditions that must

be met before a judge may grant an application for supervision:

(i)      First, a sentence of imprisonment of two years or more must be warranted for the

offence for which the offender has been convicted (s. 753.1(1)(*a*) *Cr. C.*).

(ii)      Next, the judge must be satisfied beyond a reasonable doubt that there is a substantial

risk that the offender will reoffend (s. 753.1(1)(*b*) *Cr. C.*; see, for example, *Beaulieu v.*

*R.*, [2007] Q.J. No. 2116 (QL), 2007 QCCA 403, at para. 25).  In assessing that risk, the judge must determine (s. 753.1(2) *Cr. C.*):

(a)  that the offender has been convicted of a sexual offence under ss. 151, 152, 153, 163.1(2), 163.1(3), 163.1(4), 163.1(4.1), 172.1, 173(2), 271, 272 or 273 *Cr. C.*, or has engaged in "serious conduct of a sexual nature in the commission of another offence of which the offender has been convicted" (s. 753.1(2)(*a*) *Cr. C.*); and

(b)  that the offender has shown a pattern of repetitive behaviour that shows a likelihood of the offender's causing injury to or inflicting severe psychological damage on other persons, *or* has, by conduct in any sexual matter, shown a likelihood of causing injury to other persons in the future (s. 753.1(2)(*b*)(i) and (ii) *Cr. C.*; see, for example, *Corneau v. R.*, [2001] R.J.Q. 2509 (C.A.)).  This assessment of [TRANSLATION] "prospective dangerousness" concerns, in sum, past conduct and the facts relating to the commission of the offences (*R. v. Ménard*, [2002] Q.J. No. 5271 (QL) (C.A.), at para. 23).

(iii)   Finally, the judge must find that there is a "reasonable possibility" of eventual control of the risk in the community (s. 753.1(1)(*c*) *Cr. C.*).  It is interesting to note that the expression used in the French version of this provision is *"possibilité réelle"* (real possibility) (*R. v. M. (J.S.)* (2003), 173 C.C.C. (3d) 75, 2003 BCCA 66, at para. 27).

[41]    This Court has previously stated that a sentencing judge must, if satisfied that a

community supervision order will make it possible "to reduce the threat to the life, safety or physical or mental well-being of other persons to an acceptable level", consider the option of finding an offender to be a *long-term* offender before finding him or her to be a *dangerous* offender (see *Johnson*, at para. 40; see also C. Ruby, *Sentencing* (6th ed. 2004), at p. 541). This is the only situation in which the *Criminal Code* requires a judge to consider the possibility of supervision before determining the appropriate sentence. The decision is thus based on controlling a serious risk: if this objective can be attained in the community, an offender cannot be found to be dangerous and, as a result, be imprisoned for an indeterminate period (see Ferris, at pp. 301-3).

[42]      Although they both contribute to assuring public safety, the dangerous offender and long-term offender designations have different objectives. Unlike a *dangerous* offender (s. 753 *Cr. C.*), who will continue to be deprived of liberty, since such offenders are kept in prison to separate them from society (s. 718.1), a *long-term* offender serves a sentence of imprisonment of two years or more and is then subject to an order of supervision in the community for a period not exceeding 10 years for the purpose of assisting in his or her rehabilitation (s. 753.1(3) *Cr. C.*). This measure, which is less restrictive than the indeterminate period of incarceration that applies to dangerous offenders, protects society and is at the same time consistent with [TRANSLATION] "the principles of proportionality and moderation in the recourse to sentences involving a deprivation of liberty" (Dadour, at p. 228).

### (2)  Relationship to Sentencing

[43]      The respondent relies on an Ontario Court of Appeal decision to argue that the principle

2008 SCC 31 (CanLII)

of proportionality should apply to the combined effect of the period of community supervision and the sentence of imprisonment.  While it was careful to state that a community supervision order is "not a sentence", the Ontario Court of Appeal made the following comments, on that occasion, regarding the combined effect of the prison sentence and the supervision period:

2008 SCC 31 (CanLII)

> Although it may be argued that a mandatory community supervision order . . . is not a sentence, in my view, as a matter of principle, the principles of sentencing in ss. 718 to 718.2 should apply when measuring the combined effect of a mandatory custodial sentence and mandatory community supervision order.  This would include the fundamental principle of proportionality in s. 718.1. . . .
>
> . . . Assuming that the principle of proportionality applies . . ., I find nothing inappropriate about the eight-year period of community supervision in addition to this sentence.  It is necessary to recognize that the custodial sentence for the predicate offences and the community supervision order each serve a discrete purpose.  Therefore, in considering the appropriateness of the length of the appellant's community supervision, it must be considered in the context of the purpose of the dangerous and long-term offender regime, which is to protect the public.
>
> (*R. v. Archer* (2005), 193 C.C.C. (3d) 376, at paras. 21-22)

[44]     Of course, a period of community supervision cannot be any longer than is necessary to obviate the risk that the offender will reoffend and thus to protect the public.  In my view, however, to adopt the general rule the respondent wishes to draw from *Archer* would be to disregard the distinction between the sentence of imprisonment and the period of supervision, which have different objectives.

### (3)  Distinction Between the Function of the Finding and That of Sentencing

[45]      This Court has held that the procedure for finding an offender to be a *dangerous* offender forms part of the sentencing process (*Lyons*, at pp. 350 and 374; *Jones*, at p. 294; *Johnson*, at para. 23).  Can it be said that the procedure for finding an offender to be a *long-term* offender also forms part of the sentencing process?  Obviously, since the sentencing judge is the same judge who would make the order so finding.  However, the similarities between that finding and a sentencing proceeding end there.

[46]      These two types of decisions can be distinguished on the basis of the objectives and methods, and certain technical aspects, of the sentencing process.  The principal objective of a prison sentence is punishment, although the sentence must be determined in accordance with the principles set out in the *Criminal Code*.  On the other hand, the objectives of and rationale for the supervision of an offender in the community are to ensure that the offender does not reoffend and to protect the public during a period of supervised reintegration into society.  The British Columbia Court of Appeal mentioned this distinction in a recent judgment:

> The fixed sentence and supervision orders focus on two different goals:  the former on punishment for the predicate offence, the latter on prevention of future criminal conduct. In the latter the predicate offence plays a relevant role as an indicator of risk.
>
> (*R. v. Blair* (2002), 167 B.C.A.C. 21, 2002 BCCA 205, at para. 37; see *R. v. J.G.E.S.*, [2006] B.C.J. No. 3455 (QL), 2006 BCSC 2004, at paras. 134 and 137, for another example of this.)

[47]      Furthermore, the sentencing judge will not calculate the length of each of these steps in

2008 SCC 31 (CanLII)

the same way.  A number of factors are considered in determining the length of a prison sentence, including, to name but a few, the gravity of the offence, the degree of responsibility of the offender, the parity principle and the possibility of imposing a less restrictive sanction.  In contrast, the length of a period of community supervision is based on an offender's criminal past and on the likelihood that he or she will reoffend, which are addressed in the assessment report.

[48]      Finally, in practice, the effect of a sentence is to deprive the offender of his or her liberty, whereas community supervision is aimed at reintegrating the offender into the community under the supervision of the Correctional Service of Canada.  Furthermore, the period of community supervision does not begin until after the sentence (imprisonment) has been served.  From this perspective, the preferred approach for a judge considering a period of community supervision is very different from the one that must be taken in determining the length of a sentence of imprisonment.

(4)  Relationship to the Determination of the Appropriate Sentence

[49]      Nevertheless, the judge determining the length of an offender's sentence of imprisonment will also receive the application to find the offender to be a long-term offender before passing sentence.  As a result, the judge will quite likely tend to consider both decisions at the same time.  He or she may accordingly find it difficult to observe the conceptual distinction between the two decisions.  Despite these practical difficulties, it is important to remain faithful to the distinction between sentencing and the imposition of a supervision period.  A judge who confuses these two processes risks straying from the normative principles and the objectives of sentencing.  A judge

2008 SCC 31 (CanLII)

who does so would also neglect the specific objective of the procedure for finding an offender to be a long-term offender, which requires the application of different principles. Parliament intended that the judge determine the appropriate sentence first. After doing so, the judge is to ask, in light of Parliament's objective of protecting the public, whether a period of supervision is warranted. The period of community supervision cannot therefore be equated with a new period of deprivation of liberty consecutive to the one resulting from the sentence.

2008 SCC 31 (CanLII)

(a) *Need to Maintain the Conceptual and Practical Distinction Between the Two Steps*

[50]     It is therefore my opinion that a long-term offender's period of community supervision cannot be taken into account when determining the acceptable length of the offender's incarceration. I fear that the principle that a sentence should be similar to other sentences imposed in similar circumstances would be seriously undermined if Canadian courts were to compare fixed sentences (for sex offenders who have not been found to be long-term offenders) with fixed sentences accompanied by supervision orders (for sex offenders who have been found to be long-term offenders).

(b) *Application to the Case at Bar*

[51]     Judge Wilhelmy pointed out that protecting society is the fundamental objective being pursued in providing in the *Criminal Code* for the supervision of offenders. She mentioned that the accused was 31 years old and had never been treated for sexual deviance, although he claimed that he wanted to enter a program for sex abusers. She added that L.M. continued to insist that he had

only fondled his daughter (without penetrating her) and to play down the gravity of what he had done to her, whereas the evidence showed that the situation was much more serious. Referring to L.M.'s history of sexual assaults and the recognizance he had entered into under s. 810.1 *Cr. C.*, Judge Wilhelmy concluded that L.M.'s deviance was of long standing. Finally, the experts agreed unanimously that there was a substantial risk that he would reoffend (judgment on long-term offender designation, at para. 27).

[52]     For all these reasons, Judge Wilhelmy ruled in favour of a long supervision period for L.M. as a long-term offender. She did not take L.M.'s period of incarceration into account when determining the length of his period of community supervision. Instead, she focussed on the future, that is, on the need to protect the public from the risk that L.M. would reoffend. In my view, her analysis was flawless.

III. Conclusion

[53]     Judge Wilhelmy imposed an appropriate sentence on L.M.  The sentence is proportionate to the gravity of his acts, and the mitigating and aggravating circumstances and the objectives of the *Criminal Code* have been accounted for. As there was no reviewable error in Judge Wilhelmy's decision, the Court of Appeal was wrong to vary the sentence. In my opinion, the trial judge correctly applied the law, placing the appropriate emphasis on the specific objectives of the finding that an offender is a long-term offender.

2008 SCC 31 (CanLII)

IV.  Disposition

[54]        For the foregoing reasons, I would allow the appeal, set aside the judgment of the

Court of Appeal and restore the sentence imposed by the Court of Québec.

2008 SCC 31 (CanLII)

        The following are the reasons delivered by

        Fish J. (dissenting) —

I

[55]        It is well established that trial judges are entitled to considerable deference in sentencing

matters.  I take no issue in this regard with the clear and persuasive reasons of my colleague, Justice

LeBel.  With respect, however, I have reached a different conclusion regarding the application of

that rule in this case.  I would therefore dismiss the appeal.

II

[56]        On an appeal against sentence, the Court of Appeal is required by s. 687 of the *Criminal*

*Code*, R.S.C. 1985, c. C-46, to "consider the fitness of the sentence appealed against".  And the

Court is expressly empowered to vary the sentence if it finds the sentence unfit.

[57]        Here, the trial judge convicted the respondent of sexual assault and found him guilty as well of "making, distributing and possessing" child pornography ([2005] Q.J. No. 1215 (QL)). The respondent was immediately incarcerated pending sentence.  Eight months later, the trial judge sentenced him to the maximum punishment for sexual assault — 10 years' imprisonment — less 16 months on account of the respondent's pre-sentence custody.  On the child pornography counts, the trial judge imposed a total of 5 years' imprisonment, to be served consecutively to the term for sexual assault.  The trial judge also found the respondent to be a "long-term offender" within the meaning of s. 753.1 of the *Code* and ordered that he be supervised in the community for an additional 10 years, which is again the maximum period provided by law ([2005] Q.J. No. 15933 (QL) and [2005] Q.J. No. 15934 (QL)).

[58]        At the time of sentence, the respondent was 31 years old.  This was his first prison sentence.  He did, however, have a previous conviction for sexual assault, committed when he was 17.  The facts relevant to his convictions in this case, and the details regarding the sentences imposed, are fully set out in the reasons of Justice LeBel.

[59]        On an appeal by the respondent, the Court of Appeal reduced his sentence for sexual assault from 10 years to 6 (again, less 16 months on account of pre-sentence custody), and the sentence on the child pornography counts from 5 years to 3 years ([2006] R.J.Q. 1354, 2006 QCCA 735).  The long-term offender finding and the 10-year supervision order were left undisturbed.

[60]        The only issue in this Court is whether the majority in the Court of Appeal erred in finding that the custodial sentences were "unfit" within the meaning of s. 687 of the *Criminal Code*.

And, in this regard, there is no dispute that a sentence will not be considered unfit if the trial judge, bearing in mind the relevant facts, applied the governing principles correctly and the sentence itself is neither manifestly inadequate nor manifestly excessive.

[61]      A governing principle of particular relevance to this appeal is set out in s. 718.2(*b*) of the *Criminal Code*, which requires the sentencing court to take into consideration the principle that "a sentence should be similar to sentences imposed on similar offenders for similar offences committed in similar circumstances". Reading the separate reasons of Nuss and Côté JJ.A. together, as one must, it may properly be said that the majority in the Court of Appeal reduced the respondent's cumulative sentence from 15 years to 9 years on the ground that the trial judge failed to adequately consider this principle, resulting in a manifestly excessive sentence.

[62]      It is true that Côté J.A. disagreed in her reasons with the trial judge's finding that the maximum sentence for sexual assault was justified on the "worst offender, worst offence" criterion, but her conclusion ultimately rests on an extensive and detailed review of the sentences meted out in sexual assault cases involving child victims, and related cases of child pornography.   She considered as well the range of sentences imposed for incest, which is punishable by 14 years' imprisonment as opposed to 10 for sexual assault. Côté J.A. recognized that the respondent had not been charged with that offence but nonetheless found sentences for incest relevant, bearing in mind the facts of this case. Her conclusion that the sentences imposed by the trial judge were unfit rests, ultimately, on its disparity in relation to the other sentences she reviewed.

[63]      In his separate reasons, moreover, Nuss J.A. made it clear that he did not adopt the

2008 SCC 31 (CanLII)

observations of Côté J.A. regarding the "worst offender, worst offence" branch of the trial judge's decision. I therefore think it right to conclude, as mentioned earlier, that the majority decision in the Court of Appeal rests essentially on the excessive severity of the impugned sentences in relation to the sentences imposed in reasonably similar cases. In my view, the court did not err in varying the sentence imposed by the trial judge for this reason. Nor did it err in finding that the respondent's reprehensible conduct warranted a lengthy term of imprisonment — 9 years — followed by 10 years of supervision in the community.

[64]     Parliament has now recognized in s. 718.2(*b*) of the *Criminal Code* that parity is a principle that trial judges *must* consider in determining a fit sentence. Failure to do so adequately thus amounts *in itself* to a reviewable error in principle: appellate intervention does not depend, in my respectful view, on the existence of an *additional* error in principle as well.

[65]     I am aware, of course, that the disparity of an impugned sentence will only justify appellate intervention where the sentence imposed by the trial judge represents a substantial and marked departure from sentences customarily imposed on similar offenders for committing similar crimes: *R. v. M. (C.A.)*, [1996] 1 S.C.R. 500, at para. 92. Moreover, appellate scrutiny on a claim of disparity is subject to due regard for the need to individualize sentences. But where a substantial and marked departure has been made out — as the Court of Appeal found was the case here — the sentence may in my view be varied to bring it within the acceptable range: see *R. v. Shropshire*, [1995] 4 S.C.R. 227, at para. 48.

[66]     I need hardly add that taking into consideration the principle of parity "does not require

2008 SCC 31 (CanLII)

the court to apply it without regard to the other principles of sentencing set out in the *Code* or in binding decisions of the courts": *R. v. Larche*, [2006] 2 S.C.R. 762, 2006 SCC 56, at para. 35.

[67]      Finally, in fairness to the trial judge and to Justice Côté, I pause here to mention that, in the recent past "[i]t has often been remarked that . . . maximum sentences ought to be reserved for the worst offender committing the worst type of offence" (*per* Lamer C.J., speaking for the Court in *M. (C.A.)*, at para. 36).  For the reasons given by Justice LeBel in this case, I agree that this criterion ought nonetheless to be abandoned.

III

[68]      A Court of Appeal cannot vary the sentence imposed at trial merely because it might have instead rendered a different sentence: *Shropshire*, at para. 46.  On an appeal by the Crown, it will thus not suffice for the Court of Appeal to conclude that the impugned sentence is *lenient*; nor, on an appeal by the accused, to find that the sentence is *severe*. Rather, a sentence may be varied only if it is found to be *too lenient* or *too severe* — that is to say, "clearly excessive or inadequate"; and therefore unfit (*Shropshire*, at para. 48).

[69]      In short, as mentioned at the outset, Courts of Appeal are indeed bound to recognize that trial courts enjoy a broad discretion in sentencing matters.  But they are required to intervene where the sentence imposed at trial is shown to be unfit, within the meaning of the decided cases.  And in reviewing their decisions on a recognized ground, we should remain mindful that provincial Courts of Appeal are endowed in sentencing matters with a supervisory jurisdiction that this Court is not

2008 SCC 31 (CanLII)

meant to share.  As Lamer C.J. put it in *M. (C.A.)*, at para. 92: "Appellate courts . . . serve an important function in reviewing and minimizing the disparity of sentences imposed by sentencing judges for similar offenders and similar offences committed throughout Canada."

IV

[70]      For all of these reasons, with respect for those who see the matter differently, I would dismiss the appeal.

**APPENDIX**

*Criminal Code*, R.S.C. 1985, c. C-46

**718.** The fundamental purpose of sentencing is to contribute, along with crime prevention initiatives, to respect for the law and the maintenance of a just, peaceful and safe society by imposing just sanctions that have one or more of the following objectives:

(*a*) to denounce unlawful conduct;

(*b*) to deter the offender and other persons from committing offences;

(*c*) to separate offenders from society, where necessary;

(*d*) to assist in rehabilitating offenders;

(*e*) to provide reparations for harm done to victims or to the community; and

(*f*) to promote a sense of responsibility in offenders, and acknowledgment of the harm done to victims and to the community.

. . .

2008 SCC 31 (CanLII)

**753.1** (1) [*Application for finding that an offender is a long-term offender*] The court may, on application made under this Part following the filing of an assessment report under subsection 752.1(2), find an offender to be a long-term offender if it is satisfied that

(*a*) it would be appropriate to impose a sentence of imprisonment of two years or more for the offence for which the offender has been convicted;

(*b*) there is a substantial risk that the offender will reoffend; and

(*c*) there is a reasonable possibility of eventual control of the risk in the community.

*Appeal allowed,* FISH J. *dissenting.*

*Solicitors for the appellant: Poursuites criminelles et pénales du Québec, Montréal.*

*Solicitors for the respondent: Des Longchamps, Bourassa, Trudeau & LaFrance, Montréal.*

2008 SCC 31 (CanLII)