1  BENJAMIN B. WAGNER
   United States Attorney
2  MICHELLE A. PRINCE
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, California 95814
4  Telephone: (916) 554-2758

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                   FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10

11 UNITED STATES OF AMERICA,        )   Case. No 2:11-MJ-310 KJN
                                    )
12              Plaintiff,          )
                                    )   EXTRADITION SUPPORTING
13        v.                        )   DOCUMENTATION
                                    )   FOR THE EXTRADITION OF FUGITIVE
14 JAMES WILLIAM ROBERTSON,         )   JAMES WILLIAM ROBERTSON FROM
                                    )   THE UNITED STATES TO CANADA
15              Defendant.          )
                                    )
16                                  )
                                    )
17 _____

18

19 //

20 //

21 //

22 //

23 //

24 //

25 //

26 //

27 //

28

                              1



## Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition

### AMERICAN FOREIGN SERVICE

Ottawa, Canada, October 5, 2011

I, Sylvia D. Johnson, Consul General of the United States of America at Ottawa, Canada, hereby certify that the annexed papers, being authenticated supporting documents proposed to be used upon an application for the extradition from the United States of James Williams Robertson, who is wanted in the Province of British Columbia to serve the remainder of his 9 years, 9 months, 18 days of his sentence and to and trial on three counts of breach of a long term supervision order, contrary to the Criminal Code of Canada, are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Canada, as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed this 5th day of October, 2011.

Sylvia D. Johnson
Consul General of the
United States of America

Form 36- Foreign Service

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

I certify That Patricia E. McDonough, whose name is subscribed to the document hereunto annexed, was at the time of subscribing the same Attorney Adviser, Office of the Legal Adviser, Department of State, United States of America, and that full faith and credit are due to her acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, Hillary Rodham Clinton, Secretary of State , have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this twenty-eighth day of October, 2011.

Secretary of State

By_____

Assistant Authentication Officer,
Department of State

Issued pursuant to CHXIV Section of
Sept. 15, 1789, 1 Stat. 68; 22
USC 2656; 5 USC 2651a; 5 USC
301; 28 USC 1733 et. seq.; 28 USC
1443(f); 28 44 Federal Rules of
Civil Pro

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF PATRICIA E. MCDONOUGH

I, Patricia E. McDonough, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser, Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the matter of the extradition case of James William Robertson. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. In accordance with the provisions of the extradition treaty in full force and effect between the United States and Canada, the Canadian Embassy has submitted a diplomatic note (No. 235, dated October 5, 2011) formally requesting the extradition of James William Robertson. A copy of the diplomatic note is attached to this declaration.

3. The relevant and applicable treaty provisions in full force and effect between the United States and Canada are found in the Extradition Treaty between the United States of America and Canada of December 3, 1971, which entered into force on March 22, 1976 (TIAS 8237), the Protocol Amending the Extradition Treaty with Canada of January 11, 1988, which entered into force on November 26, 1991, and the Second Protocol Amending the Extradition Treaty with Canada of January 12, 2001, which entered into force on April 30, 2003. Copies of the Treaty and the Protocol are attached to this declaration.

4. In accordance with Article 17 of the 1971 Extradition Treaty between the United States and Canada, the Government of the United States provides legal representation in its courts for Canada in its extradition requests, and Canada provides legal representation in its courts for extradition requests made by the United States.

5.  The offenses for which extradition is sought are extraditable pursuant to Article 2 of the 1971 Extradition Treaty, as replaced by Article I of the 1988 Protocol.  Article 2 of the 1971 Extradition Treaty, as replaced by Article I of the 1988 Protocol, provides that extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Canada and the United States by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

6.  The documents submitted by the Government of Canada in support of its extradition request were certified on October 5, 2011, by Silvia D. Johnson, Consul General of the United States of America in Ottawa, in accordance with Title 18, United States Code, Section 3190. Ms. Johnson, at the time of her certification, was the principal consular officer of the United States in Canada.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 27, 2011.

PATRICIA E. MCDONOUGH

Attachments:
1.  Copy of Note
2.  Copy of Treaty and Protocols



𝕮𝖆𝖓𝖆𝖉𝖎𝖆𝖓 𝕰𝖒𝖇𝖆𝖘𝖘𝖞          𝕬𝖒𝖇𝖆𝖘𝖘𝖆𝖉𝖊 𝖉𝖚 𝕮𝖆𝖓𝖆𝖉𝖆

Note No. 0235

The Embassy of Canada presents its compliments to the Department of State and has the honour to request the extradition of James William Robertson, a Canadian citizen born in Vancouver, BC on July 12, 1940 and an American citizen since September 19, 1997, holder of  US passport No:712193774.

The subject is described as being 183 cm in height; weighs 77 kg; blue eyes; grey hair and has a faded tattoo of an anchor "RCN"  on the left forearm and has a one and a half inch scar on the right eye. A photograph of the person sought is appended to the supporting extradition documents.

Subject is to serve the remainder of a sentence (9 years 9 months 18 days of a long term supervision order) imposed on January 20, 2005 for:

- One count of sexual assault, contrary to section 246.1 of the *Criminal Code*;

- Two counts of indecent assault of a male person upon another male person, contrary to section 156 of the *Criminal Code*;

- Two counts of indecent assault upon a female, contrary to section 141(1) of the *Criminal Code*;

.../2

- Three counts of indecent assault upon a female contrary to section 149(1) of the *Criminal Code*;
- One count of rape, contrary to section 136(a) of the *Criminal Code*;
- One count of rape, contrary to section 144 of the *Criminal Code*;
- One count of common assault, contrary to section 231(1) of the *Criminal Code*; and
- One count of common assault, contrary to section 245(1) of the *Criminal Code*.

In addition to this cumulative jail sentence of 5 years, the Court found that the subject posed a substantial risk to re-offend sexually, and, in accordance with section 753.1 of the *Criminal Code* of Canada, found him to be a long-term offender and ordered him to be supervised upon his release by the Correctional Service of Canada for a period of ten years (the "Long-term Offender Order").

The subject completed the 5 year sentence on January 19, 2010, on which date he became legally obligated to comply with the terms and conditions of the Long-term Offender Order. After serving less than three months of his Long-term Offender Order he left Canada, he has 9 years 9 months 18 days remaining to be served on the order.

The Warrant of Committal upon conviction was issued by Honourable Madam Justice Kirkpatrick, a Justice of the Supreme Court of British Columbia on January 20, 2005.

.../3

-3-

The subject is also to stand trial as follows:
James Williams Robertson on or about March 12, 2010, near Surrey,
British Columbia, did commit the following offences:

- Three counts of breach of order for long term
  supervision, contrary to section 753.3(1) of the
  *Criminal Code*.

Information was sworn on September 13, 2010 by Court
Liaison Officer L. Witzer for Sidney, British Columbia.

Warrant for arrest was issued on September 23, 2010 by
Justice of the Peace R. Speed.

There is no statute of limitations in respect of the
offences for which the person sought stands charged. The offences
are punishable by more than one year of imprisonment.

The last known location of the accused was 3535 Lake
Tahoe Blvd, Apartment # 125, South Lake Tahoe, California, USA.
James William Robertson was provisionally arrested in South Lake
Tahoe on September 30, 2011.

The Prosecuting Attorney is Catherine Anne Murray,
Q.C., Crown Counsel, Ministry of Attorney General of British
Columbia, tel 250-387-6459.

The Canadian Investigator is Cst Hernan Topacio, Royal
Canadian Mounted Police, "E" Division Major Crimes Section,
Integrated Child Exploitation Unit, office tel:604-598-4625, cell
phone: 604-317-2956.

. . ./4

-4-

The Foreign Investigator is Det Doug Sentell, South Lake Tahoe Police Department, tel: 530-542-6138.

The Embassy of Canada avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.



WASHINGTON, D.C.

October 05, 2011

| 101st Congress 2d Session | SENATE | Treaty Doc. 101-17 |
|---|---|---|

## PROTOCOL AMENDING THE EXTRADITION TREATY WITH CANADA

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE PROTOCOL SIGNED AT OTTAWA ON JANUARY 11, 1988, AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA, SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

Entered into Force on November 26, 1991



English Text Only

APRIL 24, 1990.—Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1990

39-118

6

authority in the requested State may, in its discretion, grant extradition."

## ARTICLE IV

Paragraph (2) of Article 4 of the Extradition Treaty, as amended, is deleted and replaced by the following:

"(2) For the purpose of this Treaty, the following offenses shall be deemed not to be offenses within subparagraph (iii) of paragraph 1 of this Article:

"(i) An offense for which each Contracting Party has the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to its competent authorities for the purpose of prosecution;

"(ii) Murder, manslaughter or other culpable homicide, malicious wounding or inflicting grievous bodily harm;

"(iii) An offense involving kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

"(iv) An offense involving the placing or use of explosives, incendiaries or destructive devices or substances capable of endangering life or of causing grievous bodily harm or substantial property damage; and

"(v) An attempt or conspiracy to commit, or counselling the commission of, any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses."

## ARTICLE V

Article 7 of the Extradition Treaty is deleted and replaced by the following:

## "ARTICLE 7

"When the person sought is being proceeded against or is serving a sentence in the requested State for an offense other than that for which extradition is requested, the requested State may surrender the person sought or postpone surrender until the conclusion of the proceedings or the service of the whole or any part of the sentence imposed."

## ARTICLE VI

Paragraph (3) of Article 11 of the Extradition Treaty is deleted and replaced by the following:

"(3) A person arrested shall be set at liberty upon the expiration of sixty days from the date of arrest pursuant to such application if a request for extradition and the documents specified in Article 9 have not been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request and documents are subsequently received."

## ARTICLE VII

The Extradition Treaty is amended by adding the following after Article 17:

7

## "ARTICLE 17 BIS

"If both contracting Parties have jurisdiction to prosecute the person for the offense for which extradition is sought, the executive authority of the requested State, after consulting with the executive authority of the requesting State, shall decide whether to extradite the person or to submit the case to its competent authorities for the purpose of prosecution. In making its decision, the requested State shall consider all relevant factors, including but not limited to:

"(i) the place where the act was committed or intended to be committed or the injury occurred or was intended to occur;

"(ii) the respective interests of the Contracting Parties;

"(iii) the nationality of the victim or the intended victim; and

"(iv) the availability and location of the evidence."

## ARTICLE VIII

Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date.

## ARTICLE IX

(1) This Protocol shall be subject to ratification in accordance with the applicable procedures of the Government of the United States and the Government of Canada and instruments of ratification shall be exchanged as soon as possible.

(2) The Protocol shall enter into force upon the exchange of instruments of ratification.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Ottawa, this 11th day of January 1988, in the English and French languages, the two texts being equally authentic.

For the Government of the United States of America.

GEORGE P. SHULTZ.

For the Government of Canada.

JOE CLARK.

O

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

The Government of the United States of America and the Government of Canada;

Desiring to make more effective the Extradition Treaty between the Contracting Parties, signed at Washington on December 3, 1971, as amended by the agreement effected by an Exchange of Notes on June 28 and July 9, 1974 (hereinafter referred to as "the Extradition Treaty");

Have agreed as follows:

## ARTICLE I

Article 2 of the Extradition Treaty is deleted and replaced by the following:

### "ARTICLE 2

"(1) Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

"(2) An offense is extraditable notwithstanding

"(i) that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States, or

"(ii) that it relates to taxation or revenue or is one of a purely fiscal character."

## ARTICLE II

The SCHEDULE to the Extradition Treaty, as amended, is deleted.

## ARTICLE III

Paragraph (2) of Article 3 of the Extradition Treaty is deleted. Paragraph (3) of Article 3 of the Extradition Treaty is amended to read as follows:

"(2) When the offense for which extradition is requested was committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall grant extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances. If the laws in the requested State do not so provide, the executive

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 8237

[Reprint of English text only]

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and CANADA

Signed at Washington December 3, 1971

*and*

Agreement Amending the Treaty
Effected by Exchange of Notes
Signed at Washington June 28 and July 9, 1974



VIII

be submitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Second Protocol by the Senate at an early date.

Respectfully submitted,

COLIN L. POWELL.

# CANADA

## Extradition

*Treaty signed at Washington December 3, 1971;*
*And agreement amending the treaty*
*Effected by exchange of notes*
*Signed at Washington June 28 and July 9, 1974;*
*Ratification of the treaty, as amended, advised by the Senate of*
  *the United States of America December 1, 1975;*
*Ratified by the President of the United States of America De-*
  *cember 12, 1975;*
*Ratified by Canada February 2, 1976;*
*Ratifications exchanged at Ottawa March 22, 1976;*
*Proclaimed by the President of the United States of America*
  *May 6, 1976;*
*Entered into force March 22, 1976.*

---

By the President of the United States of America

## A PROCLAMATION

Considering that:

The Treaty on Extradition between the United States of America and Canada was signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada;

The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended,

(1)                                           TIAS 8237

2

to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six and of the Independence of the United States of America the two hundredth.

[SEAL]

GERALD R. FORD

By the President:
JOSEPH JOHN SISCO
*Acting Secretary of State*

3

TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND CANADA

The United States of America and Canada, desiring to make
more effective the cooperation of the two countries in the
repression of crime by making provision for the reciprocal
extradition of offenders, agree as follows:

TIAS 8237

4

## ARTICLE 1

Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty committed within the territory of the other, or outside thereof under the conditions specified in Article 3(3) of this Treaty.

## ARTICLE 2

(1) Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

(2) Extradition shall also be granted for attempts to commit, or conspiracy to commit or being a party to any of the offenses listed in the annexed Schedule.

(3) Extradition shall also be granted for any offense against a federal law of the United States in which one of the offenses listed in the annexed Schedule, or made extraditable by paragraph (2) of this Article, is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

## ARTICLE 3

(1) For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including air space

TIAS 8237

7

## ARTICLE 5

If a request for extradition is made under this Treaty for
a person who at the time of such request, or at the time of the
commission of the offense for which extradition is sought, is
under the age of eighteen years and is considered by the
requested State to be one of its residents, the requested State,
upon a determination that extradition would disrupt the social
readjustment and rehabilitation of that person, may recommend
to the requesting State that the request for extradition be
withdrawn, specifying the reasons therefor.

## ARTICLE 6

When the offense for which extradition is requested is
punishable by death under the laws of the requesting State and
the laws of the requested State do not permit such punishment
for that offense, extradition may be refused unless the requesting
State provides such assurances as the requested State considers
sufficient that the death penalty shall not be imposed, or, if
imposed, shall not be executed.

## ARTICLE 7

When the person whose extradition is requested is being
proceeded against or is serving a sentence in the territory of
the requested State for an offense other than that for which
extradition has been requested, his surrender may be deferred
until the conclusion of the proceedings and the full execution
of any punishment he may be or may have been awarded.

8

## ARTICLE 8

The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

## ARTICLE 9

(1)  The request for extradition shall be made through the diplomatic channel.

(2)  The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3)  When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4)  When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting State, by a statement showing how much of the sentence has not been served, and by evidence proving that the person requested is the person to whom the sentence refers.

TIAS 8237

9

ARTICLE 10

(1)  Extradition shall be granted only if the evidence be
found sufficient, according to the laws of the place where the
person sought shall be found, either to justify his committal
for trial if the offense of which he is accused had been committed
in its territory or to prove that he is the identical person
convicted by the courts of the requesting State.

(2)  The documentary evidence in support of a request for
extradition or copies of these documents shall be admitted in
evidence in the examination of the request for extradition when,
in the case of a request emanating from Canada, they are
authenticated by an officer of the Department of Justice of
Canada and are certified by the principal diplomatic or consular
officer of the United States in Canada, or when, in the case of
a request emanating from the United States, they are authenticated
by an officer of the Department of State of the United States and
are certified by the principal diplomatic or consular officer of
Canada in the United States.


ARTICLE 11

(1)  In case of urgency a Contracting Party may apply for
the provisional arrest of the person sought pending the presentation
of the request for extradition through the diplomatic channel.
Such application shall contain a description of the person sought,
an indication of intention to request the extradition of the person
sought and a statement of the existence of a warrant of arrest
or a judgment of conviction against that person, and such further
information, if any, as would be necessary to justify the issue of
a warrant of arrest had the offense been committed, or the person
sought been convicted, in the territory of the requested State.

10

(2)  On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3)  A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received.  This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

ARTICLE 12

(1)  A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i)  He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii)  He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii) The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his extradition to a third State, provided such other offense is covered by Article 2.

(2)  The foregoing shall not apply to offenses committed after the extradition.

TIAS 8237

11

ARTICLE 13

(1)  A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought.

(2)  Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

ARTICLE 14

(1)  The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)  If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

ARTICLE 15

(1)  To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered to the requesting State if extradition is granted.

TIAS 8237

12

(2)  Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall be returned to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

ARTICLE 16

(1)  The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

(2)  The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE 17

(1)  Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State.  The appropriate legal officers of the State in which the extradition proceedings take place shall, by all legal means within their power, assist the requesting State before the respective judges and magistrates.

TIAS 8237

13

(2)  No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

ARTICLE 18

(1)  This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2)  This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3)  This Treaty shall enter into force upon the exchange of ratifications.[1] It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

_____

[1] Mar. 22, 1976.

14

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and French languages, each language version being equally authentic, at Washington this third day of December, one thousand nine hundred seventy one.

FOR THE UNITED STATES OF AMERICA:

*[signature]* [1]

FOR CANADA:

*[signature]* [2]

---

[1] William P. Rogers
[2] Mitchell Sharp

TIAS 8237

15

SCHEDULE

1. Murder; assault with intent to commit murder.

2. Manslaughter.

3. Wounding; maiming; or assault occasioning bodily harm.

4. Unlawful throwing or application of any corrosive substances
   at or upon the person of another.

5. Rape; indecent assault.

6. Unlawful sexual acts with or upon children under the age
   specified by the laws of both the requesting and requested
   States.

7. Willful nonsupport or willful abandonment of a minor when
   such minor is or is likely to be injured or his life is or
   is likely to be endangered.

8. Kidnapping; child stealing; abduction; false imprisonment.

9. Robbery; assault with intent to steal.

10. Burglary; housebreaking.

11. Larceny, theft or embezzlement.

12. Obtaining property, money or valuable securities by false
    pretenses or by threat of force or by defrauding the public
    or any person by deceit or falsehood or other fraudulent
    means, whether such deceit or falsehood or any fraudulent
    means would or would not amount to a false pretense.

13. Bribery, including soliciting, offering and accepting.

14. Extortion.

16

15. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.

16. Fraud by a banker, agent, or by a director or officer of any company.

17. Offenses against the laws relating to counterfeiting or forgery.

18. Perjury in any proceeding whatsoever.

19. Making a false affidavit or statutory declaration for any extrajudicial purpose.

20. Arson.

21. Any act done with intent to endanger the safety of any person travelling upon a railway, or in any aircraft or vessel or other means of transportation.

22. Piracy, by statute or by law of nations; mutiny or revolt on board a vessel against the authority of the captain or commander of such vessel.

23. Any unlawful seizure or exercise of control of an aircraft, by force or violence or threat of force or violence, or by any other form of intimidation, on board such aircraft.

24. Willful injury to property.

25. Offenses against the bankruptcy laws.

26. Offenses against the laws relating to the traffic in, production, manufacture, or importation of narcotic drugs, Cannabis sativa L., hallucinogenic drugs, amphetamines, barbiturates, cocaine and its derivatives.

17

27.   Use of the mails or other means of communication in
      connection with schemes devised or intended to deceive
      or defraud the public or for the purpose of obtaining
      money or property by false pretenses.

28.   Offenses against federal laws relating to the sale or
      purchase of securities.

29.   Making or having in possession any explosive substance
      with intent to endanger life, or to cause severe damage
      to property.

30.   Obstructing the course of justice in a judicial
      proceeding, existing or proposed, by:

      a)    dissuading or attempting to dissuade a person by
            threats, bribes, or other corrupt means from
            giving evidence;

      b)    influencing or attempting to influence by threat,
            bribes, or other corrupt means a person in his
            conduct as a juror; or

      c)    accepting a bribe or other corrupt consideration
            to abstain from giving evidence or to do or to
            refrain from doing anything as a juror.

35

[AMENDING AGREEMENT]

*The Canadian Ambassador to the Secretary of State*



Canadian Embassy          Ambassade du Canada

Washington, D.C.

June 28, 1974

No. 126

Excellency,

      I have the honour to refer to the Treaty on Extradition between the Government of Canada and the Government of the United States signed at Washington on December 3, 1971 and to subsequent discussions between representatives of our two governments concerning the amendment of the said Treaty.

      Further to those discussions I now have the honour to propose that the said Treaty be amended as follows:

          (1) That Article 4(2)(i) of the Treaty shall be amended to read: "A kidnapping, murder, or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt or conspiracy to commit, or being a party to

The Honourable
  Henry A. Kissinger,
    Secretary of State,
      Washington, D.C.
        20520

TIAS 8237

36

the commission of, such an offence with

respect to any such person."

(2) That clause 26 of the Schedule annexed to

the Treaty shall be amended to read:

"Offences against the laws relating to

the traffic in, production, manufacture or

importation of drugs listed in Schedule I

to the Single Convention on Narcotic Drugs

of March 30, 1961[1] and of drugs listed in

Schedules I, II and III to the Convention

on Psychotropic Substances of February 21,

1971."

If this proposal meets with the approval of your

government, I have the further honour to propose that

this Note, which is authentic in English and in French,

and your reply shall constitute an amendment to the Treaty

on Extradition between Canada and the United States referred

to above, which shall come into force on the date of the

entry into force of the said Treaty and which shall be con-

sidered an integral part of the said Treaty.

Accept, Excellency, the assurances of my highest

consideration.

M. Cadieux,
Ambassador.

---

[1] TIAS 6298; 18 UST 1539.


TIAS 8237

39

*The Secretary of State to the Canadian Ambassador*

DEPARTMENT OF STATE
WASHINGTON

July 9, 1974

Excellency:

I have the honor to refer to your note of June 28, 1974, in the English and French languages, relating to amendment of the Treaty on Extradition between the United States of America and Canada, signed at Washington December 3, 1971.

On behalf of the United States of America I confirm the understanding set forth therein and consider that your note and this reply constitute an agreement between the United States and Canada on this matter.

Accept, Excellency, the renewed assurances of my highest consideration.

For the Secretary of State:

Acting Secretary

*Joseph John Sisco*

His Excellency

Marcel Cadieux,

Ambassador of Canada.

Department of Justice    Ministère de la Justice
Canada                   Canada

Ottawa, Canada
K1A 0H8

# CERTIFICATE OF AUTHENTICATION

*IN THE MATTER OF the extradition of JAMES WILLIAM ROBERTSON from the United States of America to British Columbia, Canada*

I, MATTHEW WILLIAMS, Senior Counsel for the International Assistance Group, Department of Justice of Canada, do hereby certify:

THAT attached to this Certificate is authenticated documentation presented by Canada in support of the extradition of *JAMES WILLIAM ROBERTSON* who is wanted in the Province of British Columbia to serve the remainder (9 years 9 months 18 days) of a sentence and to stand trial on three counts of breach of a long term supervision order, contrary the *Criminal Code.*

THAT the documentation attached to this certificate is composed of:

- the original Affidavit of Law prepared by Catherine Anne Murray, Crown Prosecutor for the Ministry of Attorney General of British Columbia, and

- the original Affidavit of Fact prepared by Constable Hernan Bundoc Topacio, Peace Officer, Royal Canadian Mounted Police.

THAT Tim Stokes whose original signature appears at the end of the Affidavit of Catherine Anne Murray is a Lawyer and a Commissioner of Oaths for the Province of British Columbia, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

# Canada

– 2 –

THAT Will Thien whose original signature appears at the end of the Affidavit of Hernan Bundoc Topacio is a Commissioner of Oaths in and for the Province of British Columbia, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

The Seal of the Minister of Justice of Canada is hereby affixed this 4th day of October, 2011.

_____
Matthew Williams

**CANADA**
**PROVINCE OF BRITISH COLUMBIA**
**CITY OF VICTORIA**

**IN THE MATTER OF AN APPLICATION FOR THE EXTRADITION FROM THE UNITED STATES OF AMERICA TO CANADA OF JAMES WILLIAM ROBERTSON WHO STANDS CHARGED IN CANADA WITH BREACH OF HIS LONG-TERM SUPERVISION ORDER**

## AFFIDAVIT

I, Catherine Anne Murray, Q.C., of the City of Victoria, in the Province of British Columbia, Canada, MAKE OATH AND SAY AS FOLLOWS:

1.　　I am a Barrister and Solicitor qualified to practice law in the Province of British Columbia, Canada since June 15, 1985. I am employed as a Crown Prosecutor with the Criminal Justice Branch of the Ministry of Attorney General of British Columbia, Canada, which is responsible for the conduct of criminal prosecutions in the Province of British Columbia, Canada and have been since May, 1997.

2.　　Since joining the Crown, my practice has been exclusively in the area of criminal law, accordingly I have developed an expertise in the field of criminal law in Canada.

3.　　I am responsible for the prosecution of James William ROBERTSON, date of birth July 12th, 1940, ("ROBERTSON") and as such I have personal knowledge of the facts and matters herein deposed, save and except where those facts are stated to be based upon information and belief and where so stated, I verily believe them to be true.

4.　　ROBERTSON is charged on Information 152261, (the "Information") with three counts of failing to comply with a Long-Term Supervision Order. Attached hereto and marked as Exhibit "A" to this my Affidavit is a certified copy of the Information. A warrant was issued by the Court Registry in Victoria, British

Columbia on September 23rd, 2010 as process for the Information.   Attached hereto and marked as Exhibit "B" to this my Affidavit is a certified copy of the warrant which is still outstanding.

5.   A Federal Warrant of Apprehension was issued by Correctional Services Canada on March 31, 2010 when ROBERTSON went missing.   Attached hereto and marked as Exhibit "C" to this my Affidavit is a certified copy of the Federal Warrant of Apprehension. ROBERTSON is wanted in Canada to continue serving the sentence of Long-Term Supervision and he is wanted to stand trial for the offences set out in Exhibit "A".

6.   A Long-Term Supervision Order ("LTSO") is imposed after a finding that the offender is a Long-Term Offender ("LTO").   An LTO pursuant to section 753.1 of the *Criminal Code of Canada ("Criminal Code")*, is an extraordinary sentence, that is imposed only when the court, after finding the offender guilty of a designated sexual offence, is satisfied that there is a substantial risk that the offender will reoffend, but is also satisfied that there is a reasonable possibility of eventual control of the risk in the community. If the offender is found to be an LTO, the court imposes a fixed sentence of two or more years and orders that the offender be supervised in the community for a further period not exceeding ten years. The supervision period has conditions that the offender must comply with and is supervised by parole officers employed by Correctional Services Canada. Attached hereto and marked as Exhibit "D" to this my Affidavit is a copy of section 753.1 of the *Criminal Code*.

7.   Pursuant to section 753.3 of the *Criminal Code*, an offender that breaches an LTSO is guilty of an indictable offence and is subject to a term of imprisonment of up to ten years. Attached hereto and marked as Exhibit "E" to this my Affidavit is a copy of section 753.3 of the *Criminal Code*.

8.   ROBERTSON was found to be a long-term offender by Madame Justice Kirkpatrick of the British Columbia Supreme Court on January 20, 2005.He was sentenced on 13 offences ranging from assault to rape to a total sentence of 16 years plus a Long-Term Supervision Order of ten years. Attached hereto and marked as Exhibit "F" to this my Affidavit is the Reasons for Judgment on Sentence. ROBERTSON is identified as J.W.R. in the Judgment as there was a ban on publication ordered by the court to protect the victims. J.W.R. and ROBERTSON are one and the same person.

9.   After being credited 11 years for time served while awaiting trial, ROBERTSON received an effective sentence of 5 years plus the Long-Term Supervision Order ("LTSO"). Attached hereto and marked as Exhibit "G" to this my Affidavit is a certified copy of the Warrant of Committal setting out the sentence.  Although Madame Justice Kirkpatrick convicted ROBERTSON on 13 offences, the Warrant of Committal only notes the sentences for 12 of the offences because the 13th offence was subsumed by two other counts and subject to the decision in *R.* v. *Kienapple* [1975] 1 SCR 729, the Justice ordered a conditional stay of proceedings on that count.

10.   ROBERTSON unsuccessfully appealed the Long-Term Offender ("LTO") finding and the ten-year LTSO to the British Columbia Court of Appeal. Attached hereto and marked as Exhibit "H" to this my Affidavit is a copy of the decision of the Court of Appeal upholding the LTO designation and the LTSO. As with the BC Supreme Court Judgment, ROBERTSON's initials are used as the accused's name as there was a ban on publication ordered by the Court. J.W.R. and ROBERTSON are one and the same person.

11.   Pursuant to the terms of his LTSO, ROBERTSON was, amongst other conditions, required to report to a parole officer as directed, advise his parole officer of his residential address and thereafter report immediately any change,

and to remain at all times in Canada. Attached hereto and marked as Exhibit "I" to this my affidavit is a certified copy of ROBERTSON'S Long-term Supervision Certificate.

12.    ROBERTSON'S LTSO commenced January 19, 2010, following the expiration of his period of incarceration and is to remain in force until January 18, 2020. In March 2010, his parole officer, Ms. Froozan Jooya ("Jooya") lost contact with him. Contrary to the conditions of his LTO ROBERTSON moved from his sister's residence in Richmond, British Columbia without advising Jooya and had ceased reporting to her. Attached hereto and marked as Exhibit "J" to this my Affidavit is a statement from Jooya, which appends a photograph of ROBERTSON.

13.    Through the investigation of Cst. Hernan Topacio of the Royal Canadian Mounted Police, it was determined that ROBERTSON is living in South Lake Tahoe, California, USA. This is in breach of his LTSO. Cst. Topacio's Affidavit sets out the details of his investigation.

14.    Having reviewed the documentation and read the Affidavit of Cst. Topacio and the statement of Jooya, and based on my expertise in the area of criminal law, it is my opinion that there is a substantial likelihood of conviction on the charges of failing to comply with a Long-Term Supervision Order as charged in Exhibit "A".

15.    All of the breaches alleged in Exhibit "A" are violations of the *Criminal Code* and are criminal offences.  All of the offences alleged in Exhibit "A" were offences that occurred on the date as set out in each of the counts within the Information, and continue to be offences today.

16.    The *Criminal Code* is a statute enacted by the Parliament of Canada. It contains the law relating to criminal offences for the whole of Canada. It therefore applies in British Columbia. The particular sections of the *Criminal Code* relevant to this extradition request were in force on the day of the alleged offences.

17.   Under Canadian law, criminal offences are divided into three categories:

    a.   Indictable offences;

    b.   Summary conviction offences; and

    c.   Offences that are, at the election of the prosecution, either indictable or summary conviction, (referred to as "Crown election" or "hybrid" offences).

18.   Canadian law has abolished the common law distinction between felonies and misdemeanours; however, indictable offences are roughly equivalent to felonies, and summary conviction offences are roughly equivalent to misdemeanours. Generally speaking, indictable offences are more serious, provide the accused with more elaborate procedures and safeguards, and carry the risk of more severe penalties.   There are no limitation periods for indictable offences. Summary conviction offences are commonly less serious offences, with less severe consequences upon conviction.  In the case of Crown election or hybrid offences, all such offences are deemed to be indictable offences unless and until the Crown elects to proceed by way of summary conviction. .

19.   If ROBERTSON is convicted of the counts set out on the Information, Crown Counsel will seek a penitentiary sentence, which is a jail term over two years in length.

20.   ROBERTSON has another outstanding charge and warrant from Richmond, British Columbia. As part of his sentence, ROBERTSON was ordered, pursuant to section 490.012 of the *Criminal Code of Canada* to comply with the Sex Offender Registration Act ("SOIRA") : see paragraphs 142 through 148 of the Reasons for Judgment ( Exhibit "F"). The SOIRA establishes a database designed to assist peace officers in the investigation of sexual offences. The database contains addresses, descriptors and other vital information of convicted sex offenders. Pursuant to the order ROBERTSON was required to report to a Sex Offender registration centre within 15 days of his release from prison and report once a year thereafter for the rest of his life.

21.   ROBERTSON has never reported to a sex offender registration centre and as a result, is charged under section 490.031 of the *Criminal Code of Canada* with the criminal offence of failing to comply with the SOIRA. Attached hereto as Exhibit "K" to this my Affidavit is a certified copy of outstanding Information 56614 from the Richmond, British Columbia Court registry. A warrant was issued for the arrest of ROBERTSON as process on this charge on May 31st, 2011. A certified copy of the warrant is attached hereto as Exhibit "L" to this my Affidavit.

22..   Pursuant to section 490.031 of the *Criminal Code of Canada* ROBERTSON is liable if convicted to a fine of up to $10,000 or to imprisonment of up to six months or to both. A copy of *Criminal Code of Canada* sections 490.012, 490.013 and 490.031 are attached hereto as Exhibit "M" to this my Affidavit. Because this is a summary conviction matter, I am aware that it does not meet the requirements for extradition, and as such I am not seeking ROBERTSON's extradition on Information 56614, however, I am referring to the existence of this information as an aggravating factor in Mr. ROBERTSON's conduct.

23.   I swear this Affidavit in support of an application to have ROBERTSON extradited from the United States of America and returned to Canada for the purpose of his standing trial on the charges set out in Information 152261 attached hereto as Exhibit "A" and to be dealt with according to law.

SWORN BEFORE ME this _____                )
day of _____ 2011 in the City of      )
Victoria, in the Province of                         )
British Columbia, Canada                          )
                                                              )
                                                              )
                                                              )
_____                    )   _____
A Commissioner for taking Oaths            )      CATHERINE ANNE MURRAY, Q.C.
In the Province of British Columbia          )

**INFORMATION/DÉNONCIATION**

Court File Number: 152261
Type Reference:
Info. Seq. Number: 1
Agency File Number: RMCS:10-3238

DNA:
K File:
SOR:

*This is Exhibit "A"
referred to in the Affidavit of*
*Catherine Munro*
*sworn before me this 23 day*
*of September 20 11*

*A Commissioner in and for taking
Affidavits for British Columbia*

CANADA:
PROVINCE OF BRITISH COLUMBIA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

Page 1 of 1                                    **"BY INDICTMENT"**

This is the information of / Les présentes constituent la dénonciation de L. Witzer
Court Liaison Officer  (the "informant" / le "dénonciateur") of / de Surrey, Sidney, British Columbia.

The informant says that the informant has reasonable and probable grounds to believe and does believe that / Le dénonciateur déclare qu'il a des motifs raisonnables et probables et croit effectivement que

**Count  1**

James William ROBERTSON, on or about the 12th day of March, 2010, at or near Surrey, in the Province of British Columbia, did, without reasonable excuse, fail or refuse to comply with a long-term supervision order, "remain at all times in Canada within the territorial boundaries fixed by your parole supervisor",  contrary to Section 753.3(1) of the Criminal Code.

COMPARED TO THE ORIGINAL AND
CERTIFIED TO BE A TRUE COPY

Aug 3d 11

**Count  2**

James William ROBERTSON, on or about the 12th day of March, 2010, at or near Surrey, in the Province of British Columbia, did, without reasonable excuse, fail or refuse to comply with a long-term supervision order, "advise your parole supervisor of...any change in your address of residence",  contrary to Section 753.3(1) of the Criminal Code.

**Count  3**

James William ROBERTSON, between the 20th day of February and the 12th day of March, 2010, at or near Surrey, in the Province of British Columbia, did, without reasonable excuse, fail or refuse to comply with a long-term supervision order, "on release...report to your parole supervisor immediately and thereafter as instructed by your parole supervisor",  contrary to Section 753.3(1) of the Criminal Code.

*Affirmed*
SWORN BEFORE ME / ASSERMENTÉ DEVANT MOI

ON / CE ___23rd___ DAY OF / JOUR DE

___September___, 2010.

AT / À Victoria,

BRITISH COLUMBIA / COLOMBIE-BRITANNIQUE

_____
A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA
JUGE DE PAIX DANS ET POUR LA PROVINCE DE
LA COLOMBIE-BRITANNIQUE

(SIGNATURE OF INFORMANT)
(SIGNATURE DU DÉNONCIATEUR)

PROCESS CONFIRMED / ACTE DE PROCÉDURE
CONFIRMÉ

_____
A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA
JUGE DE PAIX DANS ET POUR LA PROVINCE DE
LA COLOMBIE-BRITANNIQUE

*SM*

*Sentence Management*
*Williamhead Institution*

**CERT LIB/SUP CERT**

Page 1

Correctional Service
Canada

**CERTIFICATE NUMBER:** V80A00013348

| PROTECTED ONCE COMPLETED |
|---|
| [ ]A    [X]B    [ ]C |
| PERSONAL INFORMATION BANK |

**LONG TERM SUPERVISION CERTIFICATE**
Corrections and Conditional Release Act

| This is to certify that the following person is subject to a period of long term supervision as indicated below. | Issued On |
|---|---|
| | 2010/01/19 |

| Name | ROBERTSON, JAMES WILLIAM | | |
|---|---|---|---|
| FPS | 873794D | | D.O.B. 1940/07/12 |
| LTSO Start Date | 2010/01/19 | Institution | WILLIAM HEAD INSTITUTION |
| | | Expiry Date | 2020/01/18 |

**CONDITIONS OF LONG TERM SUPERVISION AND ACKNOWLEDGEMENT**

I fully understand and accept the conditions of my long term supervision (attached), any special conditions noted below or attached and any instructions given by my parole supervisor in respect to any condition of my release. I understand that if I violate them, my long term supervision may be suspended. I also understand that failure or refusal without reasonable excuse to abide by the conditions of the long term supervision order is an offence under 753.3(1) of the Criminal Code of Canada.

753.3(1)  An offender who is required to be supervised by an order made under paragraph 753.1(3)(b) and who, without reasonable excuse, fails or refuses to comply with that order is guilty of an indictable offence and liable to imprisonment for a term not exceeding ten years.

**Special Conditions**

| | Effective Date | End Date |
|---|---|---|
| | Y   M   D | Y   M   D |
| MUST AVOID CERTAIN PERSONS | | |
| Not to be in contact with anyone under the age of 18 without an adult present who has been previously authorized in writing by your Parole Supervisor. | 2010/01/19 | 2020/01/18 |
| MUST AVOID CERTAIN PERSONS | | |
| No direct or indirect contact with any of your victims without the prior written approval of your parole supervisor. | 2010/01/19 | 2020/01/18 |
| OTHER | | |
| Report all relationships, acquaintances, and friendships with females to your Parole Supervisor. | 2010/01/19 | 2020/01/18 |
| FOLLOW PSYCHOLOGICAL COUNSEL. | 2010/01/19 | 2020/01/18 |

I understand that the long term supervision certificate is the property of the National Parole Board and must be delivered on demand of the National Parole Board or of my parole supervisor.

_James W Robertson_
Released offender - Signature

_Witness - Signature_

| Y | M | D |
|---|---|---|
| 2010 | 01 | 12 |
Date

**INSTRUCTIONS**

Pursuant to the conditions of your long term supervision, you must obey these instructions. Failure to do so may result in suspension of your release. You should also understand that failure or refusal without reasonable excuse to abide by the conditions of the long term supervision order is an offence under 753.3(1) of the Criminal Code of Canada.

You must proceed directly to          Richmond, B.C.

and report to your Parole Supervisor

at   JOOYA, FROOZAN F
     VANCOUVER PAROLE OFFICE
     401 - 877 EXPO BOULEVARD
     VANCOUVER          BRITISH COLUMBIA          (604) 666-8004

Chief of Sentence Management
William Head Institution

**CERTIFIED TRUE COPY**

_signature_

Other Amendments

LONG TERM SUPERVISION CERTIFICATE
Ce formulaire existe aussi en français.
CSC 1201 (99-09) OMS          VERS (1)
Date and Time Produced   2010/01/12 10:42

TIME IS BASED ON A 24-HOUR CLOCK PERIOD

This is Exhibit "_E_"
referred to in the Affidavit of
_Catherine Milne_
sworn before me this _2nd_ day
of _September_ 20 _11_

_signature_
A Commissioner/in and for taking
Affidavits for British Columbia

Page 1

CERT LIB/SUP CERT

PROTECTED ONCE COMPLETED

[ ]A   [X]B   [ ]C

PERSONAL INFORMATION BANK

| CERT. # | V80A00013348 | NAME | ROBERTSON, JAMES WILLIAM |
| FPS | 873794D | LOC. | WILLIAM HEAD INSTITUTION |

Director - Signature                                    Parole Supervisor - Signature

```
Chief of Sentence Management
    William Head Institution

CERTIFIED TRUE COPY
```

LONG TERM SUPERVISION CERTIFICATE

Ce formulaire existe aussi en français.

CSC 1201 (99-09) OMS        VERS (1)

Date and Time Produced   2010/01/12 10:42                TIME IS BASED ON A 24-HOUR CLOCK PERIOD.

Page 2 of 4

# CERT LIB/SUP CERT

PROTECTED ONCE COMPLETED

[ ]A   [X]B   [ ]C

PERSONAL INFORMATION BANK

| CERT. #   V80A00013348 | NAME   ROBERTSON, JAMES WILLIAM |
|---|---|
| FPS        873794D | LOC.   WILLIAM HEAD INSTITUTION |

Special Instructions

YOUR PAROLE OFFICER IS Froozan Jooya at Vancouver Parole Office.

Vancouver Community Corrections
# 401-877 Expo Blvd.
Vancouver, BC V6B 1K9
PH: 604-666-8004

CONTACT Froozan Jooya DIRECTLY AT:
Phone: 604-666-2341
Pager: 604-714-7451

YOU ARE REQUIRED TO REPORT MONTHLY TO THE RICHMOND RCMP.

_____          _____
Director - Signature                       Parole Supervisor - Signature

Chief of Sentence Management
William Head Institution

CERTIFIED TRUE COPY

LONG TERM SUPERVISION CERTIFICATE
Ce formulaire existe aussi en français.
CSC 1201 (99-09) OMS        VERS (1)
Date and Time Produced   2010/01/12 10:42        TIME IS BASED ON A 24-HOUR CLOCK PERIOD.

CERT LIB/SUP CERT

Page

PROTECTED ONCE COMPLETED
[ ]A    [X]B   [ ]C
PERSONAL INFORMATION BANK

| CERT. # | V80A00013348 | NAME | ROBERTSON, JAMES WILLIAM |
|---------|--------------|------|--------------------------|
| FPS | 873794D | LOC. | WILLIAM HEAD INSTITUTION |

| REPORTS TO POLICE | | | | | | VISITS TO SUPERVISOR | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

## CONDITIONS OF RELEASE
### (Long Term Supervision Order)

The conditions that the National Parole Board is deemed to have imposed in respect of any offender released on long term supervision are that you:

(a)   on release, travel directly to your place of residence, as set out in your release certificate, and report to your parole supervisor immediately and thereafter as instructed by your parole supervisor;

(b)   remain at all times in Canada within the territorial boundaries fixed by your parole supervisor;

(c)   obey the law and keep the peace;

(d)   inform your parole supervisor immediately on arrest or on being questioned by the police;

(e)   at all times carry the release certificate and the identity card provided by the releasing authority and produce them on request for identification to any peace officer or parole supervisor;

(f)   report to the police if and as instructed by your parole supervisor;

(g)   advise your parole supervisor of your address of residence on release and thereafter report immediately of:

   (i)    any change in your address of residence,

   (ii)   any change in your normal occupation, including employment, vocational or educational training and volunteer work,

   (iii)  any change in your domestic or financial situation (of the offender), and on request of the parole supervisor, any change that you (the offender) have knowledge of in your family situation (of the offender), and

   (iv)   any change that may reasonably be expected to affect your ability to comply with the conditions of long term supervision;

(h)   not own, possess or have the control of any weapon, as defined in section 2 of the Criminal Code, except as authorized by your parole supervisor.

Chief of Sentence Management
William Head Institution

**CERTIFIED TRUE COPY**

LONG TERM SUPERVISION CERTIFICATE
Ce formulaire existe aussi en français.
CSC 1201 (99-09) OMS        VERS (1)
Date and Time Produced   2010/01/12 10:42          TIME IS BASED ON A 24-HOUR CLOCK PERIOD.

Page 4 of 4

Royal Canadian
Mounted Police

Gendarmerie royale
du Canada

## CERTIFICATE OF CONVICTION
## OR DISCHARGE
(Sub-paragraph 667(1)(a)(iii) CC)

## CERTIFICAT DE CONDAMNATION
## OU DE LIBÉRATION
(Sous-alinéa 667(1)(a)(iii) du C. cr.)

I, **Mark Gray** a fingerprint examiner designated as such for the purposes of Section 667 of the *Criminal Code* by the Minister of Public Safety and Emergency Preparedness, do hereby certify that
James William ROBERTSON

Je, préposé aux empreintes digitales ainsi nommé pour l'application de l'Article 667 du *Code criminel* par le Ministre de la Sécurité Publique et de la Protection Civile, certifie par les présentes que
James William ROBERTSON

FPS # 873794D

numéro de S.E.D. 873794D

whose fingerprints are shown reproduced below or attached hereto, and which have been compared and certified to the fingerprints submitted for each charge

dont les empreintes digitales sont reproduites ci-dessous ou sont annexées aux présentes, et qui ont été comparés et certifiés aux empreintes digitales soumises pour tous les charges d'accusation



has been convicted, discharged under Section 730 of the *Criminal Code* or convicted and sentenced in Canada as follows:

a été déclaré coupable, absous en vertu de l'Article 730 du *Code criminel* ou a été déclaré coupable et condamné au Canada comme suit :

| Date and Place of Disposition / Date et lieu de la disposition | Charge / Accusation | Disposition | Name / Nom |
|---|---|---|---|
| 2005-01-20 Vancouver BC | (1) Sexual Assault Section 246.1 Criminal Code<br><br>(2) Indecent assault on female Section 141(1) Criminal Code<br><br>(3) Indecent assault on female Section 149(1) Criminal Code<br><br>(4) indecent assault on male Section 156 Criminal Code (2 charges)<br><br>(5) Rape Section 136(a) Criminal Code<br><br>(6) Rape Section 144 Criminal Code | (1-3) 3 years on each charge concurrent & found to be a long term offender as per Section 753.1(3) Criminal Code & given a long term supervision for 10 years.<br><br>(4) 18 months on each charge concurrent & concurrent<br><br>(5-6) 5 years on each charge concurrent & concurrernt | James William ROBERTSON |

☐ SIGN-OFF
SIGNATURE



RCMP GRC 0812 (2008-08)          form - formule 44                              Canada

| CERTIFICATE OF CONVICTION OR DISCHARGE (Subparagraph 667(1)(b)(ii)) | CERTIFICAT DE CONDAMNATION OU DE LIBÉRATION (Sous-alinéa 667(1)b)(ii) du c.cr.) | | FPS no. N° SED 873794D | Page no N° de pa 2 |

| Date and Place of Disposition Date et lieu de la disposition | Charge Accusation | Disposition | Name Nom |
|---|---|---|---|
| continued..... | | | |
| 2005-01-20 Vancouver BC | (7) Assault Section 231(1) Criminal Code | (7-9) 6 months on each charge concurrent & concurrent | James William ROBERTSON |
| | (8) Indecent assault on female Section 149(1) Criminal Code | | |
| | (9) Assault Section 245(1) Criminal Code | | |
| | (10) Indecent assault on female Section 141(1) Criminal Code | (10-11) 2 years on each charge concurrent & concurrent | |
| | (11) Indecent assault on female Section 149(1) Criminal Code | & mandatory prohibition order Section 109 Criminal Code | |

☑ SIGN-OFF SIGNATURE

Dated this **10** day of **September** , **2011** , at Ottawa, Ontario
Daté du      jour de                                à Ottawa, Ontario

# Warrant for Arrest

**In the Provincial Court**

Canada: Province of British Columbia

Ban - none

Police File No.
RMCS:10-3238

Court File No:
1201:152261-1

Primary Enf. Agency:

D.O.B.: July 2, 1940

*This is Exhibit "B"
referred to in the Affidavit of
Catherine Murray
sworn before me this 22nd day
September 2011*

*A Commissioner in and for taking
Affidavits for British Columbia*

To the Peace Officers in the Province of British Columbia

Whereas **James William Robertson**
of 3660 Shuswap Ave, Richmond, BC, Canada V7E 3T3

(the "accused") has been charged with the following offence(s):

**Count 1**, on or about March 12, 2010, at or near Surrey, BC, did commit an offence of breach of order for long-term supervision, contrary to section 753.3(1) Criminal Code.

**Count 2**, on or about March 12, 2010, at or near Surrey, BC, did commit an offence of breach of order for long-term supervision, contrary to section 753.3(1) Criminal Code.

**Count 3**, on or about March 12, 2010, at or near Surrey, BC, did commit an offence of breach of order for long-term supervision, contrary to section 753.3(1) Criminal Code.

**See a total of 3 Charges**

COMPARED TO THE ORIGINAL AND
CERTIFIED TO BE A TRUE COPY

*Aug 30/4*

Clerk of the Court

*R SPEED*

And whereas:

**there are reasonable and probable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused**

You are commanded, in Her Majesty's name, forthwith to arrest the accused and to bring him/her before any Justice/Judge in and for the Province of British Columbia to be dealt with according to law.

Dated / Fait le **September 23, 2010**
at / à **Victoria**

British Columbia / Colombie-Britannique

**R. Speed** 2010.09.23 12:03:38 -07'00'

Justice of the Peace / Juge de paix R Speed, in and for the Province of British Columbia / dans et pour la province de la Colombie-Britannique

---

**Endorsement of Warrant**

**CANADA: Province of British Columbia - Form 29 (Section 507)** Whereas this warrant is issued under section 507, 508 or 512 of the *Criminal Code* in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 of that Act.

Dated

at                                    British Columbia

A Justice of the Peace in and for the Province of British Columbia

| Warrant Cancelled (Return to Registry) | Warrant Executed (Return to Registry and attach original bail document if applicable) |
|---|---|
| by | |
| Person contacted | by |
| by phone at           m. Date | Date |
| Reason           Bail reinstated | |

**(CC) Warrant for Arrest (adult)**

PCR 014
Form 7
01/05

res12:02-23.09.2010

**File, Police**

Page 1 of 2

*Sentence Management*
*Williamhead Institution .*

*SM*   *B*

**L**
Correctional Service
Canada

CANADA
PROVINCE/TERRITORY OF        **BRITISH COLUMBIA**

Page 1   *C*

PROTECTED ONCE COMPLETED
This is Exhibit _____
referred to in the Affidavit of
*Catherine Munn*

F.P.S.   873794D
D.O.B.   1940/07/13

sworn before me this *2nd* day
*September* 20 *11*

IN THE MATTER OF THE CORRECTIONS AND CONDITIONAL RELEASE act

WARRANT OF APPREHENSION AND SUSPENSION OF
LONG TERM SUPERVISION (s.135.1(1))

A Commissioner in and for taking
Affidavits for British Columbia

TO ANY PEACE OFFICER IN CANADA

WHEREAS, **ROBERTSON, JAMES WILLIAM**                        , hereinafter
referred to as the offender, commenced a period of **LONG TERM SUPERVISION** on the **19th** day of
**January**   , **2010**, under the Corrections and Conditional Release Act, referred to as the Act, and that the
**LONG TERM SUPERVISION** was to continue in force until the **18th** day of   **January** , **2020**.

AND WHEREAS, I, **SADAFI, RAMTIN**                        , a member of the National
Parole Board or a person duly designated pursuant to the Act, having reasonable and probable grounds to believe
that the offender should be apprehended, hereby suspend the **LONG TERM SUPERVISION** of the offender and
command you to apprehend and convey the offender safely to a prison, and deliver the offender to the keeper
thereof, together with the precept:

YOU THE SAID keeper are hereby commanded to receive the offender into custody until the offender is
dealt with further pursuant to Section 135.1 of the Act.

DATED this **31st** day of **March**   , 2010 ,
at the City/Town/Municipality of **VANCOUVER**
in the Province/Territory of **BRITISH COLUMBIA**

SADAFI, RAMTIN

EXECUTED on the _____ day of _____ , _____
at the City/Town/Municipality of _____
in the Province/Territory of _____
by _____

PEACE OFFICER                    RANK
WARRANT NO.   V80A00041431

Chief of Sentence Management
William Head Institution

**CERTIFIED TRUE COPY**

---

WARRANT OF APPREHENSION AND SUSPENSION OF LONG TERM SUPERVISION
Ce formulaire existe aussi en français.
CSC 1202 (99-09) DMS   (VERS 1)

Data and Time Produced   2010/03/31 16:15                    TIME IS BASED ON A 24-HOUR CLOCK PERIOD.

Page 1 of 1

This is Exhibit "D"
referred to in the Affidavit of
Catherine Muny
sworn before me this 22nd day
of September 20 11
A Commissioner in and for taking
Affidavits for British Columbia

Application for finding that an offender is a long-term offender

**753.1** (1) The court may, on application made under this Part following the filing of an assessment report under subsection 752.1(2), find an offender to be a long-term offender if it is satisfied that

(a) it would be appropriate to impose a sentence of imprisonment of two years or more for the offence for which the offender has been convicted;

(b) there is a substantial risk that the offender will reoffend; and

(c) there is a reasonable possibility of eventual control of the risk in the community.

Substantial risk

(2) The court shall be satisfied that there is a substantial risk that the offender will reoffend if

(a) the offender has been convicted of an offence under section 151 (sexual interference), 152 (invitation to sexual touching) or 153 (sexual exploitation), subsection 163.1(2) (making child pornography), subsection 163.1(3) (distribution, etc., of child pornography), subsection 163.1(4) (possession of child pornography), subsection 163.1(4.1) (accessing child pornography), section 172.1 (luring a child), subsection 173(2) (exposure) or section 271 (sexual assault), 272 (sexual assault with a weapon) or 273 (aggravated sexual assault), or has engaged in serious conduct of a sexual nature in the commission of another offence of which the offender has been convicted; and

(b) the offender

(i) has shown a pattern of repetitive behaviour, of which the offence for which he or she has been convicted forms a part, that shows a likelihood of the offender's causing death or injury to other persons or inflicting severe psychological damage on other persons, or

(ii) by conduct in any sexual matter including that involved in the commission of the offence for which the offender has been convicted, has shown a likelihood of causing injury, pain or other evil to other persons in the future through similar offences.

Sentence for long-term offender

(3) If the court finds an offender to be a long-term offender, it shall

(a) impose a sentence for the offence for which the offender has been convicted, which must be a minimum punishment of imprisonment for a term of two years; and

(b) order that the offender be subject to long-term supervision for a period that does not exceed 10 years.

Exception — if application made after sentencing

(3.1) The court may not impose a sentence under paragraph (3)(a) and the sentence that was imposed for the offence for which the offender was convicted stands despite the offender's being found to be a long-term offender, if the application was one that

(a) was made after the offender begins to serve the sentence in a case to which paragraphs 753(2)(a) and (b) apply; and

(b) was treated as an application under this section further to the court deciding to do so under paragraph 753(5)(a).

(4) and (5) [Repealed, 2008, c. 6, s. 44]

**If offender not found to be long-term offender**

(6) If the court does not find an offender to be a long-term offender, the court shall impose sentence for the offence for which the offender has been convicted.

1997, c. 17, s. 4;
2002, c. 13, s. 76;
2008, c. 6, s. 44.

**Breach of long-term supervision**

**753.3** (1) An offender who, without reasonable excuse, fails or refuses to comply with long-term supervision is guilty of an indictable offence and liable to imprisonment for a term not exceeding 10 years.

**Where accused may be tried and punished**

(2) An accused who is charged with an offence under subsection (1) may be tried and punished by any court having jurisdiction to try that offence in the place where the offence is alleged to have been committed or in the place where the accused is found, is arrested or is in custody, but if the place where the accused is found, is arrested or is in custody is outside the province in which the offence is alleged to have been committed, no proceedings in respect of that offence shall be instituted in that place without the consent of the Attorney General of that province.

1997, c. 17, s. 4;
2008, c. 6, s. 46.

This is Exhibit "E"
referred to in the Affidavit of
_____
sworn before me this _____ day
of _____ 20___

A Commissioner in and for taking
Affidavits for British Columbia

ROBERTSON
8737940

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:     *R. v. R.(J.W.),*
              2005 BCSC 75

                                        Date: 20050120
                                        Docket: 93060
                                        Registry: Victoria

                    Regina

                   Against

                 R.(J.W.)

+-------------------------------------------------------------+
|                                                             |
|  AN ORDER HAS BEEN MADE IN THIS CASE PROHIBITING PUBLICATION OF ANY |
|  INFORMATION THAT COULD DISCLOSE THE IDENTITY OF THE COMPLAINANTS,  |
|        PURSUANT TO S. 486(3) OF THE *CRIMINAL CODE*                 |
|                                                             |
|                 BAN ON PUBLICATION                          |
|                  C.C.C. 486(3)                              |
|                                                             |
+-------------------------------------------------------------+

This is Exhibit ____
referred to in the Affidavit of
_____ Mury _____
sworn before me this ____ day
of ___ September ___ 20 __
_____
A Commissioner in and for taking
Affidavits for British Columbia

Before: The Honourable Madam Justice Kirkpatrick

## Reasons for Judgment

Counsel for the Crown:                  P.W. Ewert, Q.C.
                                        T.P. Stokes

Counsel for the Accused:                L.D. Myers
                                        J. Whysall

Date and Place of Hearing:              October 13, 14, 19-21 and
                                        December 15 and 16, 2004
                                        January 20, 2005
                                        Vancouver, B.C.

[1]     On November 7, 2003, I found JWR guilty of 13 counts of various historical offences ranging from common assault to rape.  The time frame of the offences spanned 23 years, from 1965 to 1988.

[2]     This was JWR's second trial on these charges.  The first trial took place before a jury in September 1998.  JWR was found guilty on 11 counts of a 27-count indictment.  Following his conviction in 1998, the Attorney General consented to an application being brought under s. 688 and 753 (now s. 754(1)) of the *Criminal Code* to determine whether

FEB 0 9 2005

ASSESSMENT C

JWR was a dangerous offender.  On June 18, 1999, the trial judge,
Mr. Justice Melvin, found JWR to be a dangerous offender in respect of
Count 2 (Count 1 in the indictment before me) and sentenced him to an
indeterminate term of imprisonment.  As to the remaining counts,
Mr. Justice Melvin sentenced JWR to 16 years imprisonment.

[3]      In October 2001, the Supreme Court of Canada overturned the
1998 convictions and ordered a new trial.  That trial was heard before
me from September 15 to October 3, 2003.

[4]      Since JWR's arrest on these charges on February 18, 1997, he
has either been in custody pending the trial of these charges or in
prison (June 18, 1999 to October 12, 2001) serving his sentence, for a
total of approximately five years and six months.

[5]      Following JWR's conviction on November 7, 2003 and before
sentencing, the Crown filed an application on December 3, 2003 for an
assessment under s. 752.1(1) of the *Criminal Code* on the basis that
there were reasonable grounds to believe that JWR might be found to be a
dangerous offender in respect of all of the counts upon which I had
found him guilty.  That application was opposed.  In granting the
application and ordering the assessment, I noted my concern with respect
to the Crown's stated intention to proceed with the dangerous or
long-term offender designation in respect of counts other than Count 1
of the indictment.

[6]      The Crown subsequently filed a fresh application on October 1,
2004, citing Count 1 as the predicate offence for determination in
relation to the dangerous offender designation.

**OFFENCES**

[7]      In my Reasons for Judgment delivered on November 7, 2003, 2003
BCSC 1694, I reviewed the circumstances of the offences and of the
offender in some detail.  I need not repeat them here.  However, a brief
synopsis with respect to each count may aid the appreciation of the
gravity of JWR's conduct.

**Count 1: Sexual Assault – January 4, 1983 to December 31, 1988**

[8]      ████ now ███ is the ███████ of JWR's ██████████, ███.  In
1984, when ███ was about 7 or 8, JWR placed her hand on his erect penis
and told her to move her hand up and down.  In a second incident, JWR
inserted his finger in her vagina, causing a burning, tearing
sensation.  In a third incident, JWR placed ███ on a hide-a-bed couch,
motioned her to place her hand on his penis, and then pulled up her
nightie and touched her on the outside of her panties.

**Count 2: Indecent Assault – July 1, 1976 to July 9, 1979**

[9]      JWR masturbated his ███, ███, ███, several times in the summer
of 1976 when his son was about 14 years of age.

**Count 3: Indecent Assault – January 1, 1966 to July 14, 1971**

[10]     ███ is JWR's ████████, whom he adopted in 1965.  In about
1966, when ███ was about 8 years of age, JWR fondled her on the outside
of her vagina; when ███ was between 8 and 10 years old, JWR inserted his
finger in her vagina more than a dozen times; he forced her to kiss his
penis; he forced her to lie on a bed without her pants on while JWR
showed her genitalia to her███████ and told him to insert his finger in
her vagina; he fondled her under her pyjamas on a truck trip; and he

attempted to rape her at a time when her [redacted] was in hospital, telling her that it was "what good little girls do for their [redacted]."

**Count 4: Indecent Assault – July 15, 1971 to December 31, 1976**

[11]     JWR attempted sexual intercourse with [redacted] in 1971 when she refused to strip naked on a boating excursion to an isolated beach.

**Count 5: Rape – January 1, 1970 to July 14, 1971**

[12]     JWR raped [redacted] from the time she was 13 years of age on more than 20 occasions.

**Count 6: Rape – July 15, 1971 to December 31, 1976**

[13]     JWR raped [redacted] until she was 16 years of age.  She could not estimate the number of times that JWR forced sexual intercourse on her.

**Count 7: Sexual Intercourse with a female under age 14 not his wife – January 1, 1970 to January 4, 1972**

[14]     This count concerning sexual intercourse with [redacted] a female person under the age of 14 years who was not JWR's wife, is subsumed in Counts 4, 5, and 6.

**Count 8: Assault – June 1, 1965 to July 14, 1972**

[15]     JWR physically assaulted [redacted] with a leather strap, his hand, and an electrical cord.

**Count 9: Indecent Assault – June 1, 1974 to September 30, 1975**

[16]     JWR fondled the breast of [redacted], a childhood friend of JWR's [redacted].

**Count 10: Indecent Assault – October 1, 1966 to July 14, 1971**

[17]     On her seventh birthday, JWR inserted his finger into the vagina of [redacted].  In another incident, JWR fondled her vaginal area and buttocks and later digitally penetrated her vagina while ostensibly helping her to change from her swimming clothes.

**Count 11: Indecent Assault – July 15, 1971 to December 31, 1976**

[18]     When [redacted] was about 11, JWR came into the bathroom in which she and a friend, [redacted], were bathing.  He began feeling around in the bathtub and touched [redacted] bottom.  [redacted] and her friend both screamed and JWR ran out of the bathroom.

[19]     In another incident when [redacted] was about 10 years of age, JWR inserted his finger in her vagina, saw blood, and informed her [redacted] that "there was a new woman in the house."

[20]     In a further incident, JWR told her to hold his erect penis and attempted to undo her pants.

[21]     Another time, after catching [redacted] smoking, he digitally penetrated her vagina and pulled her nipples.  On one or two occasions JWR went into [redacted] bedroom after she had been out for the evening and either inserted his fingers in her vagina or opened her legs and looked at her.

**Count 12: Assault – June 1, 1965 to July 14, 1972**

[22]     On the morning after JWR's indecent assault on [redacted] on her seventh birthday, [redacted] went to her parents' bedroom to tell her mother

that she had noticed blood on her underpants. JWR told her to return to her room. He came into her bedroom and beat her with a bath brush.

## Count 14: Indecent Assault – July 15, 1971 to December 31, 1976

[23]     JWR performed oral sex on his son, ████, on at least one occasion. JWR asked his ████ on several occasions if he would like to touch his ████████ genitals.

## ALLEGATIONS OF OTHER SEXUAL MISCONDUCT

[24]     In addition to the evidence tendered at the trial, the Crown also relies on the evidence of ████ as to certain events that took place in California in 1988 and 1989. That evidence was also the subject of a *voir dire* during the trial in which the Crown sought unsuccessfully to have the evidence admitted as similar fact evidence. The Crown and the defence agreed, both as to the evidence on the *voir dire* and on the dangerous offence hearing, that the evidence would take the form of the transcript of ████ testimony at the first trial in 1998. The following is a summary of her evidence concerning the California incidents.

[25]     When ████ was 11, in the summer of 1988, she and her siblings went to California to visit JWR. ████ alleges that, after experiencing a bad sunburn one day at the beach, she had taken a cold shower in JWR's trailer. After the shower, she put on a nightgown. JWR told her that he was going to put aloe vera cream on her for the burn. He told her to remove her nightgown and lie down on the bed in his room. He rubbed cream on all over her body, including her breasts and labia. He then said that he wanted to kiss her "down there." She said no, but he did so anyway, telling her that it was the "grown-up, normal thing to do." He rolled her over on top of him and positioned her on his erect penis. He attempted intercourse, but said that he was too big for her and could not fit. She was crying and upset and told him she wanted to go and sleep with her siblings.

[26]     On the same trip, ████ said that JWR took the children for a car ride up a mountain. When they got to the top, they got out of the car. JWR picked her up for a piggy-back ride. He placed his hands behind her buttocks and then moved them inside the crotch area of her underwear, touching her vaginal area and digitally penetrating her vagina.

[27]     ████ testified that she and her siblings returned for a visit to JWR in the summer of 1989 when she was 12. JWR took the children for a visit to the San Diego Zoo and they stayed at a Marriott hotel. She testified that on one occasion while swimming in the hotel pool, JWR dove into the pool and grabbed her in the vaginal area and pulled her down underwater. She testified that she told him never to touch her again and then told him she was going to tell her mother what he was doing to her. He told her that her mother would not believe her and, if she did report it, he would hurt ████.

[28]     The Crown also called ███, formerly ███. She was born on July 16, 1965. On December 26, 1982, she was injured in a motor vehicle accident. Her ██████ was a client of the law firm in which JWR was then a partner. They met with JWR in January 1983 to discuss her motor vehicle accident claim. She knew the R family, had once dated JWR's ████████, and went to school with another ████████.

[29]     ████ met with JWR on one or two occasions with her father present. At some point, JWR suggested to her that her father seemed to be dominating the discussions and he wanted to see her separately. He

made arrangements for a meeting at his office at 5:00 or 5:30 p.m. a week or so later.

[30]     When ● arrived at the office at the appointed time, JWR was waiting in front of the office at his car.  He told her that he needed to get a file from his boat.  ● was uneasy about leaving and told JWR that she did not think that it was a good idea.  However, JWR assured her that it would not take long and that he would have her back to the office at the time she had arranged to have a friend pick her up.

[31]     ● was, at the time, wearing a neck brace and an arm sling. JWR assisted her into his sailboat and poured her an alcoholic drink that she said she did not want.  He then proceeded to ask her whether she had a boyfriend; was her boyfriend older than her; did she like older men; and whether she had ever thought about having sex with her father.  Most significantly, JWR told her:  "I could throw you in back and fuck you right now."

[32]     ● was upset and frightened.  She cajoled JWR, telling him that he did not want to do as he said because of her injuries.  JWR told her that he had, in her words, "noticed your cute little ass on the way out the door."  ● thought that remark was, in her words, "kind of inappropriate."

[33]     ● eventually persuaded JWR to take her back to his office, and then to her home when her friend who had agreed to pick her up from her appointment was not at the office.  JWR did not discuss her legal case during this incident.

[34]     ● did not tell her parents or anyone else about the remarks made to her by JWR until 1996 or 1997, when she saw an article in a local newspaper concerning the charges against JWR.  She made a statement to the R.C.M.P. on October 3, 1997.

## EXPERT EVIDENCE

[35]     In his submissions at the close of the dangerous offender hearing, Crown counsel urged me to consider the Reasons for Judgment of Mr. Justice Melvin, in which he found JWR to be a dangerous offender. Crown counsel also filed the psychiatric and psychological reports and evidence tendered at the 1999 dangerous offender hearing.  I have read the Reasons of Mr. Justice Melvin and the expert evidence filed before him.  That evidence was also considered by the experts who testified at this hearing.  However, I think it more valuable to give closer consideration to the testimony that I have heard and the reports that have been tendered on this dangerous offender proceeding.

[36]     I will review the evidence in the order in which it was given at the dangerous offender hearing.

## Dr. Lohrasbe

[37]     Dr. Shabehram Lohrasbe is a psychiatrist who was qualified to give expert opinion evidence in the areas of the dynamics of child sexual and physical abuse; the diagnosis, treatment and rehabilitation of sexual offenders; and the risk assessment of sex offenders.  His evidence was tendered on behalf of the Crown.

[38]     Dr. Lohrasbe also provided an opinion on November 22, 1998, in the proceedings before Mr. Justice Melvin.  JWR, on the advice of his counsel, did not permit Dr. Lohrasbe to interview him either in 1998 or 2004.

[39]     In his 1998 report, Dr. Lohrasbe accepted that JWR had sexually
assaulted both male and female children, all of whom, with one
exception, were members of his family.  Dr. Lohrasbe concluded that JWR
is a paedophile because of the number of victims, of both sexes, and the
length of time over which the assaults occurred.  Dr. Lohrasbe stated:

> A striking feature of this case is the degree of
> intimidation, threat, force and control used by JWR.  Also
> of concern is JWR['s] apparent ability to ignore fear and
> suffering in his victims.  This is an ominous feature of
> his offending, given that the victims were children whom he
> did or should have protective and loving feelings for.  He
> is capable of humiliating and brutalizing those that he in
> other ways cared for.  Many possibilities arise when trying
> to understand such a pattern.  He may have a limited
> ability to empathize with others.  He may have very strong
> deviant sexual urges, that override concerns for the
> wellbeing of his victims.  He may enjoy the infliction of
> humiliation or pain i.e., he may be sadistic.  He may be so
> emotionally unstable that angry impulses are carried out
> without restraint.  Whatever the precise combination of
> psychological factors driving his behaviour, it is hard to
> escape the impression, emerging from the transcripts, that
> his sexual violence was extremely destructive on the
> victims that he had assaulted.
>
> Looking to the future, it is important to note that
> pedophilia is not known to spontaneously disappear.  Like
> any sexual behaviour it tends to persist in an
> [individual's] life, particularly when well established.
> Patterns of sexual arousal and gratification are not easily
> extinguished.  In a man with a well-established pattern,
> the best that can be hoped for is self-control.  There is
> no cure.  The potential to reoffend will always be there.
> The only recognized method of predictable control is
> through a comprehensive sex-offender treatment program.  In
> British Columbia, the only appropriate program for JWR is
> that offered by the Regional Health Centre in Matsqui,
> which is a Federal Institution.

[40]     Dr. Lohrasbe expressed concern as to JWR's denial of the
offences which, he stated, can be an absolute obstacle to treatment.
Without knowing whether JWR would successfully engage in a treatment
program, Dr. Lohrasbe considered him to be at a high risk to re-offend.
He did not attach much weight to the then 10-year period since JWR's
last known offence, stating that it is not uncommon for there to be long
gaps in a sexual offender's pattern of offences.  Dr. Lohrasbe noted
that JWR was aware of the risk that he might be exposed after the
initial offences, but nevertheless re-offended years later, which
suggested a strong deviancy to Dr. Lohrasbe.

[41]     In his 2004 report, Dr. Lohrasbe confirmed that the views he
had expressed in 1998 had not changed.  He re-emphasized the following
finding that he originally made in 1998:

> *To summarize, my review of the available information*
> *suggests that JWR is a pedophile.  Without treatment,*
> *he will remain a high risk to reoffend and at this*
> *stage we do not know whether he will enter, never*

*mind complete, the process of treatment. Although
this prognostication does not equate with the legal
criteria under section 753, I believe that a
comprehensive psychiatric assessment, especially one
that includes several interviews with JWR, could lead
to findings and opinions that are strongly supportive
that JWR is a Dangerous Offender. I emphasize again
that this is not a formal psychiatric report, that I
have never interviewed JWR and that in order to
provide a comprehensive psychiatric assessment that I
would need to do so.*

There are two additional issues and [sic] that arise since
I wrote the report in 1998. Firstly, there is the 'passage
of time' factor, with no known additional sexual offenses.
Secondly, it would appear that JWR has not engaged in any
form of treatment aimed at his sexual offending. While
both issues add to the factors to be considered in any risk
assessment, they do not by themselves alter my opinion.

[42]     Dr. Lohrasbe testified that JWR's risk to re-offend, relative
to the average citizen, is high. Dr. Lohrasbe's opinion of JWR's high
risk to re-offend is based on his clinical experience with such
offenders. Dr. Lohrasbe does not use actuarial tools of risk
assessment, chiefly because he is not comfortable using instruments that
draw data from a pool of individuals about whom he has no deep
knowledge. He did not argue that the clinical approach he favours is
more accurate or better than the actuarial approach taken by the other
experts who have interviewed JWR.

[43]     Under cross-examination, he elaborated:

Q.:   A lot of what you say in terms of your assessment of
      JWR is, "I don't know if he's dangerous or likely to
      reoffend or not because I don't know the man.  I don't
      know what propelled him, I don't know why this hiatus
      exists, I don't know what, if any, effect age has had
      upon him."

A.:   I think I generally agree, but I do need to qualify
      that. When there is a large vacuum of information
      about any offender, one approach -- and when I say
      vacuum, I mean about the sexual offending. One
      approach is to say, "Well, since we don't know a lot
      about, or we don't know anything about his sexual
      offending, we'll simply apply group measures,
      statistical measures and take some comfort in that."
      And that's an honourable approach, it's one I don't
      agree with. Where there is a vacuum in knowledge --

Q.:   Sorry, I -- okay, I'll let you finish.

A.:   I take the approach that then since we know not what
      created the offending in the first place, we have to
      assume that under the right conditions those factors
      can pop up again and therefore he's at high risk.

[44]     JWR's sexual deviancy is, according to Dr. Lohrasbe, the
highest risk indicator because:

(a)    his victims were both male and female, aged 7 to 16,
indicating that he is easily aroused, which creates a wider
potential pool of victims.  Homosexual pedophiles perpetuate
abuse much longer than heterosexual pedophiles.  The picture is
less clear with bisexual offenders;

(b)    he employed a broad repertoire of approaches to his victims
including seduction, threats, and force;

(c)    he inflicted violence towards his █████████; and

(d)    the offences occurred over a long period of time and into
the next generation of his ██████, which suggests that his sexual
deviancy is well-established.

[45]    Dr. Lohrasbe acknowledged that certain factors lowered JWR's
risk to re-offend, including:

(a).    JWR's age (64).  Dr. Lohrasbe testified that the risk of
all forms of violence decreases with age, but that in sexual
offenders the decline is less steep; and

(b)    the length of time since the last known offence.  As more
time passes without re-offending, it is less likely that an
offender will re-offend.  Dr. Lohrasbe could not shed light on
JWR's risk in this regard without first understanding the factors
that led JWR to commit the offences.  He testified:

> Now, with him, what do we know?  We know
> nothing about what arouses him, other than
> children arouse him, in terms of the risk
> management.  How are we going to separate him
> from children?  How?  How are you going to make
> sure he has no contact with children, other
> than some location where he can be extremely
> tightly monitored 24 hours a day.  That doesn't
> exist in the community.  So I'd say that we're
> in a no-go situation in terms of risk
> management.

[46]    Dr. Lohrasbe testified that JWR's denial is, from a clinical
perspective, problematic because it is not known if he will engage in
treatment.  He stated that if denial is perpetuated, it can be an
absolute obstacle to treatment.

[47]    However, Dr. Lohrasbe also acknowledged that denial is, in the
current view of the profession, irrelevant in terms of risk assessment.
Nevertheless, he considers that denial probably remains relevant in that
it may affect the monitoring and supervision of an offender.

[48]    In addition, the fact that JWR obtained his teacher
certification affects JWR's risk management.  People such as JWR, who
have a sexual interest in children, will gravitate to areas in which
there are children and where they can exert power over them.  In
Dr. Lohrasbe's view, JWR must be kept away from children.

[49]    Dr. Lohrasbe and, indeed, all of the experts, were struck by
the impulsive and reckless behaviour that JWR exhibited in the incident
involving ██.  Dr. Lohrasbe thought it unusual and it confirmed to him
the strength of JWR's deviancy.  He was particularly struck by what he
described as JWR's predatory and malevolent comment:  "I could fuck you
right now."

04/28/2010 11:30 FAX 604 666 2000       VANCOUVER PAROLE                    ☑010/032

[50]      Dr. Lohrasbe testified that none of the information he has seen with respect to JWR, including the assessments performed by the other experts, allows him to determine how to manage JWR. No one has discovered the factors that led to his offending (because of his resolute denial). All that is known is that children arouse him. Self-control issues are, according to Dr. Lohrasbe, the primary focus of therapy. However, given JWR's blanket denial, Dr. Lohrasbe says that, in his words, "We are in a state of absolute ignorance as to his primary factors."

[51]      Dr. Lohrasbe agreed under cross-examination that discovery and public vilification can be powerful deterrents to sexual offenders, depending on the strength of the deviancy. He also agreed that considerable time (1988-2004) has elapsed since JWR's last known offence. He speculated that it might be due to lower sex drive, control, lack of opportunity, remorse, regret, new relationships, change, or a host of relevant things.

[52]      Dr. Lohrasbe also acknowledged that JWR had the opportunity to re-offend when his children resided with him after the last known offences and when he taught school in California.

[53]      Dr. Lohrasbe confirmed his opinion that JWR's denial of the offences does not mean he is not treatable. Indeed, he confirmed that JWR needs to be in therapy, especially if he is out of custody. He conceded, when told that JWR had stated his willingness to be treated, that although it may be an empty agreement, it is nonetheless better than denying the need to be treated.

[54]      One of the defence experts, Dr. Zoffmann, later clarified that JWR stated his willingness to engage in treatment, but that he would not admit to the offences.

**Dr. Zoffmann**

[55]      Dr. Elisabeth Zoffmann is a psychiatrist who was qualified to give expert opinion evidence in the areas of psychiatry and, in particular, the diagnosis, treatment and rehabilitation of sexual offenders. Her evidence was tendered by JWR.

[56]      Dr. Zoffmann interviewed JWR for a total of six hours on September 19, 2004. She reviewed a substantial body of information, including the expert opinions of Dr. Lohrasbe and Dr. Miller (the court-appointed expert) and Dr. Ley and Dr. Perry (who gave evidence at JWR's first dangerous offender hearing).

[57]      Dr. Zoffmann reviewed the victim impact statements which, in her words:

> All speak of long-standing disruption in social and intimate relations. They also describe long-standing fear, guilt and shame.

[58]      Dr. Zoffmann also interviewed collateral acquaintances and ▉▉▉▉▉▉▉▉ of JWR, which she found to partially corroborate certain aspects of the history provided to her by JWR.

[59]      In that part of her expert opinion entitled "Risk Analysis," Dr. Zoffmann reviewed the instruments based on statistical information that she considered in reference to JWR. She stated, in part:

The challenge with this particular risk assessment is the disparity between the intra-familial and extra-familial behaviour patterns demonstrated by JWR. Another confounding factor is the absence of any identified offending behaviour in the 10 years prior to his arrest. This absence of offending behaviour appears to correspond with an absence of a settled domicile or family-like setting that includes children.

. . .

One of the struggles in completing risk assessment instruments on JWR is that the manual instructions for the SVR-20 and the PCL-R dictate that the behaviour must be pervasive, long-standing and observed through all the areas of functioning before a positive score is made.

There are some factors in this case which may invalidate scoring. For example on the Violence Risk Assessment Guide, there is an item for 'age at the index offence'. This particular index offence is remote or historical and the offending behaviour occurred over a period of 22 years. The questions then becomes whether one scores according to the age at last incident or the age at first incident or average it somewhere in between. I suspect that this conundrum makes use of the VPS in this case non-standard and perhaps invalid.

. . .

STATIC 99:

The score on this evaluation is 3. This is similar to the score obtained by Dr. Miller. This score places JWR's risk for reoffence in the low to low-moderate range before one goes on to consider specific dynamic factors. The dynamic factors that predict a lowering of risk are positive social relations and the presence of social supports. The ability to obtain and maintain employment, the absence of significant alcohol and drug related problems and the absence of acute anxiety, dysphoria or depression will also moderate that risk downwards.

The factors which moderate risk upwards are the denial of offending behaviours and the consequence of an inability to examine the self for future patterns of risk.

. . .

SVR-20:

In this construct that is a frame of reference for considering items that were thought to be contributors to sexual offending when the book was published in 1997 are not given scores per se. The presence of a factor contributes to an impression of higher risk. The partial presence of the factors may also contribute to risk and the absence of the factors lead to an impression of lower risk.

Thus, in JWR's case, we have a positive history of sexual deviation. He has had sexual arousal to children of

various ages in his care.  These children have been both
male and female.  The sexual acts vary from inappropriate
touching through to rape.

There is a history of high density of sex offences over the
period of time that he has been convicted for.  Likewise,
there is a history of multiple offence types described by
his victims.  Finally, there is extreme minimization of his
offending behaviour.  (JWR refutes the allegations against
him.)

. . .

Likewise, there is a history of relationship problems with
his ex-wife.  She gives a history of physical and emotional
abuse with controlling and manipulative behaviour.

JWR has a history of multiple jobs and activities.  This
might be viewed as 'employment problems' although the
history supports the notion that he has always been
employed and has not relied upon other sources of income to
support him.

With respect to the offending pattern, the SVR-20
definition of serious harm indicates that there is only
partial evidence of serious harm according to this defined
criterion.  That is not to minimize or deny that the
physical aggression in sexual assaults were not painful or
did not cause significant psychological distress and harm.

In Item 18 according to the definition in the manual, there
is partial evidence for attitudes condoning sexual
assault.  These are derived from the statements of his
children describing him telling them that the sexual
behaviour carried out with them was normal.

With respect to Item 19 - there is partial evidence that he
lacks realistic plans.  He has plans for the future to
return to his condominium and take up legal work again.  He
states that he has a number of debts to pay to friends and
family.  It is not clear whether this is a realistic plan.
JWR also has a history of being able to find employment in
a number of different areas such as driving bus and on the
ski patrol.  He is experienced in these areas and so this
is a possible realistic plan that would need verification.
Finally, there is partial evidence that he has a negative
attitude towards treatment.  This is in spite of his
expressed agreement or cooperation.  He cannot fully
embrace or accept treatment while he denies the offences.
This is not a statement about his apparent acceptance of
and good behaviour within the prison setting.

On the lower risk end, we find that he is not a victim of
abuse.  He is not defined as a psychopath (the coding
regulations note that a score of 20 or lower is not
considered a risk factor).  He does not have a major mental
illness and he does not express suicidal or homicidal
ideation.  There is no history of past non-sexual offending
and there is no history of past non-violent offences.
There is no history of supervision failure as defined by

the SVR-20.  There is no history of weapons or threats in
the commission of the sexual offences.  (Note here that the
manual defines the threats as threats of death).  Finally,
there is no evidence that there was an escalation of his
offending behaviour while he was at opportunity to do so.

In summary, while there are four factors that are
definitely present, seven factors that are partially
present, and nine factors that are absent.  These factors
add together to predict low-moderate risk of offending.

Hare Psychopathy Checklist Rating (PCL-R):

...

I would state at this point, that there is a fairly sharp
difference between JWR's behaviour within his family and
with those who are acquainted with him at a different level
such as long-term friends, siblings, mother, aunts and
uncles.  This difference in behaviour is not inconsistent
with what we know about individuals who commit abuse and
violence within the family setting.  It is common to hear
descriptions of good community functioning while the person
behaves very badly with their ████████████████████s.

...

Whether his score is at or around 14 or 20, he is not
classified as being psychopathic.  Further, for purposes of
risk evaluation, scores of 20 and under are considered low
as opposed to moderate - 20-29 and high - 30-40.

[60]      In her summary of risk, Dr. Zoffmann stated:

I am of the opinion that JWR is an ██████-type sex
offender.  The extended pattern of ████████offending has
been perpetrated against his male and female ███████,
████████████████ and his ████████████as well as two
instances of sexual touching of children under his care and
control in his home.

I am of the opinion that as part of this category of sex
offender and based on the actuarial instruments and the
SVR-20, he represents a low risk for reoffending.  Then,
when one considers his advancing age and the period of time
that he has been free of further convictions prior to his
arrest as well as the lack of history of general criminal
behaviour, he remains a low risk for reoffence.  The
presence of protective factors such as community supports,
lack of substance abuse and an ability to earn a living
further reduce the risk of reoffense.  These qualities also
make him a better prospect for eventual community
supervision.

That is not to state that the risk for reoffending is
absolutely zero.  As Dr. Lohrasbe has pointed out, he has
seen men as old as 80 committing sexual offenses.  However
in this case we are left with examining statistics to see
where the best fit occurs for this specific case.

[61]      Dr. Zoffmann concluded her report by stating that JWR's
"vehement and persistent denial of sexual offending" rendered intensive

sex offender treatment "pointless." She agreed with Dr. Nicholaichuk's opinion that low intensity sex offender treatment would be appropriate.

[62]   Dr. Zoffmann shared the concern expressed by Dr. Lohrasbe that "we don't know what led to" JWR's sexual offending behaviour. In her examination in chief, Dr. Zoffmann testified:

> Q.:   So were you able to refine those statistical limits, or did it assist you in refining those statistical limits by interviewing JWR and members of the community, including friends and family?
>
> A.:   If we look at the things which we know to have positive prognostic factors, things like an absence of general criminal behaviour, a capacity to form relationships, maintain friendships, a capacity to engage in work and be employed, an absence of emotional disregulation in most contexts, those are positive prognostic factors.
>
> Q.:   In regards to JWR?
>
> A.:   In regards to JWR. Negative prognostic factors or things which are left as a question mark are things such as the inaccessibility around his sexual offending behaviour and the thinking that led to it. Likewise, for example, the numerous studies by Hanson revealed that they have found that the quality of sexual preoccupation is a strong -- not huge, but strong predictor of sexual offence recidivism. We don't know. That's an open question. We don't know what goes on in JWR's mind with respect to the past behaviour.

That negative aspect was balanced with JWR's positive features of absence of other criminal behaviour, his capacity to work and be employed, and his extra-familial and social support.

[63]   Dr. Zoffmann testified that JWR falls into into a certain risk category of "low-moderate" based on aggregate statistics of offenders aged 18 to 90 years old. She said that an offender's age at release from custody has a significant impact in that, after age 50, recidivism drops to half over the long term and, after age 60, the risk is almost zero.

[64]   Dr. Zoffmann stated that JWR's low score for psychopathy, coupled with his age, lowers his risk to re-offend as does the absence of high needs (such as drug or alcohol dependency, inability to work, etc.).

[65]   Dr. Zoffmann stated that a prolonged supervision order would allow JWR's risk to be managed.

[66]   Dr. Zoffmann testified as to the likelihood that JWR will re-offend as follows:

> When one looks at the specific instance of an offender, such as JWR in this case, we're looking at low to low/moderate. I am looking at his risk of reoffence compared to others of his class and his age and with his particular needs. The numbers that we have from recidivism

studies place that risk at somewhere between four percent to as high as 25 percent, or four out of a hundred will recidivate, or 25 out of a hundred will recidivate. Those are the outside barriers of the recidivism statistics.

The problems with applying it, I can say JWR belongs in that class, but that's where it stops. Without more time and observation and opportunity, I cannot be any more precise about how likely he is to be that one in 25 or one in five person who reoffends.

[67]     Under cross-examination, Dr. Zoffmann confirmed that her analysis of JWR's risk was based on risk assessment instruments that are developed in reference to re-conviction rates. She agreed that recidivism rates underreport the actual occurrence rates of sexual re-offending.

[68]     Dr. Zoffmann testified that JWR possesses several narcissistic traits and he has problems with his core sense of identity. As a result, he had intrusive and controlling intimate relationships. She described JWR's denial of the offences as "profound and unrealistic," suggesting a propensity for "hysterical denial."

[69]     Dr. Zoffmann confirmed that JWR's sexual deviancy cannot be cured, "it can only be managed." To that end, she stated that he required intensive assessment of his physiological sexual function and counselling as to his aberrant arousal. Among the management strategies she recommended was that JWR be restricted from forming family-style relationships that include children under 18 years of age.

[70]     Dr. Zoffmann said that the behaviour described by LAR is not inconsistent with JWR's personality. She described JWR as exhibiting incredibly poor judgment and impulsivity consistent with his poor core identity.

[71]     Lastly, Dr. Zoffmann stated that the significant passage of time since JWR's last offence must be approached with a great deal of caution because it may invalidate the scoring on the Hare Psychopathy Checklist Rating, one of the risk assessment tools that she used to assess JWR.

## Dr. Schweighoffer

[72]     Dr. Anton Schweighoffer, the senior psychologist in the sexual offender treatment program for the Pacific region of the Correctional Service of Canada, testified as to the treatment programs available to offenders in custody and in the community.

[73]     Dr. Schweighoffer explained that there are three levels of treatment programs available for sexual offenders in British Columbia: high, moderate, and low intensity. Those programs are available, respectively, at Pacific Institute, Mountain Institution, and William Head. As well, there are maintenance programs available at a number of institutions to strengthen and maintain skills, and relapse prevention programs available to all levels of offenders at risk of recidivism.

[74]     Dr. Schweighoffer stated that an offender is not excluded from participating in treatment if he is in denial.

[75]     Dr. Schweighoffer described the programs available to offenders after release from the federal system. He testified that if a sexual offender has not completed treatment in the institution, then he is not

eligible to participate in programs in the community. By definition, it is expected that the sexual offender will have completed either a high, moderate or low intensity program. However, he explained that in practice, if an offender has not completed such a program, he may nevertheless be placed in a community program after a facilitator has met with the offender to help him understand his self-management and risk factors.

[76]    Dr. Schweighoffer testified that he is unaware of any sexual offender treatment programs available in the private sector.

[77]    Under cross-examination, Dr. Schweighoffer confirmed that an offender who is released on statutory release is always released subject to conditions that may include directions for treatment. If the offender fails to abide by the release conditions, he is subject to suspension of parole or, where there is significant concern, to revocation of parole.

Dr. Miller

[78]    Dr. Robert Miller was appointed to conduct an assessment of JWR at the earlier dangerous offender hearing before Mr. Justice Melvin in 1999. He prepared a report dated January 18, 1999. Dr. Miller requested an interview with JWR. JWR declined to participate.

[79]    On May 12, 2004, I ordered that JWR be remanded for assessment pursuant to s. 752.1 of the *Criminal Code*. Dr. Miller conducted the assessment of JWR. He provided a report to the court dated July 10, 2004. JWR, on the advice of his counsel, declined to be interviewed by Dr. Miller. JWR later agreed to be interviewed and, pursuant to a further court order, another assessment was conducted on October 29 and November 1, 2004.

[80]    Dr. Miller was qualified to give expert opinion evidence in the area of forensic psychiatry and the dynamics of child physical and sexual abuse; the diagnosis, treatment and rehabilitation of sexual offenders; as well as his assessment of JWR's mental condition and risk.

[81]    Dr. Miller testified that there was no substantial change in his assessment of JWR's risk of re-offending as between his report dated July 10, 2004 and his report dated November 12, 2004.

[82]    In his report dated July 10, 2004, Dr. Miller employed actuarial methods of risk prediction. He scored JWR to be in the moderate rage under the Psychopathy Checklist - PCL-R - scoring high as to strong narcissistic features and low in respect of antisocial features. He assessed JWR under the manual for assessment of sexual risk violence - SVR-20 - and found him to be of moderate risk of sexual re-offence if victims are available to him. As to the Static-99 score, Dr. Miller reported as follows:

> My scoring of the Static-99, according to the Static-99 coding rules, is 3, which places JWR into the second of four risk categories and which is label[l]ed medium-low. The sexual recidivism rate of 206 offenders followed over a period of 15 years, who had characteristics that now would be scored 3 using the Static-99 coding rules, was 12% at five years, and 19% at 15 years.

In my opinion, this data should be treated with caution.  I
would suggest that it may be unusual for an offender to be
convicted of as many offenses as JWR, dating back over many
years, at a first trial.  JWR's case, therefore, may not be
comparable to many of the 206 offenders on which the
actuarial prediction is based.

[83]    He concluded:

Therefore although I have provided the Court with the
information available from actuarial assessment, I would
continue to be of the opinion that JWR should be seen as at
moderate risk of further sexual offending should he have
exposure to victims.

[84]    Dr. Miller concluded his July 10, 2004 report with these
important observations:

**Management**

Without treatment management, this risk would likely best
be achieved by excluding JWR's access to children.  I am
unable to state whether or not JWR would disclose access to
children if supervised in the community.  If JWR continues
to deny responsibility for the offenses, it would seem
reasonable that he may also not disclose gaining access to
potential victims to a community supervisor.  Under these
circumstances community supervision may not be effective in
decreasing JWR's risk of reoffending.  If JWR accepted
responsibility for his offending behaviour, was accepted
into an intensive sex offender treatment program, and was
judged in the program as making progress and becoming more
disclosive, then I would have more confidence that
community supervision could be safely undertaken.

**Potential Victim Impact**

In my 1999 report I considered the Victim impact statements
of the victims of JWR[']s offenses.  I stated, *"Several of
the victims describe in their statements typical reactions
to chronic, traumatic experiences.  Trauma at a young age
that goes on for a prolonged period of time effects [sic] a
person's ability to form trusting relationships.  It causes
emotional numbing and avoidance in addition to subjective
distress at reminders of the trauma.  Finally it causes the
physiological symptoms of anxiety.* ■■■ *for example,
describes being 'very withdrawn' and unable to have a
satisfactory sexual relationship with her husband.  She has
'a very bad nerve problem and at times my hands and body
will be very upset and shake as when I was younger'.* ■■■
*describes that 'now it seems like I am constantly thinking
of things that happened in the past.'*

*Psychological symptoms that go on for more than two or
three months after a traumatic episode tend to become
chronic.  It is likely that these victims who continue to
suffer psychological symptoms many years after their
episodes of abuse will continue from time to time to have
relapses of their symptomatology."*  I remain of the opinion

that any future victims would be likely to suffer similar symptoms.

[85]     As I have noted, Dr. Miller's assessment of risk did not change after his interviews with JWR. However, he stated that, under Axis 1 of the DSM IV criteria, "JWR's history of sexual behaviour during his lifetime is compatible with a diagnosis of paedophilia-nonexclusive type." He was unable to make a personality disorder diagnosis. He offered suggestions for further investigation and treatment for JWR. As to his prognosis, Dr. Miller stated in his November 12, 2004 report:

> JWR's victims have all been in circumstances where he was acting in a supervisory capacity. There is one other allegation of sexually inappropriate behaviour in situations where JWR is providing professional advice and assistance. Although JWR may have decreased opportunity to sexually abuse others under his care I am unable to state that he will not have opportunity. Although JWR's sexual drive may decrease with increased age, I am unable to state when or if that will occur.

Dr. Miller confirmed that JWR should be excluded from access to children and recommended that he not be permitted to teach or practice law because this would allow him access to students and clients who may be vulnerable to sexual abuse by him.

[86]     As with all of the experts who testified, Dr. Miller noted that "risk" is defined by re-offence, arrest, and conviction. He testified that:

A.:     .... I think that what you're getting at is that the -- it's generally accepted that there may be offences for which a person is convicted, for example, but the conviction is not for a sexual offence. It may be for a nonsexual offence, even though there was actually a sexual component to the offence, and then there are other offences or other incidents where a person may have committed some but -- something but not have been apprehended or charged.

Q.:     Yes. I think it's accepted generally, is it not, by experts that a lot of sexual offences do not get reported.

A.:     Yes, that's true.

[87]     Unlike Dr. Lohrasbe, who compared JWR's risk of re-offending to the general population, Dr. Miller adopted what appears to be the more accepted approach, namely comparing the offender to those who have been convicted of sexual offences. He explained:

Q.:     Yes. Now, you have assessed his risk as to a moderate risk to reoffend?

A.:     Yes.

Q.:     Okay. And can you define that? I mean, moderate in the sense of that particular group of offenders that we're talking about, or moderate in relation to society?

A.:     Yes. When I'm using the word, "moderate," "low,"
        "moderate," or "high" --

Q.:     Right.

A.:     -- what I'm referring to is compared to the base rate
        of offending so that, for persons who have been
        convicted for sexual offending, we know that, on
        average, there's a rate that's, depending on the
        study that you look at, somewhere between 20 and
        30 percent chance of reoffending over a period of
        five years. If I'm using the word, "high," then I'm
        saying that the risk is higher than that. If I'm
        using the word, "low," then I'm saying that it's
        lower than that. If I'm saying that it's,
        "moderate," it's in that ballpark.

Q.:     Okay. Excuse me a minute.

THE     Just so I'm clear, you said that the -- on average,
COURT:  the risk of a sexual offender reoffending within five
        years is 20 to 30 percent?

THE     Yes. It depends a bit upon the type of sexual
WITNESS: offending, whether it's a rape or whether it's
        pedophilia, whether it's incest. It -- I think that
        it also does depend upon, in the individual case, on
        many of those other markers that we've looked at as
        to whether the person has a previous history of
        sexual offending, for example, and I think that one
        of the things that I don't think the studies get at
        very well is, when someone is convicted of sexual
        offending, are they convicted of just a single sexual
        offence or are they convicted, as in this case, on a
        first occasion, of multiple sexual offending. And
        that's -- that's part of the problem with the --
        looking at the numbers of the percentage of people
        reoffending over five or ten years.

[88]    Dr. Miller stated with some emphasis that, "on a societal
level, we should do everything we can to protect the public, and to make
sure that JWR does not have the opportunity to offend against
children."

[89]    Dr. Miller agreed with the defence proposition that JWR's
denial of the offences is not a bar to treatment. However, he qualified
his agreement as follows:

A.      Yeah, I do agree that it makes it most more difficult.
        In this particular case, in reviewing the literature or
        reviewing the Correctional files, it's kind of unclear
        why JWR didn't have treatment so far. And part of it's
        there is reference to him saying, you know, denying
        that he was -- or saying he doesn't want treatment, but
        in another place it says that he needs to wait until he
        is able to take responsibility before he's offered
        treatment. So it's not clear to me exactly what
        happened, so I think that theoretically you're right
        that, you know, it's not an absolute bar to treatment,

but I do think as these kind of people go through the
kind of bureaucratic system in CSC, you know, it --
potentially it is a factor which may mean it's less
likely that he gets treatment. I also think that, you
know, I also think that it's important to point out
that, I mean, I think that somebody who has as many
offences as JWR, who, when he talks to me about going
into treatment says, well, what he would deal with in
treatment is the effect that the legal process has had
upon his family, basically he's still externalizing
it. I do think that it's bad prognostically that he
continues to deny it --

Q.:     Well --

A.:     And I think I would also say that, you know, when one
looks at the effectiveness of treatment, treatment is
effective, but when one says it's effective one's not
saying that people don't reoffend if they have
treatment. What it means is there's a small percentage
of people who would have reoffended but don't, but it's
always worthwhile doing.

## Dr. Nicholaichuk

[90]     Dr. Terry Nicholaichuk is a psychologist currently employed by
the Correctional Service of Canada. He was tendered as an expert by
JWR. He was qualified as an expert in forensic psychology and, more
particularly, in the diagnosis and treatment of sexual offenders and the
assessment of risk.

[91]     Dr. Nicholaichuk interviewed JWR on July 17 and 18, 2004 for a
total of 5.75 hours.

[92]     In his report dated July 27, 2004, Dr. Nicholaichuk stated that
JWR's offence pattern indicates that he is an incest type sexual
offender:

Men such as this typically do not have a primary or ongoing
sexual attraction to children but take sexual advantage of
children within ████████████ or their immediate social
sphere. Marital discord coupled with the offender's
inability to manage it are common concomitants to their
offences. Within ████████████ it is not unusual for
them to be exploitative, aggressive and abusive (many of
the descriptors applied to JWR). However, in spite of the
damage they do to members of their immediate families, they
are rarely dangerous to the rest of the community,
particularly after they have been detected and prosecuted.
In addition, subsequent to detection, their rate of
recidivism is the lowest of any sexual offender group.

[93]     Certain factors indicated to Dr. Nicholaichuk that JWR is at
low risk to re-offend, including:

(a)     he belongs to an offender group that has a very low
recidivism rate subsequent to detection;

(b)     the time he spent in the community from 1988 until his
arrest without reported offences;

(c)    he is not sexually deviant (in the sense that he is not exclusively sexually deviant);

(d)    he is not young;

(e)    he has no criminal history aside from his current convictions;

(f)    JWR does not earn his living by criminal activity; and

(g)    he seems to have healthy, pro-social support.

[94]    In his summary, Dr. Nicholaichuk stated:

JWR was assessed as being at low risk to commit additional sexual offences. This assessment was based upon his offence pattern, [h]is age and his lack of criminality and sexual deviance. He has already demonstrated that he is able to be compliant with direction he is given and has completed two periods of conditional release. Although there are indications that he has been less than truthful in the investigation and trial process, these are not factors which affect his risk to commit new sexual offences. Offenders such as this, even though they many deny their offences, tend to be good candidates for supervision in the community as they are behaviourally stable and compliant with the terms of supervision.

[95]    Dr. Nicholaichuk testified that current literature in the area of treatment of sexual offenders indicates that those offenders who cooperate with the treatment program and still deny the offences, nevertheless do well. The goal of treatment is to regulate and control the offenders' behaviour.

[96]    Under cross-examination, Dr. Nicholaichuk was challenged in respect of his conclusion that JWR did not meet the criteria for diagnosis of Narcissistic Personality Disorder under the DSM IV. The cross-examination confirmed that JWR's behaviour is consistent with his belief that he is special or unique and has a sense of entitlement, and that he was exploitative and aggressive.

[97]    Crown counsel also challenged Dr. Nicholaichuk's finding that JWR is an "incest type" sexual offender. He defined that type of offender as one who molests his or her own children or stepchildren (the latter, he said, have a five times greater risk of being molested); who is in a "not great marriage"; and whose primary sexual interest is adult heterosexual.

[98]    Dr. Nicholaichuk ultimately conceded that, under the DSM IV, JWR is unquestionably a pedophile. He conceded that, in light of JWR's behaviour in relation to ███ ███ and ███ (the girl with whom JWR's ███████ was bathing as set out in Count 11), he may not be an incest type offender.

[99]    Dr. Nicholaichuk further conceded that, although the statistical risk of recidivism declines dramatically after offenders reach age 50, he of course cannot say whether that is true in JWR's case. He confirmed that recidivism rates for homosexual offenders decline later in life.

[100]    Dr. Nicholaichuk agreed with the proposition that the best predictor of future conduct is past conduct. He said that history

contributes about half the variance in outcome. He also acknowledged that there have been gaps in JWR's life in which he has not committed offences (1977 to 1983; 1983 to 1988; 1988 to the present; and no known offences in the first 20 years of his life). He conceded that the gaps have little significance because JWR has demonstrated that he has committed offences after gaps in his life.

[101]     He also confirmed that, if JWR re-offends, there is no question that he is likely to cause injury, pain, or other evil to his victim.

[102]     Lastly, Dr. Nicholaichuk testified that when he met with JWR, the only explanation he offered as to why his family reported the offences was that it had been orchestrated by his ex-wife.

## VICTIM IMPACT STATEMENTS

[103]     JWR's ███████████████ ██, provided a statement that described in vivid detail the anger, helplessness, vulnerability, shame and embarrassment she experienced as a result of JWR's abuse of her. She stated that she exposed herself to painful relationships because she did not understand the meaning of a relationship until she was almost 30 years of age. She became pregnant at 16, believing that the pregnancy would cause JWR to leave her alone. She had an abortion. She lacked self-confidence which affected her achievement at school. She said that her childhood, and that of her daughter, was stolen from her by the offender. She feels profound guilt and devastation due to the offences perpetrated by JWR ████████████ and the consequent belief that she failed to protect her ████████.

[104]     The offender's ████ ██████████ ██, stated that she has experienced feelings of anxiety and fear most of her life. She distrusts people, especially men. The impact of JWR's crimes have affected her ability to concentrate and to maintain relationships, including sexual relationships. She has suffered from depression. She has attained only a Grade 7 education.

[105]     JWR's ████████████████, described the upset caused by the crime committed on her, including the loss of drive, sensitivity around adult men, and the strain on her relationship with her mother, ████.

[106]     None of the victims who provided statements wish to ever have contact with JWR. ███described him as "an evil presence." ████ expressed concern that he would seek retribution from her upon his release from custody.

## CRIMINAL CODE PROVISIONS

[107]     The Crown's application is made under s. 753(1) of the *Criminal Code*, which reads as follows:

> The court may, on application made under this Part following the filing of an assessment report under subsection 752.1(2), find the offender to be a dangerous offender if it is satisfied
>
> (a)    that the offence for which the offender has been convicted is a serious personal injury offence described in paragraph (a) of the definition of that expression in section 752 and the offender constitutes a threat to the life, safety or physical or mental well-being of other persons on the basis of evidence establishing

5

and territorial waters and vessels and aircraft registered in that Contracting Party or aircraft leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in, that Contracting Party if any such aircraft is in flight, or if any such vessel is on the high seas when the offense is committed. For the purposes of this Treaty an aircraft shall be considered in flight from the moment when power is applied for the purpose of the take-off until the moment when the landing run ends.

(2)  In a case when offense 23 of the annexed Schedule is committed on board an aircraft at any time from the moment when all its external doors are closed following embarkation until the moment when any such door is opened for disembarkation, such offense and any other offense covered by Article 2 committed against passengers or crew of that aircraft in connection with such offense shall be considered to have been committed within the territory of a Contracting Party if the aircraft was registered in that Contracting Party, if the aircraft landed in the territory of that Contracting Party with the alleged offender still on board, or if the aircraft was leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in that Contracting Party.

(3)  When the offense for which extradition has been requested has been committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

6

ARTICLE 4

(1)  Extradition shall not be granted in any of the
following circumstances:

(i)  When the person whose surrender is sought is being
proceeded against, or has been tried and discharged or punished
in the territory of the requested State for the offense for which
his extradition is requested.

(ii) When the prosecution for the offense has become barred
by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is
requested is of a political character, or the person whose
extradition is requested proves that the extradition request
has been made for the purpose of trying or punishing him for an
offense of the above-mentioned character.  If any question arises
as to whether a case comes within the provisions of this
subparagraph, the authorities of the Government on which the
requisition is made shall decide.

(2)  The provisions of subparagraph (iii) of paragraph (1)
of this Article shall not be applicable to the following:

(i)  A kidnapping, murder or other assault against the life
or physical integrity of a person to whom a Contracting Party has
the duty according to international law to give special protection,
or any attempt to commit such an offense with respect to any such
person.

(ii) When offense 23 of the annexed Schedule, or an attempt
to commit, or a conspiracy to commit, or being a party to the
commission of that offense, has been committed  on board an aircraft
engaged in commercial services carrying passengers.

TIAS 8237