1  BENJAMIN B. WAGNER
   United States Attorney
2  MICHELLE A. PRINCE
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, California 95814
4  Telephone: (916) 554-2758

5

6

7                 IN THE UNITED STATES DISTRICT COURT

8            FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10

11  UNITED STATES OF AMERICA,      )   Case. No 2:11-MJ-310 KJN
                                   )
12              Plaintiff,         )
                                   )   EXTRADITION SUPPORTING
13       v.                        )   DOCUMENTATION
                                   )   FOR THE EXTRADITION OF FUGITIVE
14  JAMES WILLIAM ROBERTSON,       )   JAMES WILLIAM ROBERTSON FROM
                                   )   THE UNITED STATES TO CANADA
15              Defendant.         )
                                   )
16                                 )
                                   )

17  _____

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

                                1

(i)    a pattern of repetitive behaviour by the offender, of which the offence for which he or she has been convicted forms a part, showing a failure to restrain his or her behaviour and a likelihood of causing death or injury to other persons, or inflicting severe psychological damage on other persons, through failure in the future to restrain his or her behaviour,

(ii)    a pattern of persistent aggressive behaviour by the offender, of which the offence for which he or she has been convicted forms a part, showing a substantial degree of indifference on the part of the offender respecting the reasonably foreseeable consequences to other persons of his or her behaviour, or

(iii)    any behaviour by the offender, associated with the offence for which he or she has been convicted, that is of such a brutal nature as to compel the conclusion that the offender's behaviour in the future is unlikely to be inhibited by normal standards of behavioural restraint; or

(b)    that the offence for which the offender has been convicted is a serious personal injury offence described in paragraph (b) of the definition of that expression in section 752 and the offender, by his or her conduct in any sexual matter including that involved in the commission of the offence for which he or she has been convicted, has shown a failure to control his or her sexual impulses and a likelihood of causing injury, pain or other evil to other persons through failure in the future to control his or her sexual impulses.

The Crown relies on s. 753(1)(a)(i) and (1)(b).

[108]    The defence concedes that the predicate offence is a "serious personal injury offence" as defined by s. 752, that JWR's conduct falls within the definition, and that, if JWR fails to restrain his sexual impulses, he will cause "injury, pain or other evil" to other persons. The defence concession is supported by the expert testimony of Dr. Lohrasbe and Dr. Miller, who both agreed that conduct of the kind JWR perpetrated on ██████ and his other victims would cause physical and psychological harm to other victims.

[109]    The principal point of contention is whether the Crown has proved beyond a reasonable doubt that it is likely that in the future the offender will fail to control his sexual impulses. The defence, as I have noted, concedes that if he fails to control his sexual impulses, he will cause injury, pain or other evil to other persons. The test as above described was confirmed to be the correct expression of the law in R. v. Bakker (1999), 133 C.C.C. (3d) 75, 1999 BCCA 84.

[110]    The defence argues that the weight of the expert evidence does not support a finding that JWR is likely to re-offend. The defence emphasizes the fact that JWR has not committed any offences for 16 years and that, at age 64, he is at an age where his sexual drive is diminishing. I note, however, that JWR has been in custody for approximately one-third of those 16 years and did not have young victims

available to him.  The defence further contends that notwithstanding
JWR's denial of his crimes, he has demonstrated that he is controllable
both in and out of prison.

[111]      The defence asks that the court give greater weight to the
expert opinions of Dr. Zoffmann and Dr. Nicholaichuk, who assessed JWR's
risk of recidivism at low to low/moderate and low, respectively.

[112]      The Crown places less emphasis on the expert testimony, noting
that the experts themselves described risk assessment as being "in its
infancy" and an inexact science.  The wide range of risk assessments
proffered in this case supports the Crown's contention.

[113]      The Crown emphasizes the third aspect of the analysis under
s. 753(1)(b):  by his past conduct, JWR has shown a likelihood of
failure in the future to control his sexual impulses.  The Crown points
to the evidence of the defence expert, Dr. Nicholaichuk, who ultimately
agreed that the best predictor (up to 50 percent) of future conduct is
past behaviour.  The Crown argues that the lack of offences since 1989
is not inconsistent with previous gaps in JWR's offending (from 1977 to
1983 and from 1983 to 1988).  As to JWR's age, JWR committed the
earliest offence against DEG as early as January 1966, when he was
25 years old.  The last offence, against his step-granddaughter,
occurred in 1988, when he was 48 years of age.  He was 49 when the
incidents in California involving his step-granddaughter took place.

[114]      Assessing the evidence as a whole, I conclude that it
establishes beyond a reasonable doubt that JWR is a moderate risk to
re-offend and that it is likely that in the future he will fail to
control his sexual impulses and will cause injury, pain or other evil to
other persons.  My primary reasons for reaching this conclusion are:

    (a)    I accept Dr. Lohrasbe's opinion that JWR has a strong
    sexual deviancy and that it is not uncommon for there to be long
    gaps in a sexual offender's pattern of offences.  In accepting
    Dr. Lohrasbe's opinion, I am mindful that he did not have an
    opportunity to interview JWR and therefore could not provide a
    psychiatric assessment.

    (b)    Both Dr. Lohrasbe and Dr. Zoffmann expressed serious
    concern as to JWR's future exposure to children and the absolute
    need for him to be supervised.

    (c)    All of the experts who assessed JWR agreed in one form or
    another that he cannot be cured of his affliction; he can only be
    managed.

    (d)    I accept Dr. Miller's diagnosis of JWR as
    pedophilia-nonexclusive type over Dr. Zoffmann's and
    Dr. Nicholaichuk's view that he is an incest type sexual
    offender.  I do not accept that JWR's sexual offending is
    confined to the ████████████.  Rather, he has exhibited that he
    is a danger to young people under his control, including a legal
    client.

    (e)    I understand and accept that the risk assessment
    instruments employed by Drs. Zoffmann, Miller and Nicholaichuk
    are useful tools in the assessment of sexual offenders.  However,
    I am cautious in accepting the conclusions drawn from the use of
    those instruments because of the acknowledged basis upon which
    they are measured, namely recidivism rates.  The deeply

troublesome aspect of the use of recidivism rates is the acknowledged and notorious fact that recidivism rates underreport the actual occurrence rates of sexual re-offending.

(f)    Those experts who interviewed JWR quite properly included in their assessments certain information provided to them by the offender and collateral family members and acquaintances.  For the reasons stated in my findings as to JWR's credibility at trial, I approach that information and the inferences drawn from it with considerable caution.  I find support in this caution from certain of the statements made to the experts by JWR.  For example, he offered an explanation to Dr. Zoffmann for his son's charges of sexual touching.  He said that he and his wife had been told to check DCCR's inguinal and scrotal area every six months or so.  That was not an explanation offered by JWR at trial because he was aware that the family doctor, his former wife and his victim would say that his explanation was untrue.

He told Dr. Miller that "he was used to being briefly naked" in the company of other men, but was otherwise modest with regard to sexuality.  This of course is contrary to his evidence at trial in which he admitted that he forced his children to strip naked on boating excursions.

JWR also told Dr. Miller that there is "some form of chemical imbalance" that caused his family to make the allegations against him.  Dr. Miller, not surprisingly, considered that explanation to be implausible.

It is apparent that JWR has continued in the assessment process to do that which he did in his testimony at trial, namely to manipulate the evidence and attempt to place himself in the most favourable light possible.  While that may, in his circumstances, seem understandable, it nevertheless causes me to treat the opinions of those who have accepted his information at face value (which, in fairness to the experts, they must) with considerable caution.

(g)    JWR's absolute denial of the offences has rendered it impossible for the experts who have interviewed him to determine the factors that cause him to sexually offend.  In consequence, they have been forced to rely on actuarial measurements of risk which, while helpful, nevertheless do not address the specific circumstances of JWR's sexual offending.  None of the experts can say what created JWR's sexual offending.  Accordingly, none can say whether his sexual offending can, for certain, be controlled.

(h)    The underlying purpose of both the dangerous offender and long-term offender provisions of the *Criminal Code* is the protection of the public: *R. v. Lyons*, [1987] 2 S.C.R. 309.  Drs. Lohrasbe, Zoffmann and Miller all testified that JWR cannot be permitted to be in situations in which children are present and at explicit risk.

(i)    It is significant that both Dr. Zoffmann and Dr. Lohrasbe regarded JWR's conduct with ●●to be particularly troubling.  Dr. Zoffmann described his behaviour as, at the very least, an example of incredibly poor judgment and impulsivity.  Dr. Lohrasbe testified that JWR's behaviour demonstrated a

recklessness that is somewhat unusual and outside the average
paedophilic offender.

[115]   JWR has been convicted of extremely serious crimes perpetrated
primarily against his ▇▇▇▇▇▇▇▇, his ▇▇▇▇▇▇▇▇ and a ▇▇▇-
▇▇▇. He raped ▇▇▇ on countless occasions from the time she was
13 years old. He fondled and groped ▇▇ and digitally penetrated her
vagina on numerous occasions. He masturbated his ▇▇▇ and performed
oral sex on them. In one particularly horrific incident he assaulted
▇▇ in the presence of his ▇▇ and encouraged his son to place his
fingers in his ▇▇▇▇▇▇ vagina. It is difficult to conceive of a more
brutal violation of his children's trust. All of these offences were
perpetrated in an atmosphere of control and violence. He threatened his
victims not to reveal his abuse, telling them it was normal or that they
would not be believed or that it would cause the ▇▇▇▇▇to
disintegrate. His behaviour was abhorrent, despicable, and horrific.
All of his victims have endured long-lasting suffering from his abuse.
He cannot be allowed to inflict similar harm again.

[116]   Having regard to all of the evidence, I conclude that the Crown
has satisfied the burden of proving that it is likely that in the future
JWR will fail to control his sexual impulses and cause pain, injury or
other evil to other persons, and has satisfied the requirements under
s. 753(1)(a)(i) and s. 753(1)(b) to have JWR declared a dangerous
offender.

[117]   However, in keeping with the direction in *R. v. Johnson*, [2003]
2 S.C.R. 357, I retain a discretion not to declare JWR a dangerous
offender even where all of the statutory criteria are met if a less
restrictive sanction will protect the public adequately from the threat
of harm. If the public threat can be reduced to an acceptable level
through either a determinate period of detention or a determinate period
of detention followed by a long-term supervision order, then I cannot
properly declare JWR dangerous and impose an indeterminate period of
detention.

[118]   Section 753.1(1) of the *Criminal Code* provides that:

The court may, on application made under this Part
following the filing of an assessment report under
subsection 752.1(2), find an offender to be a long-term
offender if it is satisfied that

(a)   it would be appropriate to impose a sentence of
imprisonment of two years or more for the offence for which
the offender has been convicted;

(b)   there is a substantial risk that the offender will
reoffend; and

(c)   there is a reasonable possibility of eventual control
of the risk in the community.

If the circumstances set out in s. 753(1)(2) are satisfied, then there
is a conclusive presumption of "substantial risk". (See: *R. v. Wessel*
(2003), 181 C.C.C. (3d) 358 (Sask. C.A.), ¶ 17-18, 56 and *R. v. McLeod*
(1999), 136 C.C.C. (3d) 492 (B.C.C.A.) ¶ 26-27.)

[119]   The court in *Johnson*, *supra*, held at ¶ 30 that:

In order for the sentencing sanctions available pursuant to
the long-term offender provisions to reduce the threat

associated with an offender who satisfies the dangerous
offender criteria to an acceptable level, it must be
possible for the same offender to satisfy both the
dangerous offender criteria and the long-term offender
criteria.  To repeat, the three criteria that must be
established on a long-term offender application are:
(i) it must be appropriate to impose a sentence of
imprisonment of two or more years in respect of the
predicate offence; (ii) there must be a substantial risk
that the offender will reoffend; and (iii) there must be a
reasonable possibility of eventual control of the risk in
the community.  On a dangerous offender application, the
sentencing judge must be satisfied that the offender
constitutes a threat to the life, safety or physical or
mental well-being of other persons, on the basis of a
pattern of repetitive or persistent aggressive behaviour,
brutal behaviour, or sexual misconduct described in
s. 753(1)(a) and (b).

[120]    As to the first criterion, there can be no doubt that the
offence in Count 1 attracts a sentence of two or more years.  The
maximum sentence is 10 years.  The forced masturbation; digital vaginal
penetration causing tearing and burning; and invited sexual touching and
fondling over the ██████████████'s vaginal area are serious offences
exhibiting a shocking abuse of trust deserving of a sentence in excess
of two years in prison.

[121]    As to the second criterion, JWR was convicted of sexual assault
under Count 1.  I have found that by his conduct in sexual matters that
he has shown a likelihood of causing injury, pain or other evil to other
persons in the future through similar offences.

[122]    The third criterion poses the greatest challenge, namely
whether there is a reasonable possibility of eventual control of the
risk in the community.  I think that the threat can be reduced to an
acceptable level so long as JWR is supervised in the community.  I make
this finding based on the following assumptions that are supported by
the evidence:

    (a)    Although I do not have reason to believe JWR's statement to
    Dr. Zoffmann that he no longer experiences a sex drive, I
    nevertheless accept (as do Drs. Lohrasbe, Zoffmann, Miller and
    Nicholaichuk) that JWR's sex drive will diminish over time.  The
    principal concern relates to his homosexual paedophilic
    tendencies, which diminish at a lesser rate.  However, these
    risks may be managed by preventing JWR from working in employment
    or being in situations in which he would have an opportunity to
    molest children.

    (b)    There is conflict in the expert evidence as to whether
    JWR's denial of these offences precludes treatment.
    Dr. Nicholaichuk testified that even sexual offenders who deny
    their behaviour but who cooperate with treatment do well.
    However, Dr. Zoffmann stated that JWR "cannot fully embrace or
    accept treatment while he denies the offences."  JWR has
    cooperated in other aspects of his behaviour since his arrest in
    1997.  He complied with the bail conditions I imposed in 2001.
    His record while in prison indicates only trivial infractions.
    JWR has stated that he is willing to undergo treatment.  That

treatment, combined with his diminishing sex drive and long-term supervision that excludes him from forming family-style relationships or working in any capacity with children, creates a reasonable possibility of eventual control of JWR's risk in the community. I accept Drs. Zoffmann's and Nicholaichuk's recommendation that low intensity treatment may be sufficient for JWR's circumstances.

(c)   A determinate sentence alone would not adequately protect the public. JWR's sentence will exceed two years, thus eliminating the possibility of imposing a probation order (s. 731(1)(b)). Later in these Reasons I find that JWR has to date served the equivalent of 11 years imprisonment. Accordingly, any conditions imposed upon his statutory release would not be sufficient to protect society for a sufficiently long period of time. Therefore, the long-term offender designation is the only appropriate sentencing alternative to the dangerous offender designation.

[123]    Accordingly, pursuant to s. 753.1(a), I sentence JWR to three years imprisonment on Count 1 and, pursuant to s. 753.1(b), order that JWR be supervised in the community for a period of ten years following his release in accordance with s. 753.2 of the *Criminal Code* and the *Corrections and Conditional Release Act*, S.C. 1992, c. 20.

[124]    At ¶ 139 and 140 of these Reasons, I discuss the totality of the sentence and the time served in custody pending trial and sentence.

## SENTENCES ON REMAINING COUNTS

[125]    The purpose and principles of sentencing are set out in s. 718 of the *Criminal Code* as follows:

The fundamental purpose of sentencing is to contribute, along with crime prevention initiatives, to respect for the law and the maintenance of a just, peaceful and safe society by imposing just sanctions that have one or more of the following objectives:

(a)   to denounce unlawful conduct;

(b)   to deter the offender and other persons from committing offences;

(c)   to separate offenders from society, where necessary;

(d)   to assist in rehabilitating offenders;

(e)   to provide reparations for harm done to victims or to the community; and

(f)   to promote a sense of responsibility in offenders, and acknowledgment of the harm done to victims and to the community.

[126]    I am also mindful that the sentences imposed must be proportionate to the gravity of the offence and the degree of responsibility of JWR: s. 718.1.

[127]    Other sentencing principles stated in s. 718.2 are applicable in the case at bar:

(a)   a sentence should be increased or reduced to account for any relevant aggravating or mitigating circumstances

relating to the offence or the offender, and, without
limiting the generality of the foregoing,

. . .

> (ii)  evidence that the offender, in committing the
> offence, abused the offender's spouse or common-law
> partner or child,

> (iii)  evidence that the offender, in committing the
> offence, abused a position of trust or authority in
> relation to the victim,

. . .

> shall be deemed to be aggravating circumstances;

(b)  a sentence should be similar to sentences imposed on
similar offenders for similar offences committed in similar
circumstances;

(c)  where consecutive sentences are imposed, the combined
sentence should not be unduly long or harsh;

(d)  an offender should not be deprived of liberty, if
less restrictive sanctions may be appropriate in the
circumstances; and

(e)  all available sanctions other than imprisonment that
are reasonable in the circumstances should be considered
for all offenders, with particular attention to the
circumstances of aboriginal offenders.

[128]   The defence provided several decisions which, it was submitted,
supported a global sentence of between 8 to 10 years imprisonment.  The
defence placed some reliance on *Bakker, supra*, in which the Court of
Appeal upheld the trial judge's decision to dismiss the Crown's
dangerous offender application and the imposition of an eight-year
prison term.  That case concerned an established paedophile who, between
1975 and 1991, committed various acts of sexual offending (buggery,
attempted buggery, gross indecency, fellatio, masturbation, indecent
assault, and sexual assault) involving six victims ranging in age from
eight to 15 years.

[129]   A unique feature of the case was that the offender committed
the crimes in respect of four of the victims when he was exercising his
authority as a senior court official.  The trial judge concluded that
the same factors, conditions and opportunities for re-offending would
not exist in the future because the offender had lost the position that
allowed him to improperly exercise his authority.

[130]   It is of some significance that JWR has stated that it is his
intention to return to the United States and to practice law.  That is
in all probability an unachievable goal.  However, it demonstrates his
lack of insight into the position in which he must not allow himself to
be placed.

[131]   The defence also referred to *R. v. T.A.D.* (1995), 68 B.C.A.C.
236, in which the Court of Appeal allowed an appeal from a three-year
sentence and imposed a term of six years.  In that case, the 51 year old
offender committed sexual offences, including sexual intercourse, on his
██████████ over a period of nine years.  The Court of Appeal found
that the three-year sentence failed to sufficiently recognize the

seriousness of the continuing abuse and the serious continuing breaches of trust. In giving the judgment for the court, McEachern C.J.B.C. stated at ¶ 9:

> Sentences for such a series of offences of up to 12 years or more have been approved by the Court but the usual range is more like five to eight or nine years.

[132]   **R. v. C.D.H.** (2002), 165 B.C.A.C. 93, 2002 BCCA 124, concerned a youthful offender with no criminal record and a disturbed background. That decision is of little assistance.

[133]   **R. v. P.P.H.** (2003), 190 B.C.A.C. 89, 2003 BCCA 591, concerned an offender who pleaded guilty to two charges of sexual assault. He repeatedly assaulted his ███████████ over a five-year period. The trial judge imposed two seven-year sentences to be served consecutively. The Court of Appeal considered the range of sentence to be between 12 and 18 years. The 14-year sentence was held to be not inappropriate given the appalling nature of the crimes.

[134]   The defence submits that a mitigating factor in the case at bar is that JWR is a first time offender. No criminal record is alleged. The defence further submits that the public exposure decreases the need for individual deterrence. The defence relies in this regard on the evidence that JWR is ███████ type of offender who, once caught and exposed, is less likely to re-offend. In that respect, I must note my rejection of the classification of JWR as solely an incest type offender.

[135]   The defence also submits that JWR has lost his family, his professional status, and his good reputation in the community. In that regard, I first note that JWR has only himself to blame for the loss of his family. Second, JWR has stated that he retains his status as a member of the California bar. Third, although the defence repeatedly referred to JWR's public vilification and "numerous trials and appeals," I note that there has been a ban on publication under s. 486(3) of the *Criminal Code* that has undoubtedly served to shield JWR from full public vilification in the interest of protecting his innocent victims, his children.

[136]   The Crown submits that the conduct in relation to Count 1 warrants a six-year sentence. I have already indicated that I consider a three-year sentence to be appropriate. The Crown submitted that a global sentence of between 20 to 25 years is warranted having regard to the profound abuse of JWR's position of trust or authority in respect of all of his victims.

[137]   I have already noted the vile circumstances of this case. The abuse of his ████████████ and those victims in which he was in a position of trust are especially aggravating factors. The effect that his conduct has had upon his victims is significant and life-long.

[138]   Having regard to the principles of sentencing, the principle of totality, the circumstances of JWR, the circumstances of the various offences, and the impact that those offences have had on the victims, I find that the appropriate sentence on the whole of the counts to be 16 years. In order to achieve that result, and to impose a fit sentence on each count, I sentence JWR as follows:

**Count 1:**      Sexual assault of ██████
                  Maximum Sentence:  10 years.
                  Sentence:  3 years.

**Count 2:**      Indecent assault of ██████
                  Maximum Sentence:  10 years.
                  Sentence:  18 months, consecutive to the sentence
                  imposed on Count 1.

**Counts 3**      Indecent assault of ██████
**and 4:**        Maximum Sentence:  5 years.
                  Sentence:  3 years on each count, concurrent the one
                  with the other.

**Counts 5**      Rape of ██████
**and 6:**        Maximum Sentence:  Life.
                  Sentence:  8 years on each count, concurrent the one
                  with the other and concurrent with the sentences
                  imposed on Counts 3 and 4, but consecutive to the
                  sentence imposed on Count 2.

**Count 7:**      Sexual intercourse with ████, a female person who was
                  not his wife and who was under the age of 14 years.
                  Maximum Sentence:  Life.
                  This count is subsumed under Counts 5 and 6 and is
                  subject to the ruling in *R. v. Kienapple*, [1975] 1
                  S.C.R. 729.  I impose a conditional stay of
                  proceedings on this count.

**Count 8:**      Assault of ██████
                  Sentence:  6 months concurrent with the sentences
                  imposed on Counts 3 to 6.

**Count 9:**      Indecent assault of ██████
                  Maximum Sentence:  5 years.
                  Sentence:  6 months, concurrent.

**Counts 10**     Indecent assault of ██████
**and 11:**       Maximum Sentence:  5 years.
                  Sentence:  2 years on each count, concurrent the one
                  with the other, but consecutive to the sentences
                  imposed on Counts 5 and 6.

**Count 12:**     Assault of ██████
                  Maximum Sentence:  2 years.
                  Sentence:  6 months, concurrent with the sentences
                  imposed on Counts 10 and 11.

**Count 14:**     Indecent Assault of ██████
                  Maximum Sentence:  10 years.
                  Sentence:  18 months, consecutive to sentence imposed
                  on Counts 10 and 11.

[139]    I have imposed consecutive sentences on those counts that are
totally unrelated and which took place at separate times and places.  By
the imposition of certain consecutive sentences, the total sentence is
16 years.  Having regard to all of the circumstances of this case, I do
not consider that the total sentence of 16 years is harsh or excessive.

[140]    Crown counsel conceded that JWR should receive double credit
for the five years and six months he has been in custody pending trial

and sentence. I exercise my discretion and find that he has served the equivalent of 11 years in custody: *R. v. Wust*, [2000] 1 S.C.R. 455.

[141]   Taking into account the 11 years that JWR has been credited with serving, and in order to achieve the resulting five-year sentence, I reduce the sentences on Counts 5 and 6 from eight years to five years and make all of the sentences concurrent one with the other. Had it not been that JWR was entitled to credit for time served, the appropriate sentence would have been 16 years.

[142]   Lastly, I must address the Crown's application, granted by me on December 16, 2004, that JWR comply with the *Sex Offender Information Registration Act*, S.C. 2004, c. 10. The Act came into force on December 15, 2004.

[143]   Since the granting of the order, I have reviewed in more detail the requirements of granting the order under s. 490.012 of the *Criminal Code*. In doing so, I am satisfied that the impact of the order made is not grossly disproportionate to the public interest in protecting society. Clearly, all available means to ensure that JWR does not re-offend, or if he does re-offend, that he will be detected, are in the public interest.

[144]   The duration of the order made in respect of JWR ensures that the registration provisions will be in effect for his lifetime.

[145]   JWR endorsed the order on December 16, 2004. However, I did not read the provisions to JWR. I do so now.

[146]   Section 4(2) of the *Sex Offender Information Registration Act* requires you to report to a registration centre within 15 days after the order is made or, if a custodial sentence is imposed, within 15 days after being released from custody. When reporting to a registration centre you must provide, among other things, your name and every alias you use, your address, telephone number for your main residence, any secondary residence, your place of employment and where you may volunteer. Further, you must give your height and weight and a description of every physical distinguishing mark on your body. If you will be away from your main or secondary residence for more than 15 consecutive days, but still within the country, you must provide every address at which you intend to stay and your departure and return dates.

[147]   I hereby direct that a copy of the order be given to JWR.

[148]   If you fail, without reasonable excuse, to comply with this order, you are liable, in the case of a first offence, on summary conviction, to a fine of not more than $10,000 or to imprisonment for a term of not more than six months, or to both; and in the case of a second or subsequent offence, on conviction on indictment, to a fine of not more than $10,000 or to imprisonment for a term of not more than two years, or to both; or, on summary conviction, to a fine of not more than $10,000 or imprisonment up to six months, or both.

[149]   I have already made, on December 16, 2004, the mandatory DNA and weapons prohibition orders.

"P.A. Kirkpatrick, J."
The Honourable Madam Justice P.A. Kirkpatrick

**Warrant of Committal Upon Conviction - Form 21/**
**Mandat de dépôt sur déclaration de culpabilité - Formulaire 21**

BRITISH COLUMBIA

| Police File No./ Nu. de dossier de la police | Court File No./ Nu. de dossier du greffe |
|---|---|
| 814:96006944 | 93060-7 Victoria |

Canada: Province of British Columbia
Province de la Colombie-Britannique

☒ Ban - See Attachment

D.O.B./D.N. : July 12 1940

Re/Objet:  Robertson

## Charges Attachment / Annexe des inculpations

Count 1,  between January 4, 1983 and December 31, 1988, at or near Sidney, BC, did commit an offence of Sexual Assault, contrary to Section 246.1 Criminal Code.
SENTENCE: Jail: 3 Year(s);

Count 2,  between July 1, 1976 and July 9, 1979, at or near Sidney, BC, did commit an offence of being a male person did indecently assault another male person, contrary to Section 156 Criminal Code.
SENTENCE: Jail: 18 Month(s);

Count 3,  between January 1, 1966 and July 14, 1971, at or near Sidney, BC, did commit an offence of indecent assault on female, contrary to Section 141(1) Criminal Code.
SENTENCE: Jail: 3 Year(s);

Count 4,  between July 15, 1971 and December 31, 1976, at or near Sidney, BC, did commit an offence of indecent assault on a female, contrary to Section 149(1) Criminal Code.
SENTENCE: Jail: 3 Year(s);

Count 5,  between January 1, 1970 and July 14, 1971, at or near Sidney, BC, did commit an offence of rape (without consent), contrary to Section 136(a) Criminal Code.
SENTENCE: Jail: 5 Year(s);

Count 6,  between July 15, 1971 and December 31, 1976, at or near Sidney, BC, did commit an offence of Rape, contrary to Section 144 Criminal Code.
SENTENCE: Jail: 5 Year(s);

Count 8,  between June 1, 1965 and July 14, 1972, at or near Sidney, BC, did commit an offence of assault, contrary to Section 231(1) Criminal Code.
SENTENCE: Jail: 6 Month(s);

Count 9,  between June 1, 1974 and September 30, 1975, at or near Sidney, BC, did commit an offence of indecent assault on a female, contrary to Section 149(1) Criminal Code.
SENTENCE: Jail: 6 Month(s);

Count 10,  between October 1, 1966 and July 14, 1971, at or near Sidney, BC, did commit an offence of indecent assault on female, contrary to Section 141(1) Criminal Code.
SENTENCE: Jail: 2 Year(s);

Charges continue on next Charge Attachment page / Suite à la prochaine page de l'Annexe des inculpations

Chief of Sentence Management
William Head Institution

**CERTIFIED TRUE COPY**

Dated/Fait le    January 20 2006
at/à le    Vancouver
British Columbia Colombie-Britannique

Clerk of the Court on behalf of Supreme Court / Greffier au nom de la cour suprême The Honourable Mr./Madam Justice /Monsieur/Madame (la) Juge Kirkpatrick, SCJ

FCR 024
Form 21
J12
4/02    file 13:22:10.01.2005

Original: Custody - Copies: File

Mandat de dépôt (prison) / Warrant of Committal (Jail)



**Warrant of Committal Upon Conviction - Form 21/**
**Mandat de dépôt sur déclaration de culpabilité - Formulaire 21**

BRITISH COLUMBIA

Police File No./
Nu. de dossier de la police
814:96006944

Court File No./
Nu. de dossier du greffe
93060-7
Victoria

Canada: Province of British Columbia
Province de la Colombie-Britannique

☒ Ban - See Attachment

D.O.B/D.N.: July 12 1940

Re/Objet: Robertson

## Charges Attachment / Annexe des inculpations

Charges continued from previous Charge Attachment page / Suite de la page précédente de l'Annexe des inculpations

Count 11, between July 15, 1971 and December 31, 1976, at or near Sidney, BC, did commit an offence of indecent assault on a female, contrary to Section 149(1) Criminal Code.
SENTENCE: Jail: 2 Year(s);

Count 12, between July 15, 1971 and December 31, 1976, at or near Sidney, BC, did commit an offence of Assault, contrary to Section 245(1) Criminal Code.
SENTENCE: Jail: 6 Month(s);

Count 14, between July 15, 1971 and December 31, 1976, at or near Sidney, BC, did commit an offence of being a male person did indecently assault another male person, contrary to Section 156 Criminal Code.
SENTENCE: Jail: 18 Month(s);

See a total of 12 Charges on 2 Charge Attachment pages / Voyez 12 inculpations sur 2 pages de l'Annexe des inculpations

Chief of Sentence Management
William Head Institution
**CERTIFIED TRUE COPY**

Dated/Fait le    January 20 2005
at/à    Vancouver
British Columbia/Colombie-Britannique

PCR 024
Form 21
Jail
4/02    ne 13:22:20.01.2005

Clerk of the Court on behalf of Supreme Court / Greffier au nom de la cour suprême The Honourable Mr./Madam Justice /Monsieur/Madame [le]la] juge Kirkpatrick, SCJ

**Original: Custody - Copies: File**

Mandat de dépôt (prison) / Warrant of Committal (Jail)



**Warrant of Committal**
**Upon Conviction - Form 21**
Canada: Province of British Columbia

Police File No.
814:96006944

Court File No.
93060-7
Victoria

Primary Enf. Agency:
[x] Ban - See Attachment

D.O.B.: July 12 1940
Proceeded: by Indictment

To the Peace Officers in the Province of British Columbia and to the Keeper of a Federal Institution
(the "place of detention").

Whereas  James William Robertson
(the "offender") was convicted on November 7, 2003 before Supreme Court Judge Kirkpatrick, SCJ on the following charge(s) as set
forth in the attached Information(s)/Indictment(s), and it was adjudged on January 20, 2005 that the offender for his/her offences be
committed to a place of detention in the Province of British Columbia  for the term(s) as specified below:

See a total of 12 Charges on 2 Charge Attachment pages

This is Exhibit _____
referred to in the Affidavit of
_____
sworn before me this _____ day
of _____ 20 __

_____
A Commissioner in and for taking
Affidavits for British Columbia

Such sentence(s) to run:
The sentences on all counts run concurrent, one with another.

Chief of Sentence Management
William Head Institution

**CERTIFIED TRUE COPY**

NORTH FRASER
PRETRIAL CENTRE
JAN 2 0 2005
POSTED BY:
CHECKED BY:

Accordingly, you are commanded, in Her Majesty's name, to arrest the offender if it is necessary to do so in order to take the
offender into custody, and to convey him/her safely to the place of detention and deliver him/her to the keeper thereof. You, the
Keeper, are commanded to receive the offender into custody in the place of detention and imprison him/her for the term prescribed
above, and this is a sufficient warrant for so doing.

Dated  January 20 2005
at Vancouver
British Columbia

Clerk of the Court on behalf of Supreme Court The Honourable Mr./Madam
Justice Kirkpatrick, SCJ

Notes:
See attached: [ ] Information(s)     [ ] Probation Order          [ ] Pre-sentence Report
[x] Indictment(s)      [ ] Conditional Sentence Order    [ ] Medical/Psychiatric Documents
[ ] Sentence imposed in offender's absence (warrant sent to police)
[x] Other:   Long-Term Offender designation made on Count 1, under section 753.1(b) and 753.2 CCC & the
Corrections and Conditional Release Act.  Offender to be placed on Supervision in the community for
a period of 10 years following release.

Warrant executed by:                                                    Date:

PCR 024
Form 21
Jail
4/02   ns 13:12:20.01.2005

Original: Custody - Copies: File

Amended on _____

Warrant of Committal (Jail)

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:          *R. v. J.W.R.,*
                   2010 BCCA 66

                                                          Date: 20100211
                                                          Docket: CA032981

Between:

## Regina

                                                                Respondent

And

---

## J.W.R.

                                                                  Appellant

**Restriction on publication: An order has been made in this case
pursuant to s. 486(3) [now s. 486.4] of the *Criminal Code* that prohibits
the disclosure of any information that could identify the complainants or
witnesses.**

Before:          The Honourable Madam Justice Ryan
                 The Honourable Mr. Justice Donald
                 The Honourable Mr. Justice Groberman

On appeal from the Supreme Court of British Columbia, January 20, 2005 (*R. v. R.(J.W.)*, 2005
BCSC 75, No. 93060, Victoria Registry)

Counsel for the Appellant:                      D. Mayland McKimm, Q.C.

Counsel for the Respondent:                        Kenneth Madsen

Place and Date of Hearing:                  Vancouver, British Columbia
                                                September 17, 2009

Place and Date of Judgment:                 Vancouver, British Columbia
                                                February 11, 2010

**Written Reasons by**:
The Honourable Mr. Justice Groberman

**Concurred in by:**
The Honourable Madam Justice Ryan
The Honourable Mr. Justice Donald

This is Exhibit _____
referred to in the Affidavit of
_____
sworn before me this ____ day
of _____ 20 ___
_____
A Commissioner in and for taking
Affidavits for British Columbia

## Reasons for Judgment of the Honourable Mr. Justice Groberman:

[1]     The appellant appeals from a finding that he is a long-term offender, and from the sentence imposed on him.  He argues that, in light of social science evidence that the probability of recidivism for sexual offenders drops off with age, the trial judge erred in finding that there was a "likelihood" or "substantial risk" that he will cause harm in future as a result of re-offending.

[2]     The appellant also contends that the trial judge erred in imposing on him a 10-year period of long-term supervision following the completion of his imprisonment, and in requiring that he comply with the provisions of the *Sex Offender Information Registration Act*, S.C. 2004, c. 10.

## The Underlying Offences and Circumstances of the Appellant

[3]     In a judgment indexed at 2003 BCSC 1694, the appellant was convicted on 13 counts involving the sexual and physical abuse of 6 children: 2 counts of common assault, 7 counts of indecent assault, 1 count of sexual assault, and 3 counts of rape.  The victims of these various crimes were two of the appellant's daughters, two of his sons, one of his granddaughters, and a friend of one of his daughters.  The convictions were upheld by this Court in a judgment indexed as 2007 BCCA 452.  On the sentencing hearing, the trial judge heard evidence of additional incidents of sexual assault against the granddaughter, and of an incident of inappropriate sexual behaviour toward a 17-year old girl who was a client of his law practice.

[4]     The details of the circumstances of the 13 convictions are set out in the reasons for judgment on conviction and summarized in the court's judgment on the conviction appeal.  For the purposes of this appeal, an overview of the circumstances will suffice.  In her reasons for judgment finding the appellant to be a long-term offender, the trial judge provided the following convenient synopsis:

> Count 1:  Sexual Assault – January 4, 1983 to December 31, 1988
>
> [8]     ▮▮▮ now LAR, is the ▮▮▮ of ▮▮▮▮▮▮▮, ▮▮▮  In 1984, when ▮▮▮ was about 7 or 8, JWR placed her hand on his erect penis and told her to move her hand up and down.  In a second incident, JWR inserted his finger in her vagina, causing a burning, tearing sensation.  In a third incident, JWR placed ▮▮▮ on a hide-a-bed couch, motioned her to place her hand on his penis, and then pulled up her nightie and touched her on the outside of her panties.
>
> Count 2:  Indecent Assault – July 1, 1976 to July 9, 1979
>
> [9]     JWR masturbated his ▮▮▮▮▮, several times in the summer of 1976 when his son was about 14 years of age.
>
> Count 3:  Indecent Assault – January 1, 1966 to July 14, 1971
>
> [10]    ▮▮▮ is ▮▮▮▮▮ whom he adopted in 1965.  In about 1966, when

was about 8 years of age, JWR fondled her on the outside of her vagina; when ████ was between 8 and 10 years old, JWR inserted his finger in her vagina more than a dozen times; he forced her to kiss his penis; he forced her to lie on a bed without her pants on while JWR showed her genitalia to her ████ and told him to insert his finger in her vagina; he fondled her under her pyjamas on a truck trip; and he attempted to rape her at a time when her mother was in hospital, telling her that it was "what good little girls do for their ████."

Count 4:  Indecent Assault – July 15, 1971 to December 31, 1976

[11]    JWR attempted sexual intercourse with DEG in 1971 when she refused to strip naked on a boating excursion to an isolated beach.

Count 5:  Rape – January 1, 1970 to July 14, 1971

[12]    JWR raped DEG from the time she was 13 years of age on more than 20 occasions.

Count 6:  Rape – July 15, 1971 to December 31, 1976

[13]    JWR raped DEG until she was 16 years of age.  She could not estimate the number of times that JWR forced sexual intercourse on her.

Count 7:  Sexual Intercourse with a female under age 14 not his wife – January 1, 1970 to January 4, 1972

[14]    This count concerning sexual intercourse with DEG, a female person under the age of 14 years who was not JWR's wife, is subsumed in Counts 4, 5, and 6.

[It should be noted that a conditional stay was entered on this count on the basis of the principle set out in R. v. Kienapple, [1975] 1 S.C.R. 729)]

Count 8:  Assault – June 1, 1965 to July 14, 1972

[15]    JWR physically assaulted DEG with a leather strap, his hand, and an electrical cord.

Count 9:  Indecent Assault – June 1, 1974 to September 30, 1975

[16]    JWR fondled the breast of KJH, a childhood friend of JWR's stepdaughter, DMR.

Count 10:  Indecent Assault – October 1, 1966 to July 14, 1971

[17]    On her seventh birthday, JWR inserted his finger into the vagina of DMR.  In another incident, JWR fondled her vaginal area and buttocks and later digitally penetrated her vagina while ostensibly helping her to change from her swimming clothes.

Count 11:  Indecent Assault – July 15, 1971 to December 31, 1976

[18]    When DMR was about 11, JWR came into the bathroom in which she and a friend, CEM, were bathing.  He began feeling around in the bathtub and touched DMR's bottom.  DMR and her friend both screamed and JWR ran out of the bathroom.

[19]    In another incident when DMR was about 10 years of age, JWR inserted his finger in her vagina, saw blood, and informed her brothers that "there was a new woman in the house."

[20]    In a further incident, JWR told her to hold his erect penis and attempted to undo her pants.

[21]    Another time, after catching DMR smoking, he digitally penetrated her vagina and pulled her nipples.  On one or two occasions JWR went into DMR's bedroom after she had been out for the evening and either inserted his fingers in her vagina or opened

her legs and looked at her.

Count 12:  Assault – June 1, 1965 to July 14, 1972

[22]    On the morning after JWR's indecent assault on ███ on her seventh birthday, ███ went to her parents' bedroom to tell her mother that she had noticed blood on her underpants.  JWR told her to return to her room.  He came into her bedroom and beat her with a bath brush.

Count 14:  Indecent Assault – July 15, 1971 to December 31, 1976

[23]    JWR performed oral sex on his ███ ███ on at least one occasion.  JWR asked his ███ on several occasions if he would like to touch his ███ genitals.

[Count 13 was stayed by the Crown, and the accused was acquitted on Count 15.]

---

[5]    The evidence heard by the trial judge on the sentencing hearing included evidence of additional sexual assaults against LAR (the complainant in count 1).  In the summer of 1988, when ███ was 11, she visited the appellant in California.  On one occasion, he touched her breasts and labia, kissed her vaginal area, and then positioned her on his erect penis.  He attempted intercourse, but found that he could not achieve penetration, as he was "too big for her".

[6]    Subsequently, on the same trip, the appellant picked ███ up to give her a "piggy-back ride".  While doing so, he placed his hands behind her buttocks, then moved them inside her underwear, digitally penetrating her vagina.

[7]    The following summer, during another visit to California, ███ was swimming in a hotel pool when the appellant dove into the pool and grabbed her vaginal area and pulled her underwater.  When ███ threatened to report the accused to her mother, the accused said he would hurt her if she did so.

[8]    On the sentencing hearing, the trial judge also heard evidence of an incident involving a 17-year old girl whom the appellant was representing in a personal injury action.  The girl had attended at his office in the company of her father.  The appellant arranged for the girl to subsequently attend at his office alone, and when she arrived, instead of meeting with her in his office, he took her to his sailboat.  On the boat he insisted that she drink an alcoholic drink, and then tried to engage her in lewd conversation, including a threatening suggestion that he might have sexual intercourse with her.  Eventually, the girl convinced the accused to take her back to his office, where a friend picked her up.

[9]    At the time of the sentencing hearing, the accused was 64 years old.  His most recent known sexual offence had occurred 16 years earlier.  He continued to deny all of the allegations against him.

[10]    The trial was the accused's second on these charges.  His convictions on his first trial

were overturned by the Supreme Court of Canada, 2001 SCC 65, [2001] 3 S.C.R. 7, 277 N.R. 49. This resulted in a lengthy period of custody prior to the disposition – a total of approximately 5 ½ years.

[11]    The trial judge found the appellant to be a long-term offender under s. 753.1 of the *Criminal Code*. She imposed a sentence of three years on count 1, to be followed by ten years' supervision in the community. On the other counts, she imposed a combination of concurrent and consecutive sentences, with the total period of incarceration on all counts coming to 5 years after taking into account double credit for pre-trial time in custody.

[12]    The appellant appeals only the finding that he is a long-term offender, the long-term supervision order of ten years, and the requirement that he register pursuant to the *Sex Offender Registration Act*.

**Statutory Provisions**

[13]    The appellant was sentenced under Part XXIV of the *Criminal Code*, R.S.C. 1985, c. C-46. The following are the statutory provisions relevant to this appeal:

> 753.1 (1)  The court may ... find an offender to be a long-term offender if it is satisfied that
>
> > (a)    it would be appropriate to impose a sentence of imprisonment of two years or more for the offence for which the offender has been convicted;
> >
> > (b)    there is a substantial risk that the offender will reoffend; and
> >
> > (c)    there is a reasonable possibility of eventual control of the risk in the community.
>
> (2)  The court shall be satisfied that there is a substantial risk that the offender will reoffend if
>
> > (a)    the offender has been convicted of an offence under ... section 271 (sexual assault) ... and
> >
> > (b)    the offender
> >
> > > (i)    has shown a pattern of repetitive behaviour, of which the offence for which he or she has been convicted forms a part, that shows a likelihood of the offender's causing death or injury to other persons or inflicting severe psychological damage on other persons, or
> > >
> > > (ii)    by conduct in any sexual matter including that involved in the commission of the offence for which the offender has been convicted, has shown a likelihood of causing injury, pain or other evil to other persons in the future through similar offences.
>
> (3)  ... [I]f the court finds an offender to be a long-term offender, it shall
>
> > (a)    impose a sentence for the offence for which the offender has been convicted, which sentence must be a minimum punishment of imprisonment for a term of two years; and

> (b)      order the offender to be supervised in the community, for a period not exceeding 10 years ....
>
> ...
>
> 753.2 (3)  An offender who is required to be supervised ... may apply to a superior court of criminal jurisdiction for an order reducing the period of long-term supervision or terminating it on the ground that the offender no longer presents a substantial risk of reoffending and thereby being a danger to the community.  The onus of proving that ground is on the applicant.

[14]    The issue with respect to the long-term offender designation is whether the trial judge erred in finding that there was a substantial risk that the appellant would re-offend, as required by s. 753.1(1)(b).  In making that finding, the trial judge relied on s. 753.1(2)(b)(ii); she was of the view that the accused's past conduct was indicative of a likelihood that he would commit further similar offences.  The appellant says that the trial judge's finding was unreasonable and unsupported by the evidence.

**The Finding of a Likelihood that the Appellant will Re-offend**

[15]    On the issue of whether there was a substantial risk that the appellant would re-offend, the trial judge heard expert evidence from three psychiatrists:  Dr. Robert Miller was appointed by the court to assess the appellant; Dr. Shabehram Lohrasbe was called by the Crown; and Dr. Elisabeth Zoffman was called by the appellant.  The appellant also called a forensic psychologist, Dr. Terry Nicholaichuk.

[16]    As might be expected, there were some differences in the views of the various experts who testified.  They emphasized different aspects of the appellant's history and provided somewhat different assessments of the appellant's likelihood of re-offending.  However, the experts were generally in agreement on the factors that affect the appellant's likelihood of committing further crimes.  As well, while they expressed the likelihood of risk somewhat differently from one another, their assessments shared a great deal of common ground.

[17]    Dr. Miller was qualified as an expert in forensic psychiatry and the dynamics of child physical and sexual abuse and in the diagnosis, treatment and rehabilitation of sexual offenders.  He did not have the opportunity to interview the appellant prior to his first report, but did conduct a "guided professional interview" before writing his second report.  He used a number of actuarial risk-assessment tools in reaching his conclusions, including tools known as the "PCL" (Psychopathy Checklist), the "SVR-20" (Sexual Violence Risk) and the "Static-99".  Each of these tools attempts to assess the risk that a sexual offender will re-offend.

[18]    Dr. Miller pointed out that the appellant's sexual offences were not confined to a clearly defined group of victims – the victims were of both sexes, and, although most were members

Case 2:11-mj-00310-KJN   Document 35   Filed 01/23/12   Page 21 of 55

of his family, there were victims who were not family members. He considered the appellant to be a pedophile, but noted that the appellant's sexual interests were not exclusively directed at children. He considered the number and variety of offences to be a matter of concern, as was the use of violence in the commission of some offences. He also noted that the appellant's continued denial of the offences made treatment more difficult. On the other hand, he accepted that the length of time that had elapsed since the last offence was a positive factor, making it less probable that the appellant would re-offend.

[19]    He noted certain limitations in the actuarial methods that he used. In respect of one test, for example, he stated:

> [T]his data should be treated with caution. I would suggest that it may be unusual for an offender to be convicted of as many offenses as [JWR], dating back over many years, at a first trial. [JWR's] case, therefore, may not be comparable to many of the 206 offenders on which the actuarial prediction is based.

[20]    He acknowledged that part of the problem with a statistical approach to risk assessment is that the statistics do not necessarily differentiate between those convicted of single offences and those convicted of multiple offences.

[21]    Dr. Miller concluded that the appellant represents a "moderate" risk to re-offend – a risk he defined as meaning that there was a 20-30% chance that a person would re-offend over a five-year period. While he agreed that the risk of re-offending might decrease with age, he said that he was unable to state "when or if" that would occur.

[22]    Dr. Lohrasbe was qualified as an expert in the dynamics of child sexual and physical abuse, risk assessment and the diagnosis, treatment, and rehabilitation of sexual offenders. He did not have an opportunity to interview the appellant, and, unlike Dr. Miller and Dr. Zoffman, he did not use formal actuarial tools in his risk assessment. He stated that he was uncomfortable with the use of such tools, because they consolidate data of numerous individuals with different characteristics.

[23]    Dr. Lohrasbe also diagnosed the appellant as a pedophile. Like Dr. Miller, he found it noteworthy that the appellant's victims were, for the most part, family members, but also included persons outside of the family. He considered the fact that the appellant had used "intimidation, threat, force and control" in the course of the various assaults to be an "ominous feature" of the offences, and said:

> Many possibilities arise when trying to understand such a pattern. He may have a limited ability to empathize with others. He may have very strong deviant sexual urges, that override concerns for the wellbeing of his victims. He may enjoy the infliction of humiliation or pain i.e., he may be sadistic. He may be so emotionally unstable that angry impulses are carried out without restraint.

[24]    Dr. Lohrasbe's prognosis was not an optimistic one:

> [I]t is important to note that pedophilia is not known to spontaneously disappear.  Like
> any sexual behaviour it tends to persist in an [individual's] life, particularly when well
> established.  Patterns of sexual arousal and gratification are not easily extinguished.  In
> a man with a well-established pattern, the best that can be hoped for is self-control.
> There is no cure.  The potential to reoffend will always be there.

[25]    Dr. Lohrasbe was aware that the appellant had not offended for a lengthy period, but did
not attach much weight to that fact, given that it is not uncommon to see long gaps in a sexual
offender's pattern of offences.  Four factors were particularly important to his assessment:

- the appellant's victims were of both sexes;

- the appellant used a variety of approaches to his victims, including seduction,
  threats and physical force;

- the appellant employed violence against his own children;

- the offences spanned a long period of time, and continued over more than one
  generation of the family.

[26]    Based on his clinical experience, Dr. Lohrasbe considered the appellant to be at a high
risk of committing further sexual offences.  His risk assessment, however, differed from those
of the other professionals, in that he compared the appellant not to others convicted of sexual
offences, but to the general population as a whole.

[27]    Dr. Zoffman was qualified to give expert evidence in the area of psychiatry, and, in
particular, the diagnosis, treatment and rehabilitation of sexual offenders.  She was able to
conduct the most complete assessment of the appellant, having interviewed him, as well as
certain persons described as "collaterals".  Like Dr. Miller, she used a number of evaluations to
gauge the degree to which the accused was dangerous.

[28]    Dr. Zoffman agreed that the appellant is properly categorized as sexually deviant, and
agreed that, as such, he could not be "cured" but only managed.  She also agreed that his
failure to acknowledge his offences was problematic – it limited the types of treatment that
could be offered, and made it impossible to assess the factors that motivated the appellant to
offend.

[29]    In terms of the risk of re-offending, Dr. Zoffman noted several aspects of the appellant's
life were indicative of a low risk: his lack of any history of general criminal behaviour; the
absence of any history of substance abuse; his capacity to form relationships and maintain
friendships and to engage in and remain in work; and the absence of emotional dysregulation

in most contexts.  On the other hand, troubling factors included the lack of any explanation for the offending behaviour and the thinking that led to it.

[30]    For Dr. Zoffman, the appellant's age was one of the most important factors in evaluating the risk that he would re-offend.  She provided evidence from the social science literature indicating that recidivism of sexual offenders drops by 50% after age 50 and to almost zero after age 60.  Nonetheless, Dr. Zoffman concluded that the accused fell into the "low-moderate" risk category.  She said:

> The numbers that we have from recidivism studies place that risk at somewhere between 4 percent to as high as 25 percent, or 4 out of 100 will recidivate, or 25 out of 100 will recidivate.  Those are the outside barriers of the recidivism statistics.
>
> The problem with applying it, I can say JWR belongs in that class, but that's where it stops.  Without more time and observation and opportunity, I cannot be any more precise about how likely he is to be that one in 25 or one in 5 persons who reoffends.

[31]    Dr. Zoffman stated that she had assessed the appellant as an "incest-type" offender, and that recidivism is relatively low for that type of offender after he is caught.  She agreed that the evidence at the sentencing hearing suggested that the appellant was a pedophile who did not confine himself to "███████████" offences.  Such a categorization, she said, increased her assessment of risk somewhat.  Depending on the method of risk assessment, it increased the likelihood of recidivism from a range of 4 to 25% to a range of 12 to 25% or from a risk of about 12% to a risk of 18-20%.  She was of the view that all of these assessments fall within the "low-moderate" range.

[32]    Despite her generally optimistic assessment of the appellant, Dr. Zoffman considered it essential that the appellant be released into the community with a "prolonged supervision order" and with restrictions on his access to children.

[33]    Dr. Terry Nicholaichuk, a psychologist, also testified.  He was tendered as an expert in forensic psychology and in the diagnosis and treatment of sexual offenders and the assessment of risk.  He categorized the appellant as an "████████████████" in his report, and said that such offenders generally have low rates of recidivism.  Several factors contributed to his view that the appellant's likelihood of committing another offence is low: the length of time since the appellant's last offence, his age, his lack of a criminal history, and the fact that he appeared to have healthy, pro-social support.

[34]    In cross-examination, Dr. Nicholaichuk agreed that the accused meets the criteria for a pedophile, and that he is arguably not just an "████████████████".  He also agreed that while the risk of recidivism declines dramatically after offenders reach the age of 50, he could not say whether that was true in the appellant's case.

[35]    Dr. Nicholaichuk provided the most optimistic assessment of the appellant, finding him to be at low risk of re-offending.

[36]    The trial judge, after reviewing the evidence, indicated that she was satisfied that there was a likelihood that the appellant would cause injury, pain or other evil to other persons in the future through similar offences.  While she acknowledged that the appellant's age might be a factor reducing the risk, she noted that the underlying cause of the appellant's behaviour could not be assessed, as he continued to deny the offences.  This factor greatly complicated risk assessment.  While she was satisfied that there was a reasonable possibility of controlling the appellant in the community, she considered that a long-term supervision order for the maximum period allowed under the statute should be imposed.

## Analysis – Declaration that the Appellant is a Long-Term Offender

[37]    The question of whether an offender is likely to re-offend is one of fact.  In order to succeed on this appeal, therefore, the appellant must show that the trial judge's conclusions were unsupportable on the evidence.  In my view, there was evidence before the trial judge upon which she could reasonably have reached the conclusions that she did.

[38]    While s. 753.1(2)(b) emphasizes the offender's past conduct in the assessment of whether there is a substantial risk of recidivism, the jurisprudence indicates that a nuanced approach must be taken.  Where, despite the offender's history, there are factors that minimize the likelihood of future offences, a court must not find the offender to be a long-term offender on the basis of his history alone: *R. v. Bakker*, 1999 BCCA 84, 133 C.C.C. (3d) 75 (sub nom. *R. v. M.O.B.*).  The trial judge, therefore, was obliged to consider whether factors such as the appellant's age made recidivism unlikely.

[39]    In this case, the trial judge reviewed the evidence of the experts in some detail.  While some of the evidence indicated that sexual offenders tend to stop offending when they reach the age that the appellant has reached, the evidence was of a general nature, and the experts agreed that its applicability to the appellant was not clear.  The appellant had a lengthy and varied history of offending.  The experts agreed that it is impossible to cure pedophilia, and that the best outcome that can be hoped for is control.  The appellant continued to deny his crimes, and there were, therefore, limits on the types of treatment that he could be given.

[40]    The task imposed on the court by the long-term offender legislation is a formidable one.  The court is greatly assisted in this task by expert evidence.  Statistics with respect to recidivism can be of great assistance.  In the end, however, the judge must consider the offender's background and history, and the quality of the existing social science evidence in making her decision.  As the respondent puts it in its factum:

The assessment of a likelihood that an offender will reoffend is a complex task that may not lend itself to precise articulation. The nature and limits of psychiatric evidence will not always provide a dispositive answer, and must be approached realistically and in conjunction with all the evidence when assessing whether the legal burden of proof has been met.

...

Thus, while medical evidence will be significant in a dangerous offender proceeding, finding a likelihood of reoffence is a legal finding, not a medical diagnosis. Ultimately, it is the trial judge who makes the finding, based not just on the medical evidence, but on the evidence in relation to all the elements required pursuant to s. 753. ... [I]t is not psychiatric or psychological conditions alone, or treatment of those conditions, that define dangerousness, or likelihood of reoffending. It is a combination of factors, including the predicate offence(s); criminal offending history; other background and behavioural characteristics; the offender's attitudes; resources available in custody and the community; reasonably foreseeable risks should there be future offending; and the assessment(s) that are considered.

[41]    The trial judge was faced with a particularly difficult task in determining whether the appellant was likely to re-offend in this case. But for his age, there would be little question but that he qualified as a long-term offender. The evidence of the psychiatrists and psychologist indicated, however, that it is unusual for sex offenders to be convicted for offences that occur after they reach the appellant's age. None of the experts, however, was able to say whether the generalization is applicable to the appellant. That should not be seen as surprising -- the psychiatric and psychological evidence that was presented was tendered in order to help the trial judge to assess the danger posed by the appellant, not to definitively predict recidivism (see, in this respect, the discussion of psychiatric evidence in *R. v. Lyons*, [1987] 2 S.C.R. 309 at 365-367, 44 D.L.R. (4th) 193). In the end, the assessment was one for the trial judge to make, after considering all of the evidence, including the psychiatric and psychological assessments.

[42]    The trial judge followed the law as established by cases such as *R. v. Currie*, [1997] 2 S.C.R. 260, 115 C.C.C. (3d) 205, and *R. v. Johnson*, 2003 SCC 46, [2003] 2 S.C.R. 357, 177 C.C.C. (3d) 97, in reaching the conclusions that she did. I am not persuaded that she erred in any way in coming to the conclusion that the appellant is a long-term offender.

## The Imposition of a 10-Year Period of Community Supervision

[43]    The next question is whether the trial judge erred in imposing the maximum period of community supervision permitted by the statute -- ten years. In assessing this question, it is important to recognize that the supervision period is not intended to be "penal" in the sense of being designed to achieve goals of deterrence or denunciation. The fixed sentence imposed on the offender is the means by which penal objectives are met: *R. v. L.M.*, 2008 SCC 31, [2008] S.C.R. 163 at para. 40, 231 C.C.C. (3d) 310. Rather, the supervision period is intended

to accomplish the goal of preventing future crimes.

[44]    The trial judge considered that the appellant remained a danger to society as a result of his pedophilia, notwithstanding his age.  She evidently considered that community supervision for a lengthy period was necessary to prevent a recurrence of the appellant's destructive behaviour, particularly in light of the limited treatment that is available for offenders who do not acknowledge their offences.

[45]    In the circumstances, I cannot say that the trial judge erred in the imposition of the maximum period of community supervision.  This was not a case in which specific treatment was envisioned, nor was it one in which the evidence suggested that a particular period of supervision would suffice to reduce the risk posed by the appellant.  The appellant's history of offending was long and varied, and apart from the hope that his advancing age would diminish his urge or ability to offend, there was little to suggest that the danger posed by the appellant would disappear.  The trial judge considered that a lengthy period of supervision was necessary to protect the community.  That was a conclusion open to her on the evidence.

[46]    On this appeal, the appellant sought to tender evidence of his progress since he was sentenced.  In my view, it would not be appropriate for this Court to consider that evidence on this appeal.  The question for this Court is whether the sentence imposed was an appropriate one, not whether subsequent progress justifies a modification of the community supervision provisions of it.  The long-term offender regime contemplates, in s. 753.2(3), an application to the Supreme Court by the offender where he can demonstrate that he no longer poses a danger to the community.  In my view, that is the preferable forum for the appellant's new evidence to be canvassed.  The trial court's procedures are better suited to the evaluation of the new evidence, and the *Criminal Code* provisions specifically provide for decisions of this nature being made in that court.  If the appellant wishes to pursue his arguments that his progress makes the long-term community supervision order unnecessary, he should do so by way of an application under s. 753.2.

### Registration under the *Sex Offender Information Registration Act*

[47]    Section 490.012 of the *Criminal Code* generally makes an order for compliance with the provisions of the *Sex Offender Information Registration Act*, S.C. 2004, c. 10, mandatory in a case such as that of the appellant.  The relevant *Code* provisions read as follows when the accused was sentenced:

> 490.012 (1)  A court shall, on application of the prosecutor, make an order in Form 52 requiring a person to comply with the *Sex Offender Information Registration Act* ... as soon as possible after it imposes a sentence on the person for [certain offences, including offences for which the appellant was convicted].

...

> (4)  The court is not required to make an order under this section if it is satisfied that the person has established that, if the order were made, the impact on them, including on their privacy or liberty, would be grossly disproportionate to the public interest in protecting society through the effective investigation of crimes of a sexual nature, to be achieved by the registration of information relating to sex offenders under *Sex Offender Information Registration Act*.
>
> (5)  The court shall give reasons for its decision.

[48]     Final submissions on the appellant's sentencing hearing were heard on December 16, 2004, only one day after the *Sex Offender Information Registration Act* (which enacted s. 490.012 of the *Criminal Code*) was brought into force.

[49]     In the course of his submissions on sentence, defence counsel simply acknowledged that an order under s. 490.012 would form part of the disposition.  Crown counsel commenced his submissions with a suggestion that certain ancillary orders be made at the outset – in particular, a firearms prohibition order, an order for the provision of a DNA sample, and an order requiring compliance with the *Sex Offender Information Registration Act* – so that they were not forgotten later on.  The following exchange then took place between the court and defence counsel:

> THE COURT:  Do you have any objections, Mr. Myers, to me making those orders now so that they don't fall between the cracks?
>
> MR. MYERS [for the accused]:        No, I don't, except I just wanted to say that while we address the issue of the order coming – the Order in Council coming into force, subsequent to his conviction, we are conceding jurisdiction to impose the order, too, because we obviously acknowledge that this would form at some point a part of his supervision.

[50]     The trial judge then proceeded to make the order, without giving reasons.  Argument on the sentencing hearing continued, and the matter of sentence was adjourned to January 20, 2005, for judgment.  In the course of her reasons for sentence given on that date, the trial judge said:

> [142]    Lastly, I must address the Crown's application, granted by me on December 16, 2004, that JWR comply with the *Sex Offender Information Registration Act*, S.C. 2004, c. 10.  The Act came into force on December 15, 2004.
>
> [143]    Since the granting of the order, I have reviewed in more detail the requirements of granting the order under s. 490.012 of the *Criminal Code*.  In doing so, I am satisfied that the impact of the order made is not grossly disproportionate to the public interest in protecting society.  Clearly, all available means to ensure that JWR does not re-offend, or if he does re-offend, that he will be detected, are in the public interest.

[51]     The manner in which the order was made on December 16, 2004, was irregular.  Section 490.012(1) contemplates an order being made only after a sentence has been

imposed.  There is a practical consideration at play here: the timing of the offender's obligation to register under the *Sex Offender Information Registration Act* depends on whether or not a custodial sentence has been imposed, so an enforceable order cannot be made until the sentence has been determined.  Technically, therefore, the trial judge fell into error in making the order on December 16, 2004, prior to sentencing the appellant.

[52]     The trial judge also fell into error in failing to give reasons for her order at the time that it was made.  The reasons given on January 20, 2005, are not particularly helpful in this regard.  The Supreme Court of Canada has indicated, in *R. v. Teskey*, 2007 SCC 25, [2007] 2 S.C.R. 267, that reasons developed after the making of an order are problematic:

> [18]     Reasons rendered long after a verdict, particularly where it is apparent that they were entirely crafted after the announcement of the verdict, may cause a reasonable person to apprehend that the trial judge may not have reviewed and considered the evidence with an open mind as he or she is duty-bound to do but, rather, that the judge has engaged in result-driven reasoning.  In other words, having already announced the verdict, particularly a verdict of guilt, a question arises whether the post-decision review and analysis of the evidence was done, even subconsciously, with the view of defending the verdict rather than arriving at it.

[53]     While the reasons given in this case were not delivered "long after" the order was made, they indicate, on their face, that the judge only addressed her mind to some of the issues of the propriety of the order after it had been made.  In my view, this Court should not consider the January 2005 reasons in determining the propriety of the December 2004 order.

[54]     All this said, the trial judge's error was a purely technical one.  Section 490.012 of the *Criminal Code* required the judge to make the order unless the accused could bring himself within the exemption set out in s. 490.012(4).  This Court has considered that exemption in *R. v. B.T.Y.*, 2006 BCCA 331, 210 C.C.C. (3d) 484,  *R. v. S.S.C.*, 2008 BCCA 262, 234 C.C.C. (3d) 365, and *R. v. May*, 2009 BCCA 161, 243 C.C.C. (3d) 413, and has concluded that it is a very narrow one.  In *May*, the Court summarized the heavy onus faced by an offender who relies on s. 490.012(4):

> [16]     ... [A]n offender who claims an exemption from a mandatory registration scheme has the onus to bring evidence that would establish on a balance of probabilities that "the public interest is clearly and substantially outweighed by the individual's privacy and security interests..." [Citation omitted.]

[55]     The appellant in this case made no effort to meet that onus.  Indeed, at trial he acknowledged that the order should be made.  In the circumstances, the failure of the trial judge to give reasons is a purely technical error, and one which can be corrected on this appeal.

[56]     In my view, the trial judge had no choice but to make an order under s. 490.012 of the

Case 2:11-mj-00310-KJN    Document 35    Filed 01/23/12    Page 29 of 55

*Criminal Code.*  The section requires an order to be made unless the order will have an unusually negative impact on the offender.  In this case, the appellant did not suggest that there was any such impact.  Accordingly, the strong presumption in favour of the granting of an order was not rebutted.  The appeal against the order should be dismissed.

## Conclusion

[57]    In the result, I would dismiss the appeal.

"The Honourable Mr. Justice Groberman"

**I agree:**

"The Honourable Madam Justice Ryan"

**I agree:**

"The Honourable Mr. Justice Donald"

*SM*

*Sentence Management*
*Williamhead Institution*

# CERT LIB/SUP CERT

Page 1

Correctional Service
Canada

**CERTIFICATE NUMBER:** V80A00013348

PROTECTED ONCE COMPLETED

[ ]A  [X]B  [ ]C

PERSONAL INFORMATION BANK

**LONG TERM SUPERVISION CERTIFICATE**
Corrections and Conditional Release Act

| This is to certify that the following person is subject to a period of long term supervision as indicated below. | Issued On 2010/01/19 |
|---|---|

| Name | **ROBERTSON, JAMES WILLIAM** | | | **D.O.B.** 1940/07/12 |
|---|---|---|---|---|
| FPS | **873794D** | Institution | **WILLIAM HEAD INSTITUTION** | |
| LTSO Start Date | **2010/01/19** | Expiry Date | **2020/01/18** | |

CONDITIONS OF LONG TERM SUPERVISION AND ACKNOWLEDGEMENT

I fully understand and accept the conditions of my long term supervision (attached), any special conditions noted below or attached and any instructions given by my parole supervisor in respect to any condition of my release.  I understand that if I violate them, my long term supervision may be suspended.  I also understand that failure or refusal without reasonable excuse to abide by the conditions of the long term supervision order is an offence under 753.3(1) of the Criminal Code of Canada.

753.3(1)  An offender who is required to be supervised by an order made under paragraph 753.1(3)(b) and who, without reasonable excuse, fails or refuses to comply with that order is guilty of an indictable offence and liable to imprisonment for a term not exceeding ten years.

| Special Conditions | Effective Date | End Date |
|---|---|---|
| | Y   M   D | Y   M   D |
| MUST AVOID CERTAIN PERSONS | 2010/01/19 | 2020/01/18 |
| Not to be in contact with anyone under the age of 18 without an adult present who has been previously authorized in writing by your Parole Supervisor. | | |
| MUST AVOID CERTAIN PERSONS | 2010/01/19 | 2020/01/18 |
| No direct or indirect contact with any of your victims without the prior written approval of your parole supervisor. | | |
| OTHER | 2010/01/19 | 2020/01/18 |
| Report all relationships, acquaintances, and friendships with females to your Parole Supervisor. | | |
| FOLLOW PSYCHOLOGICAL COUNSEL. | 2010/01/19 | 2020/01/18 |

I understand that the long term supervision certificate is the property of the National Parole Board and must be delivered on demand of the National Parole Board or of my parole supervisor.

| *James W Robertson* | | Y   M   D 2010 | 01 | 12 |
|---|---|---|
| Released offender - Signature | Witness - Signature | Date |

## INSTRUCTIONS

Pursuant to the conditions of your long term supervision, you must obey these instructions.  Failure to do so may result in suspension of your release.  You should also understand that failure or refusal without reasonable excuse to abide by the conditions of the long term supervision order is an offence under 753.3 of the Criminal Code of Canada.

**Chief of Sentence Management**
**William Head Institution**

**CERTIFIED TRUE COPY**

You must proceed directly to          Richmond, B.C.

and report to your Parole Supervisor

**JOOYA, FROOZAN F**
at   **VANCOUVER PAROLE OFFICE**
     401 - 877 EXPO BOULEVARD
     VANCOUVER          **BRITISH COLUMBIA**          (604) 666-8004

Other Amendments

LONG TERM SUPERVISION CERTIFICATE

Ce formulaire existe aussi en français.

CSC 1201 (99-09) OMS          VERS (1)

Date and Time Produced  2010/01/12 10:42          TIME IS BASED ON A 24-HOUR CLOCK Page 1 of 1

This is Exhibit _____
referred to in the Affidavit of
_____
sworn before me this _____ day
of _____ 20__

_____
A Commissioner in and for taking
Affidavits for British Columbia

# CERT LIB/SUP CERT

PROTECTED ONCE COMPLETED

[ ]A    [X]B   [ ]C

PERSONAL INFORMATION BANK

| CERT. # | V80A00013348 | NAME | ROBERTSON, JAMES WILLIAM |
|---------|--------------|------|--------------------------|
| FPS | 873794D | LOC. | WILLIAM HEAD INSTITUTION |

Director – Signature                                    Parole Supervisor – Signature

Chief of Sentence Management
William Head Institution

CERTIFIED TRUE COPY

LONG TERM SUPERVISION CERTIFICATE

Ce formulaire existe aussi en français.

CSC 1201 (99-09) OMS        VERS (1)

Date and Time Produced   2010/01/12 10:42           TIME IS BASED ON A 24-HOUR CLOCK PERIOD.

# CERT LIB/SUP CERT

PROTECTED ONCE COMPLETED

[ ]A   [X]B   [ ]C

PERSONAL INFORMATION BANK

| CERT. # | V80A00013348 | NAME | ROBERTSON, JAMES WILLIAM |
|---|---|---|---|
| FPS | 873794D | LOC. | WILLIAM HEAD INSTITUTION |

Special Instructions

YOUR PAROLE OFFICER IS Froozan Jooya at Vancouver Parole Office.

Vancouver Community Corrections
# 401-877 Expo Blvd.
Vancouver, BC V6B 1K9
PH: 604-666-8004

CONTACT Froozan Jooya DIRECTLY AT:
Phone: 604-666-2341
Pager: 604-714-7451

YOU ARE REQUIRED TO REPORT MONTHLY TO THE RICHMOND RCMP.

_____        _____
Director - Signature                    Parole Supervisor - Signature

Chief of Sentence Management
William Head Institution

**CERTIFIED TRUE COPY**

LONG TERM SUPERVISION CERTIFICATE
Ce formulaire existe aussi en français.
CSC 1201 (99-09) OMS        VERS (1)
Date and Time Produced   2010/01/12 10:42        TIME IS BASED ON A 24-HOUR CLOCK PERIOD.

# CERT LIB/SUP CERT

Page 4

PROTECTED ONCE COMPLETED

[ ]A   [X]B   [ ]C

PERSONAL INFORMATION BANK

| CERT. # | V80A00013348 | NAME | ROBERTSON, JAMES WILLIAM |
|---------|--------------|------|--------------------------|
| FPS | 873794D | LOC. | WILLIAM HEAD INSTITUTION |

| REPORTS TO POLICE | | | | | | VISITS TO SUPERVISOR | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

## CONDITIONS OF RELEASE
### (Long Term Supervision Order)

The conditions that the National Parole Board is deemed to have imposed in respect of any offender released on long term supervision are that you:

(a)  on release, travel directly to your place of residence, as set out in your release certificate, and report to your parole supervisor immediately and thereafter as instructed by your parole supervisor;

(b)  remain at all times in Canada within the territorial boundaries fixed by your parole supervisor;

(c)  obey the law and keep the peace;

(d)  inform your parole supervisor immediately on arrest or on being questioned by the police;

(e)  at all times carry the release certificate and the identity card provided by the releasing authority and produce them on request for identification to any peace officer or parole supervisor;

(f)  report to the police if and as instructed by your parole supervisor;

(g)  advise your parole supervisor of your address of residence on release and thereafter report immediately of:

    (i)  any change in your address of residence,.

    (ii)  any change in your normal occupation, including employment, vocational or educational training and volunteer work,

    (iii)  any change in your domestic or financial situation (of the offender), and on request of the parole supervisor, any change that you (the offender) have knowledge of in your family situation (of the offender), and

    (iv)  any change that may reasonably be expected to affect your ability to comply with the conditions of long term supervision;

(h)  not own, possess or have the control of any weapon, as defined in section 2 of the Criminal Code, except as authorized by your parole supervisor.

Chief of Sentence Management
William Head Institution

**CERTIFIED TRUE COPY**

LONG TERM SUPERVISION CERTIFICATE

Ce formulaire existe aussi en français.

CSC 1201 (99-09) OMS        VERS (1)

Date and Time Produced   2010/01/12 10:42          TIME IS BASED ON A 24-HOUR CLOCK PERIOD.

This is Exhibit _____
referred to in the Affidavit of
_____
sworn before me this _____ day
of _____ 20 11
_____
A Commissioner in and for taking
Affidavits for British Columbia



~~I, Parole Officer, Froozan Jooya confirm that the above~~
picture is that of federal offender, ROBERTSON, JAMES (FPS
873794D: DOB 1940-07-12).

On 2006/03/21 Mr. ROBERTSON was released on Day Parole from
William Head Institution and was supervise red by the New
Westminster Community Correction until he reached his Statutory
Release date. He was then was transferred to the Vancouver Area
Community Corrections' office upon the commencement of his
Statutory Release (2008-05-21). Since then, he had been residing
with his sister, Carol-Ann in Richmond BC and supervised by the
writer during his Statutory Release and subsequent Long Term
Supervision Order (2010-01-19).

Mr. Robertson was supervised at a frequency of twice per month.
As such, this writer maintained twice monthly face to face
contact with him since May of 2008 until he became unlawfully at
large in March of 2010.

FORM/FORMULAIRE 2
PCR 004-G
REV./RÉV. 05/88

**INFORMATION/DÉNONCIATION**

| | |
|---|---|
| Court Identifier: | 2025 - P - R - A |
| Court File Number: | 56614 |
| Type Reference: | |
| Info. Seq. Number: | 1 |
| Agency File Number: | 722:11-10454 |
| DNA: | ☐ |
| K File: | ☐ |
| SOR: | ☒ |

CANADA:
  PROVINCE OF BRITISH COLUMBIA
  PROVINCE DE LA COLOMBIE-BRITANNIQUE

Page 1 of 1

This is the information of / Les présentes constituent la dénonciation de _____ DAVE JUNG _____ , a
Court Liaison Officer  (the "informant" / le "dénonciateur") of / de Richmond, British Columbia.

The informant says that the informant has reasonable and probable grounds to believe and does believe that / Le
dénonciateur déclare qu'il a des motifs raisonnables et probables et croit effectivement que

<u>Count 1</u>

James William ROBERTSON, from the 27th day of December, 2010 to the 29th day of January, 2011, inclusive, at
or near Richmond, in the Province of British Columbia, did fail to comply with an order under Section 490.012 of
the Criminal Code, to wit: to comply with Section 4.1 of the Sex Offender Information Registration Act for the
applicable period specified in Section 490.013 of the Criminal Code, by failing to report to a Registration Centre,
contrary to Section 490.031 of the Criminal Code.

SWORN BEFORE ME / ASSERMENTÉ DEVANT MOI

ON / CE ___31___ DAY OF / JOUR DE

___May___ , __2011__ .

AT / À Richmond,

BRITISH COLUMBIA / COLOMBIE-BRITANNIQUE

_____
A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA
JUGE DE PAIX DANS ET POUR LA PROVINCE DE
LA COLOMBIE-BRITANNIQUE

_____
(SIGNATURE OF INFORMANT)
(SIGNATURE DU DÉNONCIATEUR)

— warrant

PROCESS CONFIRMED / ACTE DE PROCEDURE
CONFIRMÉ

_____
A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA
JUGE DE PAIX DANS ET POUR LA PROVINCE DE
LA COLOMBIE-BRITANNIQUE

CERTIFIED TO BE A TRUE COPY
OF THE ORIGINAL DOCUMENT

CLERK OF THE PROVINCIAL COURT OF
BRITISH COLUMBIA AT THE CITY OF
RICHMOND



This is Exhibit _____
referred to in the Affidavit of
Catherine Munson
sworn before me this ___ day
of September 20 11

A Commissioner in and for taking
Affidavits for British Columbia

# Warrant for Arrest

**In the Provincial Court**

Canada: Province of British Columbia

Ban - none

Police File No.
**722:11-10454**

Court File No.
**2025:56614-1**

File

Primary Enf. Agency:

D.O.B.: July 12, 1940

To the Peace Officers in the Province of British Columbia

Whereas **James William Robertson**
of **3660 Shuswap Ave, Richmond, BC, Canada V7E 3T3**

(the "accused") has been charged with the following offence(s):
**Count 1, between December 12, 2010 and January 28, 2011, at or near Richmond, BC, did commit an offence of fail to comply with an order or obligation, contrary to section 490.031 Criminal Code.**

**See a total of 1 Charge**

CERTIFIED TO BE A TRUE COPY
OF THE ORIGINAL DOCUMENT

CLERK OF THE PROVINCIAL COURT OF
BRITISH COLUMBIA AT THE CITY OF
RICHMOND

This is Exhibit _____
referred to in the Affidavit of
_____
sworn before me this _____ day
of _____ 20 11

A Commissioner in and for taking
Affidavits for British Columbia

And whereas:

**there are reasonable and probable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused**

You are commanded, in Her Majesty's name, forthwith to arrest the accused and to bring him/her before any Justice/Judge in and for the Province of British Columbia to be dealt with according to law.

Dated / Fait le **May 31, 2011**
    at / à **Richmond**
        British Columbia / Colombie-Britannique

**G. Thind**   2011.05.31 10:39:03
-07'00'

Justice of the Peace / Juge de paix G Thind, in and for the Province of British
Columbia / dans et pour la province de la Colombie-Britannique

(CC) Warrant for Arrest (adult)

---

**Endorsement of Warrant**

**CANADA: Province of British Columbia - Form 29 (Section 507)** Whereas this warrant is issued under section 507, 508 or 512 of the *Criminal Code* in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 of that Act.

Dated

at          British Columbia    A Justice of the Peace in and for the Province of British Columbia

| Warrant Cancelled (Return to Registry) | Warrant Executed (Return to Registry and attach original bail document if applicable) |
|---|---|
| by | by |
| Person contacted | Date |
| by phone at    m. Date | |
| Reason      Bail reinstated | |

This is Exhibit _____
referred to in the Affidavit of
_Catherine Mun___
sworn before me this ____ day
of _____ CMMy Gw_____ 20_1_

_____
A Commissioner in and for taking
Affidavits for British Columbia

*Order to Comply with the Sex Offender Information Registration Act*

Order

**490.012** (1) When a court imposes a sentence on a person for an offence referred to in paragraph (*a*), (*c*), (*c*.1), (*d*) or (*e*) of the definition "designated offence" in subsection 490.011(1) or renders a verdict of not criminally responsible on account of mental disorder for such an offence, it shall make an order in Form 52 requiring the person to comply with the *Sex Offender Information Registration Act* for the applicable period specified in section 490.013.

Order — if intent established

(2) When a court imposes a sentence on a person for an offence referred to in paragraph (*b*) or (*f*) of the definition "designated offence" in subsection 490.011(1), it shall, on application of the prosecutor, make an order in Form 52 requiring the person to comply with the *Sex Offender Information Registration Act* for the applicable period specified in section 490.013 if the prosecutor establishes beyond a reasonable doubt that the person committed the offence with the intent to commit an offence referred to in paragraph (*a*), (*c*), (*c*.1), (*d*) or (*e*) of that definition.

Order — if previous offence established

(3) When a court imposes a sentence on a person for a designated offence in connection with which an order may be made under subsection (1) or (2) or renders a verdict of not criminally responsible on account of mental disorder for such an offence, it shall, on application of the prosecutor, make an order in Form 52 requiring the person to comply with the *Sex Offender Information Registration Act* for the applicable period specified in section 490.013 if the prosecutor establishes that

(*a*) the person was, before or after the coming into force of this paragraph, previously convicted of, or found not criminally responsible on account of mental disorder for, an offence referred to in paragraph (*a*), (*c*), (*c*.1), (*d*) or (*e*) of the definition "designated offence" in subsection 490.011(1) or in paragraph (*a*) or (*c*) of the definition "designated offence" in section 227 of the *National Defence Act*;

(*b*) the person was not served with a notice under section 490.021 or 490.02903 or under section 227.08 of the *National Defence Act* in connection with that offence; and

(*c*) no order was made under subsection (1) or under subsection 227.01(1) of the *National Defence Act* in connection with that offence.

Failure to make order

(4) If the court does not consider the matter under subsection (1) or (3) at that time, the court

(*a*) shall, within 90 days after the day on which it imposes the sentence or renders the verdict, set a date for a hearing to do so;

(*b*) retains jurisdiction over the matter; and

(*c*) may require the person to appear by closed-circuit television or any other means that allows the court and the person to engage in simultaneous visual and oral communication, as long as the person is given the opportunity to communicate privately with counsel if they are represented by counsel.

2004, c. 10, s. 20;

2007, c. 5, s. 13;
2010, c. 17, s. 5.

Date order begins

**490.013** (1) An order made under section 490.012 begins on the day on which it is made.

Duration of order

(2) An order made under subsection 490.012(1) or (2)

(*a*) ends 10 years after it was made if the offence in connection with which it was made was prosecuted summarily or if the maximum term of imprisonment for the offence is two or five years;

(*b*) ends 20 years after it was made if the maximum term of imprisonment for the offence is 10 or 14 years; and

(*c*) applies for life if the maximum term of imprisonment for the offence is life.

Duration of order

(2.1) An order made under subsection 490.012(1) applies for life if the person is convicted of, or found not criminally responsible on account of mental disorder for, more than one offence referred to in paragraph (*a*), (*c*), (*c.1*), (*d*) or (*e*) of the definition "designated offence" in subsection 490.011(1).

Duration of order

(3) An order made under subsection 490.012(1) or (2) applies for life if the person is, or was at any time, subject to an obligation under section 490.019 or 490.02901, under section 227.06 of the *National Defence Act* or under section 36.1 of the *International Transfer of Offenders Act*.

Duration of order

(4) An order made under subsection 490.012(1) or (2) applies for life if the person is, or was at any time, subject to an order made previously under section 490.012 of this Act or section 227.01 of the *National Defence Act*.

Duration of order

(5) An order made under subsection 490.012(3) applies for life.

2004, c. 10, s. 20;
2007, c. 5, s. 14;
2010, c. 17, s. 6.

*Offences*

Offence

**490.031** (1) Every person who, without reasonable excuse, fails to comply with an order made under section 490.012 or under section 227.01 of the *National Defence Act* or with an obligation under section 490.019 or 490.02901, under section 227.06 of the *National Defence Act* or under section 36.1 of the *International Transfer of Offenders Act* is guilty of an offence and liable

(*a*) on conviction on indictment, to a fine of not more than $10,000 or to imprisonment for a term of not more than two years, or to both; or

(*b*) on summary conviction, to a fine of not more than $10,000 or to imprisonment for a term of not more than six months, or to both.

Reasonable excuse

(2) For greater certainty, a lawful command that prevents a person from complying with an order or obligation is a reasonable excuse if, at the time, the person is subject to the Code of Service Discipline within the meaning of subsection 2(1) of the *National Defence Act*.

Proof of certain facts by certificate

(3) In proceedings under subsection (1), a certificate of a person referred to in paragraph 16(2)(*b*) of the *Sex Offender Information Registration Act* stating that the sex offender failed to report under section 4, 4.1, 4.2 or 4.3 — or provide information under section 5 or notify a person under subsection 6(1) — of that Act is evidence of the statements contained in it without proof of the signature or official character of the person appearing to have signed it.

Attendance and cross-examination

(4) The sex offender named in the certificate may, with the leave of the court, require the attendance of the person who signed it for the purpose of cross-examination.

Notice of intention to produce

(5) A certificate is not to be received in evidence unless, before the commencement of the trial, the party who intends to produce it gives the sex offender a copy of it and reasonable notice of their intention to produce it.

2004, c. 10, s. 20;
2007, c. 5, s. 28;
2010, c. 17, s. 21.

CANADA

PROVINCE OF BRITISH COLUMBIA

)
)
)
)
)
)
)
)
)
)
)
)

IN THE MATTER OF AN APPLICATION
FOR THE EXTRADITION FROM THE
UNITED STATES OF AMERICA TO
CANADA OF JAMES WILLIAM
ROBERTSON WHO STANDS
CHARGED IN CANADA WITH (x3
COUNTS) OF THE OFFENCE OF
BREACH OF ORDER FOR LONG-
TERM SUPERVISION.

## AFFIDAVIT

I, Hernan Bundoc TOPACIO, of the City of Surrey, in the Province of British Columbia, MAKE OATH AND SAY AS FOLLOWS:

1.  That I, Constable Hernan Bundoc TOPACIO, am a Police Officer and have been a member of the Royal Canadian Mounted Police (hereinafter referred to as the RCMP) for fifteen years. I am presently attached to the "E" Division Major Crime Section, Integrated Child Exploitation Unit in the City of Surrey in the Province of British Columbia.

2.  I have personal knowledge of the matters and facts hereinafter to which I depose in this Affidavit, save and except where such facts are stated to be on information and belief. In such case, I verily believe them to be true.

3.  The following paragraphs relate to James William ROBERTSON (date of birth July 12, 1940) who breached the conditions of his court imposed Long Term Supervision Order (LTSO) by allegedly crossing into the United States on March 12, 2010 without prior authorization from his parole supervisor ( a condition of his supervision order).

4.  On April 8, 2010 the members of the Royal Canadian Mounted Police (RCMP) "E" Division Major Crime Section's Integrated Sexual Predator Observation Team (ISPOT) were made aware of the fact that James William ROBERTSON (B: 1940-07-12)  who was subject to a Court imposed Long Term Supervision Order, was unlawfully at large, and that a Federal warrant of apprehension had been issued by Correctional Services Canada.

5.  I personally became involved in this investigation on April 8, 2010 when I was attached to the ISPOT team and assigned as lead investigator. In order to fulfill this role I reviewed associated police investigation reports, correctional services (criminal profile) reports, court documents pertaining to past judicial findings, and

obtained statements from both law enforcement and civilian witnesses. I prepared and submitted a report to Crown Counsel detailing the circumstances of ROBERTSON's disappearance after he failed to report as directed to his parole officer. Charges were laid, and a Canada wide warrant of arrest for ROBERTSON was subsequently issued by the British Columbia Courts - for three (x3) counts of "Breach of Order for Long-Term Supervision", contrary to section 753.3(1) of the *Criminal Code* of Canada.

6.   On April 8, 2010, I reviewed some preliminary material provided to me by Correctional Services Canada Liaison Officer - Kerry O'FLANAGAN. In reading this material, I was informed in part of the following:

   a.   The offences for which ROBERTSON was convicted took place between June 1965 and December 1988 predominantly in Sidney, British Columbia, Canada. The (child) victims included both immediate and extended family members as well as a family friend.

   b.   ROBERTSON was last seen in person by his parole officer on March 4, 2010. The last contact that his parole officer received was via a phone message that ROBERTSON had left for her - advising her that he felt the frequency of his reporting (to her) was merely imposed by her and not a lawful requirement. The parole officer's subsequent follow up with ROBERTSON's sister with whom he lived in Richmond, British Columbia, confirmed that she had not seen him for at least two weeks and that she did not know his current whereabouts as she was only able to contact him via email.

   c.   ROBERTSON was born in Vancouver, British Columbia and raised in the Greater Vancouver / Fraser Valley areas. He is known to have worked in the construction and trucking industries, and practiced law in Sidney, British Columbia for about 10 years before immigrating to Santa Barbara, California, USA where he eventually worked for a time as an attorney. Given this history, it was believed that ROBERTSON still has ties to the United States and as such, it was highly suspected that he had taken flight into the USA.

7.   On April 8, 2010, I conducted an online (internet) "Attorney Search" with the State Bar of California website and confirmed that James William ROBERTSON is a registered and current member of the California State Bar (Member # 140969). The contact information listed on his profile page provided his known

Canadian address of 3660 Shuswap Ave., Richmond, British Columbia, V7E3T3, Canada (his sister's address) and his known phone number of (604)317-5891.

8.     On April 8, 2010, I read a report written by RCMP Constable Nicole SANSREGRET, a fellow member of the Integrated Sexual Predator Observation Team. Constable SANSREGRET's report documented the information that she had gleaned during the initial stages of investigating ROBERTSON's disappearance.  In reading this report I was advised, in part, of the following:

   a.     Constable SANSREGRET was tasked with locating any vehicles registered to ROBERTSON and any of his associates that may have been of assistance in locating him.

   b.     Constable SANSREGRET conducted checks through various law enforcement information data-banks in both Canada and the United States.  In doing this, she determined that ROBERTSON did not have a vehicle registered in British Columbia and had not for a few years. He did have a valid British Columbia driver's license as well as a valid California driver's license.  ROBERTSON had a 1984 Nissan Pickup registered to him from California - with California license plate 3SPX097.  This vehicle was associated to ROBERTSON at Apartment 125, 3535 Lake Tahoe Boulevard, South Lake Tahoe, California.

9.     On April 8, 2010 I read a report written by Vancouver Police Detective Constable Jennifer TANG, a fellow member of the Integrated Sexual Predator Observation Team.  Detective Constable TANG assisted in the investigation into ROBERTSON's disappearance by making enquiries with the Canadian and American border services.  In her report, Detective Constable TANG detailed in part the following information:

   a.     At 10:10 hours on April 8, 2010 Detective Constable TANG confirmed through the Canada Border Services agency that ROBERTSON's last recorded entry into Canada from the United States (at the Peace Arch border crossing) was on October 26, 2009.  During this crossing, ROBERTSON was alone in a vehicle bearing California license plate 3SPX097.

   b.     At 11:41 hours on April 8, 2010 Detective Constable TANG received information from the RCMP Integrated Border Integrity Team that ROBERTSON appeared to have been in the United States since mid-March as he crossed the border from Canada into the United States (at the Peace Arch border crossing) at 08:39 hours on March 12, 2010. According to their records, he had not returned back into Canada.  When

Page 3 of 13

ROBERTSON crossed the border, he was traveling alone in a 1984 Nissan pickup truck bearing California license plate 3SPX097. This vehicle was registered to ROBERTSON with an address of 125 - 3535 Lake Tahoe Boulevard, South Lake Tahoe. At the time of this crossing, ROBERTSON was traveling with a US passport #712193774.

10.   At 08:55 hours on April 13, 2010 I contacted James ROBERTSON's sister, Carol Ann ROBERTSON (B: 1947-03-10) via telephone.   She was asked if she had some time for me to attend her residence to speak with her briefly about the recent disappearance of her brother. Carol ROBERTSON advised that she had to work in the afternoon and that her morning was not free either. I spoke with Carol ROBERTSON while I had her on the phone, and the following was what she disclosed to me:

a.   Her brother James ROBERTSON was living with her full time before he left.

b.   She has had limited contact with him since he left- the majority of which was in the form of emails.  She also spoke with him on the phone as late as mid-week, last week.

c.   She has no idea where he presently is.

d.   Her brother left about a month ago.  He mentioned he was heading to Vancouver Island to stay with some friends.

e.   Her brother had been living with her for about three years beginning when he left the halfway house.

f.   Her brother had a grey 4x4 pickup.

g.   Her brother was working as a truck driver at least until the recession hit. As he was only working part time, he was not called back.  It's been months now since he last worked.  She does not know of any other employment that he's held since - only that he receives an old age pension.

h.   Her brother was a lawyer years ago (about 15 years ago now) on Vancouver Island.

11.   I advised Carol Ann ROBERTSON that I would still like to obtain a face to face statement from her.  Arrangements were made to have her attend at the "E" Division Major Crime Section office to speak with me at 12:00 hours on April 14, 2010.

12.   At 11:14 hours on April 13, 2010 I received a witness statement from Parole Officer Froozan JOOYA.  In reading JOOYA's statement, I was informed in part of the following:

a.   James ROBERTSON's frequency of (Long Term Supervision) contact was set at 2 times per month.  This was based on the assessment of his reintegration potential.  These meetings were mandatory in person, face to face meetings-.  JOOYA usually called ROBERTSON and provided him with a meeting time and date.  He was receptive to this arrangement and was punctual for his meetings.  These meeting arrangements were conveyed verbally on the phone.  The locations of JOOYA's meetings with ROBERTSON varied.  She would meet him at his work locations, at the office, at his home or at local coffee shops, etc.

b.   The last time (JOOYA) saw ROBERTSON in person was on March 4th, 2010 at her office at approximately 14:00 hours.  This was her last face to face meeting with him.

c.   JOOYA received an email from ROBERTSON on March 8, 2010.  As per her request, he provided her with the contact information of his church.

d.   On March 29, 2010 JOOYA called ROBERTSON to schedule an appointment with him to meet prior to the end of the month.  She called his cell phone (phone number 604-317-5891) but the cell phone was off.  She left a message for him, stating that he was to call her back to schedule a meeting.  Later in the afternoon, JOOYA also called ROBERTSON's residential phone number (604-272-9338).  JOOYA spoke with ROBERTSON's sister Carol Ann ROBERTSON.  JOOYA asked if she could speak with James ROBERTSON and was informed that he was not home at the moment.  JOOYA informed Carol ROBERTSON that she (JOOYA) would come to their home the next day (March 30) at 10:30 hours to meet with James.  Carol Ann ROBERTSON stated that she would convey the message to James ROBERTSON.

e.   At approximately 10:30 hours on March 30, 2010, JOOYA attended ROBERTSON's residence located at 3660 Shushwap Drive, Richmond, British Columbia.  While there, JOOYA rang the doorbell, but nobody answered the door.  JOOYA attempted to call both ROBERTSON's home and cell phone but was only able to leave messages informing him that

she was waiting outside his home. JOOYA waited outside the residence until approximately 11:25 hours. Prior to departing from ROBERTSON's residence, JOOYA left another message on both of his phone numbers directing him to call her either at her office or her cell phone for the purposes of reporting. Throughout the day, JOOYA made further attempts to contact ROBERTSON via telephone but found that the phone was off. She continued to leave messages for him indicating that he was required to physically be seen once more for the month of March. On that day, no contact was established with James ROBERTSON.

f.     At 09:14 hours on March 31, 2010 ROBERTSON left JOOYA a voice mail message on her office line acknowledging that he had received her phone messages requesting him to meet for his last contact of the month. The message was left from a phone number of 775-348-5992. In his message, ROBERTSON stated that his phone was not working properly and that his sister never passed the message on to him. ROBERTSON stated that he thought he did not need to see JOOYA and claimed that the frequency of contact set by her was not required by the law and that it was something she had made up. JOOYA made further unsuccessful attempts throughout the day to contact ROBERTSON by telephone. Later in the day JOOYA discussed with her supervisor the details of ROBERTSON's failure to meet his required frequency of contact. Following this, a warrant of apprehension for ROBERTSON was issued as he did not fulfill his mandatory frequency of contact for the month and his whereabouts became unknown.

g.     On April 1, 2010 Froozan JOOYA spoke with Carol Ann ROBERTSON, James ROBERTSON's sister via telephone. Carol Ann admitted that she had not seen James in two weeks and that she did not know where he could be. Carol Ann stated that she had email contact with him and would email him to find out where he could be.

h.     On April 1, 2010 Froozan JOOYA contacted the Richmond (British Columbia) RCMP and informed them of the active Correctional Services Canada warrant of apprehension for James ROBERTSON. JOOYA was informed that officers would be attending ROBERTSON's residence in Richmond to execute the warrant.

i.     James ROBERTSON did not have any permission from Froozan JOOYA (his parole supervisor) to leave the country.

13.   At 11:55 hours on April 13, 2010 I received a telephone call from Carol ROBERTSON's lawyer, Kevin FILKOW. In speaking with FILKOW, I was informed that Carol ROBERTSON no longer wished to attend for the purposes of

providing a statement to me, and that any further contact with her was to be made through him.

14.    On April 14, 2010 I was made aware that the Richmond RCMP had opened an investigative file to assist Correctional Services Canada. RCMP Constables Thomas BOYCE and Calvin LEUNG attended at the ROBERTSON residence in Richmond, British Columbia at 20:36 hours on April 1, 2010. They spoke with ROBERTSON's sister – Carol Ann and confirmed that she had not seen her brother for a couple of weeks. Carol Ann ROBERTSON consented to the officers searching the residence. On searching the residence, the officers determined that James ROBERTSON was in fact not there.

15.    At 13:42 hours on April 14, 2010 I received a written correspondence from Special Agent Jesse MILLER of the United States Department of Homeland Security / Immigration and Customs Enforcement Section. In reviewing the correspondence, I was made aware of the following facts:

a.    Mr. James William ROBERTSON crossed the border into the United States on March 12, 2010 at 08:39 a.m. at the Peace Arch Port of Entry, Blaine, Washington.

b.    Mr. ROBERTSON used a U.S. Passport # 712193774.

c.    The Customs and Border Protection officer's remarks were "USC (United States Citizen) Traveling to Condo in Lake Tahoe. Lives four months in Canada then returns to U.S. for remainder."

d.    Mr. ROBERTSON was in a California licensed vehicle # 3SPX097. A 1984 Nissan with Vehicle Identification Number JN6ND02Y0EW000644. This vehicle is registered to James William ROBERTSON, 3535 Lake Tahoe Blvd, Apartment 125, Lake Tahoe, CA 96150.

16.    At 09:33 hours on April 15, 2010 I read a police statement written by Constable Thomas BOYCE of the Richmond RCMP Detachment. In reading Constable BOYCE's statement, I learned in part the following:

a.    Constable BOYCE is a member of the Richmond RCMP. He was on duty on April 1, 2010 for the night shift hours of 20:00 hours to 07:00 hrs, wearing full duty uniform and driving a marked police vehicle. Constable BOYCE was working with a partner Constable LEUNG.

b.    On April 1, 2010 at 20:36 hours Constable BOYCE received a request

from the Vancouver Parole Board to assist in the execution of a warrant. The warrant was for the Apprehension and Suspension of Long Term Supervision, s.135.1(1) of James ROBERTSON.

c.   At 21:00 hours Csts. BOYCE and LEUNG arrived at 3660 Shushwap Drive, Richmond, British Columbia. This was the address on file for James ROBERTSON. Carol ROBERTSON, whose identity was confirmed on attendance, answered the door and stated that she was the sister of James ROBERTSON.

d.   Carol ROBERTSON stated the following:

    i.   She is the sister of James;

    ii.   She spoke with his Parole Officer earlier in the day (April 1, 2010);

    iii.   She has not seen her brother, James in a couple of weeks (possibly two weeks);

    iv.   James had taken most of his belongings with him;

    v.   She has no idea where James is currently located and does not have a phone number for him;

    vi.   James has not contacted her since he left.

e.   Carol ROBERTSON was not entirely sure of when she last saw James. It was some time near the start or middle of March 2010. Carol allowed the officers to search her residence for James or any signs of his departure. She was cooperative and advised that she would inform the police if James returned.

f.   Constable BOYCE noted after completing a search of the residence that it appeared as though James ROBERTSON had not been living there for some time. ROBERTSON had very few belongings left behind and his bedroom almost appeared completely abandoned.

17.   On October 9, 2010 I spoke on the telephone with Monterey County, California (United States of America) Police Department Officer Brent HALL. Officer HALL conducted a traffic stop of James ROBERTSON on September 23, 2010 in Monterey County. In speaking with Officer HALL, I was informed in part of the following:

a. At 15:29 hours on September 23, 2010 ROBERTSON was observed driving through a cross walk where he cut off a pedestrian that had already stepped into the street crossing. He (ROBERTSON) was cited for the violation.

b. At the time of the traffic stop, ROBERTSON was alone, and driving a green-turquoise coloured Ford Ranger pickup truck bearing California license plate # 52Z25094. On conducting a record check for this license plate, Officer HALL learned that that the registered owner was in fact James ROBERTSON.

c. ROBERTSON informed Officer HALL that he was living in an apartment condominium in the South Lake Tahoe, California area and was practicing law as a member of the State Bar.

d. ROBERTSON advised Officer HALL that he was staying at a "Youth Hostel" while in town for the conference. Officer HALL confirmed otherwise - when he checked the attendee list at the conference and noted that ROBERTSON was signed in as staying at the Monterey Hotel.

e. ROBERTSON was in Monterey County for three days attending a law conference and Officer HALL saw him every day during that time period.

18. At 09:41 hours on November 12, 2010 I received a correspondence from Department of Homeland Security Special Agent Jesse MILLER regarding James William ROBERTSON's legal status in the United States of America. In reading the provided information, I was informed in part of the following:

a. ROBERTSON is a naturalized U.S. Citizen.

b. In 1991 ROBERTSON obtained his Lawful Permanent Resident Card and then officially became a U.S. Citizen on September 19, 1997.

c. ROBERTSON was issued a U.S. passport on February 14, 2007 and it expires on February 13, 2017.

19. On February 22, 2011 I was made aware of the fact that while Unlawfully at Large, James William ROBERTSON (B: 1940-07-12) was also currently in violation of his reporting conditions – as per the legal requirements of the National Sex Offender Registry. This order was made as a component of ROBERTSON's sentencing, and the duration of his obligation extends for a period of Life. Robertson was required to attend between December 28, 2010 and January 28, 2011 to fulfil this obligation, however he failed to do so within the designated time constraints as specified in the Sex Offender Information

Registration Act.

20.     At 11:04 hours on May 6, 2011 I received a written statement via email from Vancouver Parole Officer Froozan JOOYA.  JOOYA had attached a recent photograph of James William ROBERTSON with her statement and informed me of the following details:

     a.     That the attached picture is that of federal offender James ROBERTSON (DOB: July 12, 1940).

     b.     On March 21, 2006 ROBERTSON was released on Day Parole from William Head Institution and was supervised by New Westminster Community Corrections until he reached his Statutory release date.  He was then transferred to the Vancouver Area Community Corrections office upon the commencement of his Statutory Release on May 21, 2008. Since then he had been residing with his sister, Carol-Ann in Richmond, British Columbia.  JOOYA supervised ROBERTSON during his Statutory Release and subsequent Long Term Supervision order (dated January 19, 2010).

     c.     ROBERTSON was supervised at a frequency of twice per month, and as such JOOYA maintained twice monthly face to face contact with him since May of 2008 until he became unlawfully at large in March of 2010.

21.     A copy of the photograph (identifying James William ROBERTSON) submitted by Froozan JOOYA is attached as Exhibit "A".

22.     At 16:53 hours on March 19, 2011 I received a telephone call from Detective Doug SENTELL of the South Lake Tahoe Police Department in California.  I have been in regular and frequent contact with Detective SENTELL since October 14, 2010 when I first informed him of James William ROBERTSON's having possibly taken up residence in his jurisdiction.  On March 19th, 2011, Detective SENTELL advised me that he had just confirmed ROBERTSON was still in fact residing and present at Apartment 125 - 3535 Lake Tahoe Boulevard, South Lake Tahoe, California.

23.     At 11:49 hours on September 7, 2011 I received a phone call from Jerry BINDEL.  BINDEL is the General Manager at the Aston Lakeland Village Resort located at 3535 Lake Tahoe Boulevard, South Lake Tahoe, California (the condominium complex where ROBERTSON owns an apartment unit and is believed to be residing at).  The apartment units at Lakeland Village are privately owned, however, the majority are kept as short term rental/vacation properties. In speaking with BINDEL, Constable TOPACIO was informed in part of the following:

a.   BINDEL knows James ROBERTSON as "Jim", and has known him for approximately the last year - as long as ROBERTSON has been physically residing at Lakeland Village.

b.   Approximately one and a half years ago, ROBERTSON mentioned he didn't want to rent his property out anymore as he wanted to commence living there.

c.   BINDEL was made aware of ROBERTSON's past criminal history when a staff member recently informed him of the outstanding (Canadian) warrant of arrest for ROBERTSON.

d.   BINDEL did an online "Google" search for ROBERTSON on July 18, 2011 and located the details of the outstanding warrant of arrest on the RCMP website. BINDEL noted that the male depicted in a photograph attached to this information was in fact the person he knew to be James ROBERTSON and who currently resides at Lakeland Village Resort.

e.   BINDEL last saw ROBERTSON in person on September 6, 2011 at the Lakeland Village Resort.

24.   I subsequently received an email from Jerry BINDEL containing an online "link" to the website where he viewed the information regarding James ROBERTSON. Upon "opening" the internet link, I noted that it was in fact for the RCMP web-page containing details of the outstanding warrant of arrest for ROBERTSON. The image of ROBERTSON displayed with this information was the same as the photograph provided by parole officer Froozan JOOYA on May 6, 2011 (*This photograph is the same as referenced earlier in paragraph 20, and which is attached to this affidavit as exhibit "A").

25.   On September 8, 2011 I conducted a search of the Canadian Police Information Center database and obtained the following information;

a.   James William ROBERTSON's British Columbia driver's licence (# 0777530) was cancelled as of October 11, 2010 and has not been renewed in the Province of British Columbia.

b.   James William ROBERTSON has a current California State driver's licence (# C5299311) which indicates ROBERTSON has a P.O. Box address of PO Box 19152, South Lake Tahoe, California.

c.     James William ROBERTSON currently has a 1999 Ford pickup truck (California license plate # 5Z25094) registered in South Lake Tahoe to his name, at an address of Apartment 125 - 3535 Lake Tahoe Boulevard, South Lake Tahoe, California, 96150.

26.     On September 19, 2011, I conducted an online (internet) "Attorney Search" with the State Bar of California website and confirmed that James William ROBERTSON remains a registered and current member of the California State Bar (Member # 140969). The contact information listed on his profile page provided an updated address of 3535 Lake Tahoe Boulevard #125, P.O. Box 19152, South Lake Tahoe, California, 96151. A phone number of (530)523-3198 was provided with this listing.

27.     At 12:31 hours on September 19, 2011, I confirmed with the Canadian Passport Office that James William ROBERTSON (B: 1940-07-12) was last issued a Canadian passport in 1998. This passport expired in 2003 and no subsequent requests for renewal have been received by their office. As ROBERTSON is a Canadian citizen by birth, I also confirmed at this time that there is no record of ROBERTSON's having officially renounced his Canadian citizenship upon his naturalization as an American citizen in September of 1997.

28.     On September 20, 2011, I received a true copy of a "Certificate of Conviction or Discharge" from the RCMP National Police Service Identification Section. To this certificate was attached a complete set of fingerprints for James William ROBERTSON as certified by fingerprint examiner Mark GRAY. A copy of this certificate is attached as Exhibit "B".

29.     At this time James William ROBERTSON (B: 1940-07-12) remains unlawfully at large in the United States of America. He has made no attempt whatsoever to contact his parole supervisor since his last telephone voice-mail message to her on March 31, 2010 indicating that his condition to meet with her twice monthly was not a lawful one and that it was merely a condition she had imposed. Given his lack of contact with his parole supervisor and all recent evidence indicating that his current whereabouts are in the United States, ROBERTSON continues to be in breach of his Long Term Supervision Order. This breach is an offence under Section 753.3(1) of the Canadian Criminal Code and an information has been sworn (Information 152261), alleging this offence.

30.     In addition to the breach of his Long Term Supervision Order, ROBERTSON remains in violation of his court ordered reporting conditions – as per the requirements of the National Sex Offender Registry. This violation is an offence under Section 490.031 of the Criminal Code and an information has been sworn (Information 56614), alleging this offence.

31.     I swear this Affidavit in support of an application to have James William
        ROBERTSON extradited from the United States of America and returned to
        Canada to answer to the charges on Informations 152261 and 56614, and to be
        dealt with according to law.


SWORN BEFORE ME at the City of            )
_Surrey_ , Province of British Columbia,  )
this _2o_ day of _SEPTEMBER_ , 2011       )
                                          )
                                          )
                                          )
_____ Sgt. WIll THIEN    )
                       Reg. # 45698        )
A Commissioner for taking Affidavits      )     _____
within British Columbia                   )     Hernan Bundoc Topacio
                                          )


Page 13 of 13

| | |
|---|---|
| **CANADA** | ) |
| | ) **IN THE MATTER OF AN APPLICATION** |
| | ) **FOR THE EXTRADITION FROM THE** |
| | ) **UNITED STATES OF AMERICA TO** |
| **PROVINCE OF BRITISH COLUMBIA** | ) **CANADA OF JAMES WILLIAM** |
| | ) **ROBERTSON WHO STANDS** |
| | ) **CHARGED IN CANADA WITH (x3** |
| | ) **COUNTS) OF THE OFFENCE OF** |
| | ) **BREACH OF ORDER FOR LONG-** |
| | ) **TERM SUPERVISION.** |
| | ) |

## CERTIFICATE

I, _Sgt. Will Thien_ the undersigned Commissioner for taking Affidavits Within the Province of British Columbia, **HEREBY CERTIFY THAT** appended hereto is a true copy of the Certificate Of Conviction or Discharge prepared by fingerprint examiner Mark GRAY in the name of James William ROBERTSON on September 10, 2011 - sworn before me at Surrey, in the Province of British Columbia, on the 20th day of September, 2011.

**GIVEN UNDER MY HAND** this _20_ day of _September_, 2011.

Sgt. Will TH
Reg. # 456

| Royal Canadian | Gendarmerie royale | IDENTIFICATION | IDENTITÉ |
| Mounted Police | du Canada | A NATIONAL POLICE SERVICE | UN SERVICE DE POLICE NATIONAL |

## CERTIFICATE OF CONVICTION OR DISCHARGE
(Sub-paragraph 667(1)(a)(iii) CC)

## CERTIFICAT DE CONDAMNATION OU DE LIBÉRATION
(Sous-alinéa 667(1)(a)(iii) du C. cr.)

I,   **Mark Gray**   a fingerprint examiner designated as such for the purposes of Section 667 of the *Criminal Code* by the Minister of Public Safety and Emergency Preparedness, do hereby certify that   James William ROBERTSON

Je,   préposé aux empreintes digitales ainsi nommé pour l'application de l'Article 667 du *Code criminel* par le Ministre de la Sécurité Publique et de la Protection Civile, certifie par les présentes que   James William ROBERTSON

FPS #   873794D

numéro de S.E.D.   873794D

whose fingerprints are shown reproduced below or attached hereto, and which have been compared and certified to the fingerprints submitted for each charge

dont les empreintes digitales sont reproduites ci-dessous ou sont annexées aux présentes, et qui ont été comparés et certifiés aux empreintes digitales soumises pour tous les chefs d'accusation



has been convicted, discharged under Section 730 of the *Criminal Code* or convicted and sentenced in Canada as follows:

a été déclaré coupable, absous en vertu de l'Article 730 du *Code criminel* ou a été déclaré coupable et condamné au Canada comme suit :

| Date and Place of Disposition<br>Date et lieu de la disposition | Charge<br>Accusation | Disposition | Name<br>Nom |
| --- | --- | --- | --- |
| 2005-01-20<br>Vancouver<br>BC | (1) Sexual Assault<br>Section 246.1 Criminal Code<br><br>(2) Indecent assault on female<br>Section 141(1) Criminal Code<br><br>(3) Indecent assault on female<br>Section 149(1) Criminal Code<br><br>(4) Indecent assault on male<br>Section 156 Criminal Code<br>(2 charges)<br><br>(5) Rape<br>Section 136(a) Criminal Code<br><br>(6) Rape<br>Section 144 Criminal Code | (1-3) 3 years on each charge concurrent & found to be a long term offender as per<br>Section 753.1(3) Criminal Code & given a long term supervision for 10 years<br><br><br>(4) 18 months on each charge concurrent & concurrent<br><br>(5-6) 5 years on each charge concurrent & concurrernt | James William ROBERTSON |

SIGN-OFF SIGNATURE



Canada

| CERTIFICATE OF CONVICTION OR DISCHARGE (Sub-paragraph 667(1)(a)(iii) CC) | | CERTIFICAT DE CONDAMNATION OU DE LIBÉRATION (Sous-alinéa 667(1)(a)(iii) du C. cr.) | FPS no. N° SED | Page no. N° de page |
|---|---|---|---|---|
| | | | 873794D | 2 |

| Date and Place of Disposition Date et lieu de la disposition | Charge Accusation | Disposition | Name Nom |
|---|---|---|---|
| continued..... | | | |
| 2005-01-20 Vancouver BC | (7) Assault Section 231(1) Criminal Code | (7-9) 6 months on each charge concurrent & concurrent | James William ROBERTSON |
| | (8) Indecent assault on female Section 149(1) Criminal Code | | |
| | (9) Assault Section 245(1) Criminal Code | | |
| | (10) Indecent assault on female Section 141(1) Criminal Code | (10-11) 2 years on each charge concurrent & concurrent | |
| | (11) Indecent assault on female Section 149(1) Criminal Code | & mandatory prohibition order Section 109 Criminal Code | |

☑ SIGN-OFF SIGNATURE

Dated this **10** day of jour de Daté du

**September** , **2011**

at Ottawa, Ontario à Ottawa, Ontario

RCMP GRC 0812 (2008-08)        form - formule 44

Canadá