1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                            --o0o--

4    UNITED STATES OF AMERICA,      )  Case No. 2:11-mj-00310-KJN
                                    )
5                   Plaintiff,      )  Sacramento, California
                                    )  Wednesday, January 18, 2012
6          vs.                      )  2:24 P.M.
                                    )
7    JAMES WILLIAM ROBERTSON,       )  Hearing re:  defendant's
                                    )  motion for bail review.
8                   Defendant.      )
     _____ )

9
                         TRANSCRIPT OF PROCEEDINGS
10              BEFORE THE HONORABLE DALE A. DROZD
                    UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For Plaintiff:              MICHELLE A. PRINCE
13                               U.S. Attorney's Office
                                 501 I Street, Suite 10-100
14                               Sacramento, CA   95814
                                 (916) 554-2700
15
     For Defendant:             RACHELLE BARBOUR
16                               Federal Defender's Office
                                 801 I Street, 3rd Floor
17                               Sacramento, CA   95814
                                 (916) 498-5700
18
     Court Recorder:            JONATHAN ANDERSON
19                               U.S. District Court
                                 501 I Street, Suite 4-200
20                               Sacramento, CA   95814
                                 (916) 930-4072
21
     Transcription Service:     Petrilla Reporting &
22                                 Transcription
                                 5002 - 61st Street
23                               Sacramento, CA   95820
                                 (916) 455-3887
24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

1

1    SACRAMENTO, CALIFORNIA, WEDNESDAY, JANUARY 18, 2012, 2:24 P.M.

2

3              THE CLERK:   Calling Magistrate Case 11-00310-KJN,

4    United States v. James William Robertson.   Your Honor, this

5    matter is on calendar for defendant's motion for bail review.

6         (Pause.)

7              MS. PRINCE:   Good afternoon, Your Honor.   Michelle

8    Prince for the United States on behalf of Canada.

9              MS. BARBOUR:   Good afternoon, Your Honor.   Rachelle

10   Barbour for Mr. Robertson who's present in court in custody.

11             THE COURT:   All right.   And the matter is on calendar

12   on defendant's motion for bail review.   I've reviewed the

13   motion.

14             And with respect to the government's opposition, Ms.

15   Prince, there was an opposition filed on the 17th, Docket No.

16   31, and then another opposition filed on the 18th, Docket No.

17   32.   Was the only difference that 32, the later one, had

18   another exhibit attached to it?

19             MS. PRINCE:   Yes, Your Honor.   When I filed it on the

20   17th --

21             THE COURT:   It's all right.

22             MS. PRINCE:   -- I thought I could just add the

23   attachments later, but I realized it had to be completely

24   re-filed.

25             THE COURT:   Okay.   I've reviewed the government's

1   opposition with both exhibits attached thereto.  I've reviewed

2   Pretrial Services' bail review report.  And, it's the defense,

3   or the defendant's, I guess he's a defendant in this context,

4   in any event, Ms. Barbour, it's your motion.  I'll certainly

5   allow you to argue anything else you wish to argue.

6          MS. BARBOUR:  Yes, Your Honor.  As we stated in our

7   original motion, and I don't think that the government has

8   rebutted this, Mr. Robertson is not a flight risk.  It's clear

9   from documents attached to the extradition packet that when he

10  came to the United States he used his own name.  He told law

11  enforcement where he was going.

12         He's always been up front with U.S. law enforcement

13  about who he is and where he lives.  It was obvious to Canadian

14  authorities long before they arrested, or that they sought his

15  arrest where he was living.  It was even posted as part of his

16  state bar membership information that he was living up in South

17  Lake Tahoe.  So, he's not trying to hide his identity.  He's

18  living in the condo that he's owned and that he lived in

19  starting in the mid-'90s and he is not a flight risk, and

20  certainly there are plenty of conditions that could be set to

21  make sure that he does not pose a flight risk or a danger.

22         I think the government's focusing on an allegation of

23  danger which just does not bear out.  He's done nothing

24  dangerous, he's done nothing illegal, and as we set forth in

25  our moving papers, this is all in the context of a pretty

1   serious fight at his condo and the woman who -- whose daughter

2   he's alleged to have had, just, pretty insignificant contact

3   with works for the condo complex.  So we don't deny that he had

4   contact with a child, but there's certainly nothing illegal,

5   and it's clear that the investigation's borne that out.

6           I set forth several special circumstances that allow

7   the Court to consider this issue, including the complexity of

8   the extradition case and the amount of time it's likely to take

9   this Court to consider and resolve those issues as well as a

10  possibility of further litigation on that; and the other

11  special circumstance which has been recognized by other federal

12  courts is the likelihood of his release if things were reversed

13  and he was in Canada.  Canada has a much lesser burden on

14  release in this type of situation, so therefore, the type of

15  sovereign interests are not as pressing.

16          So I would ask that the Court release Mr. Robertson.

17  I think it's quite amazing and says something special about his

18  character that his neighbors up in South Lake Tahoe want him

19  released, have petitioned the Court on his behalf, have filed

20  letters saying we want him back.  It's really not something you

21  would expect to see for a scary fugitive sex offender that the

22  government tries to make him out to be.

23          Pretrial Services has verified all of his

24  information.  We have people who will cosign bonds.  His sister

25  will post her house, he will post his condo.  There's certainly

4

1    plenty of conditions that the Court can impose so that Mr.

2    Robertson can be out of custody while the Court is considering

3    whether he should be extradited.

4           So I would ask that the Court order his release on

5    any conditions the Court deems necessary, and we've proposed

6    several of them, but the Court's certainly not limited to the

7    ones we've proposed.  Thank you.

8           THE COURT:  In arguing special circumstances, do you

9    have any position -- you allude to the fact that from your

10   point of view, Mr. Robertson traveled openly to this country,

11   and that Canadian officials were well aware of where he was

12   during the time following his departure from Canada and had

13   access, as you've pointed to, information in the extradition

14   packet itself indicating that they had that information.

15          Do you have any position about -- I'm just trying to

16   understand what people are arguing to me.  Your position is,

17   well, all of this really started with this dispute at the

18   condominium complex in South Lake Tahoe.  I'm not sure I

19   totally understand what you're trying to tell me there.  Is it

20   your position that Canada's extradition request was motivated

21   by a condominium dispute in South Lake Tahoe?

22          MS. BARBOUR:  I don't know what motivated Canada

23   after 18 months or so to ask for his provisional arrest.  I

24   don't know the process.  Ms. Prince probably knows it far

25   better than me why it took 18 months during which they seemed

5

1   to know where he was for this to come to a head.  I'm not sure

2   why everything happened at the end of September.  It may be

3   that there was just rumblings in his community that made the

4   government take notice, I don't know, due to that fight that

5   they were having and -- at the condo complex.

6        I mean, that certainly seems to be the view of the

7   people who know the situation up there, and we know that after

8   Mr. Robertson was arrested, the management sought to threaten

9   other people, you go against us, you and Jim will be roomies.

10  That's pretty odd.  But I don't know how that relates to what

11  Canada decided to do right then.

12       THE COURT:  Well I couldn't tell if what -- if the

13  position you were taking was that as a practical matter, what

14  happened here, Judge, was, yes, Mr. Robertson left Canada.  The

15  Canadian authorities knew that he left Canada.  The Canadian

16  authorities knew where he was, and the Canadian authorities

17  took no action.

18       And then 15, 18 months later, some dispute arises in

19  this condominium complex where he owns a condominium, partially

20  as a result, perhaps, of which a Lake Tahoe Police detective is

21  called upon to investigate whether he's had inappropriate

22  contact with a minor.  The decision is made that there's no

23  evidence that he's had inappropriate illegal contact.

24       But that detective reports his investigation to the

25  U.S. Attorney's Office in the Eastern District of California,

6

1    and that the U.S. Attorney's Office makes inquiry with the

2    Government of Canada or Department of Justice, or a U.S.

3    Marshal, somebody -- some law enforcement in the United States

4    makes contact with Canada to inquire about, hey, do you know

5    this guy is, you know, now living in Lake Tahoe and, you know,

6    it looks like you could have done something about it, and we've

7    got concerns, and what are you going to do about it, and as a

8    result of which the Canadians 18 months after the fact decide

9    to ask for his extradition.

10            MS. BARBOUR:  Which --

11            THE COURT:  Is that what you're telling me?

12            MS. BARBOUR:  I'm not privy to what Canada was doing.

13   I do know that that same detective and a constable in Canada

14   had contact in March of 2011.  So it certainly wasn't the first

15   contact regarding Mr. Robertson even made between Canada and

16   South Lake Tahoe much less, you know, we know from the

17   affidavit attached to the extradition packet that the Canadian

18   authorities knew where he was.

19            So what brought it to a head maybe Ms. Prince knows,

20   I don't know, but it is clear that Canada knew for a long time

21   where he was.  And I think that goes to lack of danger and lack

22   of flight risk that he's living openly for that long.  He's not

23   getting plastic surgery to change his appearance, he's not

24   taking on an assumed name, he's not hiding assets, he's not

25   doing anything else that the government originally claimed that

7

1   he was doing when it first opposed his release.  He's living

2   openly, and Canada knows where he is.

3          THE COURT:  All right.

4          MS. BARBOUR:  And then, at the end of September,

5   something happens.

6          THE COURT:  Well, I'll get back to that, because some

7   of that, to me, under the law probably is irrelevant when

8   you're considering whether bail is appropriate in an

9   international extradition case.

10          Ms. Prince?

11          MS. PRINCE:  Yes, Your Honor?

12          THE COURT:  Anything that you wish to add on behalf

13   of the government?  And I'm not saying that it's going to

14   dictate the result on -- at least in front of me with respect

15   to bail, but in trying to piece together, okay, what is going

16   on here, what actually happened, I've laid out a possibility to

17   Ms. Barbour asking her if that's what she's suggesting took

18   place, and she has said, Judge, we don't know exactly because

19   we don't know why the Canadians didn't do anything for as long

20   as they didn't do anything.  But if that were the scenario --

21          MS. PRINCE:  Uh-huh.

22          THE COURT:  -- along with other things about the

23   extradition request -- actually, it might all start to make a

24   little bit more sense as to why the Canadians were somewhat

25   reluctant to move.  But it would cause me concern if the

8

1   extradition request was -- had its roots in contact from law

2   enforcement in the United States as opposed to a desire on the

3   part of the Canadians.  So if you can tell me anything about

4   that, I'd be interested in hearing how this came about.

5          MS. PRINCE:  Well, Your Honor, first of all, in

6   regards -- there's quite a few issues that you've given the

7   government to deal with.  Regards to whether Canada was

8   actually acting on its own accord, you know that there was an

9   arrest warrant that was issued March 31st, 2010.  So, that was

10  before September of 2011, well before that.  So Canada, on its

11  own accord, did have arrest warrants in the system which had

12  nothing to do with any contact with our office.  But the

13  reality is, is that regardless --

14         THE COURT:  Was that on the --

15         MS. PRINCE:  Sorry.

16         THE COURT:  Was that on the -- did they issue those

17  arrest warrants, though, on the basis of the offense which

18  we --

19         MS. PRINCE:  Yes.

20         THE COURT:  -- I think have agreed that he's not

21  extraditable for?

22         MS. PRINCE:  Oh, no, sorry.  The warrant of --

23         THE COURT:  Or are they on the one that you're

24  moving -- the Canadians have moved for extradition on?

25         MS. PRINCE:  Right.

1          THE COURT:  Okay.

2          MS. PRINCE:  The warrant of apprehension is --

3          THE COURT:  Well, good.  That makes me -- the --

4          MS. PRINCE:  Right.  That was issued on March 31st,

5    2010.  And I will explain to the Court, I mean, I don't know

6    everything that Canada did preceding from the point where I got

7    this case, but I'll explain that in a second what I do know.

8          But the fact of the matter remains, regardless of

9    whether the extradition request was initiated from Canada or

10   from law enforcement being vigilant and contacting, hey, we've

11   got an unregistered sex offender that's a fugitive in the

12   United States, the status of Mr. Robertson is the status of Mr.

13   Robertson.

14         And whether Canada realized, okay, we actually need

15   to act on this and do something at this point in time and, you

16   know, the warrant's been in the system, we need to do --

17   contact OIA, I don't think that should matter in regards to who

18   initiated what, because the fact is the defendant is an

19   international fugitive.  That's not a fact that's been made up

20   by either country, either the United States or Canada.  The

21   defendant left Canada.

22         THE COURT:  Well you -- you'd have to, I don't know.

23   Throughout these arguments, you just see the world much more

24   black and white than I do, I suppose, and it's -- we have some

25   difficulty communicating because -- perhaps the -- of the

1    difference in the way we see things.

2         But if, for instance -- wouldn't you have to agree

3    that it is not your typical international fugitive who shows up

4    at the border between the two countries, shows his true

5    identification, and when asked by authorities where he intends

6    to go, says, oh, I'm returning to my home at the following

7    address in South Lake Tahoe.  That's not your typical

8    international fugitive, is it?

9         MS. PRINCE:  Your Honor, let me -- okay.  First of

10   all, he's a dual citizen, so there is no issue between -- as a

11   dual citizen, he's not a permanent resident who has to go

12   through fingerprinting when crossing the border like legal

13   permanent residents have to do when they come into the United

14   States.  He is a dual citizen.  So the fact is that him

15   crossing the border, law enforcement did not know his criminal

16   history.

17        In the United States, for the longest time, law

18   enforcement here in South Lake Tahoe, the District Attorney's

19   Office, did not know about his prior convictions.  That wasn't

20   known when he crossed over.  So, when you say, did he have to

21   conceal certain things, that wasn't an issue.  He just shows

22   his United States passport.  You're just waved on through.  How

23   long are you going to be in the country?  Oh, for a few months.

24   It's that's -- that's really not difficult to do, and they're

25   not going to be running your criminal history or your

1  background check.

2       So yes, he could go back and pass back and forth very

3  easily.  And he lived very openly in Lake Tahoe.  Most people

4  don't necessarily think they're living around a sex offender.

5  The problem that Mr. Robertson ran into is when he befriended a

6  neighbor and her daughter and then disclosed to her about his

7  prior sex offense.

8       And she, on her own accord, was concerned and

9  contacted the police, which any concerned parent would do.  And

10  that's how the ball got rolling in terms of, okay, you know

11  what, law -- what -- this is the part that I do know.  At that

12  point in time, law enforcement contacted a District Attorney's

13  Office, I think -- I believe that the FBI were involved, and

14  the U.S. Marshal's Office.  I wasn't involved until OIA

15  contacted our office.  I have never been able to have a one on

16  one conversation with Canada because of the diplomatic channels

17  that have followed.

18       So I don't actually know exactly who approached --

19  whether Canada contacted OIA or OIA contacted Canada, but what

20  I can tell you is that, from the warrants that are in the

21  system, Canada was actively putting out that they wanted Mr.

22  Robertson back since March 31st, 2010.  Whether they did the

23  diplomatic channels and extradition treaty paperwork, that did

24  come later.

25            THE COURT:  Okay.  Well the answer that the warrants

1    were in the Canadian system as of March 31st, 2010, and I --

2    you've told me that, it just didn't stick.

3              MS. PRINCE:  Yes, Your Honor.

4              THE COURT:  That answers my question.

5              MS. PRINCE:  Okay.

6              THE COURT:  I still think we see the world a little

7    differently sometimes, but --

8         (Laughter.)

9              THE COURT:  -- things that you think are very obvious

10   to me seem not so obvious, but we'll work through it, I'm sure.

11   Anyway --

12             MS. PRINCE:  I --

13             THE COURT:  -- what -- please feel free to advance

14   any other arguments that you want with respect to the issue of

15   bail.

16             MS. PRINCE:  Well, Your Honor, I believe that the

17   government's really laid out their argument in the papers

18   before the Court.  But I also would like to update the Court

19   that the state bar is actually in the process of revoking the

20   defendant's California Bar License, because I noticed that the

21   defense counsel referred to him being a practicing attorney

22   several times.

23             Also, in addition, I don't even think that the

24   defense gets to argue special circumstances in this case

25   because clearly there is a flight risk and there is still a

1   danger issue.  Whether -- fortunately, we don't have a case --

2   we're not facing an issue where the child disclosed that any

3   abuse actually occurred, and I'm thankful that did not happen.

4   　　　　　But the fact of the matter is, is that Mr. Robertson

5   is well aware of his probation requirements and that he is not

6   meant to be unsupervised with any child under the age of 18 and

7   knowing this and after the fact he informs a parent that he --

8   of his situation, but was still alone with a 7-year-old child.

9   That is disturbing, given the convictions which at this time,

10  even though the defense is arguing his innocence, he was

11  convicted of abusing several family members.

12  　　　　　So with that, Your Honor, the government submits.

13  　　　　　THE COURT:  Anything in closing, Ms. Barbour?

14  　　　　　MS. BARBOUR:  The government uses Mr. Robertson's

15  statement to the parent as if that's a bad thing.  That's not a

16  bad thing.  He told the parent what she clearly wanted to know.

17  It's just another example of how he's living openly, and his

18  friends and neighbors up there know the situation, and they

19  still support him.

20  　　　　　And this woman was not a neighbor.  She was an

21  employee there, and she actually worked for Jerry Bindell

22  (phonetic), who's discussed in the extradition packet, who's

23  one of the managers there, and who had contact with Canadian

24  law enforcement in September of 2011.

25  　　　　　So you know, I don't -- and I'm not trying to make

1    this out to be some nefarious thing that the Court has to

2    legally take into account, but it does go to his lack of flight

3    risk.  It goes to his openness about his situation, and it goes

4    to the fact that if he's released back to South Lake Tahoe, he

5    will comply with any conditions that the Court sets.

6         THE COURT:  All right.  As all of the parties

7    recognize under the holdings in Wright v. Henkel, 190 U.S. 40

8    at 63, a 1903 decision, and Salerno v. United States, 878 F .2d

9    317, Ninth Circuit, 1989, there is a presumption against bail

10   and extradition in an extradition case, and only special

11   circumstances will justify bail.

12        It's been said, in cases such as the Extradition of

13   Kyung Jung Kim, 2004 Westlaw 578 2517, a Central District 2004

14   decision, that special circumstances must be extraordinary and

15   not factors applicable to all defendants facing extradition,

16   citing the decision in In Re: Extradition of Mainero, 950

17   F.Supp. 290 at 294, Southern District of California, 1996.

18        The -- based upon my reading of those cases and

19   others, such as Extradition of Santos, 473 F.Supp. 2d 1030,

20   Central District of California 2006, also Gullers v. Bejarano,

21   2009 Westlaw 250053, a Southern District of California 2009

22   decision, and Judge Morrow's decision in Garcia v. Benov, 2009

23   Westlaw 6498194, Central District of California 2009.

24        And I'm providing all these citations because I

25   understand the desire for speed, and I also want to address the

1    extradition request that's pending in front of me that's been

2    argued, and I don't want to take more time back in chambers

3    issuing a written order in connection with this bail request

4    when I know that all parties are best served by me getting the

5    decision on the underlying request out as soon as I can.

6         But I've taken all those decisions into account, and

7    it seems to me the way to analyze a bail request in an

8    international extradition proceeding under U.S. Supreme Court

9    and Ninth Circuit authority is first, are there special

10   circumstances which must be truly extraordinary?  That is, not

11   a factor normally present in all international extradition

12   cases, and only if there are such special circumstances, then

13   and only then does one turn to the questions of whether the

14   defendant has satisfied his burden not only of establishing the

15   presence of special circumstances, but also the burden of

16   establishing a lack of flight risk and a lack of danger.

17        We all know that the Bail Reform Act does not apply

18   in these situations, but that the traditional -- if you get to

19   the part of the test after determining that the defendant's

20   satisfied his burden of establishing the existence of special

21   circumstances, and you get to flight risk and danger, you may

22   apply the traditional factors in determining flight risk and

23   danger, and those are normally thought to be those identified

24   in Bail Reform Act itself and in Bail Reform Act cases.  So

25   it's not a Bail Reform Act case, but if you get that far in the

16

1    analysis, you can consider those factors.

2        It may be seen as somewhat unusual, as I suggested,

3    that an international fugitive does not -- well, if I was

4    writing this I would be choosing my words even more carefully.

5    I take back the unusual part.

6        It might strike one, at first blush, as one of my

7    questions suggested, that an international fugitive would not

8    be expected, in the usual case, to use one's own name, to

9    openly identify their address of residence, even to officials

10   of the country from which they fled.

11       But I think if you look at all these cases, you'll

12   see that that's not quite as unusual as you might -- as you

13   might think.  A lot of the cases that I've referred to, and

14   many cases that those cases referred to, involve folks whose

15   extradition is sought from the United States who, if not dual

16   citizens, were legal permanent -- were legal residents of the

17   United States.

18       Some -- I recall one case, it might have been -- it

19   was the Gullers case, out of the Southern District of

20   California.  The defendant's extradition was sought to -- by

21   the Government of Mexico on fraud charges.  She was a citizen

22   of Mexico, the United States, and Sweden.

23       And even in some of the other cases, I think in the

24   Jung Kim case out of the Central District, the defendant was a

25   United States citizen, but was of Korean descent and traveled

1   frequently to Korea.  And in some of the other cases, I mean,

2   there's a variety of circumstances, and many of these people

3   were living openly, using their true name, no aliases, no

4   attempts to mislead authorities, or limited attempts to mislead

5   authorities.  So that, although at first blush might strike you

6   as somewhat unusual, really isn't all that unusual.

7           The other circumstance that's been pointed to by the

8   defense is essentially realizing that it's got to take into

9   account the factors identified as unusual circumstances by the

10  Ninth Circuit in Salerno.  Hasn't argued about medical

11  condition, really, and while Mr. Robertson is 70 years old, he

12  appears to be in generally good health, so I don't think a

13  medical condition special circumstance is really being

14  advanced.

15          Really the two things that are being advanced by the

16  defense in requesting bail are delay and a substantial issue

17  upon which they would like to argue the defendant is likely to

18  prevail on the extradition request.  Well, on the delay issue,

19  if -- and I didn't -- I wasn't quite sure how to read this.  I

20  think I know how I read the argument, but I wasn't sure exactly

21  how it was intended.

22          But to the extent that was a bit of an argument that,

23  look, the request itself was delayed.  He's been here for, you

24  know, however many months, he was -- over a year he was in the

25  United States living openly, maybe it was up to 18 months, I'm

1    not sure, before the extradition request was made.

2         Well, the Eleventh Circuit, in <u>Martin v. Warden of</u>

3    <u>the Atlanta Penitentiary</u>, 993 F .2d 824, addressed a claim

4    about whether there was a due process right to a speedy

5    extradition proceeding, whether that be a speedy request or

6    speedy proceedings thereafter.  In any event, the Court

7    concluded that there was not.

8         So I would reject any notion that some delay in

9    Canada's making of their extradition request is a special or

10   unusual circumstance.  And likewise, any -- first of all, there

11   hasn't been delay in this case at this point.  Certainly not

12   unusual or extraordinary delay.

13        If you look at all the international extradition

14   requests out there, well, there's one way that the proceedings

15   are speedy:  that's where extradition is uncontested.  That'd

16   make it fast.  If bail's available on this offense in Canada,

17   well, one might say well, I -- a non-opposition to the

18   extradition request and an appearance in Canada might just be

19   the quickest ticket.  But one way or another, that -- that'd be

20   quick.

21        But if you look at the cases where extradition is

22   contested, and certainly it's within the defendant's every

23   right to contest extradition if it's being inappropriately

24   sought, in his view, yes, those cases take a considerable

25   amount of time.  There's no doubt about it.  Some take much

1    longer than others.

2         Right now, as of -- as we sit here today, we're

3    moving along expeditiously.  I'm the general duty judge this

4    week and next week, so it's almost certain that no decision by

5    me on the request will come out during that period of time.

6    But I hope to, as soon thereafter, as soon as I'm off the duty

7    calendar, as soon thereafter I hope to get my decision out.

8         My recollection is that that decision, if it's

9    adverse to the defendant, is attacked by way of habeas

10   petition.  But as we sit here today, I cannot find that there's

11   been any unusual or extraordinary delay.  So that doesn't

12   satisfy any unusual circumstance.

13        And the defense last position, I think, is well, it's

14   an unusual, extraordinary case justifying bail because there's

15   complex issues of international extradition upon which the

16   defense has a substantial probability.  That's what they would

17   have to argue.  I'm not sure that's exactly how they've argued

18   it, because -- but I think to prevail, or to even establish

19   that that circumstance existed, they would have to, I believe,

20   establish that there's a substantial likelihood that they will

21   prevail on the request.

22        Now I'll grant you, as I think the record at the

23   hearing and my questions would indicate, that yes, I think the

24   issues are somewhat complex.  In comparison to what?  Complex

25   in the notion of American or federal U.S. criminal

1    prosecutions?  Sure.  Because we don't see all that many

2    international extradition requests, and we see even fewer

3    contested international extradition requests.  So, in that

4    sense, almost every one of these cases is somewhat complex.  We

5    don't do them all the time.

6           Is the -- are the principles surrounding dual

7    criminality, which is where most of my questions lie, is that

8    an unusual area of the law?  Yes, I think it's pretty

9    specialized.  It may be the first time counsel has ever dealt

10   with it.  I've dealt with it in my career as a lawyer before,

11   and I'm one of the very few folks I knew in my practice that

12   had ever been involved in an international extradition

13   proceeding.

14          So, yes, unusual, complex, but in comparison to what?

15   In comparison to other international extradition cases?  No,

16   this one's teed up pretty nicely.  I mean, when you look at

17   Magistrate Judge Wistrich's order in the extradition of Santos,

18   473 F.Supp. 2d 1030, now there is a showing of a substantial

19   possibility of prevailing.

20          That's a case where Mexico was requesting extradition

21   based upon an arrest warrant that had been struck down not

22   once, but twice, by the Mexicans -- by the Mexican courts, and

23   officials in Mexico were appealing the decisions in Mexico

24   striking down the arrest warrants that the extradition request

25   was based on.

1      Well, yeah, I'd say that the defendant had a pretty

2  good shot on that one because, as they sat there in those

3  proceedings at that point, there wasn't even a valid arrest

4  warrant in Mexico.  It had been struck down by the Mexican

5  courts.

6      That -- I mean, yes, that's complex, that's unusual,

7  and that's a pretty substantial showing that, hey, I've got a

8  good shot at prevailing.  And in that case, as the magistrate

9  judge pointed out, and the only way the government can prevail

10  eventually is if they get the striking down of the warrants in

11  Mexico reversed by the Mexican Court of Appeals.  That's the

12  only way the government can prevail.  That could take years

13  before we could even come back and start these extradition

14  proceedings up in earnest.  Well, that's a whole different ball

15  of wax.  I mean, that is a truly extraordinary set of

16  circumstances.

17      We don't have anything like that here.  This issue's

18  teed up pretty nicely.  I still have concerns, and I need to

19  spend some time thinking about it, and I know the government's

20  argument is, Judge, you can't get into interpreting Canadian

21  law.

22      My gut level response to that is, well, if I'm not

23  going to look at Canadian law, how do I determine whether dual

24  criminality's been satisfied?  It's got to be an extraditable

25  offense in both countries, and they've got to match, if not

1    exactly, at least they've got to match that they qualify for

2    extradition under the treaty in both countries.

3         And how do I do that?  I can't just take a Canadian

4    prosecutor's word for it.  I've got to have some sense that

5    what I'm being told is at least very arguably correct under

6    Canadian law, it seems to me, and that's going to take me a

7    little bit of time.  But I don't think it's all that

8    complicated of an issue.  It may be hard to decide.  I don't

9    think it's all that complicated.

10        So for all those reasons, I don't think extraordinary

11   circumstances have been shown.  Both U.S. Supreme Court

12   authority and Ninth Circuit authority say there's a presumption

13   against bail in these proceedings, and that only if I find

14   extraordinary circumstances can I even consider flight risk and

15   danger.

16        I will say, for the record, for what it's worth,

17   while defendant's made arguments that he's neither a flight

18   risk nor a danger, it's his burden here, even if I found

19   extraordinary circumstances, to establish that he's not a

20   flight risk or a danger.

21        Some of those cases addressing this aspect have said

22   the defendant's got to establish that he will not, and it's

23   will not flee, even stronger language than under the Bail

24   Reform Act where we at least recognize that there's no such

25   thing as an absolute guarantee.  The language in these cases is

1    even stronger.

2         And while the defendant has traveled openly,

3    nonetheless, if I were to -- asked, all right, if you were

4    wrong about extraordinary circumstances, has the defendant

5    satisfied you that he's absolutely not a danger or a flight

6    risk?  I would say no.

7         And the reason I would say no is, yes, he's done all

8    of this openly, but the defendant had to know, it seems to me,

9    when he left Canada openly, that he was under a supervision

10   order, and that under that order he had to stay in touch with

11   that parole officer or the equivalent thereof in Canada.

12        And I think he took a -- it just seems to me clear

13   that he must have taken a calculated risk.  He made an

14   assessment of the situation and either believed that some day

15   he could mount an argument that that couldn't be applied to him

16   if he was out of the country, or that he wasn't required to

17   abide by that condition unless he was in Canada, but he knew,

18   or had to know that it was a strategy that had its risk

19   associated with it.  And he did it.

20        That doesn't make me feel real comfortable about

21   whether he wouldn't make similar assessments of other

22   situations if he was released on bond.  I don't have to get

23   there, but if I -- as I sit here today, if I found

24   extraordinary circumstances, I'm still not convinced that the

25   defendant's met his burden with respect to flight risk and

24

1   danger.  Yeah.  Both, really.

2          So for all those reasons, the defendant's motion is

3   denied.  I think it can be -- well, I won't speak to where it

4   can go from here on that issue.

5          On the underlying extradition request, I'm hoping

6   that some time after next week I can turn my attention in

7   earnest.  I have a lot of other matters backed up behind it.

8   Everybody knows what the weighted case load of the Court is.

9   We're swamped, but I understand this is a priority to get this

10   on its way and take my best crack at the request, and I'll do

11   that in a written order as soon as I can after next week.

12          MS. BARBOUR:  Okay.  Thanks, Your Honor.

13          THE COURT:  Anything else?

14          MS. PRINCE:  Yes, Your Honor.  Just quickly, in case

15   the Court does not find in favor of the government in

16   extraditing the defendant, I would -- I'm requesting that -- is

17   it possible for the Court to please advise the defendant that

18   should he be released after your decision that he register in

19   the jurisdiction in which he decides to reside as a sex

20   offender?

21          THE COURT:  Well, the government's stated its

22   position.  I'm not going to issue a -- an advisory opinion on

23   California law.  I assume that's the law that would apply.

24          MS. PRINCE:  It is.

25          THE COURT:  But obviously, if Mr. Robertson is

25

1    released in the United States at some point, I think through

2    its pleadings and otherwise, the government's made its view

3    clear as to what it thinks is required under the circumstances,

4    and once again Mr. Robertson would be proceeding in -- at his

5    own risk, depending on what he decides to do.

6              All right?  Thank you.

7              MS. PRINCE:  Thank you.

8              MS. BARBOUR:  Thank you, Your Honor.

9              MR. ROBERTSON:  Thank you, Your Honor.

10        (Whereupon the hearing in the above-entitled matter was

11    adjourned at 3:07 p.m.)

12                         --o0o--

13                        CERTIFICATE

14        I certify that the foregoing is a correct transcript from

15    the electronic sound recording of the proceedings in the above-

16    entitled matter.

17

18    _____        July 10, 2012

19    Patricia A. Petrilla, Transcriber

20    AAERT CERT*D-113

21

22

23

24

25